# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE<br>4805 Mt. Hope Drive<br>Baltimore, MD 21215<br><br>              *Plaintiff,*<br><br>   v.<br><br>U.S. DEPARTMENT OF EDUCATION,<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>LINDA MCMAHON, *in her official capacity as U.S. Secretary of Education,*<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>CRAIG TRAINOR, *in his official capacity as Acting Assistant Secretary for Civil Rights of the U.S. Department of Education,*<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>            *Defendants.*[1] | **Civil Action No. _____**<br><br>     **<u>COMPLAINT</u>** |

# <u>COMPLAINT</u>

Plaintiff National Association for the Advancement of Colored People ("NAACP"), by and through undersigned counsel, brings this action against Defendants and in support states:

## I.    PRELIMINARY STATEMENT

1.    Every child should have equal access to a quality public education, which "is the very foundation of good citizenship." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954).

---

[1] The Defendants named in their official capacities include any successors in office.

The U.S. Department of Education ("ED") is charged with ensuring that access by enforcing anti-discrimination laws.

2.    Yet, in a startling abdication of that responsibility, Defendants issued a Dear Colleague Letter ("Letter" or "DCL") on February 14, 2025, an accompanying Frequently Asked Questions document ("FAQs") on February 28, 2025, and a certification requirement on April 3, 2025 ("Certification") (collectively, "Title VI Documents") that advance a misinterpretation of those laws plainly foreclosed by controlling Supreme Court and D.C. Circuit precedent to deny Black children equal opportunities.[2]

3.    The Title VI Documents prohibit policies and practices that ED has long recognized to be not only permissible, but often necessary to ensure that Black students, including NAACP members, are afforded equal educational opportunities—such as truthful, inclusive curricula; efforts to remove obstacles that deny Black students a fair chance to compete for selective programs; and programming, training, and affinity groups that support Black students.

4.    As a result of the Title VI Documents, NAACP members have been denied, or face the imminent loss of, the programs and policies that afford them equal educational opportunity. For example, pursuant to the Letter, an Iowa school district withdrew its students, including one NAACP member's child, from the 19th Annual African American Read-In and required teachers

---

[2] Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter (Feb. 14, 2025), available at https://web.archive.org/web/20250410162101/https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf [hereinafter "DCL"]; Off. for C.R., U.S. Dep't of Educ., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Mar. 1, 2025), available at https://web.archive.org/web/20250410162045/https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf [hereinafter "FAQs"]; U.S. Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard (Apr. 3, 2025), available at https://web.archive.org/web/20250403164255/https://www.ed.gov/media/document/reminder-of-legal-obligations-undertaken-exchange-receiving-federal-financial-assistance-and-request-certification-under-title-vi-and-sffa-v-harvard-april-3 [hereinafter "Certification"].

to return 808 books intended for students.[3] At one member's Pennsylvania college, the name of the "Kente Ceremony"—a ceremony where graduating students are given a Kente cloth stole to commemorate their achievements and heritage—was changed to "Senior Celebration" due to the Letter. Rowan University in New Jersey announced on February 27, 2025 that "[b]ecause the [] Letter allowed institutions two weeks to comply," "[e]ffective immediately, Rowan has reorganized and realigned the departments within the former Division of Inclusive Excellence, Community & Belonging."[4] The "reorganization" directly affects the lives of Black students, including NAACP members, by stripping programming that many find essential.

5.     Despite ongoing legal challenges and ED's agreement to temporarily pause enforcement through April 24, 2025, the Title VI Documents continue to coerce schools to comply with ED's legally unsupported interpretation of Title VI by threatening them with unjustified funding cuts and legal challenges if they do not eliminate diversity, equity, and inclusion programs, threats that are particularly menacing given ED's revocation of the funding of a number of PK-12 and post-secondary schools.[5] Accordingly, NAACP members face a substantial risk that their children's schools will be forced to cease all diversity, equity, and inclusion programs, inclusive curricula, restorative justice programs, efforts to recruit Black faculty, and other programs that ensure equal opportunities for Black students.

---

[3] Kyle Werner, *Fearing Federal DEI Policies, Waterloo Schools Withdrew from African American Reading Event*, Des Moines Reg. (Mar. 11, 2025), https://www.desmoinesregister.com/story/news/local/2025/03/11/waterloo-schools-withdraw-african-american-read-in-trump-dei/81949713007/.

[4] Ali A. Houshmand and Anthony M. Lowman, *Ensuring We Are Inclusive To All*, Rowan Today (Feb. 27, 2025), https://today.rowan.edu/news/2025/02/ensuring-we-are-inclusive-to-all.html.

[5] *See, e.g.*, Courtney Ott, *Approved Pa. Department of Education Funding Yanked by Trump Administration, Shapiro Joins Lawsuit*, Fox 43 (Apr. 11, 2025), https://www.fox43.com/article/news/local/shapiro-lawsuit-trump-administration-department-of-education-pennsylvania/521-22e3ef86-5cab-4453-b522-8a7a51cd27e7; Carolyn Jones, *Trump Canceled Millions in California School Grants. The State Is Suing to Reclaim the Money*, CalMatters (Apr. 10, 2025), https://calmatters.org/education/k-12-education/2025/04/education-department-2/; Emma Tucker, *Trump Administration Demands Changes in Letter to Harvard University as Review of Federal Funding Underway*, CNN (Apr. 4, 2025), https://www.cnn.com/2025/04/04/us/harvard-trump-administration-demand-letter/index.html.

6.     The Title VI Documents, which are final agency action contrary to law enacted without proper process, intentionally discriminate against NAACP members, violate due process with unconstitutionally vague terms, and infringe upon NAACP members' First Amendment rights to continue receiving instruction and programming free from viewpoint discrimination. Accordingly, the Title VI Documents must be enjoined.

## II.     JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Constitution and the laws of the United States.

8.     Venue is proper in this District under 28 U.S.C. § 1391(e) because each Defendant is a United States agency or an officer or employee of the United States or any agency thereof acting and sued in their official capacities, at least one Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

9.     The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act).

## III.     PARTIES

10.     Plaintiff **NAACP** was founded in 1909 and has more than 2,200 local branches, 371 college chapters, forty-nine Youth Councils, and twenty-three high school chapters across the country. The NAACP's principal objectives are to ensure the political, educational, social, and economic equality of all citizens; to eliminate racial prejudice; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state, and local laws securing civil rights; and to inform the public of the continued adverse effects of racial discrimination. The NAACP's members include families in every state, including Black students who attend PK-12 schools and colleges throughout the country. NAACP members access

4

educational opportunities through admissions policies that fairly identify qualified students and practices that prevent and redress discrimination in classrooms and on campuses, including via truthful, inclusive curricula, voluntary affinity groups, and other programs that promote inclusion and belonging.

11.     Defendant **ED** is a federal agency headquartered in Washington, DC. ED's mission is to, *inter alia*, promote achievement and equal access to education for students of all ages.[6] ED enforces Title VI and other civil rights laws against federally funded educational institutions.

12.     Defendant **Linda M. McMahon** is the Secretary of Education. She is sued in her official capacity. Defendant McMahon is responsible for the operations of ED.

13.     Defendant **Craig Trainor** is ED's Acting Assistant Secretary for Civil Rights. He is sued in his official capacity. Defendant Trainor leads ED's Office for Civil Rights ("OCR").

## IV.     FACTUAL BACKGROUND

### A.  ED issues the Title VI Documents and takes related enforcement actions.

#### i.     ED issues the Dear Colleague Letter.

14.     On February 14, 2025, ED released the Letter, reframing lawful efforts to ensure equal opportunity as "racial discrimination [that] ha[s] emanated throughout every facet of academia," victimizing white and Asian students, and running afoul of *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023). DCL at 1–2.

15.     The Letter declares that ED considers a wide range of lawful activities to be *de facto* illegal discrimination, including voluntary affinity group "graduation ceremonies, . . . dormitories[,] and other facilities"; instruction concerning "systemic and structural racism" in the

---

[6] U.S. Dep't of Educ., Mission of the U.S. Department of Education, https://www.ed.gov/about/ed-overview/mission-of-the-us-department-of-education (last visited Apr. 11, 2025).

United States; "programs . . . motivated by racial considerations," including efforts to advance equal opportunity that are "neutral on their face" and "increase racial diversity," such as "eliminat[ing] standardized testing"; and "using race in decisions pertaining to admissions, hiring, promotion, compensation, financial aid, scholarships, prizes, administrative support, discipline, housing, graduation ceremonies, and all other aspects of student, academic, and campus life." DCL at 1–3.

16.    The Letter also describes "diversity, equity, and inclusion" programs as discrimination, but fails to define those terms, DCL at 2–3, leaving schools, educators, and students at risk of losing funding if they continue any of a broad range of activities that benefit Black students.

17.    The Letter states that OCR "intends to take appropriate measures to assess compliance with the applicable statutes and regulations based on the understanding embodied in this letter beginning no later than 14 days from today's date." DCL at 3. The Letter threatens that recipients that fail to comply may lose federal funds. DCL at 4.

### ii.    ED launches an "EndDEI" Portal.

18.    On February 27, 2025, ED launched an EndDEI portal, inviting reports of alleged discrimination or promotion of "divisive ideologies and indoctrination"[7] without defining those terms. Per ED, "submissions will be used to identify potential areas for investigation."[8]

### iii.    ED issues its Frequently Asked Questions document.

19.    On February 28, 2025, ED released its FAQs.

---

[7] Press Release, Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal; U.S. Dep't of Educ., EndDEI.Ed.Gov, https://enddei.ed.gov/ (last visited Apr. 11, 2025).
[8] *Id.*

20.     The FAQs' language is broad, vague, and difficult to understand. To the extent they can be understood, the FAQs similarly seem to prohibit, as *de facto* discrimination, a broad range of activities that touch nearly every aspect of PK-12 and university life. These include undefined "DEI" initiatives, social-emotional learning and culturally responsive teaching that the FAQs allege may "veil racially discriminatory policies," and courses, orientation programs, or trainings "that are designed to emphasize and focus on racial stereotypes." FAQs at 6–7.

21.     The FAQs expressly prohibit other activities. For example, the FAQs state that "schools must not discriminate against students based on race in how they discipline or sanction students . . . whether through the use of 'bias response teams,' mandatory trainings, or compelled statements." FAQs at 7. They also prohibit admissions interviews that allow an interviewer to "visually assess an applicant's race"—*i.e.*, see an applicant—to prevent "likely illegally attempting to do indirectly what cannot be done directly." FAQs at 8.

### iv.     ED announces investigations pursuant to Letter.

22.     On March 14, 2025, ED announced Title VI investigations pursuant to the Letter, including six universities being investigated due to "alleged impermissible race-based scholarships and race-based segregation," and forty-five universities due to their alleged involvement with The Ph.D. Project. The Ph.D. Project assists underrepresented students in their pursuit of a Ph.D. and is open to all students.[9] Fearing the imminent loss of critical funding, multiple universities have since cut ties with The Ph.D. Project.[10]

---

[9] Press Release, U.S. Dep't of Educ., Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education (Mar. 14, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-higher-education-0.

[10] Cheyanne Mumphrey & Jocelyn Gecker, *Colleges Cut Ties with a Little-known Nonprofit Targeted By the Trump Administration over DEI* Associated Press (Mar. 21, 2025) (noting that the University of Kentucky and University of Nevada, Las Vegas cut ties with The Ph.D. Project), https://apnews.com/article/trump-dei-college-investigation-phd-project-65d5d9bd5a13db89bea730142b467fde.

23.    ED's investigations have already resulted in prospective funding cuts to these universities. On April 4, 2025, news outlets reported that ED threatened to freeze nearly $9 billion and $510 million in federal funding to Harvard University and Brown University respectively.[11] White House sources confirmed that the prospective freezes were due, in part, to both college's respective DEI initiatives,[12] with ED explicitly demanding that Harvard immediately shutter any such programs.[13]

**v.    ED requires schools to certify compliance with Title VI.**

24.    On April 3, 2025, ED, citing the Letter and FAQs, announced that state educational agencies ("SEAs") must certify compliance with Title VI as interpreted in the Letter.[14] The Certification gave SEAs ten days to collect compliance certifications from Local Education Agencies ("LEAs") and submit them to ED. On April 8, ED extended the deadline to April 24.[15]

25.    The Certification states that engaging in "certain DEI practices" and using "DEI[] programs to advantage one's race over another" may result in the loss of federal funding but does not specify or define terms like "certain DEI practices" or "illegal DEI practices." Certification at 3.

---

[11] Emma Tucker, *Trump Administration Demands Changes in Letter to Harvard University as Review of Federal Funding Underway*, CNN (Apr. 4, 2025), https://www.cnn.com/2025/04/04/us/harvard-trump-administration-demand-letter/index.html.
[12] Letter from John Gruenbaum et al., Comm'r of the Fed. Acquisition Serv., to Alan M. Garber, President of Harvard Univ., and Penny Pritzker, Lead Member of Harvard Corp. (Apr. 3, 2025) available at https://static.foxnews.com/foxnews.com/content/uploads/2025/04/21527.pdf; Roma Shah, *What You Need to Know About the White House's Plan to Freeze $510 Million at Brown*, Brown Daily Herald (Apr. 4, 2025), https://www.browndailyherald.com/article/2025/04/what-you-need-to-know-about-the-white-houses-plan-to-freeze-510-million-at-brown.
[13] Letter from John Gruenbaum et al., *supra* note 12, at 2.
[14] Press Release, U.S. Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://www.ed.gov/about/news/press-release/ed-requires-k-12-school-districts-certify-compliance-title-vi-and-students-v-harvard-condition-of-receiving-federal-financial-assistance.
[15] Lexi Lonas Cochran, *School DEI Programs' Removal Deadline Extended: Department of Education*, The Hill (Apr. 8, 2025), https://thehill.com/homenews/education/5237831-education-department-dei-program-certification/.

26.    Per ED, states that fail to comply with the Certification may lose federal funding and incur "substantial liabilities, including the potential initiation of litigation for breach of contract by the Department of Justice" and treble damages under the False Claims Act. Certification at 2–3.

**B.  The Title VI Documents are vague.**

27.    The Title VI Documents' key terms and standards are so vague that recipients cannot determine what activities are affected and thus do not know how to conform their activity to the Documents' requirements. Similarly, those at ED tasked with enforcement are unable to fairly and consistently enforce the law. Consequently, the Title VI Documents deter lawful activities by forcing institutions and their students to steer clear of almost anything involving race. Recipients are either forced to end lawful activities, including activities to address racial inequality, or risk the loss of federal funds, breach of contract litigation, or liability under the False Claims Act.

28.    For example, the Title VI Documents fail to define "diversity," "equity," "inclusion" or "DEI," implying through examples that the terms include everything from courses to "privilege walks"—another term ED does not define—to investigations. *See, e.g.*, FAQs at 6–7. As Superintendent John Bernia of the Warren Consolidated Schools in Michigan noted: "If you ask 10 people what DEI is, you'll get 10 different answers."[16] He added: "one of the big challenges that we have as I read the letter . . . is I'm not totally clear on what we're talking about at this time."[17] Indeed, when one NAACP member attended a school board meeting in her Iowa district, teachers said they did not know what lessons or programs are prohibited by the Letter.

---

[16] Isabel Lohman, *Facing Deadline to End DEI, Michigan Schools Ask Crucial Question: What Is DEI?, Bridge Mich.* (Feb. 28, 2025), https://www.bridgemi.com/talent-education/facing-deadline-end-dei-michigan-schools-ask-crucial-question-what-dei.
[17] *Id.*

29.     The FAQs prohibit schools from engaging in any "aspect of school life that allows one race but not another or otherwise separates students, faculty, or staff based on race," but does not explain what "otherwise separates" means. FAQs at 5. One NAACP member believes that there is a substantial likelihood that events, student groups, courses, and initiatives that improve Black students' experience at their Washington, DC university and foster a sense of inclusivity will be discontinued due to the FAQs' vague mandate. As a result, Black students will feel less comfortable, and the school might become "unbearable."

30.     The Title VI Documents reference "racial considerations," "race-based decision-making," "racial preferences," and "race consciousness," DCL at 1–2, FAQ at 1 n.2, but these terms are nebulous and undefined. Further, it is unclear what ED means when it proscribes "using race" in "hiring, promotion, compensation, financial aid, scholarships, prizes, administrative support, discipline, housing, graduation ceremonies, and all other aspects of student, academic, and campus life." DCL at 2. It is also unclear what it means to engage in "race-based decision-making" or conduct activities with some level of "race consciousness." Thus, a reasonable reader cannot tell whether mere awareness of any indicia of race would convert a decision into one that is "race-based," is motivated by "racial considerations," or "uses race."

31.     Per the Title VI Documents, "programs focused on interests in particular cultures, heritages, and areas of the world," and Black History Month programming may run afoul of the law if they create a "hostile environment" or "deny students the ability to participate fully in the life of a school." DCL at 3, FAQ at 6. Far from providing assurance that such activities would not expose a recipient to an investigation or litigation, ED notes, "[a] school's history and stated policy of using racial classifications and race-based policies to further DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals will be probative in OCR's analysis of the facts

and circumstances of an individual case." FAQs at 9. Indeed, a Maryland NAACP member whose children are enrolled in a French Immersion Program reasonably believes that the program will be discontinued due to the Title VI Documents because the program is bilingual, teaches her children about different cultures, and is intended to promote diversity. Another NAACP member reasonably believes that the Black Student Union at her school is likely to be discontinued or forced to terminate future programming designed to support Black students pursuant to the Title VI Documents.

32.     Given uncertainty about what conduct is proscribed, the short deadlines established by the Letter and Certification, and the imminent threat of funding loss or other legal action unsupported by a fulsome investigation, recipients have no choice but to err on the side of caution and cut a wide swath of policies and programs to avoid the loss of funding and potential legal action. As a result, the Title VI Documents' vagueness has denied, and substantially risks, NAACP members' access to programming, resources, and other opportunities that ED could conceivably deem "DEI," impermissible race-neutral measures, or impermissible use of race in decision-making.[18]

---

[18] For example, in April 2025, ED unilaterally terminated a resolution agreement with the Rapid City Area School District, stating that the agreement violated Title VI because it required "DEI" and "racial balancing." However, ED was not clear about which terms of the agreement it found objectionable. The agreement, adopted in May 2024 to redress racial discrimination against Native American students, included terms requiring the school district to identify root causes of disparities in discipline and course enrollment and to hold student and parent information sessions to better communicate about district policies and opportunities. *See* Annie Ma & Sarah Raza, *Education Department Withdraws from Plan to Address Discipline Disparities for Native Students*, Associated Press (Apr. 10, 2025), https://apnews.com/article/school-civil-rights-dei-dakota-a98f3f943c6e580b8044c602e5580f38; Laura Meckler, *Feds End a Civil Rights Agreement on Treatment of Native Students, Citing DEI*, Wash. Post (Apr. 8, 2025), https://www.washingtonpost.com/education/2025/04/08/trump-native-american-students-civil-rights-south-dakota/.

**C.  The Title VI Documents are factually unsupported and contradict and misinterpret Title VI, the Equal Protection Clause, and laws governing curricula.**

   **i.  The Title VI Documents are factually inaccurate.**

33.     The Letter claims it is a false premise to state that "the United States is built upon 'systemic and structural racism'" and advanced discriminatory policies and practices." DCL at 2. That claim is itself demonstrably false.

34.     Contrary to the Title VI Documents' assertions, there is incontrovertible evidence of racial oppression and white supremacy in the United States. Enslaved Black people were forced to provide free labor to white people for hundreds of years. For generations, Black people were deemed to only count as three-fifths of a person in the United States Constitution. And the Supreme Court declared in *Dred Scott v. Sanford* that Black people were inferior to white people and "had no rights which the white man was bound to respect." 60 U.S. 393, 407 (1857). Despite the Emancipation Proclamation and constitutional amendments that recognized the freedom of Black Americans and their rights to constitutional protections as full citizens, Jim Crow laws allowed racial segregation to flourish—segregation that was officially endorsed by the Supreme Court in *Plessy v. Ferguson*, 163 U.S. 537 (1896).

35.     Black people have had the legal protections established in *Brown v. Board of Education* and federal civil rights statutes for only 60 to 70 years of our nation's 250-year history.

36.     While the Letter denies the existence of the legacy of centuries of racial discrimination that continues to deny equal opportunities to Black students, it asserts that schools have racially discriminated against white and Asian students. DCL at 1. However, Black students are over 2.8 times more likely to attend school in a chronically underfunded district than white and

Asian American students.[19] "Black students are more likely to attend schools that have high percentages of novice teachers in almost every state across the country."[20] In addition, 58% of Black students attend majority minority schools, or schools in which the combined enrollment of minority students is at least 75% of total enrollment.[21] Such schools, particularly those where the majority of students are Black and Latino, are denied high quality resources and facilities and often report significant disparities in academic outcomes.[22] Even Black students who attend integrated, well-resourced schools are taught by teachers who are less likely to call on them in class, or to encourage and recommend them for college preparatory courses.[23] And though Black students do not misbehave more than other students,[24] Black students are disciplined at disproportionately higher rates.[25] This disparity has been linked to a wider achievement gap between Black and white students.[26] In light of these and other well-documented disparities in educational opportunity that

---

[19] Bruce D. Baker, Matthew Di Carlo & Mark Weber, The Adequacy and Fairness of State School Finance Systems 18, Sch. Fin. Data Database (6th ed. 2024), https://www.schoolfinancedata.org/the-adequacy-and-fairness-of-state-school-finance-systems-2024/.

[20] Press Release, EdTrust, As Districts Face Teacher Shortages, Black and Latino Students Are More Likely to Have Novice Teachers Than Their White Peers (Dec. 15, 2021), https://edtrust.org/press-room/as-districts-face-teacher-shortages-black-and-latino-students-are-more-likely-to-have-novice-teachers-than-their-white-peers/.

[21] Racial/Ethnic Enrollment in Public Schools, in The Condition of Education 2020 32, 34, (Inst. Educ. Scis. 2020), https://nces.ed.gov/programs/coe/pdf/coe_cge.pdf.

[22] Roslyn Arlin Mickelson, School Integration and K-12 Outcomes: An Updated Quick Synthesis of the Social Science Evidence, Nat'l Coal. on Sch. Diversity (Oct. 2016) https://eric.ed.gov/?id=ED571629; Press Release, Ed. Trust, As Districts Face Teacher Shortages, Black and Latino Students Are More Likely to Have Novice Teachers Than Their White Peers (Dec. 15, 2021), https://edtrust.org/press-room/as-districts-face-teacher-shortages-black-and-latino-students-are-more-likely-to-have-novice-teachers-than-their-white-peers/; Chris Hacker et al., Majority-Black School Districts Have Far Less Money to Invest in Buildings — and Students Are Feeling the Impact, CBS News (Sept. 14, 2023), https://www.cbsnews.com/news/black-school-districts-funding-statebudgets-students-impact/; Roby Chatterji et al., Closing Advanced Coursework Equity Gaps for All Students, Ctr. for Am. Progress (Jun. 30, 2021), https://www.americanprogress.org/article/closing-advanced-coursework-equity-gaps-students/.

[23] Amanda E. Lewis & John B. Diamond, Despite the Best Intentions: How Racial Inequality Thrives in Good Schools 95–96 (Oxford Univ. Press 2015); Chatterji, supra note 22.

[24] Russell J. Skiba & Natasha T. Williams, Are Black Kids Worse? Myths and Facts About Racial Differences in Behavior: A Summary of the Literature 4, The Equity Project at Ind. Univ. (Mar. 2014), https://indrc.indiana.edu/tools-resources/pdf-disciplineseries/african_american_differential_behavior_031214.pdf; Off. for C.R., U.S. Dep't of Educ., 2013–2014 Civil Rights Data Collection: A First Look 1, 3 (2016), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf.

[25] Jayanti Owens and Sara S. McLanahan, Unpacking the Drivers of Racial Disparities in School Suspension and Expulsion, 98 Soc. Forces 1548 (May 19, 2021), https://doi.org/10.1093/sf/soz095.

[26] Francis A. Pearman et al., Are Achievement Gaps Related to Discipline Gaps? Evidence From National Data, 5 Am. Educ. Rsch. Ass'n Open (Oct. 2019) https://doi.org/10.1177/2332858419875440.

adversely affect Black students, it is reasonable for schools, parents, and students to undertake the activities, formerly endorsed by ED, that ED now claims violate Title VI.

37.    The factual inaccuracies underlying the Title VI Documents lead to confusion that has and will continue to harm Black students, including NAACP members.

**ii.    The Title VI Documents contradict Title VI and Equal Protection case law.**

38.    Most of the activities implicated in the Title VI Documents are lawful under controlling Supreme Court and D.C. Circuit precedent.

39.    For example, the Title VI Documents characterize race-neutral efforts to advance equal opportunity as unlawful,[27] but *SFFA* did not concern race-neutral policies and practices.[28] In fact, the Title VI Documents directly contradict a long line of cases upholding the use of race-neutral measures to equalize educational opportunities at all levels of education.[29] And since *SFFA*, courts have upheld race-neutral changes to admissions policies to remedy the under-identification of Black and Latinx students for selective programs with no objection from the Supreme Court.[30]

---

[27] DCL at 3 (declaring, "Relying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systemic one. It would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity.").

[28] *See generally SFFA*, 600 U.S. 181.

[29] See, e.g., *Tex. Dep't of Hous. & Cmty. Aff. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015) (explaining that "race may be considered in certain circumstances and in a proper fashion," and quoting Justice Kennedy's opinion in *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788–89 (2007) (Kennedy, J., concurring in part and concurring in judgment), recognizing that "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods."); *Doe v. Lower Merion Sch. Dist.*, 666 F. 3d 524, 548 (3d Cir. 2011) ("The consideration or awareness of race [by a decisionmaker] while developing or selecting a policy . . . is not in and of itself a racial classification."). See also *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose' however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (citation omitted).

[30] See *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 61 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15, 2024 WL 5036302 (U.S. Dec. 9, 2024) ("[W]e find no reason to conclude that Students for Fair Admissions changed the law governing the constitutionality of facially neutral, valid . . . admissions policies under equal protection principles.").

40.     The Title VI Documents also characterize diversity, equity, and inclusion efforts as illegal "discriminatory practices." DCL at 2. But courts have routinely upheld the legality of various diversity, equity, and inclusion efforts, including diversity statements,[31] anti-bias trainings,[32] targeted recruiting,[33] and aspirational diversity goals.[34]

41.     The Letter states that diversity cannot be a compelling interest pursuant to the Supreme Court's decision in *SFFA*. DCL at 2. However, nowhere in the Title VI Documents do Defendants explain that whether diversity was a "compelling interest" was only relevant in the *SFFA* decision because the universities at issue explicitly considered race in admissions. The Title VI Documents also fail to acknowledge that the Supreme Court in the *SFFA* decision affirmed that the benefits of diversity as "plainly worthy" "commendable goals" for universities to lawfully pursue.[35]

42.     And while the Title VI Documents suggest that race cannot be considered at all in admissions,[36] the Supreme Court made clear that "nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise."[37]

---

[31] *See, e.g., Johnson v. Metro. Gov't of Nashville*, 502 F. App'x 523, 535 (6th Cir. 2012); *Bissett v. Beau Rivage Resorts*, 442 F. App'x 148, 152–53 (5th Cir. 2011); *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 594 (E.D. Pa. 2020).

[32] *Young v. Colo. Dep't of Corr.*, No. 22-cv-00145-NYW-KLM, 2023 WL 1437894 (D. Colo. Feb. 1, 2023).

[33] *Vavra v. Honeywell Int'l Inc.*, No. 21-cv-06847, 2023 WL 5348764 (N.D. Ill. Aug. 21, 2023).

[34] *See, e.g.*, *Mlynczak*, 442 F.3d at 1050 (finding that U.S. Department of Energy's recruitment policy was intended to ensure "diversity in the applicant pool for positions at the agency" and was not evidence of discrimination because they "were of the type that expand the pool of persons under consideration, which is permitted"); *Duffy v. Wolle*, 123 F.3d 1026, 1038–39 (8th Cir. 1997), *abrogated on other grounds by Torgerson v. Rochester*, 643 F.3d 1031 (8th Cir. 2011) (finding that efforts to recruit minority and female applicants do "not constitute discrimination" but "enable[] employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment.").

[35] *SFFA*, 600 U.S. at 213–14.

[36] *See, e.g.*, DCL at 2 ("For example, a school may not use students' personal essays, writing samples, participation in extracurriculars, or other cues as a means of determining or predicting a student's race, and favoring or disfavoring such students.").

[37] *SFFA*, 600 U.S. at 230.

43.    ED has provided no explanation for its deviation from clearly established law.

44.    These misstatements in the Title VI Documents create further confusion about what programs ED will target for enforcement, forcing schools and universities to either cut lawful programs that benefit NAACP members or face enforcement, the loss of funding, and legal action.

### iii.    The Title VI Documents conflict with past ED guidance and positions.

45.    The Title VI Documents ignore and conflict with years, sometimes decades, of ED's past guidance and positions pertaining to civil rights enforcement. For example, to the extent the Title VI Documents' vague pronouncements can be understood, they appear to prohibit diversity, equity, and inclusion programs and instruction, including culturally-responsive instruction and social-emotional learning. DCL at 2–3, FAQ at 5, Certification at 3. But this prohibition conflicts with past ED guidance and statements, including by former Secretary of Education Betsy Devos, and Congressional action embracing diversity, equity, and inclusion activities as consistent with Title VI and public education goals.[38]

46.    The Title VI Documents prohibit instruction "that the United States is built upon 'systemic and structural racism.'" DCL at 2. However, for decades, "OCR has consistently maintained that the statutes that it enforces are intended to protect students from invidious

---

[38] Off. for C.R., U.S. Dep't of Educ., Fact Sheet: Diversity and Inclusion Activities Under Title VI 1–2, available at https://web.archive.org/web/20241203144143/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocr-factsheet-tvi-dia-202301.pdf; *see, e.g.*, Grants/Cibola County Schools Resolution Agreement, OCR Case No. 08-19-1269 (Sept. 18, 2020) (to remedy patterns of discrimination against Native American students, district agreed to conduct a self-assessment of racial equity in gifted and talented education); East Side Union High School District Resolution Agreement, Case No. 09-14-1242 (to remedy racially disparate discipline of Black, Latino, and LEP students, district agreed to establish Equity Committee); 20 U.S.C. § 7231(a)(4)(A), (b), b(3) (the purpose of the Magnet Schools Assistance Program is, *inter alia*, to "desegregate and diversify schools"); Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/trump-diversity-education-department.html.

discrimination, not to regulate the content of speech."[39] Moreover, ED has agreed that a school district would remedy past Title VI violations in part by adopting "diverse and global education."[40]

47.    The Title VI Documents dictate aspects of schools' curricula and instructional materials in contravention of federal law prohibiting such interference by federal agencies. But federal law prohibits the use of federal funds "to endorse, approve, develop, require, or sanction any curriculum . . . designed to be used in an elementary school or secondary school" and bars federal employees from exercising "any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system." *See* 20 U.S.C. §§ 7906(a), 7907; 20 U.S.C. § 1232a; 20 U.S.C. § 3403. ED has no basis in Title VI or any other federal law to impose those prohibitions and offers no explanation for its position.

48.    The FAQs state that it is unlawful for schools to "engage in any programming, graduation ceremonies, housing, or any other aspect of school life that allows one race but not another or otherwise separates students, faculty, or staff based on race" but does not explain what, in particular, "otherwise separates" students or faculty. FAQs at 5. The FAQs also originally stated that it is unlawful for schools to engage in programming that "discourages members of all races from attending," but did not explain what conduct would discourage such attendance. Contrary to the Title VI Documents' vague prohibitions, past ED guidance states that, as long as programming

---

[39] Off. for C.R., U.S. Dep't of Educ., First Amendment: Dear Colleague Letter (July 28, 2003), available at https://web.archive.org/web/20250201021450/https://www.ed.gov/about/offices/list/ocr/firstamend.html.
[40] Lawrence Budd, Lebanon Schools Pay $150,000 to Settle Racial Discrimination Case, Dayton Daily News (Aug. 29, 2017), https://www.daytondailynews.com/news/local-education/lebanon-schools-pay-150-000-settle-racial-discrimination-case/LkyN5pCuMeKYOdNfPCJsaO/.

is open to all, schools "likely ha[ve] not adversely impacted students based on an individual's race or violated Title VI."[41]

49.     The FAQs were revised, without notice, after April 7 to remove the language requiring that schools consider whether programming "discourages" attendance by students of all races, creating additional uncertainty about the permissibility of programs related to culture, history, and identity.[42]

50.     To the extent the Title VI Documents' vague language can be understood, they appear to prohibit schools from crafting essay prompts or considering essays in which students discuss experiences with race. DCL at 2–3, FAQ at 7. This contradicts ED guidance permitting universities to continue holistic review after *SFFA*.[43]

51.     The Title VI Documents prohibit the "use of race in decisions pertaining to . . . discipline" and describe the use of bias response teams and mandatory trainings as unlawful discrimination. FAQ at 7, DCL at 2. However, ED has required schools to collect data on racial disparities in discipline for decades, has ordered schools to regularly analyze racial disparities in discipline to remedy and prevent the recurrence of Title VI violations, and has used data on racial

---

[41] Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter on Race and School Programming 11, available at https://web.archive.org/web/20250122000106/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-20230824.pdf.

[42] ED made several changes to the text of the FAQs some time after April 7, 2025, but did not re-issue the document nor announce these changes. The updated FAQs do not include an issue date. *Compare* FAQs at 10 *with* Off. for C.R., U.S. Dep't of Educ., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act 9, Internet Archive, https://web.archive.org/web/20250303101352/https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf.

[43] Off. for C.R., U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* 2, available at https://highered.collegeboard.org/media/pdf/ocr-questionsandanswers-tvi-20230814%202023-08-14%2015_12_55%20-%20Copy%20%283%29.pdf.

disparities in discipline to assess Title VI compliance and recommend appropriate remedies, including mandatory trainings and school-based teams to address bias in discipline.[44]

52.     The Title VI Documents' vague pronouncements seem to prohibit schools from taking race-neutral measures or relying on non-racial information to equalize educational opportunities. DCL at 3. However, past ED guidance and resolution agreements are replete with examples of ED permitting, and sometimes requiring, schools to adopt race-neutral measures to advance educational equity.[45]

53.     The Title VI Documents also prohibit the use of race in "all . . . aspects of student, academic, and campus life," including hiring, promotion, scholarships, and housing. DCL at 3. But 2014 ED guidance states that when schools work proactively to identify and address the root causes of racial disparities, including by considering race, they are "less likely to be violating Title VI" and may instead "identify and remedy a violation on their own."[46] ED's longstanding position is consistent with controlling precedent.[47]

54.     Schools and universities have rightly relied on ED's guidance, which has remained consistent on these issues, to ensure that they are complying with all applicable federal laws. ED's guidance has shaped the practices and policies of educational institutions for decades.

---

[44] Off. for C.R., U.S. Dep't of Educ., Resource on Confronting Racial Discrimination in Student Discipline (May 26, 2023), available at https://web.archive.org/web/20231015063358/https://www.justice.gov/d9/press-releases/attachments/2023/05/26/tvi-student-discipline-resource-202305_0.pdf; *see, e.g.,* Victor Valley Union High School District Resolution Agreement, OCR Case No. 09-14-5003 (Aug. 16, 2022); Davis School District, Farmington, UT Agreement/Findings (Oct. 21, 2021); East Side Union High School District Resolution Agreement, OCR Case No. 09-14-1242.

[45] Off. For C.R., *supra* note 44 at 6; Off. for C.R., U.S. Dep't of Educ., Guidance of Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools (Dec. 2, 2011), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/guidance-ese-201111.pdf; Grants/Cibola Resolution Agreement, *supra* note 38.

[46] Off. of C.R., U.S. Dep't of Educ., October 2014 Fact Sheet: Ensuring Students Have Equal Access to Educational Resources Without Regard to Race, Color, or National Origin 2, available at https://web.archive.org/web/20230609233326/https://feminist.org/wp-content/uploads/2020/06/factsheet-resourcecomp-201410.pdf.

[47] *See supra* Section IV.C.ii.

55.    ED has not explained how and why it has changed its position on any of these issues.

**D. By announcing a new, enforceable interpretation of Title VI via guidance documents, ED deviates from required rulemaking procedures.**

56.    The Title VI Documents present new law. This is apparent from the fact that the Title VI Documents contradict both ED's prior interpretation of Title VI and binding Supreme Court and D.C. Circuit precedent. *See supra* Section IV.C.ii–iii.

57.    As such, the Title VI Documents reflect the culmination of ED's decision making process and, per ED, are now enforceable law.

58.    The Letter threatens that any institution that did not, by February 28, 2025, take specific steps to comply with its unsupported interpretation of Title VI may lose its federal funding. DCL at 3–4. In addition, SEAs and LEAs that do not, by the required deadline, return a Certification attesting that they will comply with the Letter's and FAQ's pronouncements may lose their federal funding or face litigation. *See* Certification.

59.    ED did not provide NAACP, NAACP parents and students for whose benefit federal funding is provided, NAACP members' schools or universities, or any other federal funding recipients or stakeholders with notice or the opportunity to participate in the rule making process and did not otherwise comply with the rule making procedures required by law.

**E. The Title VI Documents disproportionately harm Black students by targeting programs that address racism and support equal educational opportunity.**

60.    For centuries, Black students have faced barriers designed to deny them equal access to educational resources and opportunities. And for nearly two hundred years, Black students, families, and educators have fought to overcome those barriers via inclusive, truthful curricula and programming; policies that equalize educational opportunity; and activities that create a supportive environment for Black students. The curricula, programming, policies, and

activities that Black students, families, and educators successfully secured to overcome unfair barriers are precisely what the Title VI Documents aim to prohibit.

61.     For example, since before Reconstruction and in the wake of *Brown*, Black families and their allies have fought for accurate and inclusive textbooks as part of the larger effort to ensure equal opportunity in education.[48] In the 1960s and 1970s, the Black Panther Party established holistic community schools, embraced diverse faculty, and adopted restorative justice and other discipline tactics that reduced school pushout of Black students.[49] And most recently, following the murders of George Floyd, Breonna Taylor, and Ahmaud Arbery in 2020, Black students, families, and educators across the country called upon schools to adopt truthful, inclusive curricula; advance diversity, equity, and inclusion; and ensure equal opportunity.

62.     As a result of this advocacy, some school districts and universities across the country have established policies to work towards equal access in admissions; adopted curricula and other instructional materials that reflect the experiences of Black people and discuss race, systemic racism, and efforts to combat systemic racism; and developed, supported, and expanded cultural programming, student organizations, trainings, and other policies and programming to ensure Black students have equal access to a learning environment free from discrimination.[50]

---

[48] Nat'l Park Serv., African Americans and Education During Reconstruction: The Tolson's Chapel Schools, https://www.nps.gov/articles/african-americans-and-education-during-reconstruction-the-tolson-s-chapel-schools.htm (last visited Apr. 13, 2025); Jakiyah Bradley, Whose History? How Textbooks Can Erase the Truth and Legacy of Racism Thurgood Marshall Inst., Legal Def. Fund (Feb. 2023), https://tminstituteldf.org/books-censorship-black-history/.

[49] Nimah Gobir, *5 Ways the Black Panthers Shaped U.S. Schools*, KQED (Aug. 13, 2024), https://www.kqed.org/mindshift/64470/5-ways-the-black-panthers-shaped-u-s-schools.

[50] For example, in 2020, the Indianapolis School District adopted a Racial Equity Policy that established a partnership with the Racial Equity Institute, increased the recruitment and retention of Black staff, promoted and ensured equitable enrollment across schools, confronted the impact of housing segregation on school choice, and established school-based equity teams tasked with analyzing data. Huriya Jabbar et al., *A Year That Forced Change: Examining How Schools and School Systems Adapted to the Challenges of the COVID-19 Pandemic and Calls for Racial Justice in 2020* 5, Nat'l Ctr. for Rsch. on Educ. Access & Choice, https://files.eric.ed.gov/fulltext/ED629490.pdf; Britney L. Jones, Reducing Racism in Schools: The Promise of Anti-Racist Policies, UConn Ctr. for Educ. Pol'y Analysis (Sept. 22, 2020), https://education.uconn.edu/2020/09/22/reducing-racism-in-schools-the-promise-of-anti-racist-policies/.

While additional steps are necessary to establish inclusive and supporting learning environments for Black students, these programs represent modest progress toward fulfilling the promise of equal education.

63.     The Title VI Documents target these programs for removal because they acknowledge the existence, and attempt to prevent the recurrence, of systemic and structural racism. The Title VI Documents force schools and universities to remove these programs or face the imminent loss of funding without an appropriate investigation.

64.     The Title VI Documents will reverse the modest progress towards equalizing educational opportunities for all, to the detriment of Black students.

> **i.     The Title VI Documents harm Black students, including NAACP members, by prohibiting policies that ensure equal access to selective programs.**

65.     Our Nation's selective educational programs have historically denied Black students an equal opportunity to compete for admission. Research shows that admissions tests underpredict the potential of Black and Latinx students,[51] application fees dissuade economically disadvantaged students from applying,[52] and teacher recommendation letters are often infected

---

[51] *See* Amici Curiae Brief of Harvard-Radcliffe Black Students Association, et al. In Support Of Defendants' Motion For Summary Judgment at 8–15, *Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll. Harvard Corp.*, No. 1:14-cv-14176-ADB (D. Mass. Aug. 3, 2018), ECF No. 471 (collecting research showing that, rather than measuring what they claim to measure, standardized tests such as the ACT assess cultural literacy; that is, how familiar the examinee is with the colloquial language commonly used in white middle class homes like those of the test creators, artificially depressing the test scores of Black and Latinx examinees). Indeed, research on the biased nature of the SAT led at least one Sixth Circuit Judge to recognize that standardized test scores are not objective measures of merit, stating that "the record indicates that LSAT scores are neither race-neutral or gender-neutral criteria for admissions decisions." *Grutter v. Bollinger*, 288 F.3d 732, 771 (6th Cir. 2002) (Clay, J., concurring), *aff'd*, 539 U.S. 306 (2003).

[52] *See, e.g.*, C. S. Mott Child.'s Hospital, *Mott Poll Report: Pay-to-Participate: Impact on School Activities*, 33 Nat'l Poll on Child.'s Health 1, 1–2 (2019), https://mottpoll.org/sites/default/files/documents/031819_PayToParticipate.pdf (pay-to-participate fees disproportionately disadvantaged low-income children).

with racial bias.[53]

66.     For example, a 2010 study showed that "the SAT 'favors one ethnic group over another,' calling into 'question the validity of SAT verbal scores for [Black] examinees.'"[54] There is "evidence for this bias pattern across a wide span of tests," including AP exams, the GRE, and high school vocabulary exams.[55]

67.     In addition, nationwide, our public schools fail to identify 63-74% of gifted Black students for inclusion in gifted and talented programs for known, correctable reasons.[56]

68.     Moreover, as of Fall 2023, Black students were 13.9% of U.S. public high school graduates, but just 5.01% of students enrolled in large, selective public colleges, while white students were 47.5% of U.S. public high school graduates and 55.68% of students enrolled in large, selective public colleges.[57]

69.     Some educational institutions have recently revised admissions processes to ensure that their selection criteria objectively identify qualified applicants. For example, the Fairfax County School Board revised its admissions process for the Thomas Jefferson High School for

---

[53] *See, e.g.*, Jason A. Grissom & Christopher Redding, *Discretion and Disproportionality: Explaining the Underrepresentation of High-Achieving Students of Color in Gifted Programs*, 2 AERA Open 1 (2016) (Black students are less likely to be identified for gifted and talented programs when teachers exercise discretion over which students are screened); Hala Elhoweris et al., *Effect of Children's Ethnicity on Teachers' Referral and Recommendation Decisions in Gifted and Talented Programs*, 26 Remedial & Special Educ. 25–31 (2005) (white students receive higher referral rates than their minority counterparts, despite similar student descriptions).

[54] Amici Curiae Brief, *supra* note 51, at *12 (citing Maria Veronica Santelices & Mark Wilson, *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 Harv. Educ. Rev. 106, 126, 128 (2010)).

[55] Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 Harv. Educ. Rev. 1, 28–29 (2003).

[56] Marcia Gentry et al., M., *Systemic Inequities in Identification and Representation of Black Youth with Gifts and Talents: Access, Equity, and Missingness in Urban and Other School Locales*, 59 Urb. Educ. 1730, 1762, https://doi.org/10.1177/00420859221095000.

[57] 47.5% of 2023 public high school graduates were white, while 13.9% were Black. U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, *Table 219.30: Public high school graduates, by race/ethnicity: School years 1998-99 through 2022-23*, https://nces.ed.gov/programs/digest/d24/tables/dt24_219.30.asp. Fall 2023 university enrollment statistics are updated from a 2018 Demos study of 67 large public universities with Fall 2023 data from the National Center for Education Statistics. Mark Huelsman, Social Exclusion: The State of State U for Black Students, Demos (Dec. 12, 2018), https://www.demos.org/research/social-exclusion-state-state-u-black-students; Nat'l Ctr. for Educ. Stat., College Navigator, https://nces.ed.gov/collegenavigator/.

Science and Technology ("TJ") in 2020 to eliminate the application fee, admission test, and teacher recommendations and admit the top 1.5% of students from each middle school.[58] By removing known obstacles that denied students an equal chance to compete for admission, the changes expanded the applicant pool, increased the average GPA of admittees, and led to an increase in the number of Black, Hispanic, low-income, English language learner, and female students admitted.[59]

70.    Lawsuits alleging that such changes discriminate against Asian and/or white students have all failed because, as multiple courts have recognized, an educational institution's desire to erase barriers to entry and increase racial diversity in its programs by adopting fairer, race-neutral selection criteria is consistent with Title VI and constitutes the opposite of discrimination.[60]

71.    The NAACP has engaged in years of advocacy and litigation to establish and defend policies that give Black students an equal opportunity to compete for admission to selective programs. For example, in 2012, the Fairfax County, Virginia Branch of the NAACP filed a complaint with OCR on behalf of Black and Latino students, arguing that TJ's overreliance on test scores in its admissions process benefitted students from households with the financial resources to pay for test preparation courses.[61] Moreover, in 2022, the Montgomery County, Maryland Branch of the NAACP joined litigation to defend race-neutral changes designed to equalize access to the Montgomery County Public Schools' magnet middle schools. Indeed, 51 of the Branch's 85 Parent's Council members surveyed were considering or planning on having their children apply

---

[58] *Coal. for TJ*, 68 F.4th at 874–75.

[59] *Id.*

[60] *See, e.g.*, *Bos. Parent Coal. for Acad. Excellence Corp.*, 89 F.4th; *Coal. for TJ*, 68 F.4th 864.

[61] OCR Complaint No. 11-12-1503 (July 23, 2012), http://mlkcommission.dls.virginia.gov/meetings/2012/OCR_FCPS_COTS_fairfax_complaint_NAACP_TJHSST_admissions_etc_7-23-12.pdf. By letter dated September 25, 2012, OCR retained jurisdiction over complainants' race-based allegations. Notification/Partial Dismissal Letter, Re: OCR Complaint No. 11-12-1503, Letter from Dale Rhines, Program Manager, U.S. Dep't of Educ., Off. for C.R., to Coal. of The Silence and NAACP-Fairfax (Sept. 25, 2012), https://coalitionofthesilence.files.wordpress.com/2012/10/cp-tj-notif-letter-pdf.pdf.

to the magnet middle schools, but many were gravely concerned that their children would be denied an equal opportunity to compete for admission if the changes were struck down.[62] The court found the changes lawful,[63] but the Title VI Documents once again threaten to deny NAACP members' children an equal opportunity to compete for admission to the magnet schools.

72.    Specifically, the Title VI Documents prohibit these race-neutral efforts to equalize educational opportunity, declaring that race neutral policy changes—such as eliminating standardized testing—are unlawful if they are intended to increase racial diversity. DCL at 2. NAACP members reasonably fear that their schools will be forced to change these programs pursuant to the Title VI Documents' mandates and threats, subjecting NAACP members to the imminent harm of being denied a fair chance to apply to selective programs, colleges, and universities.

73.    Indeed, school boards have already been forced to terminate policies advancing equal access pursuant to the Title VI Documents to avoid the imminent loss of federal funds. For example, in response to the Certification, the School Board of the City of Virginia Beach adopted a resolution directing the Superintendent to comply with the Title VI Documents so that the Board can continue to receive more than $74 million in federal funding.[64] The resolution directs the Superintendent to suspend "all educational program offerings that do not comply" with the Title VI Documents, and strike from its strategic plan "all references to equity and equity emphasis, . . .

---

[62] NAACP Decl., *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, No. 20-2540 (D. Md. Jan. 18, 2022), ECF No. 69-3.
[63] *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 617 F. Supp. 3d 358 (D. Md. 2022).
[64] Madie MacDonald & Keagan Hughes, *VB Board Adopts Resolution to Suspend DEI Initiatives*, WAVY.com (Apr. 10, 2025), https://www.wavy.com/news/local-news/virginia-beach/vbcps-adopts-resolution-to-suspend-dei-initiatives/.

the equity dashboard, and racial emphasis."[65] The Superintendent said signing the Certification was "put[ting his] name on the line to be fired."[66]

74.     NAACP members' access to higher education is also immediately threatened by loss of scholarship funding. One NAACP member expects that her daughter's college scholarship, awarded to students from diverse backgrounds, will be cancelled, because similar scholarships, such as the University of Michigan Alumni Association's LEAD Scholars Program, have been cancelled in response to the Title VI Documents.[67] Without these scholarship funds, the NAACP member may not be able to afford her daughter's tuition.

75.     NAACP members benefit from efforts to equalize access to selective educational resources and opportunities. Those members are harmed by Defendants' unlawful prohibition of those efforts.

> ii.     **The Title VI Documents harm Black students, including NAACP members, by prohibiting truthful, inclusive curricula because of its viewpoint.**

76.     Since the Civil War, our country's textbooks and classrooms have largely omitted those parts of our history related to Black people and the systemic anti-Black racism that persists to this day. Indeed, "[o]ne survey of 500 U.S. schools found over 90% used Eurocentric textbooks as their core instructional materials, featuring predominantly White narratives, histories, and perspectives."[68] Likewise, a 2015 study found that "generally only 1 to 2 lessons or 8–9 percent of total class time is devoted to Black history in U.S. history classrooms."[69] These circumstances

---

[65] *Id.*

[66] *Id.*

[67] John Wisely, *U-M Alumni Association End Diversity Scholarship Program*, Detroit Free Press (Mar. 21, 2025), https://www.freep.com/story/news/education/2025/03/21/u-m-alumni-association-ends-diversity-scholarship-program/82588500007/.

[68] Blessing Ngozi Iweuno et al., *Impact of Racial Representation in Curriculum Content on Student Identity and Performance*, 23 World J. Advanced Rsch. and Revs. 2913, 2915 (2024), https://doi.org/10.30574/wjarr.2024.23.1.2280.

[69] Lagarrett King, *Status of Black History in U.S. Schools and Society*, 81 Soc. Educ. 14, 15 (2017), https://www.socialstudies.org/system/files/publications/articles/se_810117014.pdf.

have prevented generations of Black students from seeing "their own communities and ancestral contributions validated through the lens of mainstream academic validation and legitimacy."[70]

77.    Yet, developing a proper understanding of systemic racism is an integral part of the "normative developmental process of [Black] adolescents." [71] A "number of important psychological and behavioral outcomes are dependent upon the way in which the adolescent copes with society's racism and other adolescent developmental tasks."[72] And "[o]ne set of positive coping responses . . . is the adoption of healthy racial identity beliefs[,]" "includ[ing] a positive view of one's racial group and an understanding of the role that racism plays in society."[73]

78.    The omission of instruction about the histories of Black people has significant adverse effects, including harming the self-esteem, motivation, sense of belonging, academic performance, and graduation rates of Black students.[74] "High school students of color in a large-scale study of 1001 students in four states reported feeling erased, disconnected, and doubting their intelligence[] when the content of their courses did not include or appreciate their race and cultural selves."[75] And Black students who attended schools that used textbooks that failed to explain the histories and achievements of people of color were more likely to drop out of school as compared to peers that used texts that incorporated the histories of people of color.[76]

79.    In response to these deficiencies, Black families and their allies have, for generations, fought for accurate, inclusive curricula and instructional materials that discuss race and racism. *See supra* ¶¶ 59–61. As a result, some school districts and universities across the

---

[70] Iweuno, *supra* note 68, at 2914.
[71] Robert M. Sellers et al., *Racial Identity Matters: The Relationship between Racial Discrimination and Psychological Functioning in African American Adolescents*, 16 J. Rsch. on Adolescence 187, 189 (June 2006), https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1532-7795.2006.00128.x.
[72] *Id.*
[73] *Id.*
[74] Iweuno, *supra* note 68, at 2914–15.
[75] Iweuno, *supra* note 68, at 2914.
[76] *Id.*

country announced the development of truthful, inclusive curricula, including curricula dedicated to understanding anti-Black racism and the histories and perspective of Black people.[77]

80.    For example, NAACP members' schools and universities adopted anti-racist curricula and ethnic studies courses. And by 2021, several states—including Texas, Virginia, Washington, New Jersey, and Connecticut—had either approved an ethnic studies curriculum or course for PK-12 schools or drafted standards to authorize or mandate ethnic studies or inclusive curricula.[78]

81.    These modest improvements benefit all students, including Black students. Research shows that instruction about race "promot[es] perspective-taking and empathy," facilitates higher levels of thinking, reduces the likelihood that students will engage in racial harassment, reduces the likelihood that students of color will experience school-based discrimination, boosts academic performance, reduces dropout rates, and improves student attendance.[79]

---

[77] Jabbar, *supra* note 50 at 5; Jones, *supra* note 50; Emily Aronson, An Update on Princeton's Ongoing Efforts to Address Systemic Racism, Princeton Univ. (May 3, 2021), https://www.princeton.edu/news/2021/05/03/update-princetons-ongoing-efforts-address-systemic-racism; Kristi Henderson, New Course Introduces Students to Anti-Black Racism, UConn Today (Sept. 4, 2020), https://today.uconn.edu/2020/09/new-course-introduces-students-us-anti-black-racism/; Hoa P. Nguyen, *Through Ethnic Studies, Schools Push to Include Marginalized Perspectives, Edutopia* (May 21, 2021), https://www.edutopia.org/article/through-ethnic-studies-schools-push-include-marginalized-perspectives/.

[78] Nguyen, *supra* note 84.

[79] Iweuno, *supra* note 78, at 2915; Christine E. Sleeter, The Academic and Social Value of Ethnic Studies: A Research Review 17, Nat'l Educ. Ass'n (2011), https://files.eric.ed.gov/fulltext/ED521869.pdf; Christy Byrd, *Does Culturally Relevant Teaching Work? An Examination from Student Perspectives*, 6 SAGE Open 1, 4–5 (2016), https://journals.sagepub.com/doi/pdf/10.1177/2158244016660744; *see also* Tabbye M. Chavous et al., *Racial Identity and Academic Attainment Among African American Adolescents*, 74 Child Dev. 1076 (2003); Oseela Thomas et al., *Promoting Academic Achievement: The Role of Racial Identity in Buffering Perceptions of Teacher Discrimination on Academic Achievement among African American and Caribbean Black Adolescents*, 101 J. Educ. Psych. 420 (2009); Thomas S. Dee & Emily K. Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum* (Nat'l Bureau of Econ. Rsch., Working Paper No. 21865, 2016), https://www.nber.org/papers/w21865; Ellen Kisker et al., *The Potential of a Culturally Based Supplemental Mathematics Curriculum to Improve the Mathematics Performance of Alaska Native and Other Students*, 43 J. Rsch. in Mathematics Educ. 78, 100 (2012); Nolan L. Cabrera et al., *Missing the (Student Achievement) Forest for All the (Political) Trees: Empiricism and the Mexican American Studies Controversy in Tucson*, 51 Am. Educ. Rsch. J. 1084, 1102 (2014); Tyrone Howard & Clarence L. Terry, *Culturally Responsive Pedagogy for African American Students: Promising Programs and Practices for Enhanced Academic Performance*, 22 Teaching Educ. 345 (2011).

82.     Despite this research and the groundswell of demand for truthful, inclusive curricula, including during the racial justice protests of 2020, the Title VI Documents seem to prohibit these curricula and instructional materials because of the viewpoint they express. For example, the Title VI Documents describe instruction on "systemic and structural racism" as a "discriminatory practice[]" that has "toxically indoctrinated students," DCL at 2, and assert that discriminatory practices may be "veil[ed] with terms like "'culturally responsive teaching.'" FAQ at 5. They further state that instruction on race or DEI is unlawful under Title VI if it acts to shame or assign guilt to students or "accuse them of being oppressors in a racial hierarchy." FAQ at 6. In doing so, Defendants deny students the right to continue receiving accurate and beneficial curricula simply because those curricula acknowledge the existence of systemic racism and advocate for greater equity.

83.     In response to the Title VI Documents and ED's EndDEI Portal, individuals who are uncomfortable with truthful discussions of systemic racism may file EndDEI reports about the schools attended by NAACP members and/or their children to complain about any instruction that they consider to be "culturally responsive teaching" or about "systemic or structural racism," whatever they believe those terms to mean.

84.     Pursuant to the mandates of the Title VI Documents, schools attended by NAACP members and/or their children face the imminent threat of funding loss or legal action without due process or appropriate investigation. Faced with these threats, schools and universities are being forced to remove the very programs they adopted to advance educational equity.

85.     As a result of the Title VI Documents, NAACP members have been denied access to truthful, inclusive curricula, or reasonably fear that their schools will—like other schools and universities—cut truthful, inclusive curricula and other instructional materials. For example,

following the Dear Colleague Letter, Kent State's University Requirements Curriculum Committee convened an emergency meeting to immediately comply by "rephrasing the university's diversity statement and limiting the course offerings for the diversity requirement to Kent Core and study abroad/international course categories."[80] Additionally, employees of Maricopa Community College District received a list of links that may "be cut or have their language changed" pursuant to the Title VI Documents, including "Chicana and Chicano Studies."[81] In contrast, schools that have not removed programs targeted by the Title VI Documents have received communications threatening imminent funding cuts.[82]

86.    NAACP members have been or will be directly harmed by their schools' compliance with the Title VI Documents. For example, one NAACP member is a Black immigrant whose two youngest children attend Maryland schools. Their schools regularly discuss systemic and structural racism, including against Black people and Native Americans. This curriculum has helped her children understand their identity as Black people and children of immigrants in relation to American history. They also learned how not to repeat the history of racism. The removal of discussions about systemic racism from her children's curriculum, to comply with the Title VI Documents, would deprive her children of important information about their identity and history and the history of other Black people in the United States. Worse, the removal of this information would harm her children's sense of self-worth to extent it could lead them to believe that they, and

---

[80] Alton Northup, *Committee Meeting to Revise Kent State Diversity Requirement*, The KentStater (Feb. 21, 2025), https://kentstater.com/126605/top-stories/committee-meeting-to-revise-kent-state-diversity-requirement/.
[81] Paige Moore & Nicole White, *Some Faculty and Students Concerned over Maricopa Community College District Leaders "at the Highest Level" Reportedly Circulating a Spreadsheet Of Course Study and Topic Links to be Reviewed—Links May Possibly "be Cut or Have Their Language Changed"*, Ne. Valley News (Apr. 4, 2025), https://nevalleynews.org/19556/news/some-faculty-and-students-concerned-over-maricopa-community-college-district-leaders-at-the-highest-level-reportedly-circulating-a-spreadsheet-of-course-study-and-topic-links-to-be-r/.
[82] *See supra* ¶ 23.

other Black people, are less worthy than non-Black people and less deserving of study and discussion in the classroom.

87.    Similarly, an NAACP member in college has taken courses that discuss systemic racism, including Black Political Thought, and intends to enroll in African American Politics next year. She excels in these courses, in which she feels represented and can engage with topics she is passionate about. However, this member fears that her university will restrict or remove these courses as her university announced that it is "considering any potential impacts" of the Letter.

### iii. The Title VI Documents harm Black students, including NAACP members, by prohibiting practices that foster a sense of belonging and address discrimination.

88.    Black youth, including NAACP members, are at greater risk of experiencing racial discrimination than their peers and must expend cognitive energy processing discrimination, rather than spending that energy on learning and development.[83] "Othering experiences [are likely] to shape the way Black students interpret and respond to commonly assessed Likert-type school-belonging items such as 'It is hard for people like me to be accepted here.'"[84] Thus, racially discriminatory acts that discourage NAACP members from embracing their racial identities are "detrimental to students' motivation, engagement, development, learning, performance, and psychological well-being."[85]

---

[83] Sellers et al., *supra* note 81, at 188 (2006); https://doi.org/10.1111/j.1532-7795.2006.00128.x; Dr. Gillian Scott-Ward, *Moving Past Racist Grooming Standards Terrorizing our Children*, Medium (Jan. 10, 2019), https://medium.com/@gillianscottward/moving-past-racist-grooming-standards-terrorizing-our-children-40df73b9ecb3.

[84] DeLeon L. Gray et al., *Black and Belonging at School: A Case for Interpersonal, Instructional, and Institutional Opportunity Structures*, 53 Educ. Psych. 97, 101 (2018), https://doi.org/10.1080/00461520.2017.1421466.

[85] *Id.* at 102; Gregory M. Walton & Geoffrey L. Cohen, *A Brief Social-Belonging Intervention Improves Academic and Health Outcomes of Minority Students*, 331 Sci., 1447, 1447 (Mar. 18, 2011), https://doi.org/10.1126/science.1198364 ("Uncertainty about belonging, especially when chronic, can undermine minorities' performance and health").

89.    "Social belonging—a sense of having positive relationships with others—is a fundamental human need."[86] A lack of a sense of belonging "harm[s] not only subjective well-being but also intellectual achievement and immune function and health."[87] "Members of socially stigmatized groups, such as African Americans, may be relatively more uncertain about their social belonging in mainstream institutions like school and work."[88] "Because their ethnic group is often negatively stereotyped and marginalized, they may be unsure of whether they will be fully included in positive social relationships in these settings."[89] In the absence of programs and policies that affirm Black students' identities and acknowledge their experiences and culture, "[u]ncertainty about belonging, especially when chronic, can undermine [their] performance and health."[90]

90.    In fact, more than a fifth of Black, postsecondary students frequently or occasionally feel discriminated against, and 61% of those students have considered dropping out of school.[91] During Fiscal Year 2024 alone, 19% (4,307) of the nearly 23,000 complaints that OCR received alleged discrimination on the basis of race, color, or national origin.[92]

91.    In addition, ED has recognized the well-documented pattern of students of color, particularly Black students, being subject to harsher and more frequent school discipline.[93] Studies

---

[86] Walton & Cohen, *supra* note 83, at 1447.
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] Camille Lloyd & Courtney Brown, *One in Five Black Students Report Discrimination Experiences*, Gallup (Feb. 9, 2023), https://news.gallup.com/poll/469292/one-five-black-students-report-discrimination-experiences.aspx.
[92] Off. for C.R., U.S. Dep't of Educ., *2024 Fiscal Year Annual Report* 8 (2024), https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.
[93] Nora Gordon, *Disproportionality in Student Discipline: Connecting Policy to Research*, Brookings Inst. (Jan. 18, 2018), https://www.brookings.edu/articles/disproportionality-in-student-discipline-connecting-policy-to-research/; *see, e.g.*, Kirsten Weir, *Inequality at School: What's Behind the Racial Disparity in Our Education System?*, 47 Am. Psych. Ass'n. 42 (2016), https://www.apa.org/monitor/2016/11/cover-inequality-school; *See* Erin Hinrichs, *Minnesota Educators Weigh in on Student Discipline Debate Unfolding in D.C.*, MinnPost (Dec. 5, 2017), https://www.minnpost.com/education/2017/12/minnesota-educators-weigh-student-discipline-debate-unfolding-dc/

show that the racially discriminatory administration of discipline has adverse effects on a students' academic performance, attendance, and behavior; may contribute to lower enrollment in higher education; and may push students into the criminal justice system.[94]

92.    Schools often fail to appropriately respond to the racial discrimination, isolation, and exclusion experienced by NAACP members. But certain policies and programs can help overcome barriers to educational access for NAACP members and other Black students, including diversity, equity, and inclusion programs; voluntary affinity groups and their programming; voluntary affinity housing and other dedicated spaces; school-wide cultural and heritage programs; a diverse faculty; affinity graduations and award ceremonies; and efforts to reduce racial disparities in discipline.

93.    In response to advocacy by Black families and their allies, some schools and universities across the country have adopted, supported, and expanded this programming, including by supporting voluntary affinity groups, hosting cultural programming, launching mandatory equity trainings, and adopting race-neutral faculty recruitment efforts and changes to discipline policies to address racial disparities.[95]

---

[https://perma.cc/S25S-SM54]; Joint "Dear Colleague" Letter from the U.S. Dep't of Educ. & U.S. Dep't of Just. (Jan. 8, 2014), available at https://web.archive.org/web/20250409163856/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf.

[94] Alicia R. Jackson, *Inherently Unequal: The Effect of Structural Racism and Bias on K-12 School Discipline*, 88 Brook. L. Rev. 459, 495 (2023); Am. Psych. Ass'n Zero Tolerance Task Force, *Are Zero Tolerance Policies Effective in the Schools?*, 63 Am. Psych. 852, 852 (2008), https://www.apa.org/pubs/reports/zero-tolerance.pdf [https://perma.cc/6SSP-7RCT]; Amity L. Noltemeyer et al., *Relationship Between School Suspension and Student Outcomes: A Meta-Analysis*, 44 Sch. Psych. Rev. 224–40 (2015), https://edsource.org/wp-content/uploads/2018/09/Noltemeyer_Ward_2015_Meta-Analysis.pdf; Emily Peterson, *Racial Inequality in Public School Discipline for Black Students in the United States*, Ballard Brief (Sept. 2021), https://ballardbrief.byu.edu/issue-briefs/racial-inequality-in-public-school-discipline-for-black-students-in-the-united-states; Wis. Coal. Against Sexual Assault, Inc., School to Prison Pipeline, https://www.wcasa.org/resources/areas-of-interest/topics/school-to-prison-pipeline/ (last visited Apr. 13, 2025).
[95] *See, e.g.*, Jabbar, *supra* note 50, at 5; Jones, *supra* note 50; We Are Teachers Staff, *What Teachers Need to Know About Restorative Justice*, We Are Teachers (Sept. 2, 2022), https://www.weareteachers.com/restorative-justice/.

94.    These programs benefit all students and affirm Black students' identities, experiences, and culture. They have been shown to mitigate "[u]ncertainty about belonging [that], especially when chronic, can undermine [their] performance and health."[96] For example, voluntary affinity groups and dedicated cultural programming, though open to all, generally attract students who choose to seek a safe, supportive space to discuss strategies for navigating the particular challenges associated with a certain shared identity, and celebrate that community's joys, customs, and heritage. "The commonality of the in-group context and shared challenges foster an atmosphere where participants speak more freely or receive validation, without fear or defensiveness related to outgroup members contesting their perspectives."[97] Voluntary affinity groups "foster[] a sense of community and social support among participants," improve participants' "social/emotional well-being," and result in increased trust, empathy, cultural competency, retention, and improved academic performance.[98]

95.    Similarly, despite the failure of the Title VI Documents to define diversity, equity, and inclusion programs and their categorical characterization of those programs as "discriminatory practices," DCL at 2, in actuality, they can include efforts like pipeline programs that expose underserved students—who are often Black students and other students of color—to science, technology, engineering, math and other careers; outreach and recruitment measures to expand the applicant pool for selective programs to include students of all races and ethnicities; and mentoring programs open to all, especially those students who might otherwise lack access to mentors.

---

[96] Walton & Cohen, *supra* note 83, at 1447.
[97] Jesse J. Tauriac et al., *Utilizing Affinity Groups to Enhance Intergroup Dialogue Workshops for Racially and Ethnically Diverse Students*, 38 J. Specialists Grp. Work, 241, 245 (2013), https://doi.org/10.1080/01933922.2013.800176.
[98] Jordon J. Beasley et al., *Reimagining Groups: A Phenomenological Investigation of Affinity Groups in Schools*, 28 Pro. Sch. Counseling 1, 2 (2024), https://doi.org/10.1177/2156759X241234919; Jessica T. DeCuir-Gunby et al., *Using Critical Race Mixed Methodology to Explore African American College Students' Experiences with Racial Microaggressions*, 49 Innovative Higher Educ. 1077, 1094 (2024), https://doi.org/10.1007/s10755-024-09732-6.

Ultimately, diversity, equity, and inclusion programs benefit all of us, as diverse environments—including racially diverse environments—help build critical thinking, problem-solving ability, and intellectual self-confidence, and prepare students to thrive in our global economy.[99]

96.    Race-neutral changes to school discipline policies and programs that analyze racial disparities in discipline equalize education for all students and mitigate harms to Black students. For example, Black students are less likely to be excluded and more likely to benefit from their educational environment when their schools adopt restorative justice practices, teams that analyze and respond to racial disparities in discipline, and other measures intended to reduce racial disparities and discrimination in school discipline. Schools that have implemented these practices into their disciplinary models have seen success, including drops in suspension rates.[100]

97.    Despite these benefits, the Title VI Documents target these programs because they acknowledge the existence, and aim to prevent the recurrence of, systemic racism and discrimination. In fact, the Title VI documents explicitly warn against the use of "social and emotional learning" and "culturally responsive' teaching," which disrupt racial disparities in discipline; affinity graduation ceremonies, affinity housing; "DEI initiatives;" "mandat[ory] courses, orientation programs, or trainings" that discuss race; and "using race in decisions pertaining to . . . discipline." FAQs at 5–7; DCL at 2.

---

[99] *See* Katherine W. Phillips, *How Diversity Makes Us Smarter*, Sci. Am. (Oct. 1, 2014), https://www.scientificamerican.com/article/how-diversity-makes-us-smarter/. *See also* Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. Personality & Soc. Psych. 507, 606 (2006); Bedoor K. AlShebli et al., *The Preeminence of Ethnic Diversity in Scientific Collaboration*, Nature Comm'n, 1, 9 (2018), https://doi.org/10.1038/s41467-018-07634-8.

[100] Anne Gregory & Katherine Evans, Nat'l Educ. Pol'y Ctr., The Starts and Stumbles of Restorative Justice in Education: Where Do We Go from Here? 3 (2020), https://nepc.colorado.edu/sites/default/files/publications/Revised%20PB%20Gregory_0.pdf [https://perma.cc/C6LE-QBS6].

98.     Under the Title VI Documents, schools attended by NAACP members face the imminent threat of funding loss or legal action without due process or appropriate investigation if they continue to offer this programming. Faced with these threats, schools and universities will have to remove the very programs they adopted to help NAACP members and/or their children feel safe, supported, and welcome at school.

99.     As a result of this coercion, NAACP members have been deprived of programming and race-neutral policies that support Black students reasonably fear that their schools will, like other schools and universities, cut such programming and policies. For example, in response to the Letter's threat of funding cuts, Green Bay Area Public School District in Wisconsin removed mentions of diversity, equity, and inclusion from two district policies that aimed to decrease achievement gaps between Black and white students through reading instruction and gifted and talented programs.[101] Similarly, the Maricopa County Community College District is "firing workers assigned to DEI roles,"[102] "canceled all convocation ceremonies that celebrate 'diverse communities and special interest groups,'" and announced that it will disband its Diversity Advisory Council, "employees in DEI-related positions will be reassigned," and "website language related to DEI initiatives will be modified."[103] Per news reports, "[w]eb pages that direct to information on Black History Month or Black Student Unions are already disappearing across

---

[101] Nadia Scharf, *Green Bay School District Cuts Race-Related Language From Two Policies; Second DEI Change*, Green Bay Press Gazette (Mar. 18, 2025), https://www.greenbaypressgazette.com/story/news/education/2025/03/18/green-bay-school-district-cuts-race-related-language-from-two-policies/82502028007/; Green Bay Area Pub. Sch. Dist., Revision Considerations Policies 341.1 and 342.3, https://go.boarddocs.com/wi/gbapsd/Board.nsf/files/DEPMRE5C5F5E/$file/Revision%20Considerations%20Policies%20341.1%20and%20342.3.pdf (last visited Apr. 13, 2025).
[102] Jerod MacDonald-Evoy, *Maricopa County Community Colleges Nuke All Diversity Programs*, Phoenix New Times (Mar. 4, 2025), https://www.phoenixnewtimes.com/news/maricopa-county-community-colleges-end-diversity-programs-21328707.
[103] Jessica Boehm, *Scoop: Arizona Universities Rename Graduation Events Honoring Diverse Student Groups* (Mar. 6 ,2025), https://www.axios.com/local/phoenix/2025/03/07/arizona-universities-graduation-celebration-convocation-dei-trump.

MCCCD."[104] In a statement, the community college district said that "[t]he changes made were entirely driven by the compliance requirements set forth by the federal government" given that "[f]ailure to comply could jeopardize federal funding, including our ability to accept financial aid."[105] Consistent with these fears, schools that have not removed these programs have been directly threatened with imminent funding cuts.[106]

100.    NAACP members have been harmed or reasonably fear that their schools will be similarly coerced into complying with the Title VI Documents, causing members and/or their children to face direct and imminent harm. For example, one NAACP member has a daughter who attends a middle school with few other Black girls. She participates in a program that is open to all and provides a space for Black girls to discuss their identities and feelings, including whether they feel valued in their school community. The program has helped this member's daughter connect with other Black girls and understand her identity. If the program is terminated, her daughter will feel even more racially isolated in her school community than she did before.

101.    Likewise, an Iowa school scheduled a Black History Month read-in that the child of an NAACP member planned to attend. The event featured the book, "All Because You Matter" by Tami Charles, which includes an image of a little boy looking at a Black Lives Matter poster. After the Letter was issued, the school cancelled the event given concerns that the book's imagery ran afoul of the Letter's vague and broad prohibitions. This member now reasonably fears that her children's schools will remove other programs honoring Black history, which have benefited her son by affirming his life experiences.

---

[104] MacDonald-Evoy, *supra* note 102.
[105] Boehm, *supra* note 103.
[106] *See supra* ¶ 23.

102.    Another member is part of the Black Student Union at her university. In the past year, she has attended events hosted by the Black Student Union and open to all students to build community among Black students and student allies and talk about Black culture. At a Black History Month event, the organization hosted a discussion of the CROWN Act, a law that prohibits race-based hair discrimination. This member's university also offers voluntary affinity housing for Black women and other groups. Due to the Title VI Documents' explicit criticisms of affinity groups and affinity housing, she reasonably fears that her university will restrict affinity groups and affinity housing to comply with the Title VI Documents. Because her school is a predominantly white institution with a Black undergraduate population of 6.5% and a Black graduate population of 10%, Black students rely on affinity spaces to build community. If they are banned, this member believes the resulting shock to Black students will be "unbearable" and that many Black students would not feel comfortable applying to or enrolling in her university.

103.    The Black children of one NAACP member attend Maryland schools that have primarily hired white teachers but are attempting to recruit a more diverse pool of applicants. This member is concerned that her district will cease these recruitment efforts as a result of the Title VI Documents. If such recruitment efforts are prohibited, another member is concerned that her children are far less likely to be taught by a diverse group of educators, including people who look like them. She reasonably fears this will reduce the benefits of their educational experience. Based on the extensive research on the subject, she feels a diverse group of teachers, especially Black teachers, are "necessary" to ensure Black children achieve equal success as their white peers. This fear is well-founded. For example, to comply with the Title VI Documents, the Virginia Beach City Public Schools struck "diversified workforce" from its strategic plan.[107]

---

[107] MacDonald & Hughes, *supra* note 64.

104.    Many NAACP members are parents of Black children who attend Maryland schools that have adopted restorative justice programs in an attempt to eradicate and prevent racial disparities in school discipline. If their school district terminates these programs in an attempt to comply with the Title VI Documents, their children will be subject to racially disparate discipline and targeting by school resource officers in their schools. One NAACP member has seen the benefits of the restorative justice program, which has been effective in engaging and deescalating conflicts, including those involving Black boys at their middle school. This member feels that restorative justice is crucial to more equal discipline and long-term success for Black students, because it takes into account systemic discrimination to address the root of the problem. He feels that the school needs restorative practices because they help to equalize students' educational experiences and their access to resources.

## V.    CLAIMS

### First Cause of Action
### Fifth Amendment – Equal Protection

105.    Plaintiffs incorporate and re-allege the above paragraphs as if fully set forth herein.

106.    The Due Process Clause of the Fifth Amendment guarantees all persons equal protection under law and prohibits the government from treating any person differently on the basis of race. *Bolling v. Sharpe*, 347 U.S. 497 (1954).

107.    Defendants' Title VI Documents evince discriminatory intent by relying upon and perpetuating pernicious racial stereotypes about alleged Black intellectual and moral inferiority.[108] The Title VI Documents further the Trump administration's use of terms like "DEI," "racial

---

[108] Devon Carbado et al., *Privileged or Mismatched: The Lose-Lose Position of African Americans in the Affirmative Action Debate*, 64 UCLA L. Rev. Discourse 174 (2016).

preferences," and "racial balancing" to impugn the qualifications, competence, talents, and ethics of Black students as well as Black people generally.[109]

108.    Defendants' actions also evince racially discriminatory intent by attempting to chill lawful activities known to benefit Black students, such as efforts to eliminate obstacles that unfairly deny Black students equal educational opportunities, efforts to correct the exclusion of the experiences of Black people from our curricula, and efforts to create safe spaces for Black students.

109.    Defendants' intent to protect certain students from any guilt associated with a truthful recitation of our longstanding history of racial subjugation demonstrates concern for students of specific races, namely white students, to the detriment of Black students, who receive particular benefits from learning that history.

110.    The events surrounding the promulgation of the Title VI Documents, substantive departures from the appropriate rulemaking and administrative processes, and Defendants' statements and enforcement actions also demonstrate that they are intended to harm Black students.

111.    The reasonably foreseeable discriminatory impacts of the Title VI Documents, along with the pretextual, factually unsupported policy rationales and plainly false and inaccurate statements that Defendants use to justify the Title VI Documents, raise a strong inference of discriminatory purpose in violation of the Fifth Amendment's guarantee of Equal Protection.

---

[109] *See, e.g.*, Melanie Mason, *Republicans Blame DEI for the LA Fires. This Fire Captain Disagrees*, Politico (Jan. 15, 2025), https://www.politico.com/news/2025/01/15/republicans-dei-la-fires-00198551; Julie Ingram & Alexander Hunter, *Some Republicans Attack Kamala Harris as "DEI Hire." Here's What That Means*, CBS News (July 26, 2024), https://www.cbsnews.com/news/republicans-attack-kamala-harris-dei-hire/ ("GOP Rep. Tim Burchett of Tennessee called Harris a 'DEI vice president,' a reference to diversity, equity and inclusion efforts. Rep. Harriet Hageman of Wyoming called Harris a 'DEI hire' and referred to her as 'intellectually, just really kind of the bottom of the barrel.'").

112.    Defendants' conduct has irreparably harmed, and will continue to irreparably harm, NAACP members and/or their children, including by depriving them of, *inter alia*, (a) instruction and programming concerning systemic racism and Black history and culture, (b) supportive spaces that help Black students foster a healthy sense of belonging, (c) services geared towards supporting marginalized students, and (d) an equal opportunity to compete for admission to selective programs.

**Second Cause of Action**
**Fifth Amendment – Due Process, Void for Vagueness**

113.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

114.    A law is void for vagueness if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement.'" *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

115.    The prohibition against vagueness "applies with particular force in review of laws dealing with speech." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990).

116.    The ability of NAACP members to continue receiving instruction, training, and programming is directly affected by their schools' ability to effectively comply with the Title VI Documents. *See Arce v. Douglas*, 793 F.3d 968, 987 (9th Cir. 2015).

117.    The Title VI Documents' vague and confusing prohibitions have and will continue to irreparably harm NAACP members.

**Third Cause of Action**
**First Amendment – Right to Receive Information**

118.    Plaintiffs incorporate and re-allege the above paragraphs as if fully set forth herein.

119.    Viewpoint discrimination, or discrimination against speech because of the opinion or perspective of the speaker, is presumed to be unconstitutional. *Reed v. Town of Gilbert*, 576

U.S. 155, 163 (2015); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–89 (1995).

120.    Discrimination against speech because of its content, even where that discrimination is not based on viewpoint, must satisfy strict scrutiny. *Minnesota Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1885 (2018).

121.    Viewpoint discrimination is especially harmful in education because schools are entrusted to "educat[e] the young for citizenship." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Students must, therefore, be prepared for civil participation "through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

122.    The First Amendment protects the right to receive information and ideas. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982); *Martin v. Struthers*, 319 U.S. 141 (1943); *Lamont v. Postmaster Gen. of U.S.,* 381 U.S. 301 (1965). This right to receive information and ideas gives true effect to the "*recipient's* meaningful exercise of [their] own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).

123.    By infringing on schools' ability to provide instruction, trainings, and programming on certain topics disfavored by Defendants, the Title VI Documents unlawfully deny students, including NAACP members, the right to receive information free from viewpoint and content-based restrictions.

124.    Defendants' conduct has and will continue to irreparably harm NAACP members, including via the loss of a truthful, inclusive education that reflects the experiences of Black people.

### Fourth Cause of Action
### First Amendment – Freedom of Association

125.    Plaintiffs incorporate and re-allege the above paragraphs as if fully set forth herein.

126.    "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

127.    The First Amendment protects student groups from government actions that deny their "access to school-sponsored forums because of the groups' viewpoints." *See Christian Legal Soc. Chap. Of the Univ. of California, Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 667 (2010); *Bd. of Educ. v. Mergens*, 496 U.S. 226, 249-50 (1990).

128.    Defendants' conduct has and will continue to irreparably harm NAACP members, including by impacting student groups' use of campus space, speech, and resources.

### Fifth Cause of Action
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Arbitrary and Capricious

129.    Plaintiffs incorporate and re-allege the above paragraphs as if fully set forth herein.

130.    Courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion . . . ," 5. U.S.C. § 706(2)(A), as agencies are required "to engage in 'reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of Univ. of Calif.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

131.    The Title VI Documents are arbitrary and capricious because they (a) purport to address a problem without providing any evidence that the problem exists, and (b) rely on vague and false criteria untethered to a legal or factual basis, evidence, or reasoned analysis to threaten

enforcement and the termination of federal funds. The Title VI Documents also fail to describe what alternatives, if any, ED considered to address this purported problem or achieve its goals.

132.    ED may not "depart from a prior policy *sub silentio*." *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009). The Title VI Documents are arbitrary and capricious because Defendants do not (a) acknowledge or explain their novel interpretation of law and departure from past positions, (b) consider that their past positions may have "engendered serious reliance interests that must be taken into account," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016); *see Dep't of Homeland Sec.*, 591 U.S. at 33, or (c) consider or address the ways the Title VI Documents interfere with applicable statutes and constitutional rights. *See infra* Sixth and Seventh Causes of Action.

133.    Defendants' conduct has and will continue to irreparably harm NAACP members.

## Sixth Cause of Action
## Administrative Procedure Act, 5 U.S.C. § 706(2)(B) – Contrary to Constitutional Rights under the First, Fifth, and Tenth Amendments and the Separation of Powers

134.    Plaintiffs incorporate and re-allege the above paragraphs as if fully set forth herein.

135.    Courts shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

136.    The Title VI Documents are unlawful agency action contrary to the Tenth Amendment; the separation of powers; and NAACP members' rights under the First Amendment and the Due Process Clause and Equal Protection guarantee of the Fifth Amendment. 5 U.S.C. § 706(2)(B); *Bolling v. Sharpe*, 347 U.S. 497 (1954); *see supra* First, Second, Third, and Fourth Causes of Action. In particular, the Title VI Documents intentionally discriminate against Black students, fail to give adequate notice of what actions are prohibited, and infringe upon NAACP members' rights to continue receiving instruction and programming and host student

organizational programming that pertains to race and advances educational equity. *See supra* First, Second, Third, and Fourth Causes of Action.

137.    The Title VI Documents threaten schools that endeavor to advance equal educational opportunity in ways that benefit Black students. DCL at 3. But Defendants' reliance on the Equal Protection Clause to justify this prohibition is unsupported. *See supra* Section IV.C.ii.

138.    Per the Tenth Amendment to the U.S. Constitution, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. ED's unprecedented interpretation of Title VI usurps states' traditional authority to govern curriculum in violation of the Tenth Amendment.

139.    ED's unprecedented interpretation of Title VI is an unconstitutional exercise of legislative and judicial power by the executive. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in . . . Congress."); U.S. Const. art. III § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.")

140.    Defendants' conduct has and will continue to irreparably harm NAACP members.

**Seventh Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(C) – In Excess of Statutory Authority under Title VI, Equal Access Act, 20 U.S.C. §§ 4071–73, and Every Student Succeeds Act, 20 U.S.C. § 7907**

141.    Plaintiffs incorporate and re-allege the above paragraphs as if fully set forth herein.

142.    The Title VI Documents are unlawful agency action in excess of Defendants' statutory authority under Title VI, the Equal Access Act, and laws prohibiting federal interference with curricula. *See* 5 U.S.C. § 706(2)(C); 42 U.S.C. §§ 2000d, et seq; 20 U.S.C. §§ 4071–4073 (2010); Every Student Succeeds Act, 20 U.S.C. § 7907; 20 U.S.C. § 3403.

143.    Title VI provides that no student "shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. But the Title VI Documents forbid schools from considering race in ways that remain lawful, if not necessary, under Title VI.

144.    The Title VI Documents disregard schools' obligations to remedy and prevent a hostile environment under Title VI and wrongly claim that diversity, equity, and inclusion activities create a hostile environment. *See, e.g.*, DCL at 3, FAQ Answer 8. This is unsupported by Title VI and disregards ED's own prior guidance, which has long required schools to implement similar activities to remedy Title VI violations. *See supra* Section III.C.iii.

145.    The Title VI Documents also disregard PK-12 schools' obligations under the Equal Access Act to provide student groups with access and resources free from viewpoint discrimination, 20 U.S.C. §§ 4071–4073 (prohibiting federally funded public secondary schools "which ha[ve] a limited open forum [from] deny[ing] equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.")

146.    The Title VI Documents also contradict federal laws prohibiting federal officials from interfering with state and local curricula. *See* 20 U.S.C. § 7907 (prohibiting the use of federal funds "to endorse, approve, develop, require, or sanction any curriculum . . . designed to be used in an elementary school or secondary school" and disclaiming that anything therein authorizes "an officer or employee of the Federal Government . . . to mandate, direct, review, or control a State, local educational agency, or school's instructional content, curriculum, and related activities"); 20 U.S.C. § 1232a ("No provision of any applicable program shall be construed to authorize any

department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system."); 20 U.S.C. § 3403(b) ("No provision of a program administered by the Secretary or by any other officer of the Department [of Education] shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum [or] program of instruction . . . of any educational institution, school, or school system, . . . or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law.").

147.    Defendants' conduct has and will continue to irreparably harm NAACP members.

148.    The Title VI Documents should be set aside as "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. §§ 706(2)(A)–(C).

### Eighth Cause of Action
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Without Observance of Procedure Required by Law

149.    Plaintiffs incorporate and re-allege the above paragraphs as if fully set forth herein.

150.    Courts shall "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." *Id.* § 706(2)(D).

151.    Though issued as "significant guidance," DCL at 1 n.3, the Title VI Documents are a legislative rule that has the force of law and presents a new interpretation of existing law that contradicts ED's prior interpretations of Title VI and the Equal Protection Clause. *See NRDC v. Wheeler*, 955 F. 3d 68 (D.C. Cir. 2020); *Sacora v. Thomas*, 628 F. 3d 1059 (9th Cir. 2010); *Time Warner Cable Inc. v. FCC*, 729 F. 3d 137 (2d Cir. 2013).

152.    ED did not provide NAACP, its members, their schools, or any other federal funding recipients or stakeholders with notice or the opportunity to participate in the rule making process and did not otherwise comply with the rule making procedures required by law. 5 U.S.C. § 706(2)(D); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 608 (6th Cir. 2024) (holding Dear Educator letter providing Department of Education's interpretation of Title IX was a final agency action and legislative rule subject to notice and comment requirements under 5 U.S.C. § 706(2)(D)).

153.    Defendants' conduct has and will continue to irreparably harm NAACP members.

## VI.    PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant the following relief:

a. Enter a declaratory judgment that the Title VI Documents are unlawful and unconstitutional, 28 U.S.C. §§ 2201 and 2202;

b. Declare unlawful and set aside the Title VI Documents as arbitrary and capricious; contrary to constitutional rights; in excess of statutory authority; and without observance of procedure required by law in violation of 5 U.S.C. §§ 706(2)(A)–(D);

c. Enter a preliminary injunction enjoining Defendants and all of their officers, employees, and agents from implementing or enforcing the Title VI Documents;

d. Award Plaintiff costs, reasonable attorneys' fees, and other disbursements as appropriate; and

e. Grant other such relief as the Court deems necessary, just, and proper.

DATED: April 15, 2025.

Respectfully Submitted,

Katrina Feldkamp*
Allison Scharfstein*
Lauren Carbajal*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
(212) 965-2200
kfeldkamp@naacpldf.org
ascharfstein@naacpldf.org
lcarbajal@naacpldf.org

Jin Hee Lee, DC Bar No. 1740850
Michaele N. Turnage Young, DC Bar No.
242398*
Morgan Humphrey*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC
700 14th Street N.W., Ste. 600
Washington, D.C. 20005
(202) 682-1300
jlee@naacpldf.org
mturnageyoung@naacpldf.org
mhumphrey@naacpldf.org

* *Admission Pro Hac Vice Forthcoming*