# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE<br>4805 Mt. Hope Drive<br>Baltimore, MD 21215<br><br>*Plaintiff,*<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION,<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>LINDA MCMAHON, *in her official capacity as U.S. Secretary of Education*,<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>CRAIG TRAINOR, *in his official capacity as Acting Assistant Secretary for Civil Rights of the U.S. Department of Education,*<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>*Defendants.* | **Civil Action No. 1:25-cv-01120 (DLF)** |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION ................................................. i

TABLE OF CONTENTS........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................. 14

STATEMENT OF THE CASE................................................................................................. 2

   I.   ED issues the Title VI Documents........................................................................... 2

   II.   Defendants enforce the Title VI Documents. ......................................................... 5

   III.   The Title VI Documents have harmed NAACP members.................................... 7

LEGAL STANDARD............................................................................................................. 10

ARGUMENT .......................................................................................................................... 10

   I.   Plaintiff Is Likely to Succeed on the Merits of Its Claim. ................................. 10

      a.   The Title VI Documents violate NAACP members' First Amendment rights............ 10

         i.   The First Amendment protects NAACP members' right to receive curricular information, instruction, training, and other programming free of viewpoint-based censorship. ......................................................................................................... 11

         ii.   The First Amendment protects NAACP members' right to associate free of viewpoint- and content-based restrictions. ........................................................ 13

         iii.   Threatening to withhold federal funding to ensure preferred viewpoints is antithetical to the First Amendment........................................................................ 14

      b.   The Title VI Documents Are Unconstitutionally Vague in Violation of Fifth Amendment Due Process. .................................................................................... 15

         i.   The Title VI Documents are unconstitutionally vague because they do not provide notice of what conduct is prohibited............................................................... 15

         ii.   The Title VI Documents are unconstitutionally vague because they are so standardless they invite arbitrary and discriminatory enforcement. ................................. 17

      c.   The Title VI Documents violate the Administrative Procedure Act............................ 18

         i.   The Title VI Documents are reviewable final agency action. ................................. 18

         ii.   The Title VI Documents were promulgated without observance of required procedures.......................................................................................................... 19

         iii.   The Title VI Documents are contrary to constitutional rights under the First and Fifth Amendments. ......................................................................................... 21

iv.   The Title VI Documents are arbitrary and capricious. ............................................... 25

1.   The Title VI Documents misstate facts and purport to address a problem without providing evidence that it exists. .................................................................................. 26

2.   The Title VI Documents misstate and contradict legal precedent under Title VI and the Equal Protection Clause, including the Supreme Court's decision in *SFFA v. Harvard*. ................................................................................................................. 28

3.   The Title VI Documents fail to provide a reasoned explanation for their departure from ED's longstanding position. ................................................................................ 31

4.   The Title VI Documents fail to consider NAACP members and schools' reliance interests or how the Documents undermine the goals of Title VI and harm Black students. ................................................................................................................... 35

v.   The Title VI Documents exceed the Education Department's authority under Title VI and laws prohibiting federal interference with curricula. ............................................. 38

II.   Absent court intervention, NAACP members will suffer imminent, irreparable harm that outweighs any harm to Defendants. ................................................................................. 40

III.   Enjoining the Title VI Documents will not unduly or substantially harm other parties but will benefit the public interest. ....................................................................................... 43

CERTIFICATE OF COMPLIANCE ................................................................................. 46

CERTIFICATE OF SERVICE ......................................................................................... 47

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
    370 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................31

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
    25 F.4th 1 (D.C. Cir. 2022) ...............................................................................26

Amici Curiae Br. of Harvard-Radcliffe Black Students Ass'n, et al. in Supp. of
    Defs' Mot. for Summ. J. at 8-15, *SFFA v. Harvard*,
    No. 1:14-cv-14176-ADB (D. Mass. Aug. 3, 2018), ECF No. 471 ................................. *passim*

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000) ..........................................................................20

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) .............................................................................16

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).......................................................................................22

*Ass'n of Flight Attendants-CWA v. Huerta*,
    785 F.3d 710 (D.C. Cir. 2015) ...........................................................................20

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ...........................................................................26

*Batson v. Kentucky*,
    476 U.S. 79 (1986).........................................................................................24

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982).................................................................................11, 12

*Bd. of Educ. v. Mergens*,
    496 U.S. 226 (1990).......................................................................................14

*Bissett v. Beau Rivage Resorts*,
    442 F. App'x 148 (5th Cir. 2011) ........................................................................30

*Bolling v. Sharpe*,
    347 U.S. 497 (1954).......................................................................................22

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*,
    89 F.4th 46 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15, 2024 WL 5036302
    (U.S. Dec. 9, 2024) .................................................................................................30

*Brown v. Bd. of Educ.*,
    347 U.S. 483 (1954) .................................................................................................25

*Christian Legal Soc. Chap. of the Univ. of Cal., v. Martinez*,
    561 U.S. 661 (2010)..................................................................................................14

*City of Arlington v. FCC*,
    569 U.S. 290 (2013)............................................................................................39, 40

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
    68 F.4th 864 (2023), *cert. denied*, 218 L. Ed. 2d 71, 2024 WL 674659 (U.S.
    Feb. 20, 2024) .........................................................................................................30

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998)..........................................................................41, 42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)...............................................................................................26, 36

*Dred Scott v. Sanford*,
    60 U.S. 393 (1857)....................................................................................................27

*Duffy v. Wolle*,
    123 F.3d 1026 (8th Cir. 1997), *abrogated on other grounds by Torgerson v.
    City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)...................................................30

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)..................................................................................................26

*EndDEI*,
    U.S. Dep't of Educ., https://enddei.ed.gov/ (last visited Apr. 11, 2025) ...........6, 15

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).......................................................................................26, 31, 35

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)..................................................................................................15

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)..................................................................................................44

*Fisher v. Univ. of Tex. at Austin*,
    570 U.S. 297 (2013)..................................................................................................31

*Fisher v. Univ. of Tex. at Austin,*
    579 U.S. 365 (2016)................................................................................................31

*Gen. Elec. Co. v. EPA,*
    290 F.3d 377 (D.C. Cir. 2002) ...............................................................................20

*Gentile v. State Bar of Nev.,*
    501 U.S. 1030 (1991)..............................................................................................15

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)...........................................................................................16, 17

*Grutter v. Bollinger,*
    288 F.3d 732 (6th Cir. 2002) (Clay, J., concurring), *aff'd*, 539 U.S. 306 (2003) ...................23

*Grutter v. Bollinger,*
    539 U.S. 306 (2003)................................................................................................31

*Hazelwood v. Kuhlmeier,*
    484 U.S. 260 (1988)................................................................................................12

*Healy v. James,*
    408 U.S. 169 (1972)................................................................................................13

*Hill v. Colorado,*
    530 U.S. 703 (2000)...........................................................................................15, 16

*Johnson v. Metro. Gov't of Nashville,*
    502 F. App'x 523 (6th Cir. 2012) ...........................................................................30

*Keyishian v. Bd. Of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967)................................................................................................11

*League of Women Voters of the U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ...................................................................................44

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) .............................................................................41

*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018)....................................................................................................11

*Mlynczak v. Bodman,*
    442 F.3d 1050 (7th Cir. 2006) ...............................................................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*
    463 U.S. 29 (1983)..................................................................................................28

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................42, 45

*NAACP v. U.S. Postal Serv.*,
    496 F. Supp. 3d 1 (D.D.C., 2020) ...............................................................42, 43

*Nat'l Council of Nonprofits v. OMB*,
    No. 25-239 (LLA), 2025 WL 368852 (D.D.C. Feb. 3, 2025) ..........................18, 19

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ............................................................................20

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ..........................................................................45

*Nat'l Res. Def. Council v. Wheeler*,
    955 F. 3d 68 (D.C. Cir. 2020) .......................................................................10, 20

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) .....................................................................................14, 15

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................44

*Off. of Commc'n of United Church of Christ v. FCC*,
    707 F.2d 1413 (D.C. Cir. 1983) .....................................................................35, 36

*Parents Involved in Community Schools. v. Seattle School District No. 1*,
    551 U.S. 701 (2007) ............................................................................22, 29, 43

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
    215 F. Supp. 2d 120 (D.D.C. 2002) ....................................................................44

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ..............................................................................................20

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022) .........................................................11, 12

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ............................................................................................29

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) ............................................................................................27

*POET Biorefining, LLC v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020) ............................................................................18

*Pub. Citizen v. FTC*,
   869 F.2d 1541 (D.C. Cir. 1989) ................................................................43

Questions and Answers Regarding the Supreme Court's Decision in *Students for
   Fair Admissions, Inc. v. Harvard College and University of North Carolina*........................35

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)........................................................................11

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)........................................................................31

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
   836 F.3d 57 (D.C. Cir. 2016) ...............................................................22

*Safe Extensions, Inc. v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007) .............................................................28

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
   467 U.S. 947 (1984)........................................................................11

*Sessions v. Dimaya*,
   584 U.S. 148 (2018)........................................................................17

*Soundboard Ass'n v. FTC*,
   888 F.3d 1261 (D.C. Cir. 2018) ............................................................18

*Stout v. Jefferson Cnty. Bd. of Educ.*,
   882 F.3d 988 (11th Cir. 2018) .............................................................25

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
   600 U.S. 181 (2023)................................................................2, 3, 29, 31

*Tennessee v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024) ......................................................10, 19, 21

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015)......................................................................3, 29

*Tomaszewski v. City of Phila.*,
   460 F. Supp. 3d 577 (E.D. Pa. 2020) .......................................................30

*Turner v. U.S. Agency for Glob. Media*,
   502 F. Supp. 3d 333 (D.D.C. 2020).........................................................44

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016)........................................................................19

*United States v. Williams*,
   553 U.S. 285 (2008) ..................................................................................16

*Vavra v. Honeywell Int'l Inc.*,
   688 F. Supp. 3d 758 (N.D. Ill. 2023) ......................................................30

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ..................................................................................15

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   485 F. Supp. 3d 1 (D.D.C. 2020) .......................................................43, 44

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ..................................................................43

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................10, 44

*Young v. Colo. Dep't of Corr.*,
   No. 22-cv-00145-NYW-KLM, 2023 WL 1437894 (D. Colo. Feb. 1, 2023) ..........................30

**Statutes and Constitutions**

5 U.S.C. § 553(b)(A) ........................................................................................20

5 U.S.C. § 704 ..................................................................................................18

5 U.S.C. § 706(2)(a) ........................................................................................26

5 U.S.C. § 706(2)(B) ........................................................................11, 15, 21, 26

5 U.S.C. § 706(2)(C) ........................................................................................39

5 U.S.C. § 706(2)(D) ........................................................................................20

20 U.S.C. § 1232a ............................................................................................39

20 U.S.C. § 3403(b) ........................................................................................39

20 U.S.C. § 3413(a) ........................................................................................18

20 U.S.C. § 7231(a)(4)(A) ..............................................................................32

20 U.S.C. § 7231(a)(4)(C) ..............................................................................32

20 U.S.C. § 7231b(3) ......................................................................................32

20 U.S.C. § 7907 ..............................................................................................39

42 U.S.C. § 2000d ....................................................................................................39, 40

U.S. Const. amend. V ......................................................................................................15

**Other Authorities**

(2022), https://doi.org/10.1177/00420859221095000 ...................................................37

2013-2014 Civil Rights Data Collection: A First Look 1, 3, Off. for C.R., U.S.
    Dep't of Educ. (2016) ........................................................................................28

Alan M. Garber, The Promise of American Education, Harvard Univ. (Apr. 14,
    2025) .....................................................................................................................7

Alton Northup, *Committee Meeting to Revise Kent State Diversity Requirement*,
    The KentStater (Feb. 21, 2025) .........................................................................13

Annie Ma & Sarah Raza, *Education Department Withdraws from Plan to Address
    Discipline Disparities for Native Students,* Associated Press (Apr. 10, 2025) ....................43

Blessing Ngozi Iweuno et al., *Impact of Racial Representation in Curriculum
    Content on Student Identity and Performance*, 23 World J. Advanced Rsch.
    and Revs. 2913, 2914-15 (2024) ................................................................38, 41

Bruce D. Baker et al., The Adequacy and Fairness of State School Finance
    Systems 18, Sch. Fin. Data Database (6th ed. 2024) .........................................27

C. S. Mott Children's Hospital, *Mott Poll Report: Pay-to-Participate: Impact on
    School Activities*, 33 Nat'l Poll on Childs.' Health 1, 1-2 (2019) ...................24

Cheyanne Mumphrey & Jocelyn Gecker, *Colleges Cut Ties with a Little-known
    Nonprofit Targeted by the Trump Administration over DEI*, Associated Press
    (Mar. 21, 2025) .....................................................................................................6

Chris Hacker et al., *Majority-Black School Districts Have Far Less Money to
    Invest in Buildings - and Students Are Feeling the Impact*, CBS News (Sept.
    14, 2023) .............................................................................................................28

Claude M. Steele, Whistling Vivaldi: And Other Clues to How Stereotypes Affect
    Us (2010) ............................................................................................................25

Davis School District, Farmington, UT Agreement/Findings (Oct. 21, 2021) ...........34

DeLeon L. Gray et al., *Black and Belonging at School: A Case for Interpersonal,
    Instructional, and Institutional Opportunity Structures*, 53 Educ. Psych. 97,
    101 (2018) ...........................................................................................................41

Devon W. Carbado & Cheryl I. Harris, The New Racial Preferences, 96 Cal. L.
    Rev. 1139, 1162 (2008) ......................................................................................24

ix

East Side Union High School District Resolution Agreement, Case No. 09-14-
1242.........................................................................................................................32, 34

Elise Boddie, *The Indignities of Color Blindness*, 64 UCLA L. Rev. Discourse 64
(2016)..........................................................................................................................24

Emma Tucker, *Trump Administration Demands Changes in Letter to Harvard
University as Review of Federal Funding Underway*, CNN (Apr. 4, 2025) ...........6

Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives
Celebrated in His First Term, N.Y. Times* (Feb. 14, 2025).....................................32

Erin Hinrichs, *Minnesota Educators Weigh in on Student Discipline Debate
Unfolding in D.C.*, MinnPost (Dec. 5, 2017) ..........................................................38

Francis A. Pearman et al., *Are Achievement Gaps Related to Discipline Gaps?
Evidence From National Data*, 5 Am. Educ. Rsch. Ass'n Open (Oct. 2019).........28

Gillian Scott-Ward, *Moving Past Racist Grooming Standards Terrorizing our
Children*, Medium (Jan. 10, 2019)..........................................................................38

Gloria Wong, et al., *The What, the Why, and the How: A Review of Racial
Microaggressions Research in Psychology*, 6:2 Race and Soc. Problems, 181
(2014).........................................................................................................................25

Grants/Cibola County Schools Resolution Agreement, OCR Case No. 08-19-
1269 (Sept. 18, 2020)................................................................................................32

Grants/Cibola Resolution Agreement, OCR Case No. 08-19-1269 (Sept. 17, 2020)..................35

Gregory M. Walton & Geoffrey L. Cohen, *A Brief Social-Belonging Intervention
Improves Academic and Health Outcomes of Minority Students*, 331 Sci.,
1447, 1447 (Mar. 18, 2011) ...............................................................................38, 41

Gregory M. Walton & Steven J. Spencer*, Latent Ability: Grades and Test Scores
Systematically Underestimate the Intellectual Ability of Negatively
Stereotyped Students*, 20 Psychological Sci. 1132, 1132 (2009).............................25

Hala Elhoweris et al., *Effect of Children's Ethnicity on Teachers' Referral and
Recommendation Decisions in Gifted and Talented Programs*, 26 Remedial
and Special Educ. 25-31 (2005)................................................................................23

Jason A. Grissom & Christopher Redding, *Discretion and Disproportionality:
Explaining the Underrepresentation of High-Achieving Students of Color in
Gifted Programs*, 2 AERA OPEN 1 (2016)............................................................23

Jayanti Owens & Sara S. McLanahan, *Unpacking the Drivers of Racial Disparities in School Suspension and Expulsion*, 98 Soc. Forces 1548 (May 19, 2021) ..................................................................................................................28

John Wisely, *U-M Alumni Association End Diversity Scholarship Program*, Detroit Free Press (Mar. 21, 2025) ..........................................................................43

Joint "Dear Colleague" Letter from the U.S. Dep't of Educ. & U.S. Dep't of Just. (Jan. 8, 2014)..........................................................................................................39

Julie Ingram & Alexander Hunter, *Some Republicans Attack Kamala Harris as "DEI Hire." Here's What That Means*, CBS News (July 26, 2024) ......................25

Kirsten Weir, *Inequality at School: What's Behind the Racial Disparity in Our Education System?*, 47 Am. Psych. Ass'n. 42 (2016) ................................................38

Lawrence Budd, *Lebanon Schools Pay $150,000 to Settle Racial Discrimination Case*, Dayton Daily News (Aug. 29, 2017) ............................................................32

Letter from John Gruenbaum et al., Comm'r of the Fed. Acquisition Serv., to Alan M. Garber, President of Harvard Univ., and Penny Pritzker, Lead Member of Harvard Corp. (Apr. 3, 2025)...............................................................7

Marcia Gentry et al., *Systemic Inequities in Identification and Representation of Black Youth with Gifts and Talents: Access, Equity, and Missingness in Urban and Other School Locales*, 59 Urb. Educ. 1730 ........................................................37

Mark Huelsman, Social Exclusion: The State of State U for Black Students, Demos (Dec. 12, 2018) ...........................................................................................37

Melanie Mason, *Republicans Blame DEI for the LA Fires. This Fire Captain Disagrees*, Politico (Jan. 15, 2025)..........................................................................25

NAACP, *Working in Your Region*...............................................................................43

Nat'l Ctr. for Educ. Stat., College Navigator........................................................................37

Nat'l Educ. Pol'y Ctr. The Starts and Stumbles of Restorative Justice in Education: Where Do We Go from Here? 3 (2020)..................................................................38

Nora Gordon, Disproportionality in Student Discipline: Connecting Policy to Research, Brookings Inst. (Jan. 18, 2018) .............................................................38

Off. of C.R., U.S. Dep't of Educ., January 2001 Dear Colleague Letter on Racial and Ethnic Disparities in Access to Educational Resources ..................................34

Off. of C.R., U.S. Dep't of Educ., October 2014 Fact Sheet: Ensuring Students Have Equal Access to Educational Resources Without Regard to Race, Color, or National Origin ...................................................................................................34

Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter (Feb. 14, 2025)........................... *passim*

Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter on Race and School Programming 11 (Aug. 24, 2023) ..........................................................................33

Off. for C.R., U.S. Dep't of Educ., Fact Sheet: Diversity and Inclusion Activities Under Title VI (Jan. 2023)..........................................................................................32

Off. for C.R., U.S. Dep't of Educ., First Amendment: Dear Colleague Letter (July 28, 2003) ...........................................................................................................33

Off. for C.R., U.S. Dep't of Educ., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Jan. 2023) ..............................................................................................................33

Off. for C.R., U.S. Dep't of Educ., Guidance of Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools (Dec. 2, 2011)..........................................................................................35

Off. for C.R., U.S. Dep't of Educ., Resource on Confronting Racial Discrimination in Student Discipline (May 26, 2023)...........................................34

Paige Moore & Nicole White, *Some Faculty and Students Concerned over Maricopa Community College District Leaders "at the Highest Level" Reportedly Circulating a Spreadsheet Of Course Study and Topic Links to be Reviewed-Links May Possibly "be Cut or Have Their Language Changed"*, Ne. Valley News (Apr. 4, 2025) .................................................................................13

Press Release, Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025).........................................................................................6

Press Release, Ed. Trust, As Districts Face Teacher Shortages, Black and Latino Students Are More Likely to Have Novice Teachers Than Their White Peers (Dec. 15, 2021) .................................................................................................27, 28

Press Release, U.S. Dep't of Educ., DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million (Mar. 7, 2025) ......................................................................................5, 7

Press Release, U.S. Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025) ...........................................3

Press Release, U.S. Dep't of Educ., Joint Task Force to Combat Anti-Semitism
Statement Regarding Harvard University (Apr. 15, 2025)................................................. 5, 7

Press Release, U.S. Dep't of Educ., Office for Civil Rights Initiates Title VI
Investigations into Institutions of Higher Education (Mar. 14, 2025)................................6, 31

*Racial/Ethnic Enrollment in Public Schools*, in The Condition of Education 2020
(Inst. Educ. Scis. 2020)..................................................................................................................27

Robert M. Sellers et al*., Racial Identity Matters: The Relationship between Racial
Discrimination and Psychological Functioning in African American
Adolescents*, 16 J. Rsch. on Adolescence 187 (June 2006). ..............................................37, 38

Roby Chatterji et al., *Closing Advanced Coursework Equity Gaps for All Students*,
Ctr. for Am. Progress (Jun. 30, 2021)........................................................................................28

Roslyn Arlin Mickelson, *School Integration and K-12 Outcomes: An Updated
Quick Synthesis of the Social Science Evidence*, Nat'l Coal. on Sch. Diversity
(Oct. 2016) ..................................................................................................................................28

Russell J. Skiba & Natasha T. Williams, Are Black Kids Worse? Myths and Facts
About Racial Differences in Behavior: A Summary of the Literature, The
Equity Project at Ind. Univ. (Mar. 2014) ..................................................................................28

U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, Table 219.30: Public high
school graduates, by race/ethnicity: School years 1998-99 through 2022-23 ........................37

U.S. Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for
Receiving Federal Financial Assistance and Request for Certification under
Title VI and SFFA v. Harvard (Apr. 3, 2025) ..........................................................................3

Victor Valley Union High School District Resolution Agreement, OCR Case No.
09-14-5003 (Aug. 16, 2022) ......................................................................................................34

# INTRODUCTION

Plaintiff NAACP, on behalf of its members, moves for a preliminary injunction barring Defendants from enforcing the February 14, 2025 Dear Colleague Letter (the "Letter" or "DCL"), the February 28, 2025 Frequently Asked Questions (the "FAQs"), and the April 3, 2025 certification requirement,

The Title VI Documents have irreparably harmed and will continue to irreparably harm Black students across the country, including NAACP members, in violation of, *inter alia*, the First Amendment, the Fifth Amendment, and the Administrative Procedure Act ("APA") by denying them (a) an equal opportunity to compete for admission to selective programs, (b) truthful, inclusive curricula concerning systemic racism and Black history and culture, and (c) programs and policies that combat racial discrimination and foster a sense of belonging.

Most glaringly, the Title VI Documents infringe upon NAACP members' First Amendment right to receive information and directly conflict with the Supreme Court's interpretation of Title VI and the Equal Protection Clause. Defendants do not have the authority to rewrite Equal Protection law or proscribe instruction on the basis of viewpoint, and their attempt to do so clearly violates the APA. Defendants also violate the APA by failing to provide an explanation for their departure from ED's longstanding position that programs supporting equal opportunities for Black students are lawful and necessary, and by promulgating the Title VI Documents without observance of required procedures. Thus, while Plaintiff brings constitutional claims, this motion can be resolved solely on the grounds that the Title VI Documents violate the APA.

For all of the foregoing reasons, the Title VI Documents must be enjoined.

## STATEMENT OF THE CASE

### I.    ED issues the Title VI Documents.

On February 14, 2025, the U.S. Department of Education ("ED") released the Letter, which inaccurately reframes lawful efforts to ensure equal opportunity as "racial discrimination [that] ha[s] emanated throughout every facet of academia," victimizing white and Asian students, and running afoul of *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023). DCL at 1-2.[1] On February 28, 2025, ED released its FAQs which, like the Letter, use language that is broad, vague, and difficult to understand and that seems to prohibit, as purported discrimination, a broad range of activities that touch nearly every aspect of "student, academic, and campus life." DCL at 2. And on April 3, 2025, ED issued its Certification, requiring state educational agencies to certify compliance with the Letter and FAQs' interpretation of Title VI.[2] Collectively, the Title VI Documents advance a misinterpretation of civil rights laws plainly foreclosed by controlling precedent and ED's own longstanding positions[3] to deny Black children equal educational opportunities.

---

[1] Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter (Feb. 14, 2025), https://web.archive.org/web/20250410162101/https://www.ed.gov/media/document/dear-colleague-letter-sffa-vharvard-109506.pdf [hereinafter "DCL"].

[2] Press Release, U.S. Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://www.ed.gov/about/news/press-release/ed-requires-k-12-school-districts-certify-compliance-title-vi-and-students-v-harvard-condition-of-receiving-federal-financial-assistance; U.S. Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard (Apr. 3, 2025), https://web.archive.org/web/20250403164255/https://www.ed.gov/media/document/reminder-of-legal-obligations-undertaken-exchange-receiving-federal-financial-assistance-and-request-certification-under-title-vi-and-sffa-v-harvard-april-3 [hereinafter "Certification"].

[3] *See supra* Argument, Section I(c)(iv)(3).

**First**, the Title VI Documents prohibit policies that ensure Black students, including NAACP members, have equal access to selective programs. The Title VI Documents declare that race-neutral policy changes, such as eliminating standardized testing, are unlawful if they intend to increase racial diversity, even if those changes remove obstacles that deny Black students an equal opportunity to compete for admission. DCL at 2. However, this pronouncement directly contradicts controlling precedent like *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015), holding that race-neutral efforts to foster diversity are lawful. In addition, the vague language of the Title VI Documents also appears to prohibit schools from crafting essay prompts or considering essays in which students discuss experiences with race or conducting interviews that allow an interviewer to "visually assess an applicant's race". DCL at 2-3, FAQs at 8. These prohibitions are unsupported by law and directly contradict *SFFA*, which permits universities to consider an applicant's discussion of how race affected their life as long as that discussion is connected to, in some way, their qualifications. 600 U.S. at 230.

**Second**, the Title VI Documents prohibit truthful, inclusive curricula, including curricula that reflects the experiences and histories of NAACP members' communities, because Defendants disfavor the curricula's viewpoint. The Documents characterize instruction on "systemic and structural racism" as a "discriminatory practice[]" and "false premise" that has "toxically indoctrinated students," DCL at 2, and assert the opinion, without evidentiary support, that discriminatory practices may be "veil[ed] . . . with terms like 'social-emotional learning' or 'culturally responsive' teaching." FAQs at 6. Defendants further state that instruction on race or diversity, equity, and inclusion is unlawful under Title VI if it acts to shame or assign guilt to students. FAQs at 7. This provision will restrict accurate teaching of history merely because some

students may feel guilt or shame in response. The Letter's vague and sweeping prohibitions, which are unsupported by law or facts, censor accurate, beneficial instruction simply because Defendants disagree with the existence and history of systemic racism and aim to impose their viewpoint on students across the country, including NAACP members.

**Third**, the Title VI Documents prohibit practices that foster a sense of belonging and that prevent and address racial disparities, discrimination, and isolation. The Title VI Documents, for example, prohibit "DEI initiatives," "mandat[ory] courses, orientation programs, or trainings" that discuss race, and "using race in decisions pertaining to admissions, hiring, promotion, compensation, financial aid, scholarships, prizes, administrative support, discipline, housing, graduation ceremonies, and all other aspects of student, academic, and campus life." FAQs at 5-7; DCL at 2. "[P]rograms focused on interests in particular cultures, heritage, and areas of the world," including Black History Month programming, may run afoul of the Documents' prohibitions if they create a "hostile environment," "engage in racial exclusion," or "deny students the ability to participate fully in the life of a school." FAQs at 6. In the context of school discipline, the Documents describe the use of bias response teams and mandatory trainings as unlawful discrimination. FAQs at 7. The language in the Title VI Documents, which is both broad and vague, will thus likely be read to prohibit programs and activities intended to redress discrimination and support Black students' access to education, such as affinity groups, housing and graduations, celebrations of cultural heritage, training pertaining to equity and inclusion, and race-neutral efforts to remedy racial disparities in discipline, hiring, academics, or student life.

The Title VI Documents' novel and unsupported interpretation of civil rights law carries the force of law. The Letter states that OCR "intends to take appropriate measures to assess compliance with the applicable statutes and regulations based on the understanding embodied in

this letter beginning no later than 14 days from today's date" and threatens non-compliant recipients with the loss of federal funds. DCL at 3-4. At least two schools have already lost funding pursuant to the DCL.[4] The Certification similarly states that schools engaging in "certain DEI practices" may lose federal funding and incur "substantial liabilities, including the potential initiation of litigation for breach of contract by the Department of Justice" and treble damages under the False Claims Act. Certification at 3-4.

## II. Defendants enforce the Title VI Documents.

Almost immediately, ED began to enforce this novel interpretation of Title VI and invite reports of conduct contrary to its interpretation. On February 27, 2025, ED launched an EndDEI portal and invited reports of alleged discrimination, including promotion of "critical theory" and "divisive ideologies."[5] Per ED, "submissions [to the portal] will be used to identify potential areas for investigation."[6] On March 14, 2025, ED announced over fifty Title VI investigations as part of its enforcement of the Title VI Documents. The investigations included forty-five universities being investigated due to alleged involvement with the Ph.D. Project, an organization that assists

---

[4] *See* Press Release, U.S. Dep't of Educ., Joint Task Force to Combat Anti-Semitism Statement Regarding Harvard University (Apr. 15, 2025), https://www.ed.gov/about/news/press-release/joint-task-force-combat-anti-semitism-statement-regarding-harvard-university; Press Release, U.S. Dep't of Educ., DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million (Mar. 7, 2025), https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-cancelation-of-grants-and-contracts-columbia-university-worth-400-million; @prem_thakker, Twitter (Mar. 13, 2025, 8:23 p.m.), https://x.com/prem_thakker/status/1900341950865133986?s=46.

[5] Press Release, Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal; *EndDEI*, U.S. Dep't of Educ., https://enddei.ed.gov/ (last visited Apr. 11, 2025).

[6] U.S. Department of Education Launches "End DEI" Portal, *supra* note 5; *EndDEI, supra* note 5.

underrepresented students in their pursuit of a Ph.D.[7] Fearing the imminent loss of funding, multiple universities have since cut ties with the Ph.D. Project.[8]

ED's broad power to investigate schools and universities, and the arbitrary and conclusory manner in which it is wielding that power to enforce the Title VI Documents, has already harmed educational institutions. On April 4, 2025, ED threatened to freeze nearly $9 billion in federal funding to Harvard University.[9] In a proposed "agreement in principle" to "maintain Harvard's financial relationship with the federal government," Acting General Counsel of ED Thomas E. Wheeler and other government officials directed Harvard to, *inter alia*, "immediately shutter all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives, under whatever name, and stop all DEI-based policies" and institute "Merit-Based Hiring Reform" and "Merit-Based Admissions Reform."[10] Following Harvard President Alan Garber's letter, declaring that Harvard "will not surrender its independence or relinquish its constitutional

---

[7] Press Release, U.S. Dep't of Educ., Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education (Mar. 14, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-higher-education-0.

[8] Cheyanne Mumphrey & Jocelyn Gecker, *Colleges Cut Ties with a Little-known Nonprofit Targeted by the Trump Administration over DEI*, Associated Press (Mar. 21, 2025) (noting that the University of Kentucky and University of Nevada, Las Vegas cut ties with The Ph.D. Project), https://apnews.com/article/trump-dei-college-investigationphd-project-65d5d9bd5a13db89bea730142b467fde.

[9] Emma Tucker, *Trump Administration Demands Changes in Letter to Harvard University as Review of Federal Funding Underway*, CNN (Apr. 4, 2025), https://www.cnn.com/2025/04/04/us/harvard-trump-administrationdemand-letter/index.html.

[10] Letter from John Gruenbaum et al., Comm'r of the Fed. Acquisition Serv., to Alan M. Garber, President of Harvard Univ., and Penny Pritzker, Lead Member of Harvard Corp. at 2-3 (Apr. 3, 2025), https://www.harvard.edu/research-funding/wp-content/uploads/sites/16/2025/04/Letter-Sent-to-Harvard-2025-04-11.pdf.

rights."[11] ED announced a freeze on nearly $2.3 billion in contracts and grants to Harvard.[12] ED similarly cancelled approximately $400 million in federal funding to Columbia University and directed that Columbia's "continued financial relationship with the United States government" depended, *inter alia*, on placing an ethnic studies department under academic receivership and "comprehensive admissions reform."[13]

### III. The Title VI Documents have harmed NAACP members.

Black students across the country, including NAACP members, felt the impact of the Title VI Documents immediately. NAACP members have endured infringements of their associational rights and right to receive accurate, inclusive instruction; the actual or imminently threatened loss of programs that address preexisting discrimination and afford them equal educational opportunities; and the deprivation of their procedural right to notice and comment.

First, NAACP members have been, and will be, denied access to truthful, inclusive instruction and programming that acknowledges and discusses systemic racism. Due to the Title VI Documents' prohibitions and ED's enforcement, NAACP members are at significant risk of losing access to ethnic studies courses and other instruction about systemic racism. *See* Johns Decl. Pls. Ex. 1, ¶¶ 45-49 (Member B) [hereinafter "Johns Decl."], ¶¶ 82-85 (Member C); Graves Decl. Pls. Ex. 2 [hereinafter "Graves Decl."], ¶¶ 16-17 (Member F); Bailey Decl. Pls. Ex. 4, ¶¶ 34-37

---

[11] Alan M. Garber, The Promise of American Education, Harvard Univ. (Apr. 14, 2025), https://www.harvard.edu/president/news/2025/the-promise-of-american-higher-education/.
[12] Press Release, U.S. Dep't of Educ., Joint Task Force to Combat Anti-Semitism Statement Regarding Harvard University (Apr. 15, 2025), https://www.ed.gov/about/news/press-release/joint-task-force-combat-anti-semitism-statement-regarding-harvard-university.
[13] Press Release, U.S. Dep't of Educ., DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million (Mar. 7, 2025), https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-cancelation-of-grants-and-contracts-columbia-university-worth-400-million; @prem_thakker, Twitter (Mar. 13, 2025, 8:23 p.m.), https://x.com/prem_thakker/status/1900341950865133986?s=46.

(Member J), ¶¶ 47-48 (Member L); ¶ 50 (Member M) [hereinafter "Bailey Decl."]. The Title VI Documents thereby infringe upon NAACP members' right to receive information free from viewpoint- and content-based discrimination. NAACP members also risk having to self-censor themselves while participating in student organization programming and other associational activities. *See* Bailey Decl. ¶¶ 42-44 (Member K).

Second, NAACP members have suffered the loss of programs that protect Black students' right to an equal education, and they risk the loss of additional, similar programs that they have benefitted from for years in schools across the country. NAACP members, for example, have been denied access to cultural and heritage programming that supports and affirms Black students. *See* Graves Decl. ¶¶ 8-10; Lewis Decl. Pls. Ex. 3, ¶¶ 35-36 (Member H) [hereinafter "Lewis Decl."]. Other NAACP members, who know that schools and universities across the country have begun to censor instruction and programming, rationally believe that their schools and universities will move quickly to remove cultural and heritage programming, or other programming that addresses systemic racism, to avoid the risk of losing critical federal funds. *See* Johns Decl. ¶¶ 10, 19 (Johns), ¶¶ 26-36 (Member A), ¶¶ 57-59 (Member C), ¶¶ 92-96 (Member D), ¶¶ 117-18 (Member E); Graves Decl. ¶¶ 15-17 (Member F); Bailey Decl. ¶¶ 34-37 (Member J); Lewis Decl. ¶¶ 17-21 (Member G).

As a result of the Title VI Documents' prohibitions and ED's enforcement, NAACP members, including in Maryland, Virginia, and Pennsylvania, reasonably fear the imminent loss of voluntary affinity groups, supportive affinity housing, and other programs and associations that support Black students, especially those experiencing racial isolation. *See* Johns Decl. ¶¶ 20-22 (Johns), ¶¶ 44-46 (Member B); ¶¶ 66-72 (Member C); Graves Decl. ¶ 21 (Member F); Lewis Decl. ¶¶ 17-21 (Member G); Bailey Decl. ¶¶ 28-30 (Member I), ¶¶ 44 (Member K). Other NAACP

members fear that schools will be forced to face unfair and arbitrary investigations, with no meaningful due process, or cut programs that redress racial disparities in discipline, Johns Decl. ¶¶ 40-41 (Member A), ¶¶ 50-52 (Member B), ¶¶ 73-78 (Member C), ¶¶ 107-09 (Member E); Bailey Decl. ¶¶ 20-23 (Member I); distribute resources more equitably, Bailey Decl. ¶¶ 12, 25-27 (Member I); increase faculty diversity given the historic exclusion of non-white educators, Johns Decl. ¶ 28 (Member A), 79-80 (Member C); Bailey Decl. ¶¶ 12, 24 (Member I); provide scholarships or funding for Black students facing unfair barriers to resources or opportunities, Johns Decl. ¶ 16, ¶¶ 86-87 (Member C); Graves Decl. ¶ 20 (Member F); Lewis Decl. ¶¶ 22-24 (Member G), ¶¶ 38-39 (Member H); Bailey Decl. ¶ 41 (Member K), ¶ 51; or reduce discrimination in admissions and increase equal access to advanced and selective programs, Johns Decl. ¶ 7; Bailey Decl. ¶¶ 7-8, 10-12, 14-17. The removal of these programs will inflict significant harm on NAACP members, who continue to face unfair disadvantages in PK-12 schools and higher education, by limiting their access to selective programs, harming their academic and emotional well-being, and increasing the likelihood that they will face racially discriminatory discipline. *See, e.g.*, Bailey Decl. ¶¶ 31-32, 38 (Member J); Lewis Decl. ¶¶ 16-18 (Member G).

Finally, NAACP members have been denied the opportunity to participate in the rulemaking process. The Title VI Documents are a legislative rule that carries the force of law. NAACP members, like all interested stakeholders, have the right to provide notice and comment when a legislative rule is promulgated. *See Nat'l Res. Def. Council v. Wheeler*, 955 F. 3d 68 (D.C. Cir. 2020); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 607-08 (6th Cir. 2024) (holding that a Dear Educator letter providing ED's interpretation of Title IX was a final agency action and legislative rule subject to notice and comment requirements under 5 U.S.C. § 706(2)(D)). Given the NAACP's decades-long work to ensure equal educational opportunities for Black students, it

would have submitted a comment on behalf of its members had such an opportunity been afforded. Johns Decl. ¶¶ 5-7, 13-14 (describing MoCo NAACP's past advocacy including testifying before state legislative bodies); Lewis Decl. ¶¶ 8-10 (describing NAACP's 2024 advocacy education policy commitments).

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show that (1) it "is likely to succeed on the merits" of its claim, (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. Plaintiff Is Likely to Succeed on the Merits of Its Claim.

Plaintiff NAACP is likely to succeed on the merits of its constitutional and APA claims.

### a. The Title VI Documents violate NAACP members' First Amendment rights.

By prohibiting schools and universities from offering instruction and programming "with the false premise that the United States is built upon 'systemic and structural racism,'" among other disfavored viewpoints, the Title VI Documents deny NAACP members at schools including Virginia Commonwealth University ("VCU") and Rowan University the right to learn from, openly discuss, and express those viewpoints. *See* Bailey Decl. ¶ 50 (Member M); Lewis Decl. ¶¶ 36-37 (Member H). Such viewpoint discrimination—the regulation or restriction of speech based on "the specific motivating ideology or the opinion or perspective of the speaker"—is prohibited by the First Amendment, *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015); *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018), and by the Administrative Procedure Act, which sets aside final agency action found to be contrary to constitutional rights. 5 U.S.C. § 706(2)(B). Prudential

limitations on standing are lessened here, "when there is a danger of chilling free speech" that outweighs society's interest in avoiding constitutional adjudication. *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 956-57 (1984).

> ### i. The First Amendment protects NAACP members' right to receive curricular information, instruction, training, and other programming free of viewpoint-based censorship.

The Supreme Court has long held that the First Amendment protects not only the freedom of speech, but the corollary and predicate right to receive information. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." *Id.* (quoting *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308 (1965) (Brennan, W., concurring)). This right is especially critical in the education setting, where students are "trained through wide exposure to that robust exchange of ideas." *Keyishian v. Bd. Of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); see also *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022) (holding that though the state has discretion in setting curricula, it cannot impose its own orthodoxy of viewpoint about the content it allows within classrooms). And in the PK-12 education setting, where the courts afford local authorities greater deference in curricular decisionmaking, a plurality of Supreme Court Justices held that students' right to receive may not be limited to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).[14]

Like the removal of targeted materials at issue in *Pico* and the prohibited curricula in *Pernell*, the Title VI Documents reflect a similar attempt to restrict Plaintiff's ability to receive

---

[14] Such deference is not extended to federal decisionmakers to shape curricula. *See supra* Section I(c)(iv).

information and ideas about systemic racism and racial inequality—viewpoints that Defendants disfavor and are attempting to suppress. DCL at 2. There is no "legitimate pedagogical concern" motivating the Title VI Documents' restrictions. *See Hazelwood v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Indeed, the Documents seek to remove existing instruction and programming, including truthful, inclusive curricula, that afford pedagogical and social-emotional benefits. *See supra* Argument Section I(c)(iv)(4). In short, the Title VI Documents do precisely what a plurality of the Supreme Court prohibited in *Pico*. 457 U.S. at 872.

NAACP members' schools and universities have already begun to cut courses and programming about race and racism in response to the Title VI Documents. VCU cancelled a course on disability, diversity, and human rights that NAACP members intended to take, and Rowan University cancelled a guest lecture on racism and bias in healthcare. Bailey Decl. ¶ 50 (Member M); Lewis Decl. ¶ 37 (Member H). Other NAACP members' schools currently offer African American studies electives and curricula that address antiracism and social justice. Johns Decl. ¶¶ 35, 39 (Member A), ¶ 48 (Member B), ¶¶ 57-58, 82-84 (Member C), ¶¶ 92-95 (Member D), ¶¶ 106, 114, 117 (Member E). But these members fear these programs will get cut. For example, Member D said that they fear their daughter's current curriculum, which celebrates diverse cultures and includes truthful accounts of history, will be cut so that her school can certify compliance with the Title VI Documents. *See also* Johns Decl. ¶ 37 (Member A), ¶¶ 48-49 (Member B), ¶¶ 59, 85 (Member C), ¶¶ 116, 118-20 (Member E).

NAACP members' fears are credible because schools have already been forced to make similar cuts to programs due to ED enforcement and threats. Kent State's University Requirements Curriculum Committee convened an emergency meeting to immediately comply with the Title VI Documents by "limiting the course offerings for the diversity requirement to Kent Core and study

abroad/international course[s]."[15] Employees of Maricopa Community College District received a list of programs that may "be cut or have their language changed" pursuant to the Title VI Documents, including "Chicana and Chicano Studies."[16] And ED cancelled a combined $2.7 billion in funding to Harvard and Columbia that will be restored only if the universities, among other things, shutter diversity, equity, and inclusion programs and agree to place an ethnic studies department under academic receivership. *See supra* Statement of the Case, Section II.

### ii. The First Amendment protects NAACP members' right to associate free of viewpoint- and content-based restrictions.

The First Amendment also protects "the right of individuals to associate to further their personal beliefs," particularly in a school setting. *Healy v. James*, 408 U.S. 169, 181 (1972). Accordingly, the government may not deny student groups their "access to school-sponsored forums because of the groups' viewpoints." *See Christian Legal Soc. Chap. of the Univ. of Cal., v. Martinez*, 561 U.S. 661, 667-68 (2010); *Bd. of Educ. v. Mergens*, 496 U.S. 226, 249-50 (1990). The Title VI Documents censor this association by targeting diversity, equity, and inclusion activities and programming "focused on interests in particular cultures, heritages, and areas of the world" and "educational, cultural, or historical observances" that create a hostile environment for participating students. FAQs at 6. But the Documents do not describe how such events could create

---

[15] Alton Northup, *Committee Meeting to Revise Kent State Diversity Requirement*, The KentStater (Feb. 21, 2025), https://kentstater.com/126605/top-stories/committee-meeting-to-revise-kent-state-diversity-requirement/.

[16] Paige Moore & Nicole White, *Some Faculty and Students Concerned over Maricopa Community College District Leaders "at the Highest Level" Reportedly Circulating a Spreadsheet Of Course Study and Topic Links to be Reviewed—Links May Possibly "be Cut or Have Their Language Changed"*, Ne. Valley News (Apr. 4, 2025), https://nevalleynews.org/19556/news/some-faculty-and-students-concerned-over-maricopa-community-collegedistrict-leaders-at-the-highest-level-reportedly-circulating-a-spreadsheet-of-course-study-and-topic-links-to-be-r/.

a hostile environment. As a result, NAACP members reasonably fear that their schools or universities will investigate or take adverse action against their student groups, voluntary affinity events, and cultural centers if they continue to conduct programming that falls within the Letter and FAQ's vague prohibitions. *See* Lewis Decl. ¶¶ 20 (Member G) (explaining that NAACP members have been instructed to remove the word "Black" from the title of student organizations such as the Black Pre-Law Association); *see also* Johns Decl. ¶¶ 66-72 (Member C); Graves Decl. ¶ 21 (Member F); Bailey Decl. ¶¶ 28-30 (Member I), ¶¶ 41-44 (Member K).

### iii. Threatening to withhold federal funding to ensure preferred viewpoints is antithetical to the First Amendment.

Government officials are prohibited from relying on the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). But the Title VI Documents penalize protected information and ideas by threatening enforcement, including the termination of federal funds and legal action, against schools that engage in speech protected by the First Amendment. Certification at 2-3. In addition, ED solicits information for enforcement against schools via the EndDEI portal, which invites members of the public to report schools that promote "divisive ideologies and indoctrination."[17] NAACP members' schools would be significantly harmed by such enforcement. For example, without that funding, around 24,000 students in the Montgomery County Public Schools in Maryland would lose access to special education services. Johns Decl. ¶ 121. The promise of similar cuts and legal action can only be understood as a "means of coercion" to facilitate the suppression of speech the government disfavors in violation of the First Amendment. *See Vullo*, 602 U.S. at 189.

---

[17] *EndDEI, supra* note 5.

### b. The Title VI Documents Are Unconstitutionally Vague in Violation of Fifth Amendment Due Process.

A rule is vague in violation of the Due Process Clause of the Fifth Amendment if it either fails to give "fair notice of conduct that is forbidden or required," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), or if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see* U.S. Const. amend. V. Laws that impose penalties, including rules imposing administrative and civil consequences, must satisfy Fifth Amendment Due Process, *see, e.g.*, *FCC v. Fox Television Stations*, 567 U.S. at 253-54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048-51 (1991) (state bar rule). When, as here, the rule also "interferes with the right of free speech and of association, a more stringent vagueness test" applies. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). Vague laws imposing penalties may also be set aside pursuant to the APA, which deems final agency action unlawful if it is contrary to constitutional rights. 5 U.S.C. § 706(2)(B). Because students possess a liberty interest in their right to receive information, and because standing requirements are relaxed for First Amendment claims, students have standing to challenge a vague rule that infringes upon their right to receive information. *See Arce v. Douglas*, 793 F.3d 968, 987-89 (9th Cir. 2015).

### i. The Title VI Documents are unconstitutionally vague because they do not provide notice of what conduct is prohibited.

The Title VI Documents are void for vagueness because they fail to provide recipients of federal funding with adequate notice of the prohibited conduct. Although a rule need not display "mathematical certainty" to avoid vagueness concerns, *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972), it nonetheless must provide sufficient "statutory definitions, narrowing context" or reference to terms with "settled legal meanings" to ensure its meaning is not open to "wholly subjective" judgments. *United States v. Williams*, 553 U.S. 285, 306 (2008). The Title VI

Documents are tainted by ambiguous terms open to "wholly subjective" judgments, making it impossible for people of ordinary intelligence—including decisionmakers at schools—to pinpoint exactly what the Documents prohibit. *Hill*, 530 U.S. 703.

Centrally, the Title VI Documents fail to define even their core concepts, including "diversity," "equity," "inclusion" or "DEI," instead only providing scattered examples of practices that may implicate those terms, including "privilege walks"—another term ED does not define. *See, e.g.*, FAQs at 6. The Title VI Documents also prohibit "racial considerations," "race-based decision-making," "racial preferences," and "race consciousness," without defining any of those terms. DCL at 1-2; FAQs at 1 n.2. Yet each is a term of art that could be used to refer to either practices that have been specifically prescribed by relevant case law or much more broadly to any program or policy that is meant to increase equity or opportunity for people of color. The same can be said of the Letter's undefined proscription against "using race" in any "aspect[] of student, academic, and campus life." DCL at 2. The cumulative result of these and other ambiguities is that the array of activities that might be prohibited under the Title VI Documents is vast. Federally funded schools must nevertheless act to avoid being defunded or subject to lawsuits.

These concerns are heightened by ED's conclusory and devastating enforcement actions, including against Harvard and Columbia University. *See supra* Statement of the Case, Section II. As a result, schools across the country have cut programming in an attempt to comply with the Title VI Documents. For example, one NAACP family's first grade student missed out on the 19th Annual African American Read-In when the Waterloo Community School District withdrew from the event and required teachers to return 800 copies of book "All Because of You" by Tami Charles because the book includes an image of a little boy looking at a Black Lives Matter poster; the

school district worried the book's imagery ran afoul of the Title VI Documents' vague and broad prohibitions. Graves Decl. ¶¶ 8-10.

### ii. The Title VI Documents are unconstitutionally vague because they are so standardless they invite arbitrary and discriminatory enforcement.

The Title VI Documents are also unconstitutionally vague because they create a risk of arbitrary and discriminatory enforcement by failing to "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108; *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018). "A vague law impermissibly delegates basic policy matters ... for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned,* 408 U.S. at 108-09. For many of the same reasons why the Title VI Documents fail to provide adequate notice, they also encourage arbitrary and discriminatory enforcement. The Documents are standardless, devoid of definitions, and open-ended; lack any objective parameters; and are premised on the assumption that schools are already engaged in discrimination.

The subjective nature of the Title VI Documents leaves government officials with no guidance on how to enforce the rules. *See* OCR Att'y Decl. Pls. Ex. 5, ¶¶ 13-14, 18-26, & 28. According to one former OCR attorney, the Title VI documents are "incredibly confusing and hard to understand" *Id.* at ¶ 24. Instead of straightforward guidance and interpretation of civil rights laws, the Title VI Documents are "full of "inflammatory rhetoric, and it [is] unclear what portions of the letter were meant to be legal guidance." *Id.* at ¶ 19. Pursuant to the mandates of the Title VI Documents, schools attended by NAACP members face the imminent threat of funding loss or legal action based on subjective whims, without due process or appropriate investigation. *Id.* at ¶ 24 ("Applying the [Title VI Documents] to any complaint . . . would be impossible. As such, enforcement of any such alleged violations would be arbitrary and completely dependent on each

OCR attorney's subjective interpretation of the guidance.") The Title VI Documents thereby give officials free rein to target those whose views they dislike.

### c.   The Title VI Documents violate the Administrative Procedure Act.

#### i.   The Title VI Documents are reviewable final agency action.

The Title VI Documents constitute "final agency action" subject to judicial review. 5 U.S.C. § 704. The Letter, FAQ, and Certification "'mark[] the consummation of the agency's decisionmaking process' and determine[] 'rights or obligations . . . from which legal consequences will flow." *Nat'l Council of Nonprofits v. OMB*, No. 25-239 (LLA), 2025 WL 368852 at *10 (D.D.C. Feb. 3, 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

An action marks the consummation of the agency's decisionmaking if the action "is properly attributable to the agency itself" and is not "informal, or only the ruling of a subordinate official, or tentative." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted). Here, the Title VI Documents were each signed or announced by Defendant Acting Assistant Secretary for Civil Rights Craig Trainor, who possesses the statutory authority to enforce civil rights laws on behalf of the agency. *See* 20 U.S.C. § 3413(a); *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020) (action is "properly attributable to the agency itself" when it is approved by "no mere subordinate" but, instead, the agency's principal advisor on the topic); *see also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 598 (6th Cir. 2024) (a Dear Educator Letter and Fact Sheet were the consummation of the agency's decision-making).

The Title VI Documents also determine "rights and obligations . . . from which legal consequences will flow" *Nat'l Council of Nonprofits*, 2025 WL 368852 at *10, because they announce an interpretation of Title VI that ED will enforce, and in fact has already enforced, in ways that are contrary to prior interpretations. *See Tennessee v. Dep't of Educ.*, 104 F.4th at 599

(Documents' statement that ED will "fully enforce Title IX" in a way that is "[c]onsistent with [its] analysis" "bind[s] the Department to a legal position and create[s] legal consequences"). The Letter and FAQs "provide[] notice of the Department's existing interpretation of federal law" which ED "will vigorously enforce," including by beginning to "assess compliance" no later than February 28. DCL at 2-3. [18] The Certification similarly requires recipients to affirm their compliance with the Letter and FAQs' mandates as a "material condition for the continued receipt of federal financial assistance" and to avoid significant legal consequences. Certification at 1, 3. This language not only binds ED's enforcement staff to carry out the Documents' mandates but coerces schools to comply by a date certain. It therefore "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.,* 578 U.S. 590, 598 (2016) (quoting *Bennett*, 520 U.S. at 178).

Finally, ED is "bas[ing] enforcement actions on the policies or interpretations" in the Documents and soliciting complaints of conduct that violates the Documents' prohibitions. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000); *see supra* Statement of the Case, Section II. Post-guidance events therefore show that ED has applied the guidance as if it were binding. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014).

### ii. The Title VI Documents were promulgated without observance of required procedures.

The Court should set aside the Title VI Documents as agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA sets different

---

[18] The Documents also provide specific safe harbors for schools and universities to avoid liability. For example, schools that "cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends" and "cease all reliance on third-party contractors, clearinghouses, or aggregators" to use such proxies will better comply with the Letter's mandates. DCL, *supra* note 1, at 3. The use of such safe harbors creates legal consequences for funding recipients. *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 599-600 (6th Cir. 2024).

procedural requirements for "legislative rules" and "interpretive rules": the former must be promulgated pursuant to notice-and-comment rulemaking; the latter need not. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015); *see also* 5 U.S.C. § 553(b)(A). The Title VI Documents are legislative rules under the standards articulated by courts: they have the "force and effect of law," and they set forth new law. *See Perez,* 575 U.S. 92; *Wheeler*, 955 F.3d 68.

First, the Letter requires schools to "*ensure* that their policies and actions comply," and "*cease* all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends." DCL at 3 (emphasis added.) The Letter was quickly followed by a requirement that each school certify its compliance with the law as stated by ED in the Title VI Documents. *See* Certification. The intent is clear that schools are to undertake a compliance search to identify and eliminate the activities described in the Letter and FAQs. Given the threat of the loss of funding and False Claims Act suits, schools have rushed to fall in line. Certification at 2-3. To reinforce that the Title VI Documents are binding, ED has taken swift enforcement action. *See, e.g.*, *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (legislative rules are "applied by the agency in a way that indicates [they are] binding"); *Ass'n of Flight Attendants-CWA v. Huerta,* 785 F.3d 710, 717 (D.C. Cir. 2015) (the most important factor in determining whether a rule is legislative is to examine "the actual legal effect (or lack thereof) of the agency action in question."). *See supra* Introduction; Statement of the Case.

Second, the Title VI Documents are legislative rules because they do not merely remind parties of existing statutory or regulatory duties but rather impose new obligations. OCR Att'y Decl. ¶¶ 20, 24. The Title VI Documents prohibit policies and practices that ED has long recognized to be not only permissible, but often necessary to ensure that Black students are

afforded equal educational opportunities. OCR Att'y Decl. ¶¶ 22-24. *See infra* Argument, Sec. I(c)(iv); OCR Att'y Decl. ¶ 21, 24.

Because the Title VI Documents are legislative rules, ED was required to give the public, including schools, parents and students of all races, notice and an opportunity to participate. Indeed, input from members of the NAACP would have been critical. Because the Title VI Documents were promulgated without notice and comment, "a court must set aside the Documents." *Tennessee v. Dep't of Educ.*, 104 F. 4th 577, 608 (6th Cir. 2024).

### iii. The Title VI Documents are contrary to constitutional rights under the First and Fifth Amendments.

The APA also provides that courts shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5. U.S.C. § 706(2)(B). Accordingly, the Title VI Documents violate the APA because, as discussed, *supra* Argument Sections I(a)-(b), (a) the Title VI Documents deprive NAACP members of their First Amendment rights to receive information and freely associate, and (b) because the Title VI Documents are unconstitutionally vague in violation of the Fifth Amendment.

In addition, the Title VI Documents violate the APA because they are contrary to the equal protection guarantee of the Fifth Amendment's Due Process Clause, which guarantees all persons equal protection under law and prohibits the government from treating any person differently on the basis of race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). A plaintiff may plead an equal protection violation by alleging (a) "that the government has expressly classified individuals based on their race," (b) "that the government has applied facially neutral laws or policies in an intentionally discriminatory manner," or (c) "that facially neutral laws or policies result in racially disproportionate impact and are motivated by a racially discriminatory purpose." *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 63 (D.C. Cir. 2016) (citations and quotations omitted). Courts

consider several non-exhaustive factors to identify discriminatory intent, including historical background, the specific sequence of events leading up to the policy change, departures from the normal procedural sequence, legislative history, and any disparate impact. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977).

The Letter "distributes burdens or benefits on the basis of individual racial classifications," *Parents Involved in Community Schools. v. Seattle School District No. 1*, 551 U.S. 701, 720 (2007), and otherwise evinces discriminatory intent where it casts "white and Asian students" as the victims of the problem the letter aims to solve: schools' unlawful racial discrimination; namely, "pervasive and repugnant race-based preferences" afforded for the benefit of non-Asian, non-white students—in other words, Black and Latinx students.

The Letter claims that the prohibited activities "deny students the ability to participate fully in the life of a school," DCL at 3, but then prohibits activities that enable Black students to participate fully in the life of their school and otherwise enjoy equal educational opportunities. Likewise, Title VI Documents' preoccupation with the guilt some students may feel when faced with a truthful recitation of our longstanding history of racial subjugation betrays that the Defendants' concern is not for Black students, whose well-being depends on having an opportunity to learn about that history. *See* FAQs at 7.

To the contrary, not only have the Defendants overlooked Black students' needs in an abdication of their responsibility to faithfully and objectively enforce anti-discrimination laws, they seek to leverage those laws in ways that violate controlling precedent and would harm Black students. For example, the Letter claims that civil rights laws prohibit using "non-racial information as a proxy for race and making decisions based on that information," then asserts, as an example, that "it would . . . be unlawful for an educational institution to eliminate standardized

testing to . . . increase racial diversity." DCL at 3. But, as explained below, those assertions about what civil rights laws require find no support in controlling precedent. Courts, including the Supreme Court, have repeatedly recognized that school districts may affirmatively work to eliminate aspects of admissions processes known to deny Black students an equal opportunity to compete for admission—such as racially biased standardized tests,[19] educator discretion[20] and application fees that dissuade economically disadvantaged students from applying.[21] Likewise, the Title VI Documents prohibit "using race in . . . admissions," DCL at 1-2, but requiring schools to redact any indicia of race from applications would prejudice applicants whose experiences are inextricably intertwined with race, including Black students, as the admissions officers would not

---

[19] *See* Amici Curiae Br. of Harvard-Radcliffe Black Students Ass'n, et al. in Supp. of Defs' Mot. for Summ. J. at 8-15, *SFFA v. Harvard*, No. 1:14-cv-14176-ADB (D. Mass. Aug. 3, 2018), ECF No. 471 (collecting research showing that, rather than measuring what they claim to measure, standardized tests such as the ACT assess cultural literacy; that is, how familiar the examinee is with the colloquial language commonly used in white middle class homes like those of the test creators, artificially depressing the test scores of Black and Latinx examinees). Indeed, research on the biased nature of the SAT led at least one Sixth Circuit Judge to recognize that standardized test scores are not objective measures of merit, stating that "the record indicates that LSAT scores are neither race-neutral or gender-neutral criteria for admissions decisions." *Grutter v. Bollinger*, 288 F.3d 732, 771 (6th Cir. 2002) (Clay, J., concurring), *aff'd*, 539 U.S. 306 (2003).
[20] *See, e.g.*, Jason A. Grissom & Christopher Redding, *Discretion and Disproportionality: Explaining the Underrepresentation of High-Achieving Students of Color in Gifted Programs*, 2 AERA OPEN 1 (2016) (Black students are less likely to be identified for gifted and talented programs when teachers exercise discretion over which students are screened); Hala Elhoweris et al., *Effect of Children's Ethnicity on Teachers' Referral and Recommendation Decisions in Gifted and Talented Programs*, 26 Remedial and Special Educ. 25-31 (2005) (white students receive higher referral rates than their minority counterparts, despite similar student descriptions).
[21] *See, e.g.*, C. S. Mott Children's Hospital, *Mott Poll Report: Pay-to-Participate: Impact on School Activities*, 33 Nat'l Poll on Childs.' Health 1, 1-2 (2019), https://mottpoll.org/sites/default/files/documents/031819_PayToParticipate.pdf (pay-to-participate fees disproportionately disadvantaged low-income children).

be able to fully consider those applicants' credentials, such as a longstanding history of leadership, service, and volunteerism as an NAACP member.[22]

In addition, the Title VI Documents claim that "a school cannot engage in . . . any . . . aspect of school life that allows one race but not another or otherwise separates students . . . based on race." FAQs at 5. While the affinity spaces that Black students often rely on to develop a sense of belonging and community are open to all, it is unclear whether the Defendants would allege that they "otherwise separate students based on race." *See id.* By threatening the existence of affinity spaces known to benefit Black students, the Title VI Documents discriminate against Black students.

The Title VI Documents also evince racially discriminatory intent by trafficking in pernicious stereotypes about Black intellectual and moral inferiority. *See, e.g.*, *Batson v. Kentucky*, 476 U.S. 79, 104 (1986) (prohibiting racial discrimination includes reliance on racial prejudice or stereotypes). Indeed, the Title VI Documents further the Trump administration's use of the terms "DEI," "racial preferences," and "racial balancing" as pejorative dog whistles to impugn the qualifications, competence, talents, and ethics of Black students as well as Black people generally.[23] By implying that Black students are the beneficiaries of widespread racial preferences,

---

[22] *See, e.g.*, Devon W. Carbado & Cheryl I. Harris, The New Racial Preferences, 96 Cal. L. Rev. 1139, 1162 (2008) (discussing difficulty for college applicants who racially identify to "come up with a meaningful account of [their] life without referencing race" and without "captur[ing] who [they] imagine[] [themselves] to be")); Elise Boddie, *The Indignities of Color Blindness*, 64 UCLA L. Rev. Discourse 64 (2016).

[23] *See* Melanie Mason, *Republicans Blame DEI for the LA Fires. This Fire Captain Disagrees*, Politico (Jan. 15, 2025), https://www.politico.com/news/2025/01/15/republicans-dei-la-fires-00198551; Julie Ingram & Alexander Hunter, *Some Republicans Attack Kamala Harris as "DEI Hire." Here's What That Means*, CBS News (July 26, 2024), https://www.cbsnews.com/news/republicans-attack-kamala-harris-dei-hire/ ("GOP Rep. Tim Burchett of Tennessee called Harris a 'DEI vice president,' a reference to diversity, equity, and inclusion efforts. Rep. Harriet Hageman of Wyoming called Harris a 'DEI hire' and referred to her as 'intellectually, just really kind of the bottom of the barrel.'").

ED furthers the slander that alleges that Black students lack the talent or work ethic to have earned their achievements on their own, thereby causing Black students dignitary and psychological harm.[24] *See Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1012 (11th Cir. 2018) (noting that a predominantly-white city's racially-motivated secession from a more diverse county school system sent "messages of inferiority," which could not have "escaped the [Black] children in the [C]ounty") (quoting *Wright v. Council of Emporia*, 407 U.S. 451, 466 (1972)); *Brown v. Bd. of Educ.*, 347 U.S. 483, 493-94 (1954) (recognizing "intangible" harms to Black students including "a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

In sum, these factors evince discriminatory intent in violation of the Fifth Amendment's guarantee of Equal Protection and must be set aside pursuant to 5 U.S.C. § 706(2)(b).

### iv.   The Title VI Documents are arbitrary and capricious.

The Title VI Documents also violate the APA because they are arbitrary and capricious. 5 U.S.C. § 706(2)(a). An agency action is arbitrary and capricious if it is not the product of "reasoned decisionmaking." *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441-42 (D.C. Cir. 2012). Because the Title VI Documents purport to address a problem without providing any

---

[24] *See* Gloria Wong, et al., *The What, the Why, and the How: A Review of Racial Microaggressions Research in Psychology*, 6:2 Race and Soc. Problems, 181, 181-- 200 (2014) https://doi.org/10.1007/s12552-013-9107-9 (Microaggressions are "subtle insults . . . directed toward racial minorities" that "sap the energy of recipients which impairs performance in multitude of settings."); *id.* ("[P]erceived stigmatization pertaining to gender, race, and sexual orientation is associated with depression and anxiety symptoms, decreased psychological wellbeing, lower selfregard, and physical health issues (e.g., higher blood pressure)."); Claude M. Steele, Whistling Vivaldi: And Other Clues to How Stereotypes Affect Us (2010) ("[S]tereotype threat" occurs when individuals fear that their performance on a task could confirm a negative stereotype about their racial (or other identity) group"); Gregory M. Walton & Steven J. Spencer, *Latent Ability: Grades and Test Scores Systematically Underestimate the Intellectual Ability of Negatively Stereotyped Students*, 20 Psychological Sci. 1132, 1132 (2009), https://doi.org/10.1111/j.1467-9280.2009.02417.x.

evidence that it exists, rely on vague criteria untethered to a legal or factual basis or reasoned analysis, fail to acknowledge or explain their novel interpretation of law, "depart from . . . prior policy *sub silentio*" without explanation, fail to consider that their past position may have "engendered serious reliance interests that must be taken into account," and fail to consider the ways the Title VI Documents interfere with applicable statutes and constitutional rights, they must be set aside. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 221-22 (2016); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

### 1. The Title VI Documents misstate facts and purport to address a problem without providing evidence that it exists.

The Title VI Documents are arbitrary and capricious because they purport to identify a problem but fail to provide any factual basis or reasoned analysis showing that the problem exists. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022); *Ass'n of Priv. Sector Colls.*, 681 F.3d at 448 (finding a regulation arbitrary and capricious "for want of adequate explanations").

For example, the Letter claims it is a false premise to teach that "the United States is built upon 'systemic and structural racism,'" that such instruction "acts to shame students of a particular race or ethnicity," and that instruction and programming that provides equal educational opportunities to Black students has discriminated against white and Asian students. DCL at 1-2; FAQs at 6-7. But the Letter provides no support for these conclusory factual assertions. Contrary to these claims, there is inconvertible evidence of racial oppression and white supremacy in the United States. Enslaved Black people were forced to provide free labor to white people for hundreds of years, were deemed by the Supreme Court in *Dred Scott v. Sanford* to be inferior to white people and "ha[ve] no rights which the white man was bound to respect," 60 U.S. 393, 407

(1857), and were subject to Jim Crow segregation for decades after the Emancipation Proclamation—segregation that was officially endorsed by the Supreme Court in *Plessy v. Ferguson*, 163 U.S. 537 (1896).

While the Title VI Documents assert, without evidence, that programming to help ensure equal opportunities for Black students harms white and Asian students, Black students continue to be denied equal educational opportunities. For example, Black students are over 2.8 times more likely to attend school in a chronically underfunded district than white and Asian American students.[25] "Black students are more likely to attend schools that have high percentages of novice teachers in almost every state across the country."[26] In addition, 58% of Black students attend majority minority schools,[27] which are denied high quality resources and facilities and often report significant disparities in academic outcomes.[28] And though Black students do not misbehave more

---

[25] Bruce D. Baker et al., The Adequacy and Fairness of State School Finance Systems 18, Sch. Fin. Data Database (6th ed. 2024), https://www.schoolfinancedata.org/the-adequacy-and-fairness-of-state-school-finance-systems-2024/.

[26] Press Release, EdTrust, As Districts Face Teacher Shortages, Black and Latino Students Are More Likely to Have Novice Teachers than Their White Peers (Dec. 15, 2021), https://edtrust.org/press-room/as-districts-face-teacher-shortages-black-and-latino-students-are-more-likely-to-have-novice-teachers-than-their-white-peers/.

[27] *Racial/Ethnic Enrollment in Public Schools* at 2, in The Condition of Education 2020 (Inst. Educ. Scis. 2020), https://nces.ed.gov/programs/coe/pdf/coe_cge.pdf.

[28] Roslyn Arlin Mickelson, *School Integration and K-12 Outcomes: An Updated Quick Synthesis of the Social Science Evidence*, Nat'l Coal. on Sch. Diversity (Oct. 2016) https://eric.ed.gov/?id=ED571629; Press Release, Ed. Trust, As Districts Face Teacher Shortages, Black and Latino Students Are More Likely to Have Novice Teachers Than Their White Peers (Dec. 15, 2021), https://edtrust.org/press-room/as-districts-face-teacher-shortages-black-and-latino-students-are-more-likely-to-have-novice-teachers-than-their-white-peers/; Chris Hacker et al., *Majority-Black School Districts Have Far Less Money to Invest in Buildings — and Students Are Feeling the Impact*, CBS News (Sept. 14, 2023), https://www.cbsnews.com/news/black-school-districts-funding-state-budgets-students-impact/; Roby Chatterji et al., *Closing Advanced Coursework Equity Gaps for All Students*, Ctr. for Am. Progress (Jun. 30, 2021), https://www.americanprogress.org/article/closing-advanced-coursework-equity-gaps-students/.

than other students,[29] Black students are disciplined at disproportionately higher rates[30] linked to

a wider achievement gap between Black and white students.[31]

Defendants have provided no facts to rebut this evidence, much less to show that programs

and instruction intended to remedy these disparities harm white and Asian students.  *See supra*

Argument, Section I(b). Defendants' "unsupported assertions" fail to provide "a rational

connection between the facts found and the choice made," and therefore cannot support ED's

decision-making. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.* 463

U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962));

*Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 605 (D.C. Cir. 2007).

### 2. The Title VI Documents misstate and contradict legal precedent under Title VI and the Equal Protection Clause, including the Supreme Court's decision in *SFFA v. Harvard*.

The Title VI Documents conflict with controlling precedent, under which most of the

prohibited activities are lawful. For example, the Title VI Documents characterize race-neutral

efforts to advance equal opportunity as unlawful, DCL at 3,[32] but *SFFA* did not concern race-

---

[29] Russell J. Skiba & Natasha T. Williams, Are Black Kids Worse? Myths and Facts About Racial Differences in Behavior: A Summary of the Literature 4, The Equity Project at Ind. Univ. (Mar. 2014), https://indrc.indiana.edu/tools-resources/pdf-disciplineseries/african_american_differential_behavior_031214.pdf; 2013–2014 Civil Rights Data Collection: A First Look 1, 3, Off. for C.R., U.S. Dep't of Educ. (2016), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf.

[30] Jayanti Owens & Sara S. McLanahan, *Unpacking the Drivers of Racial Disparities in School Suspension and Expulsion*, 98 Soc. Forces 1548 (May 19, 2021), https://doi.org/10.1093/sf/soz095.

[31] Francis A. Pearman et al., *Are Achievement Gaps Related to Discipline Gaps? Evidence From National Data*, 5 Am. Educ. Rsch. Ass'n Open (Oct. 2019) https://doi.org/10.1177/2332858419875440.

[32] Declaring, "Relying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systemic one. It would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity.").

neutral policies and practices.[33] In fact, the Title VI Documents directly contradict a long line of cases upholding the use of race-neutral measures to equalize educational opportunities at all levels of education. *See, e.g.*, *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 545 (explaining that "race may be considered in certain circumstances and in a proper fashion," and quoting Justice Kennedy's opinion in *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788-89 (2007) (Kennedy, J., concurring in part and concurring in judgment), recognizing that "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods."); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose' however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (citation omitted).

Nothing in *SFFA* purported to overrule this controlling precedent. Indeed, since *SFFA*, courts have continued to uphold race-neutral changes to admissions policies to remedy the under-identification of Black and Latinx students for selective programs with no objection from the Supreme Court. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (2023), *cert. denied*, 218 L. Ed. 2d 71, 2024 WL 674659 (U.S. Feb. 20, 2024); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 61 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15, 2024 WL 5036302 (U.S. Dec. 9, 2024) ("[W]e find no reason to conclude that [*SFFA*] changed the law

---

[33] *See generally Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023).

governing the constitutionality of facially neutral, valid . . . admissions policies under equal protection principles.").

The Title VI Documents also characterize diversity, equity, and inclusion efforts as illegal "discriminatory practices." DCL at 2. But courts have routinely upheld the legality of diversity, equity, and inclusion efforts, including diversity statements, anti-bias trainings, targeted recruiting, and aspirational diversity goals. *See, e.g.*, *Johnson v. Metro. Gov't of Nashville*, 502 F. App'x 523, 535 (6th Cir. 2012); *Bissett v. Beau Rivage Resorts*, 442 F. App'x 148, 152-53 (5th Cir. 2011); *Mlynczak v. Bodman*, 442 F.3d 1050, 1054, 1058 (7th Cir. 2006); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 594 (E.D. Pa. 2020); *Young v. Colo. Dep't of Corr.*, No. 22-cv-00145-NYW-KLM, 2023 WL 1437894 (D. Colo. Feb. 1, 2023); *Vavra v. Honeywell Int'l Inc.*, 688 F. Supp. 3d 758 (N.D. Ill. 2023); *Duffy v. Wolle*, 123 F.3d 1026, 1038-39 (8th Cir. 1997), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

The Letter states that diversity cannot be a compelling interest pursuant to the Supreme Court's decision in *SFFA,* DCL at 2. However, *SFFA* (a) did not concern race-neutral measures, and (b) did not overrule decades of precedent holding that the educational benefits of diversity are a compelling government interest.[34] Although the Supreme Court found that the particular race conscious admissions policies at issue in *SFFA* were not sufficiently narrowly tailored to this interest, the Supreme Court affirmed the educational benefits of diversity as "plainly worthy" "commendable goals." *SFFA*, 600 U.S. at 213-15. And while the Title VI Documents suggest that race cannot be considered at all in admissions, *see, e.g.* DCL at 2, the Supreme Court made clear that "nothing in this opinion should be construed as prohibiting universities from considering an

---

[34] *See, e.g.*, *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 311-13 (1978); *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013); *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 380 (2016).

applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *SFFA*, 600 U.S. at 230. ED has provided no explanation for its deviation from clearly established law.

### 3. The Title VI Documents fail to provide a reasoned explanation for their departure from ED's longstanding position.

The Title VI Documents ignore and conflict with years, sometimes decades, of ED's past guidance and positions pertaining to civil rights enforcement. This is no accident—ED's promulgation and enforcement of the Documents is, per ED's own press release, intended to "reorient civil rights enforcement."[35] But ED's "depart[ure] from . . . prior policy *sub silentio*," *FCC v. Fox Television Stations*, 556 U.S. at 515, and failure to acknowledge this change in practice and direction renders the Title VI Documents arbitrary and capricious. *See Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 33 (D.D.C. 2019).

For example, to the extent the Title VI Documents' vague pronouncements can be understood, they are likely to be read to prohibit diversity, equity, and inclusion programs and instruction, including culturally-responsive instruction and social-emotional learning. DCL at 2-3; FAQs at 6, Certification at 3. But this prohibition conflicts with past ED guidance, including resolution agreements that embrace diversity, equity, and inclusion activities and statements by former Secretary of Education Betsy Devos.[36] In an address to her staff, Secretary Devos advised

---

[35] Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education, *supra* note 7.

[36] Off. for C.R., U.S. Dep't of Educ., Fact Sheet: Diversity and Inclusion Activities Under Title VI 1-2 (Jan. 2023), https://web.archive.org/web/20241203144143/https://www.ed.gov/sites/ed/files/about/offices/list /ocr/docs/ocr-factsheet-tvi-dia-202301.pdf; see, e.g., Grants/Cibola County Schools Resolution Agreement, OCR Case No. 08-19- 1269 (Sept. 18, 2020) (to remedy patterns of discrimination against Native American students, district agreed to conduct a self-assessment of racial equity in gifted and talented education); East Side Union High School District Resolution Agreement,

that "embracing diversity and inclusion are key elements of success" and highlighted the importance of encouraging students to embrace diversity.[37] Moreover, ED's new position conflicts with Congressional intent to embrace diversity, equity, and inclusion activities as consistent with public education goals and ED's Title VI mandates.[38]

The Title VI Documents prohibit instruction concerning "systemic and structural racism," DCL at 2, but in the past ED proposed and agreed that a school redresses Title VI violations in part by adopting "diverse and global education."[39] ED has also, for decades, "consistently maintained that the statutes that it enforces are intended to protect students from invidious discrimination, not to regulate the content of speech."[40]

The FAQs state that it is unlawful for schools to "engage in any programming, graduation ceremonies, housing, or any other aspect of school life that allows one race but not another or otherwise separates students, faculty, or staff based on race" but does not explain what, in particular, "otherwise separates" students or faculty means. FAQs at 5. The FAQs also originally stated that it is unlawful for schools to engage in programming that "discourages members of all

---

Case No. 09-14-1242 (to remedy racially disparate discipline of Black, Latino, and LEP students, district agreed to establish Equity Committee).

[37] Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term, N.Y. Times* (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/trump-diversity-education-department.html.

[38] *See, e.g.*, 20 U.S.C. § 7231(a)(4)(A), § 7231(a)(4)(C), § 7231b(3) (the purpose of the Magnet Schools Assistance Program is, inter alia, to "desegregate and diversify schools").

[39] Lawrence Budd, *Lebanon Schools Pay $150,000 to Settle Racial Discrimination Case*, Dayton Daily News (Aug. 29, 2017), https://www.daytondailynews.com/news/local-education/lebanon-schools-pay-150-000-settle-racial-discrimination-case/LkyN5pCuMeKYOdNfPCJsaO/.

[40] Off. for C.R., U.S. Dep't of Educ., First Amendment: Dear Colleague Letter (July 28, 2003), https://web.archive.org/web/20250201021450/https://www.ed.gov/about/offices/list/ocr/firstamend.html.

races from attending," but did not explain what conduct would discourage such attendance.[41] This prohibition also contradicts past ED guidance, which states that as long as programming is open to all, schools "likely ha[ve] not adversely impacted students based on an individual's race or violated Title VI."[42] The FAQs were then revised, without notice, after April 7 to remove the language requiring that schools consider whether programming "discourages" attendance by students of all races, creating additional uncertainty about ED's position and the permissibility of these programs.[43]

The Title VI Documents prohibit "using race in decisions pertaining to . . . discipline" and describe the use of bias response teams and mandatory trainings as unlawful discrimination. FAQs at 7, DCL at 2. They similarly prohibit the use of race in "all . . . aspects of student, academic, and campus life," including hiring, promotion, scholarships, and housing. DCL at 2. However, ED has required schools to collect data on racial disparities for decades, has ordered schools to regularly analyze racial disparities to remedy and prevent the recurrence of Title VI violations, and has used data on racial disparities to assess Title VI compliance and recommend appropriate remedies,

---

[41] Off. for C.R., U.S. Dep't of Educ., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act 9, pg. 6, Internet Archive, https://web.archive.org/web/20250303101352/https://www.ed.gov/media/document/frequently-asked-questionsabout-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf.

[42] Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter on Race and School Programming 11 (Aug. 24, 2023), https://web.archive.org/web/20250122000106/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-20230824.pdf (last updated Jan. 22, 2025).

[43] ED made several changes to the text of the FAQs sometime after April 7, 2025, but did not re-issue the document nor announce these changes. The updated FAQs do not include an issue date. *Compare* FAQs at 10 *with* Off. for C.R., U.S. Dep't of Educ., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act at 9 (Jan. 2023), https://web.archive.org/web/20250303101352/https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf.

including mandatory trainings and school-based teams to address bias.[44] In addition, ED has generally embraced the consideration of race to understand and redress racial disparities in educational opportunity. For example, 2014 ED guidance states that when schools work proactively to identify and address the root causes of racial disparities, including by considering race, they are "less likely to be violating Title VI" and may instead "identify and remedy a violation on their own."[45] ED's longstanding position is consistent with controlling precedent. *See infra* Argument Section I(c)(2).

The Title VI Documents even prohibit schools from using race-neutral measures or relying on non-racial information to equalize educational opportunities. DCL at 3. But past ED guidance and resolution agreements are replete with examples of ED permitting, and even requiring, schools to adopt race-neutral measures to advance equal educational opportunity.[46] For example, recent ED guidance stated that schools may lawfully ensure equal admissions opportunities by admitting all students from community colleges or who graduate with a certain GPA, and a 2018 resolution

---

[44] Off. for C.R., U.S. Dep't of Educ., Resource on Confronting Racial Discrimination in Student Discipline (May 26, 2023), https://www.justice.gov/d9/press-releases/attachments/2023/05/26/tvi-student-discipline-resource-202305_0.pdf ; *see, e.g.,* Victor Valley Union High School District Resolution Agreement, OCR Case No. 09-14-5003 (Aug. 16, 2022); Davis School District, Farmington, UT Agreement/Findings (Oct. 21, 2021); East Side Union High School District Resolution Agreement, OCR Case No. 09-14-1242.

[45] Off. of C.R., U.S. Dep't of Educ., October 2014 Fact Sheet: Ensuring Students Have Equal Access to Educational Resources Without Regard to Race, Color, or National Origin at 2, https://web.archive.org/web/20250315161230/https://dese.ade.arkansas.gov/Files/20210204160958_OCR-Ensuring-Students-Have-Equal-Access-to-Educational-Resources.pdf ; *see also* Off. of C.R., U.S. Dep't of Educ., January 2001 Dear Colleague Letter on Racial and Ethnic Disparities in Access to Educational Resources at 2-3, https://web.archive.org/web/20250201010530/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-200101-title-vi.pdf.

[46] *See, e.g.*, Off. for C.R., U.S. Dep't of Educ., Guidance of Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools at 6, 9-13. (Dec. 2, 2011), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/guidance-ese-201111.pdf.

agreement required a school district to revise its gifted and talented eligibility criteria to remedy racial disparities in access.[47]

ED fails to display any awareness that it is dismantling longstanding policy positions, much less "show that there are good reasons for [this] new policy." *FCC v. Fox Television Stations*, 556 U.S. at 515. This is especially concerning because ED's position on programming to support equal educational opportunities has remained consistent across decades. *See Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1439 (D.C. Cir. 1983) ("elimination of such a longstanding policy thus prompts this court to scrutinize more closely the [agency's] proffered explanations for its actions"). Defendants' sweeping and unsupported departures from longstanding ED positions, without explanation, render the Title VI Documents arbitrary and capricious.

### 4. The Title VI Documents fail to consider NAACP members and schools' reliance interests or how the Documents undermine the goals of Title VI and harm Black students.

"When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30. This is especially true, where, as here, schools and NAACP members have relied on ED guidance that has been consistent throughout the decades. *See Off. of Commc'n of United Church*, 707 F.2d at 1439 (agency's "elimination" of a policy that governed "for almost 50 years" required the court "to scrutinize more closely the [agency's] proffered explanations for its actions").

---

[47] Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina*, https://drive.google.com/file/d/17CqAxzgR74AT9-i2JNkk-GolEy4YROjQ/view at 6; Grants/Cibola Resolution Agreement, OCR Case No. 08-19-1269 (Sept. 17, 2020).

The Defendants have disregarded how the Title VI Documents, and their actions in furtherance of the Title VI Documents, have and will continue to upset NAACP members' longstanding reliance interests. Indeed, as explained more fully in the Section IV.E of the Complaint, which is incorporated by reference here, NAACP members have invested significant time and resources to ensure that all students, including Black students, are afforded an equal opportunity to get an education. *See, e.g.*, Lewis Decl. ¶¶ 5, 7, 10-11; Johns Decl. ¶¶ 5-17; Bailey Decl. ¶¶ 6-8; Graves Decl. ¶¶ 5-7, 10. In particular, NAACP members have fought to (a) eliminate unfair obstacles that deny Black students an equal opportunity to compete for admission to selective programs[48], (b) correct the exclusion of the Black history (which includes our country's longstanding history of racial subjugation) from our curricula[49], and (c) establish programs and policies that combat racial discrimination and foster a sense of belonging in Black students.[50] ED's policy change undermines those efforts and has already reversed much of the modest progress towards equal opportunity that those efforts have yielded.

Defendants fail to consider how prohibiting efforts to ensure selective admissions processes are fair will exacerbate the denial of equal opportunity to Black students.[51] Defendants

---

[48] *See* Compl. ¶ 71.

[49] Compl. ¶ 79.

[50] Compl. ¶ 93.

[51] For example, nationwide, our public schools fail to identify 63-74% of gifted Black students for inclusion in gifted and talented programs for known, correctable reasons. Marcia Gentry et al., *Systemic Inequities in Identification and Representation of Black Youth with Gifts and Talents: Access, Equity, and Missingness in Urban and Other School Locales*, 59 Urb. Educ. 1730, 1762 (2022), https://doi.org/10.1177/00420859221095000. And as of Fall 2023, Black students were 13.9% of U.S. public high school graduates, but just 5.01% of students enrolled in large, selective public colleges, while white students were 47.5% of U.S. public high school graduates and 55.68% of students enrolled in large, selective public colleges. U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, Table 219.30: Public high school graduates, by race/ethnicity: School years 1998-99 through 2022-23, https://nces.ed.gov/programs/digest/d24/tables/dt24_219.30.asp?current=yes (last visited Apr.

likewise fail to consider how the removal of instruction on systemic racism harms Black students. Instruction that develops a proper understanding of systemic racism is central to the "normative developmental process of [Black] adolescents" and facilitates positive coping responses including "the adoption of healthy racial identity beliefs," "a positive view of one's racial group and an understanding of the role that racism plays in society."[52] In contrast, the omission of instruction about the histories of Black people works numerous adverse effects on Black students, including harming their self-esteem, motivation, sense of belonging, academic performance, and graduation rates.[53] Defendants also fail to consider how chilling programs that combat racial discrimination and promote a sense of belonging harms Black students and contributes to a racially hostile school environment. For example, absent programs that affirm Black students' identities, "[u]ncertainty about belonging, especially when chronic, can undermine [their] performance and health."[54] This is especially concerning because Black youth, including NAACP members, are already at greater risk of experiencing racial discrimination than their peers and must expend cognitive energy

---

19, 2025). Fall 2023 university enrollment statistics are updated from a 2018 Demos study of 67 large public universities with Fall 2023 data from the National Center for Education Statistics. Mark Huelsman, Social Exclusion: The State of State U for Black Students, Demos (Dec. 12, 2018), https://www.demos.org/research/social-exclusion-state-state-u-black-students; Nat'l Ctr. for Educ. Stat., College Navigator, https://nces.ed.gov/collegenavigator/ (data gathered from compiling data gathered in searches of individual colleges).

[52] Robert M. Sellers et al*., Racial Identity Matters: The Relationship between Racial Discrimination and Psychological Functioning in African American Adolescents*, 16 J. Rsch. on Adolescence 187, 189 (June 2006), https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1532-7795.2006.00128.x.

[53] Blessing Ngozi Iweuno et al., *Impact of Racial Representation in Curriculum Content on Student Identity and Performance*, 23 World J. Advanced Rsch. and Revs. 2913, 2914-15 (2024), https://doi.org/10.30574/wjarr.2024.23.1.2280.

[54] Gregory M. Walton & Geoffrey L. Cohen, *A Brief Social-Belonging Intervention Improves Academic and Health Outcomes of Minority Students*, 331 Sci., 1447, 1447 (Mar. 18, 2011), https://doi.org/10.1126/science.1198364.

processing discrimination, rather than spending that energy on learning and development.[55] In addition, race-neutral changes to school discipline policies, including those adopting restorative justice practices, reduce racial discrimination in the administration of discipline.[56] But without such programs, it is well-documented that students of color, particularly Black students, are subject to harsher and more frequent school discipline.[57]    By imposing restrictions that inflict and exacerbate harms to Black students, ED frustrates Title VI's purpose to redress discrimination on the basis of race, 42 U.S.C. § 2000d, and disregards schools' longstanding obligations to remedy and prevent a hostile environment under Title VI. The Title Documents thus interfere with schools and universities' administration of Title VI.

### v. The Title VI Documents exceed the Education Department's authority under Title VI and laws prohibiting federal interference with curricula.

The Title VI Documents also violate the APA by "exce[eding] [ED's] statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). To determine if a final agency action exceeds

---

[55] Sellers et al., *supra* note 53, at 188 (2006); Gillian Scott-Ward, *Moving Past Racist Grooming Standards Terrorizing our Children*, Medium (Jan. 10, 2019), https://medium.com/@gillianscottward/moving-past-racist-grooming-standards-terrorizing-our-children-40df73b9ecb3.

[56] Nat'l Educ. Pol'y Ctr. The Starts and Stumbles of Restorative Justice in Education: Where Do We Go from Here? 3 (2020), https://nepc.colorado.edu/sites/default/files/publications/Revised%20PB%20Gregory 0.pdf [https://perma.cc/C6LEQBS6].

[57] Nora Gordon, Disproportionality in Student Discipline: Connecting Policy to Research, Brookings Inst. (Jan. 18, 2018), https://www.brookings.edu/articles/disproportionality-in-student-discipline-connecting-policy-to-research/; *see, e.g.,* Kirsten Weir, *Inequality at School: What's Behind the Racial Disparity in Our Education System?*, 47 Am. Psych. Ass'n. 42 (2016), https://www.apa.org/monitor/2016/11/cover-inequality-school; *See* Erin Hinrichs, *Minnesota Educators Weigh in on Student Discipline Debate Unfolding in D.C.*, MinnPost (Dec. 5, 2017), https://www.minnpost.com/education/2017/12/minnesota-educators-weigh-student-discipline-debate-unfolding-dc/ [https://perma.cc/S25S-SM54]; Joint "Dear Colleague" Letter from the U.S. Dep't of Educ. & U.S. Dep't of Just. (Jan. 8, 2014), https://web.archive.org/web/20250409163856/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf.

statutory authority, courts "always [ask] whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

The Department of Education Organization Act prohibits ED's Secretary or officers from "exercis[ing] any direction, supervision, or control over the curriculum [or] program of instruction . . . of any educational institution, school, or school system, . . . or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law." 20 U.S.C. § 3403(b).[58] But the Title VI Documents dictate schools' curricula and instructional materials, including by barring instruction on systemic racism and instruction or "programming that acts to shame students of a particular race or ethnicity." DCL at 2, FAQs at 6. This overreach exceeds "what Congress has permitted [ED] to do." *Arlington*, 569 U.S. at 298.

Congress authorizes ED to enforce Title VI, which provides that no student "shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefit or, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. But ED exceeds this authority by weaponizing an unsupported interpretation of Title VI to forbid schools from considering race in ways that remain lawful, if not

---

[58] *See also* Prohibitions on Federal Government and Use of Federal Funds, 20 U.S.C. § 7907 (prohibiting the use of federal funds "to endorse, approve, develop, require, or sanction any curriculum . . . designed to be used in an elementary school or secondary school" and states that no part of the Act authorizes "an officer or employee of the Federal Government . . . to mandate, review, or control a State, local educational agency, or school's instructional content, curriculum, and related activities"); Prohibition Against Federal Control of Education, 20 U.S.C. § 1232a ("No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system.").

necessary, under Title VI. *See infra* Argument, Section I(c)(2)-(3). This novel, unsupported interpretation forces schools to choose between compliance with the Title VI Documents or compliance with the longstanding ED guidance on which those schools have come to reply. Defendants' actions thus disregard and undermine schools' obligation to remedy and prevent a hostile environment on the basis of race and directly contradicts ED's mandate to enforce Title VI. *See infra* Argument, Section I(c)(2)-(4). ED is acting, therefore, "beyond [its] jurisdiction" as "authoritatively prescribed by Congress." *Arlington*, 569 U.S. at 297.

By violating the equal protection guarantee of the Fifth Amendment's Due Process Clause (and causing federally funded educational institutions to do the same), as explained above, *infra*, Argument, Section I(c)(iii)(4), I(c)(iv), the Title VI Documents also violate Title VI, which prohibits federally funded institutions from discriminating based on race. *See* 42 U.S.C. § 2000d.

## II.   Absent court intervention, NAACP members will suffer imminent, irreparable harm that outweighs any harm to Defendants.

If the Title VI Documents are not enjoined, NAACP members will suffer the imminent, irreparable harm of being denied: (1) multiple constitutional freedoms; (2) the loss of the right to notice and comment,[59] and (3) policies and programs that ensure Black students are afforded equal educational opportunities, including (a) instruction and programming concerning systemic racism and Black history and culture, (b) supportive spaces that help Black students foster a healthy sense of belonging, (c) services geared towards supporting marginalized students, and (d) an equal opportunity to compete for admission to selective programs. Unfortunately, in addition to the dignitary harms described above, *infra*, Argument, Section I(c)(iii) and as explained more fully in Section IV.E of the Complaint, which is incorporated by reference here, this deprivation will result

---

[59] Lewis Decl. ¶ 9 (attesting that NAACP would have commented on the Title VI documents had it been afforded an opportunity to do so).

in grave harm to the well-being of Black students, including NAACP members, such as harms to their motivation, sense of belonging, academic performance, graduation rates, psychological wellbeing, and immune function and health.[60]

"[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Moreover, the only proof of injury required for declaratory and injunctive relief against the threatened invasion of a constitutional right is the threatened constitutional deprivation itself. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). "As [the D.C. Circuit] ha[s] held previously, there is a 'presumed availability of federal equitable relief against threatened invasions of constitutional interests.'" *Id.* (citing *Hubbard v. EPA*, 809 F.2d 1, 11 (D.C. Cir. 1986)).

In addition, "[a] party experiences actionable harm when 'depriv[ed] of a procedural protection to which he is entitled' under the APA," such as the ability to participate in notice and comment procedures. *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)). *See NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 19 (D.D.C., 2020) (holding that a failure to comply with notice and comment procedures "is sufficient to show irreparable harm" for injunctive relief). "If such were not the case, 'section 553 would be a dead letter.'" *N. Mariana Islands*, 686 F. Supp. 2d at 17 (quoting *Sugar Cane Growers Coop. of Fla.*, 289 F.3d at 95).

---

[60] Blessing Ngozi Iweuno et al., *supra* note 54; DeLeon L. Gray et al., *Black and Belonging at School: A Case for Interpersonal, Instructional, and Institutional Opportunity Structures*, 53 Educ. Psych. 97, 101 (2018), https://doi.org/10.1080/00461520.2017.1421466; Walton & Cohen, *supra* note 55 ("Uncertainty about belonging, especially when chronic, can undermine minorities' performance and health").

Finally, the Title VI Documents have harmed and will imminently cause further harm to NAACP members by depriving them of policies and programs that ensure Black students are afforded equal educational opportunities. For example, because the Virginia Beach City Public Schools are suspending programs that do not comply with the Title VI documents, Member J expects her daughter will lose the African American culture club at her high school, which has provided critical community and support given the racial harassment she otherwise faces at school, and that the African American history course she has been eager to take will similarly be cancelled. Bailey Decl. ¶¶ 34-37 (Member J). Member C fears that their children's current history curriculum, which includes discussions of systemic and structural racism and truthful accounts of African Americans and Native Americans will be cut in an effort to comply with the Title VI documents. Johns Decl. ¶¶ 57-59. Members A, B, C, and E fear that the restorative justice practices and programs that have addressed racial disparities and improved the climate at their children's schools will be discontinued in an effort to comply with the Title VI Documents, similar to ED's unilateral termination of an agreement to address racial disparities in discipline in North Dakota.[61] Johns Decl. ¶¶ 40-41, 50-52, 73-78, 107-09. Finally, Member F expects that her daughter will lose two scholarships she has been awarded because they are designed to support students from disadvantaged and diverse backgrounds, and other similar scholarships have been cancelled in response to the Title VI Documents.[62] *Id.* ¶ 20. Without this funding, Member F may no longer be able to afford her daughter's tuition. *Id.*

---

[61] *See* Annie Ma & Sarah Raza, *Education Department Withdraws from Plan to Address Discipline Disparities for Native Students,* Associated Press (Apr. 10, 2025), https://apnews.com/article/school-civil-rights-dei-dakota-a98f3f943c6e580b8044c602e5580f38.

[62] John Wisely, *U-M Alumni Association End Diversity Scholarship Program*, Detroit Free Press (Mar. 21, 2025), https://www.freep.com/story/news/education/2025/03/21/u-m-alumni-association-ends-diversity-scholarshipprogram/82588500007/.

Plaintiff's irreparable harm also readily establishes the NAACP's standing on behalf of its members. "Irreparable harm' is a higher burden than that necessary to establish Article III standing." *U.S. Postal Serv.*, 496 F. Supp. 3d at 11 (citing *Nat'l Res. Def. Council, Inc. v. EPA*, 383 F. Supp. 3d 1, 11 (D.D.C. 2019)). The NAACP, which has members in all fifty states, also meets the requirements for associational standing.[63] *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013); *see also Parents Involved in Cmty. Schs.*, 551 U.S. at 718-19 (plaintiff organization had associational standing to bring the claims of members seeking relief from injury to their children); *Pub. Citizen v. FTC*, 869 F.2d 1541, 1550 (D.C. Cir. 1989) (same). In addition, where NAACP members assert irreparable harm caused by Defendant's regulation of third parties, such harms are the direct result of "the predictable effect of Government action on the decisions of third parties." *See, e.g.*, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 24 (D.D.C. 2020) (citing *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). It is "reasonably predictable" that schools faced with the risk of devastating federal funding cuts and legal action will comply with the Title VI Documents' likely interpretation, despite the fact that doing so requires cutting lawful programs and inflicting harm on NAACP members and other students. *Whitman-Walker Clinic*, 485 F. Supp. 3d at 24.

### III. Enjoining the Title VI Documents will not unduly or substantially harm other parties but will benefit the public interest.

Neither Defendants nor the public at large has any legitimate injury that overcomes Plaintiff's interest in preliminary relief. When considering a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the

---

[63] NAACP, *Working in Your Region*, https://naacp.org/our-work/working-your-region (last visited Apr. 20, 2025).

granting or withholding of the requested relief," while paying "particular regard for the public consequences" of entering or withholding injunctive relief. *Winter*, 555 U.S. at 24 (citations omitted). When the government is the defendant, those inquiries merge, resulting in a balancing that turns on the public interest. *Nken v. Holder*, 556 U.S. 418, 435-36 (2009).

Where, as here, constitutional rights have been violated, those merged factors favor relief. *Turner v. U.S. Agency for Glob. Media,* 502 F. Supp. 3d 333, 386 (D.D.C. 2020) ("government actions in contravention of the Constitution are always contrary to the public interest"). Indeed, "the public interest favors a preliminary injunction whenever First Amendment rights have been violated." *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), but "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id*. (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also N. Mariana Islands*, 686 F. Supp. 2d at 21 (specifically applying this to the Administrative Procedure Act). Thus, the Court does not need to look any further than the illegality of the Title VI Documents to conclude that the balance of equities and the public interest favor an injunction.

But if the Court does wish to consider the public interest, the balance clearly weighs in favor of Plaintiff. The Title VI Documents have and will continue to deny NAACP members truthful and inclusive curricula, programs that foster a sense of belonging and prevent discrimination, and policies that equalize access to educational opportunities. *See supra,* Statement of the Case, Section III; Argument, Section I. In contrast, a preliminary injunction will not substantially injure Defendants. ED will not spend any additional effort or incur any cost to allow

NAACP members to assemble in groups of their choice, to learn about the history of this country, or to celebrate their culture and heritage. On the contrary, it will require substantial effort and cost to enforce the prohibitions set forth in the Title VI Documents. Any harm the government might assert is outweighed by the protections of the APA and the Constitution.

A nationwide injunction is the appropriate remedy when regulations are declared unlawful under the APA. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation omitted) (We have made clear that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") An injunction may extend to parties not before the court where, as here, a rule of broad applicability is invalidated. *Id.* And because NAACP has members in every state, such relief is appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff's motion and issue a preliminary injunction consistent with that requested in the Proposed Order.

DATED: April 20, 2025.

Respectfully Submitted,

| | |
|---|---|
| Rachel Kleinman*<br>Katrina Feldkamp*<br>Allison Scharfstein*<br>Lauren Carbajal*<br>NAACP LEGAL DEFENSE AND<br>EDUCATIONAL FUND, INC.<br>40 Rector Street, 5th Floor<br>New York, New York 10006<br>(212) 965-2200<br>rkleinman@naacpldf.org<br>kfeldkamp@naacpldf.org<br>ascharfstein@naacpldf.org | /s/ *Katrina Feldkamp*<br>Jin Hee Lee, DC Bar No. 1740850<br>Michaele N. Turnage Young, DC Bar No. 242398*<br>Morgan Humphrey*<br>NAACP LEGAL DEFENSE AND<br>EDUCATIONAL FUND, INC<br>700 14th Street N.W., Ste. 600<br>Washington, D.C. 20005<br>(202) 682-1300<br>jlee@naacpldf.org<br>mturnageyoung@naacpldf.org<br>mhumphrey@naacpldf.org |

| lcarbajal@naacpldf.org | |
|---|---|
| | *Admission Pro Hac Vice Forthcoming* |
| | |

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Local Civil Rule 7(e), as it does not exceed forty-five pages, as well as the typeface requirements of Local Civil Rule 5.1(d), as it has been prepared using Microsoft Word in 12-point Times New Roman font.

Dated: April 20, 2025                    Respectfully submitted,

                                     */s/ Katrina Feldkamp*

                                     NAACP LEGAL DEFENSE &
                                     EDUCATIONAL FUND, INC.
                                     40 Rector Street, 5th Floor
                                     New York, NY 10006
                                     (212) 965-2200
                                     @naacpldf.org

                                     *Counsel of Record for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on April 20, 2025, this memorandum and accompanying motion, exhibits and proposed order were filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

Dated: April 20, 2025                    Respectfully submitted,

*/s/ Katrina Feldkamp*
_____

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
@naacpldf.org

*Counsel of Record for Plaintiff*

47