UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, et al.<br><br>*Defendants*. | Case No.: 1:25-cv-01120-DLF |

**DECLARATION OF FORMER OCR ATTORNEY**

I declare as follows pursuant to 28 U.S.C. § 1746:

1. I previously served as a General Attorney and Senior Attorney with the U.S. Department of Education (the "Department"), Office for Civil Rights ("OCR") from 2016 until 2025. I have worked as an enforcement attorney with an OCR regional office and as a policy attorney with the OCR Program Legal Group ("PLG").

2. I am submitting this Declaration in support of Plaintiff's Motion for a Preliminary Injunction of the February 14, 2025 Dear Colleague Letter and the accompanying Frequently Asked Questions document and certification requirement (collectively, "Title VI Documents").

3. I am no longer employed by the federal government, but I was employed by OCR at the time that the Title VI Documents were released.

4. OCR is charged with enforcing, and investigating alleged violations of, various federal civil rights laws that protect students against discrimination, including Title VI of the Civil Rights Act of 1964 ("Title VI"), Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, and the Boy Scouts of American Equal Access Act of 2002.

1

5. OCR's regional enforcement offices handle complaints of discrimination against entities that receive federal financial assistance from the Department ("recipients"). These entities include public elementary and secondary schools, public and private institutions of higher education, and libraries.

6. Complaints of discrimination are generally submitted by students, parents, other family members, teachers, staff, advocates, and any member of the public who believes that a recipient of federal financial assistance is discriminating against another person on the basis of race, color, national origin, sex, or disability status.

7. Some common Title VI issues that our enforcement office saw were allegations of discrimination on the basis of race, discrimination in administering school discipline for students of different races, race-based harassment, and disparities in the allocation of resources for students of different races.

8. In order to evaluate and investigate complaints of discrimination, OCR enforcement attorneys would conduct interviews with complainants, witnesses, and school staff; visit school sites; request records and data; conduct surveys; and review legal and policy guidance.

9. OCR cases are resolved through various processes. Prior to the conclusion of any investigation, recipients may request to voluntarily resolve allegations. Through this voluntary resolution process, the recipient and OCR negotiate and consent to a voluntary resolution agreement that would address any alleged violations. Enforcement attorneys then monitor these voluntary resolution agreements until they determine that the recipient has fully and effectively complied with the terms of the resolution agreement.

10. If OCR completes its investigation, OCR might issue a Letter of Finding detailing specific civil rights violations. After issuing a Letter of Finding, OCR and the recipient enter into

a resolution agreement to address each of the violations that OCR found. Enforcement attorneys then monitor these voluntary resolution agreements until they determine that the recipient has fully and effectively complied with the terms of the resolution agreement.

11. In the rare occasions where OCR finds a violation through its investigation and the recipient either refuses to enter into a resolution agreement or fails to uphold an agreement, the case would be referred to the Department of Justice to begin the process of terminating the recipient's access to federal financial assistance in accordance with the statutory terms of Title VI.

12. In addition to evaluating, investigating, negotiating, and monitoring cases, OCR enforcement attorneys also provide technical assistance to the general public and to recipients. Technical assistance includes conducting calls, delivering presentations, answering emails, and staffing hotlines to answer questions and help educate students, families, teachers, staff, and administrators about the laws that OCR enforces.

13. In both investigating cases and providing technical assistance, attorneys in all enforcement offices rely heavily on guidance documents produced by OCR to understand the specific requirements of each of the statutes that we enforce. These guidance documents include Dear Colleague Letters ("DCLs"), Frequently Asked Questions documents ("FAQs"), fact sheets, and internal memoranda. Many enforcement attorneys review relevant guidance documents prior to drafting memoranda and letters for cases.

14. Most of the attorneys in our office regularly referred to these documents to aid their work. As part of our technical assistance efforts, we often provided school districts, colleges, and universities with copies of OCR policy guidance documents, including DCLs and FAQs, to help educate them on relevant legal requirements.

15. In addition to my enforcement experience, I worked as a policy attorney within OCR's PLG. PLG serves as the policy shop for OCR and is the group of attorneys responsible for drafting regulations and sub-regulatory guidance documents, including Dear Colleague Letters, FAQs, and fact sheets.

16. In my time with PLG, I worked on several policy documents. The process for creating these documents was painstaking and took considerable amounts of time. Each document involved an intense process of drafting, revision, stakeholder listening sessions, feedback, and input across the agency, as well as clearance and review from other agencies, the Department of Justice, and the White House. All the documents I worked on took several months from origination to publication, and many of them took over a year to complete.

17. On February 14, 2025, OCR released a new Dear Colleague Letter ("February 14 DCL") interpreting Title VI and the Supreme Court's decision in *Students for Fair Admissions Inc. v. President and Fellows of Harvard College* ("*SFFA*").

18. The release of the February 14 DCL was a surprise to me and the rest of my office. When it was released, I had a difficult time understanding what this letter meant for enforcement. The tone of the letter was markedly different than any other Dear Colleague Letter issued during my time at OCR.

19. The letter included inflammatory rhetoric, and it was unclear what portions of the letter were meant to be legal guidance. The letter implied that all "DEI" programs were impermissible discrimination, but the letter included no workable definition of "DEI." The discussion around "DEI" in the letter was so vague that it was difficult to discern any clear standards that we were meant to apply in our casework. Additionally, the letter made references to curricula and instructional topics that may or may not be impermissible, but it was entirely unclear

what Title VI standards we were supposed to apply to curricula, an area in which the Department usually has limited jurisdiction.

20. The February 14 DCL also created significant areas of confusion for me and my colleagues because it significantly contrasted with our past guidance documents and with relevant case law. The departure from past guidance was so drastic that it seemed to be announcing new agency priorities and new rules under the law.

21. To start, the February 14 DCL's discussion of *SFFA* seemed to deviate from the Supreme Court's decision in that case. In one section, the February 14 DCL discusses the impermissibility of making race-neutral changes to school policies. The February 14 DCL states, "it would, for instance, be unlawful for an educational institution to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." That directive seems entirely new, and it contradicts previous OCR guidance and federal case law. For example, the Department of Education and Department of Justice filed amicus briefs in federal litigation in recent years that directly addressed the question of whether a school district could make race-neutral changes to its admissions policies in order to make the admissions process fairer. Two federal appellate courts ruled in favor of the school districts in each case, and, to my knowledge, no federal appellate court has issued a contrary ruling, thus seemingly foreclosing the legal argument advanced in the February 14 DCL.

22. The February 14 DCL also directly conflicts with past OCR guidance addressing topics like student affinity groups, racially inclusive curriculum, and diversity, equity, and inclusion activities. In August of 2023, OCR issued the Race and School Programming Dear Colleague Letter ("RSP DCL") which included clear statements about Title VI standards and how they apply to different programs and activities. For example, the RSP DCL makes it clear that

5

affinity groups, including those with racial or cultural themes, generally do not raise Title VI concerns if they are open to all students. The February 14 DCL seems to contradict that prior guidance. To the extent these activities are considered diversity, equity, and inclusion activities, the new DCL seems to imply that they could be legally suspect, and OCR does not explain the reasoning for the departure from OCR's previous statements. The February 14 DCL also does not provide clear instructions on how to resolve these contradictions.

23. On February 28, 2025, OCR released a Frequently Asked Questions document ("February 28 FAQ") expanding on the February 14 DCL. Instead of providing clarity, this document created even more confusion in our office. There seemed to be contradictions between the February 28 FAQ and the February 14 DCL. For example, the February 28 FAQ seemed to take a more permissive approach to programs that are labeled as advancing "diversity, equity, and inclusion." It was entirely unclear how I and other OCR attorneys should resolve the contradictions between these two documents.

24. I found that both the February 14 DCL and February 28 FAQ were incredibly confusing and hard to understand. If asked to apply these documents to my cases related to race discrimination, I would not know how to do so. The documents lacked clear statements of law. In the few places in which the documents expressed legal standards, those standards seemed to be new and inconsistent with case law and OCR's past guidance. My colleagues shared this confusion. Applying the February 14 DCL and the February 28 FAQ to any complaint that alleged that a program related to diversity, equity, and inclusion violated Title VI would be impossible. As such, enforcement of any such alleged violations would be arbitrary and completely dependent on each OCR attorney's subjective interpretation of the guidance.

25. I also would not be able to provide technical assistance for stakeholders to explain these documents. The documents leave too many questions unanswered.

26. On April 3, 2025, the Department sent State Education Agencies a directive to certify their compliance with Title VI and *SFFA* ("April 3 Certification Request"). The letter accompanying this request included some of the same confusing and vague statements as the February 14 DCL and February 28 FAQ.

27. OCR generally focuses on responding to complaints that we receive from the public. It is rare for OCR to address potential civil rights violations unrelated to complaints, so this certification requirement seems out of the ordinary.

28. In general, the February 14 DCL, February 28 FAQ, and April 3 Certification Request are abnormal for OCR. These documents include unclear and possibly unsupported statements of law that contradict past guidance. The documents themselves do not provide enough legal analysis or clear reasoning for enforcement staff to actually use them as guidance.

29. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed: April 19, 2025                      __/s/ Former OCR Attorney_____
                                             Former OCR Attorney