# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF
COLORED PEOPLE,

        *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,

        *Defendants*.

Case No. 1:25-cv-01120-DLF

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
# PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................ 3

I.    ED's Initial Guidance Following the *SFFA* Decision in 2023. .............. 3

II.   ED's Further Guidance in the DCL Issued in February 2025. .............. 4

III.  This Litigation. ........................................................ 7

LEGAL STANDARD ............................................................ 7

ARGUMENT .................................................................. 8

I.    NAACP is unlikely to succeed on the merits because it lacks standing. 8

    A.  NAACP does not have standing based on its members' right to receive information from willing speakers. .................................... 9

    B.  NAACP does not have standing based on a purported deprivation of a procedural right to notice-and-comment. ...................... 14

II.   NAACP lacks a cause of action under the APA because it does not challenge any final agency action. .................................... 16

III.  NAACP is unlikely to succeed on the merits of its APA claims. .......... 20

    A. The DCL does not violate the APA's notice and comment requirement. ............................................................ 20

    B.  The DCL is within ED's statutory authority and consistent with applicable law. .................................................... 21

    C.  The DCL is not arbitrary and capricious. .......................... 22

IV.   NAACP is unlikely to succeed on the merits of its Constitutional claims. ............................................................ 26

    A.  Fifth Amendment ............................................ 26

        i.   The DCL affords more notice than ED is required to provide before exercising its enforcement discretion.............................. 27

        ii.  The DCL is not vague because it clearly reiterates well-established prohibitions on discriminatory conduct. ...................... 28

iii.   The DCL is not contrary to the Fifth Amendment's Equal Protection
guarantee. ................................................................................................ 30

B.   First Amendment ................................................................................ 34

i. The DCL does not censor protected speech implicating any First
Amendment right to receive information. ............................................. 35

ii.   NAACP's derivative argument is also unlikely to succeed because
the DCL does not implicate any First Amendment right to associate. . 38

iii.   ED's longstanding conditioning of federal funding on non-
discrimination is not coercive. ............................................................. 39

V.    NAACP does not face irreparable harm. ............................................... 41

VI.    The balance of the equities weighs against an injunction. ................... 43

VII.    Scope of relief. .................................................................................... 44

CONCLUSION ................................................................................... 45

INTRODUCTION

This case concerns a Dear Colleague Letter ("DCL") issued by the Department of Education ("ED") on February 14, 2025 to explain ED's understanding of the preexisting requirements of the Equal Protection Clause of the Constitution and Title VI of the Civil Rights Act following the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"). As it states explicitly, the DCL does not have the force or effect of law and does not bind the public or create new legal standards.

Nonetheless, Plaintiff, the National Association for the Advancement of Colored People ("NAACP"), has filed suit challenging the DCL, a related "Frequently Asked Questions" document ("FAQs"), and ED's certification requirement ("Certification"), arguing that they violate the First and Fifth Amendments to the U.S. Constitution and the Administrative Procedure Act ("APA"). NAACP now moves for a preliminary injunction, asking the Court to enjoin ED from implementing or enforcing the DCL, FAQs, or Certification. The Court should deny NAACP's motion because it is unlikely to succeed on the merits of its claim, it does not face irreparable harm, and the public interest weighs against an injunction halting ED's enforcement of the nation's civil rights laws.

NAACP cannot succeed on its claims because it is unable to establish constitutional standing. NAACP relies solely on an associational standing theory, but it has not shown that any one of its members would have standing to sue in his or her own right. Indeed, NAACP's members alleged injuries are all based on speculation about independent actions by non-member educational institutions.

1

Because the NAACP does not establish that any of its members face an actual or imminent, concrete and particularized injury fairly traceable to the challenged documents, NAACP fails to demonstrate associational standing.

Further, NAACP's APA claims fail as a threshold matter because the DCL and other challenged documents do not have the force of law and thus do not constitute final agency action under the APA. NAACP therefore fails to state an APA cause of action. NAACP's APA claims also are unlikely to succeed on the merits. For the same reason it does not constitute final agency action, the documents were not required to go through notice-and-comment rulemaking. Furthermore, ED has statutory authority under Title VI to withhold funding from schools that unlawfully discriminate, and ED's explanation of how it intends to exercise this enforcement discretion does not conflict with any other governing statutes or attempt to prescribe school curricula. Lastly, the DCL is not arbitrary and capricious as it reflects a reasonable interpretation of *SFFA* and is rationally grounded in the longstanding principle that policies that classify on the basis of race are not lawful unless narrowly tailored to achieve a compelling interest.

NAACP's constitutional claims, in turn, are unlikely to succeed, because the challenged documents do not discriminate on the basis of race, are not unconstitutionally vague, and do not implicate speech protected by the First Amendment.

Because NAACP has not even demonstrated it has Article III standing, it cannot establish that it faces any imminent, irreparable harm in the absence of

injunctive relief.  Finally, given that the public interest in diligent enforcement of the nation's civil rights laws is extraordinarily high, the balance of equities weighs against a preliminary injunction.

Accordingly, the Court should deny NAACP's requests for preliminary relief.

BACKGROUND

## I.   ED's Initial Guidance Following the *SFFA* Decision in 2023.

To effectuate the promises of the Equal Protection Clause and Title VI, Federal agencies have published guidance and regulations to ensure that schools provide equal education to students regardless of a student's race.  *See generally Nondiscrimination in Federally-Assisted Programs of the department of Health, Education, and Welfare—Effectuation of Title VI of the Civil Rights Act of 1964*, 29 Fed. Reg. 16298, 16298–305 (Dec. 4, 1964).  In 2023, the Supreme Court decided *SFFA*, a challenge to two schools' consideration of applicants' race as a plus factor in their higher-education admissions processes for the purposes of obtaining a diverse student body.  600 U.S. 181.  The Court held that the schools' use of race violated the Equal Protection Clause of the Fourteenth Amendment. *Id*.  The decision noted that the Court has to date recognized only two compelling interests the government may have in considering a person's race for purposes of satisfying strict scrutiny; the first is an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the second is in "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id*. at 207.  In handing down its ruling, the Court announced that "[t]he time for making distinctions based on race had passed" and that "[e]liminating racial discrimination means eliminating

3

all of it." *Id*. at 204, 206. The Court noted that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Id*. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)).

Following the decision in *SFFA*, the Departments of Education and Justice co-authored a Dear Colleague Letter, Defs.' Ex. A ("2023 DCL"), and Frequently Asked Questions document, Defs.' Ex. B ("2023 FAQs"), that were sent to schools receiving federal funding in an effort to provide compliance guidance on how to "pursue *lawful* steps to promote diversity and full inclusion," 2023 DCL at 1 (emphasis added), but also "noting [ED's] continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 from early childhood through postsecondary education." *Id*. at 3.

## II.    ED's Further Guidance in the DCL Issued in February 2025.

On February 14, 2025, ED issued the Dear Colleague Letter challenged in this case. U.S. Dep't of Educ., Off. C.R, Dear Colleague Letter ("2025 DCL") (Feb. 14, 2025), https://perma.cc/J5PJ-DTKG. It explains that Title VI, as interpreted by the agency in light of *SFFA*, forbids discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race." *Id*. at 2. The letter explains that the strict scrutiny analysis of Equal Protection, as well as the analysis of whether a school is in compliance with Title VI, will turn on a central question: does the school "treat[] a person of one race differently than it treats another person because of that person's race?" *Id*. at 2. The 2025 DCL also provides further detail regarding how ED

4

understands Title VI to apply following *SFFA*.  However, the DCL is explicit that its "guidance does not have the force and effect of law and does not bind the public or create new legal standards."  *Id*. at 1 n.3.

On February 27, 2025, ED launched a public portal, https://enddei.ed.gov/, for parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in publicly-funded K-12 schools, which ED could subsequently investigate to determine whether those schools were engaging in discriminatory behavior.  *See* U.S. Dep't of Educ., Press Release, U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://perma.cc/QT6V-68L7.

On March 1, 2025, ED released a Frequently Asked Questions document "to anticipate and answer questions that may be raised in response to the [DCL]." Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act at 1 (Mar. 1, 2025), https://perma.cc/WK7Z-JBC2.  On April 9, 2025, ED issued a revised version of the FAQs.  Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Apr. 9, 2025) ("2025 FAQs"), https://perma.cc/43EZ-ME6A.  This document reiterates that ED's interpretations "do not have the force and effect of law and do not bind the public or impose new legal requirements."  *Id*. at 1 n.3.  It also reaffirms ED's commitment to "enforce[] federal civil rights law consistent with the First Amendment" and confirms that "[n]othing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the [DCL] indicate as much."  *Id*. at 6.

5

To be sure, the DCL and FAQs articulate ED's concerns regarding diversity, equity, and inclusion ("DEI") *programs*—not concepts—and their susceptibility to treating individuals differently on the basis of race. But as the FAQs emphasize, "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" *Id*. Rather, all school programs—DEI or otherwise—must not "intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races." *Id*.

On April 3, 2025, ED's Office for Civil Rights ("OCR") emailed a certification letter to every State Department of Education. *See* U.S. Dep't. Ed., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard*, https://perma.cc/AL43-BUMH (April 3, 2025) ("Certification Letter"). The email directed:

> Within ten (10) days, please sign and return the attached certification along with the certifications of your Local Education Agencies (LEAs). Furthermore, within these ten (10) days, please report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs.

Defs.' Ex. C ("April 3 Email"). The recipients were asked to certify their compliance with legal obligations undertaken in exchange for receiving federal financial assistance under Title VI and *SFFA*, as explained in the certification letter. Certification Letter at 2-4. On April 7, 2025, OCR sent a follow-up email to the same State Departments of Education notifying the recipients that ED had granted all

States and LEAs a 10-day extension to provide the certifications requested in the April 3 Email.

### III. This Litigation.

On April 15, 2025, NAACP filed a complaint for declaratory and injunctive relief against the United States Department of Education, as well as Education Secretary Linda McMahon and Acting Assistant Secretary for Civil Rights Craig Trainor in their official capacities. *See* Compl., ECF No. 1. NAACP is a nonprofit organization that operates, *inter alia*, "to ensure the political, educational, social, and economic equality of all citizens . . ." *Id.* at 4. The complaint alleges violations of the First Amendment, Fifth Amendment, and various provisions of the APA. Compl. at 50-59. On April 20, 2025, NAACP filed a motion for a preliminary injunction, seeking to enjoin ED from implementing or enforcing the DCL, FAQs, or Certification. *See* Prelim. Inj. Mot., ECF No. 13; Pls.' Proposed Order, ECF No. 13-8. Soon after, the Court directed NAACP to file a supplemental briefing on the issue of standing, which it did on April 21, 2025. *See* Suppl. Br., ECF No. 14.

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014). Where, as here, the defendants are government entities or

official sued in their official capacities, the balance of equities and the public interest

factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

ARGUMENT

## I.    NAACP is unlikely to succeed on the merits because it lacks standing.

The NAACP fails to establish standing to bring any of its claims.  NAACP's

asserted standing is based solely on alleged harms to its associational interests, that

is, to its members.  *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com*., 928 F.3d 95, 100

(D.C. Cir. 2019) ("As an organization, [Plaintiff] can assert standing in one of two

ways. It can assert standing on its own behalf, as an organization, or on behalf of its

members, as associational standing.").  But in order to establish associational

standing, NAACP must show that "at least one of its members would have standing

to sue in his own right."  *Am. Trucking Assocs., Inc. v. Fed. Motor Carrier Safety

Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013).  Yet NAACP fails to show that at least

one of its members would have standing in his or her own right.[1]

    The Article III minimum of standing requires a plaintiff to show,

> [f]irst, . . . an "injury in fact"—an invasion of a legally protected interest which
> is (a) concrete and particularized; and (b) "actual or imminent," not
> "conjectural" or "hypothetical."   Second, there must be a causal connection
> between the injury and the conduct complained of—the injury has to be fairly
> traceable to the challenged action of the defendant, and not the result of the
> independent action of some third party not before the court.   Third, it must be

---

[1] Defendants note that the doctrine of associational standing has been questioned in
recent years, and there are doubts as to its continued viability.  *See, e.g.*, *FDA v. All.
for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (Thomas, J., concurring) ("Our third-
party standing doctrine is mistaken. . . . . [A] plaintiff cannot establish an Article III
case or controversy by asserting another person's rights. . . . Associational standing .
. . is simply another form of third-party standing.").

"likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

Here, NAACP has not shown that at least one of its members is suffering or will imminently suffer a concrete and particularized injury fairly traceable to the challenged documents that likely will be redressed by a favorable decision. NAACP alleges its members face two types of harm. First, under the First Amendment and Fifth Amendments, NAACP alleges members have been denied "the right to receive instruction on, openly discuss, and express the viewpoints targeted by the Title VI Documents." Suppl. Br. at 1-2, ECF No. 14. Second, NAACP alleges its members have standing to bring APA claims because they have been "deprived of the right to comment on a new Title VI legislative rule, in violation of required procedures." Neither of these harms is sufficient to show standing because, with respect to the first, NAACP has not identified a willing speaker whom a challenged law or regulation prohibits from sharing desired information, and with respect to the second, NAACP fails to allege any concrete harm to its members in connection with the purported procedural injury. *See* Suppl. Br. at 1-6.

### A. NAACP does not have standing based on its members' right to receive information from willing speakers.

The NAACP's putative First and Fifth Amendment claims rest on the theory that the challenged documents may suppress speech that its members wish to hear.[2]

---

[2] While Member K expresses concern about her *own* ability to speak about the history of slavery as a tour guide at her school, she does not allege that she has actually been prevented from speaking. *See* Bailey Decl. ¶ 43.

*See* Suppl. Br. at 7 ("Plaintiff's [Fifth Amendment] vagueness claim is predicated on its members' [First Amendment] right to receive information.").  To have standing to bring a First Amendment claim based on a right to receive certain information, a plaintiff must show that she is being deprived of the information because the government has suppressed the speech of someone willing to provide that information. *See, e.g., Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983) ("To establish actual injury from a restriction of the right to receive information, there must be a speaker who is willing to convey the information." (citation omitted)); *see also United States v. Wecht*, 484 F.3d 194, 203 (3d Cir. 2007), as amended (July 2, 2007) ("The purpose of the 'willing speaker' requirement . . . is not to tie the third party's interests to those of the speaker, but to ensure that there is an injury in fact that would be redressed by a favorable decision."); *Fox v. Leavitt*, 572 F. Supp. 2d 135, 141 (D.D.C. 2008) ("To maintain a 'right to listen' claim, a plaintiff must clearly establish the existence of an otherwise willing speaker, and that the challenged policies caused the speaker to be unwilling to speak." (citation omitted)). This standard, known as the "willing speaker" requirement, was set forth by the Supreme Court in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976).

However, NAACP does not rest its claim of injury on evidence that schools are failing to provide members with information due to a law that prohibits provision of such information. *Cf. id.* at 756 & n.14 (noting that a willing speaker existed in that case because the parties had stipulated to the fact that, "[i]n the absence of Section

54-524.35(3), some pharmacies in Virginia would advertise, publish and promote price information regarding prescription drugs"). Rather, throughout its argument, NAACP suggests that its members will be injured *if* a willing speaker becomes unwilling. Moreover, NAACP fails to show that any of the challenged documents actually prohibit provision of the information that its members wish to receive.

For example, NAACP highlights that "Member E's child is eager to enroll in an ethnic studies course," but does not discuss any reason the child would not be able to do so, other than Plaintiff's speculation that the course might not be offered. *See* Suppl. Br. at 2. Similarly, Plaintiff argues that "Member L enrolled in two courses for the Fall 2025 semester that necessarily include discussions of systemic and structural racism," but once again does not identify any would-be speaker who is no longer willing to discuss this topic. *Id.* Moreover, *see infra* Section IV.B., NAACP fails to challenge any document that in fact prohibits provision of such information.

Thus, NAACP's standing theory relies on mischaracterization of the challenged documents as banning the teaching of certain subjects, *see* Suppl. Br. at 2 ("courses and programs have been deemed unlawful"), and speculation that unidentified teachers who would otherwise teach these subjects have not done so because of the imagined prohibition. *Cf. Am. C.L. Union v. Holder*, 673 F.3d 245, 255 (4th Cir. 2011) (holding that appellants lacked standing because they failed to show "a direct connection" with an "identifiable willing speaker"). However, The DCL does not prohibit instruction regarding certain books, the history of race, racism, and slavery, gender, or any other topic. See 2025 DCL at 3 (advising schools to ensure

their policies comply with civil rights laws, their programs do not use racial proxies, and that their contractors also comply—not addressing teachers or directing curricula change). ED has long made clear that, pursuant to its statutory authority, it does not "exercis[e] control over the content of school curricula," 2025 FAQs at 6.

And even in the limited instances in which NAACP does allege that a willing speaker is declining to speak due to the challenged documents—in response to the DCL, Plaintiff alleges "[Virginia Commonwealth University] cancelled a course on disability, diversity, and human rights that NAACP members intended to take, and Rowan University cancelled a guest lecture on racism and bias in healthcare," Prelim. Inj. Mot. at 12 (citing Decl. of the NAACP ¶ 37, ECF No. 13-3; Decl. of Cozy Bailey ¶ 50, ECF No. 13-4)—NAACP does not identify any particular member who wishes to receive the withheld speech. The Bailey Declaration claims that Member M was informed by her professor that a course, "Disability, Diversity, and Human Rights" would not be offered in the Fall 2025 semester "as result of [Virgina Commonwealth University]'s efforts to comply with the Title VI Documents." Bailey Decl., ¶ 50. But Member M admits that she has already taken that course. *Id*. Consequently, Member M has suffered no First Amendment injury in connection with her inability to receive information due to the cancellation of that course and, therefore, lacks standing to assert a First Amendment claim based on a right to receive information. Similarly, the Lewis Declaration alleges that "[i]n response to the DCL, Rowan [University] has . . . cancelled events for students that highlight Black scholars[,]" such as "Dr. Uche Blackstock, whose work focuses on bias and racism in medicine and healthcare."

NAACP Decl. ¶ 37.  But nowhere in that declaration does NAACP identify any actual members who had planned to attend Dr. Blackstock's event.  *See id.*[3]  Further, as addressed below, *see infra* Section IV.B., NAACP does not even attempt to show that any of the challenged documents would prohibit the university from hosting such an event.  *See* Suppl. Br. at 2.  Indeed, because the challenged documents do not prohibit such prospective conduct, or impose criminal or civil sanctions for engaging in such conduct—let alone address prospective conduct by the NAACP itself—NAACP's reliance on *Susan B. Anthony List v. Driehaus* is misplaced. 573 U.S. 149, 160 (2014) (explaining that a plaintiff can establish preenforcement standing if she "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" (citation omitted)); *see* Suppl. Br. at 2-3.

NAACP's speculation that it may have *some* member who is deprived of the opportunity to listen to *some* would-be speaker based a decision not to speak in light of the DCL does not establish any concrete and particularized injury, let alone one

_____

[3] With respect to the allegation that Waterloo's 19th Annual African American Read-In was cancelled following the DCL, *see* Suppl. Br. at 2, Plaintiffs identify only one would-be listener, who it claims is an "NAACP member's grandchild."  *Id.* While an association whose members are parents may have standing to claim injuries to those parents' children, see *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718-19 (2007), it is less likely that this is so with grandparents, *cf. Jakubowicz v. Islamic Republic of Iran*, No. CV 18-1450 (RDM), 2022 WL 3354719 (D.D.C. Aug. 9, 2022) ("to establish standing to seek solatium damages, the remaining plaintiffs must show that they are functionally equivalent to [a third party's] 'immediate family members.'").  NAACP does not supply any evidence that this member is functionally equivalent to a parent of the child.

that is fairly traceable to the challenged documents and that would likely be redressed by a favorable decision. *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 (2013) ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."). Thus, NAACP fails to establish associational standing on its First and Fifth Amendment claims regarding its members' right to receive information because it does not demonstrate that any one of its members is currently being deprived of information that an identifiable, willing speaker would be providing them if not for a governmental restriction.

### B. NAACP does not have standing based on a purported deprivation of a procedural right to notice-and-comment.

The only other theory of standing offered by NAACP is that its members were deprived of the opportunity to comment on the DCL before it was issued. However,

> deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing. Only a "person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy."

*Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (quoting *Lujan*, 504 U.S. at 572 n.7). Because NAACP does not plausibly assert any injury to a concrete interest that the ability to comment would have protected, it has not established standing based on an alleged procedural injury.

NAACP first argues that the concrete interest that the deprivation of an opportunity to comment "conflicts with" is "NAACP members . . . right to comment on a new Title VI legislative rule . . . ." Suppl. Br. at 4. This circular argument,

however, exposes NAACP's attempt to assert a procedural right *in vacuo*. *See Summers*, 555 U.S. at 496. NAACP suggests alternatively that the procedural right to comment would have protected against an injury to its "members' interest in equal opportunity to compete in selective admissions . . . ." Suppl. Br. at 5. But NAACP has not identified any member who alleges to have been denied such an opportunity.

NAACP also obliquely describes an injury whereby "NAACP members have, and will continue to be, deprived of efforts that help ensure they enjoy equal educational opportunities." *Id*. While NAACP members surely enjoy a right to equal educational opportunities, they point to no precedent establishing a right to specific methods or "efforts" by which this is achieved. Thus, while NAACP alleges that Virginia Beach City Public Schools "suspended its Equity Plan," this alone does not establish that Member I's son has faced any actual or concrete deprivation of his right to equal educational opportunities. Furthermore, NAACP does not demonstrate that its members' interest in diverse faculty or in reducing racial disparities in discipline has been harmed by their inability to comment. *See generally id*. Nor does NAACP show that any of its members has suffered some other concrete harm in connection with his or her lack of opportunity to comment on the challenged documents. This is especially so with respect to the Certification, as members and their school districts are not the parties who are required to sign off on Title VI assurances—rather, it is State superintendents who are required to sign and can delegate this function to local education associations. *See* Certification Letter at 1.

Because Plaintiff fails to demonstrate a concrete interest affected by the lack of an opportunity to comment on the DCL, it claims a procedural injury *in vacuo*, which is insufficient to afford Article III standing to bring claims under the APA. *Summers*, 555 U.S. at 496.

## II. NAACP lacks a cause of action under the APA because it does not challenge any final agency action.

The APA directs courts to review "[a]gency action made reviewable by statute and final agency action." 5 U.S.C. § 704. Unless agency action is made reviewable by statute, a plaintiff who fails to challenge final agency action thus lacks a cause of action under the APA. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action here, there is no doubt that appellant would lack a cause of action under the APA.").

Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (cleaned up). The DCL is explicit that it "does not have the force and effect of law and does not bind the public or create new legal standards." 2025 DCL at 1 n.3. Because the DCL does not have the force and effect of law, bind the public, or create new legal standards, it does not determine anyone's rights or obligations or have direct legal consequences.

Indeed, the DCL fits comfortably within the APA's definition of an "interpretative rule." 5 U.S.C. §§ 553(b)(4)(A), (d)(2). An interpretive rule is "issued by an agency to advise the public of the agency's construction of the statutes and rules

which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). Such rules do not have the force and effect of law, which distinguishes them from "legislative rules" that are subject to more rigorous procedures. *Id.* The purpose of interpretive rules is to provide notice to regulated entities of how an agency intends to exercise its enforcement discretion. "[I]nterpretative rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'" *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (quoting Judge Harry T. Edwards et al., *Federal Standards of Review* 157 (2d ed. 2013)). To the contrary, any legal consequences from an interpretive statement ultimately flow from the statute the statement interprets. *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding that a letter from Department of Labor interpreting the Fair Labor Standards Act "created no new legal obligations beyond those the [statute] already imposed"). Here, any hypothetical legal consequences flow from Title VI and the Equal Protection Clause, not the DCL.

The DCL does no more than reiterate the agency's interpretation of Title VI. *See* 2025 DCL at 1 ("This letter explains and reiterates *existing legal requirements* under Title VI of the Civil Rights Act of 1964," (emphasis added)). Moreover, the DCL expressly states that it does not have the force and effect of law, it was not published in the CFR, and it did not rely on ED's rulemaking authority. *See Guedes v. ATF*,

920 F.3d 1, 19 (D.C. Cir. 2019) (describing each of these as factors in evaluating whether a document is an interpretive rule).

The FAQs, which anticipate questions recipients may have regarding the DCL, is also not "final agency action" within the meaning of the APA for the same reasons the DCL is not. Like the DCL, the FAQs state "[t]he contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements." 2025 FAQs at 1 n.3. And they too seek only to "provide clarity about *existing law* for the benefit of the public." *Id.* (emphasis added). Finally, the FAQs were not published in the CFR, nor did they rely upon ED's rulemaking authority. *See Guedes*, 920 F.3d at 19.

Lastly, the Certification is also not final action because it does not create any binding consequences independent from those that are already imposed by Title VI. The Certification document reiterates the longstanding requirements under Title VI that,

> "Every application for Federal financial assistance must, 'as a condition to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI and with all requirements imposed pursuant to the executive regulations issued under Title VI. In fact, applicants for federal assistance literally sign contracts in which they agree to comply with Title VI and to 'immediately take any measures necessary' to do so. This assurance is given 'in consideration of' federal aid, and the federal government extends assistance 'in reliance on' the assurance of compliance. *See* 3 R. Cappalli, Federal Grants § 19:20, at 57, and n. 12 (1982) (written assurances are merely a formality because the statutory mandate applies and is enforceable apart from the text of any agreement)."

Certification Letter at 2 (quoting *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629–30 (1983)).

NAACP asserts that the "Title VI Documents constitute final agency action subject to judicial review," Prelim. Inj. Mot. at 18 (citation omitted), primarily relying upon a decision from the Sixth Circuit, *Tennessee v. Department of Education*, which held that a "Dear Educator" Letter, along with a Fact Sheet, was final agency action. 104 F.4th 577, 598 (6th Cir. 2024).  But NAACP's reliance on that case is misplaced. The Sixth Circuit relied on the fact that the "Dear Educator" Letter in *Tennessee* involved an attempt by ED to promote a new understanding of schools' Title IX obligations in light of the Supreme Court's Title VII decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020).  That letter, which interpreted one statute by drawing on implications from the Supreme Court's interpretation of a different statute, is fundamentally distinct from the DCL at issue here, which interprets the *same statute* that was the focus of *SFFA*: Title VI.  Importantly, the Sixth Circuit depended in part upon the fact that ED had earlier taken a position "that *Bostock* did not construe Title IX, and that the 'Title IX text is very different from Title VII text in many important respects.'" *Tennessee*, 104 F.4th at 585.  Because the DCL interprets the same statute as *SFFA*, an analogous inconsistency is not possible here.  Furthermore, even in the Dear Educator Letter's markedly different context, the dissent in *Tennessee* would have declined to find it was final agency action because "the Documents explain[ed] legal obligations; they d[id] not create them."  *Id.* at 620 (Boggs, J., dissenting).

Because the DCL is at most an interpretive rule that does not have the force and effect of law, and because neither the DCL nor the FAQs determines rights or obligations or have legal consequences, NAACP does not challenge a "final agency

action" within the meaning of the APA and lacks a valid cause of action under the APA.  *See Am. Tort Reform Ass'n*, 738 F.3d at 395.

## III.   NAACP is unlikely to succeed on the merits of its APA claims.

NAACP's APA arguments also are unlikely to succeed on the merits, as ED is vested with statutory authority to enforce the civil rights laws, and the DCL and other challenged documents are consistent with longstanding understandings of Title VI and the Equal Protection Clause.

### A. The DCL does not violate the APA's notice and comment requirement.

NAACP's argument that the DCL is procedurally invalid because it did not go through notice-and-comment rulemaking applies the wrong procedural requirement. Prelim. Inj. Mot. at 19-21. While legislative rules must go through notice and comment, the APA explicitly exempts interpretive rules like the DCL from such procedures.  5 U.S.C. § 553(b)(4)(A) ("Except when notice or hearing is required by statute, this subsection does not apply . . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."); *see also Perez*, 575 U.S. at 105 ("the text of the APA makes plain: 'Interpretive rules do not require notice and comment.'" (quoting *Shalala*, 514 U.S. at 99).  "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez*, 575 U.S. at 97 (quoting *Shalala*, 514

U.S. at 99.  For the reasons just discussed, the DCL is an interpretive rule; therefore, it is exempt from notice and comment.  *Id.*

### B. The DCL is within ED's statutory authority and consistent with applicable law.

NAACP's argument that the DCL and FAQs are outside ED's statutory authority and contrary to law are without merit.  NAACP contend that the documents violate the Department of Education Organization Act's  (DEOA's) provision that ED shall not exercise "direction, supervision, or control" over, *inter alia*, "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system."  20 U.S.C. § 3403(b); *see* Prelim. Inj. Mot. at 39.  But NAACP does not identify any portion of the documents that actually conflicts with the DEOA by prescribing curricula.

The only language NAACP cites as an example of purported inconsistency with the DEOA is the DCL's comment that "programming that acts to shame students of a particular race or ethnicity" violates Title VI.  Prelim. Inj. Mot. at 39.  But here, the DCL merely informs schools that they must comply with Title VI's and not discriminate among students when implementing their curricula—it does not tell schools what to teach.  There is a critical distinction between ED prescribing curricula or exercising control over school administration versus telling schools they must act in a nondiscriminatory manner in implementing their curricula and executing administrative decisions so that they avoid stereotyping and stigmatizing based on

race.  NAACP's conflation of the two would leave little room for ED to enforce the civil

rights laws.  *See id.*  Moreover, the DEOA should not be read in a manner that would

frustrate Title VI's nondiscrimination requirements.  *See Torres v. Lynch*, 578 U.S.

452, 459 (2016) ("In considering that issue, we must, as usual, 'interpret the relevant

words not in a vacuum, but with reference to the statutory context.'" (citation

omitted)); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018) (applying the interpretive

"canon against reading conflicts into statutes").

### C. The DCL is not arbitrary and capricious.

NAACP contends that the challenged documents are arbitrary and capricious

on the basis that they (1) misstate facts and purport to address a problem ED does

not have evidence exists; (2) unreasonably interpret *SFFA;* (3) fail to explain their

departure from ED's prior guidance; and (4) fail to consider important aspects of the

problem they address.  Prelim. Inj. Mot. at 25-38.  Review under the arbitrary and

capricious standard is "deferential," *U.S. Dep't of Com. v. New York*, 588 U.S. 752,

773 (2019), and merely examines whether the agency's decision "was the product of

reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Because the DCL's guidance is both reasonable

and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417

(2021), it satisfies the deferential "arbitrary and capricious" standard.

***Statement of the problem***.  As observed by ED in the DCL, under the

standard articulated in *SFFA*, many Diversity, Equity, and Inclusion programs may

violate the Equal Protection Clause—and thus also Title VI—by introducing "explicit

race-consciousness into everyday training, programming, and discipline."  2025 DCL

22

at 2.  As a result, DEI programs "frequently preference certain racial groups" in ways that make them more susceptible to discriminating based on race.  *Id*.  In making this observation, ED simply applied the longstanding principle that policies that distinguish on the basis of race are not lawful unless justified by a fact-supported compelling interest.  NAACP disputes the accuracy of ED's claim that white and Asian students have been subjected to discrimination under the guise of equity, *see* Prelim. Inj. Mot. at 27, but ED reasonably grounded this finding in the facts found in *SFFA*, which confirmed that schools "routinely used race as a factor in admissions" in a way that discriminated against white and Asian students.  2025 DCL at 1,

 ***Consistent with SFFA***.  NAACP attempts to argue that the DCL is inconsistent with *SFFA*, however, in doing so, it is NAACP that misstates the Supreme Court's holding, not ED.  NAACP attempts to argue that *SFFA* "did not overrule decades of precedent holding that the educational benefits of diversity are a compelling government interest."  Prelim. Inj. Mot. at 30.  But that is *exactly* what it did.  *See SFFA*, 600 U.S. at 287 (Thomas, J., concurring) ("The Court's opinion rightly makes clear that *Grutter* is, for all intents and purposes, overruled.").  The Supreme Court found that the educational benefits of diversity are "commendable goals, [but] they are not sufficiently coherent for purposes of strict scrutiny."  *SFFA*, 600 U.S. at 214. Accordingly, the DCL correctly stated, "To date, the Supreme Court has recognized only two interests as compelling in the context of race-based action: (1) 'remediating specific, identified instances of past discrimination that violated the Constitution or a statute'; and (2) 'avoiding imminent and serious risks to human

safety in prisons, such as a race riot.' 2025 DCL at 2 (quoting *SFFA*, 600 U.S. at 207).
And while NAACP is right that the Supreme Court did not prohibit race-neutral
alternatives to achieving diversity, Prelim. Inj. Mot. at 28-29, neither do the
challenged documents. The challenged documents merely caution that "race-based
decision-making, no matter the form, remains impermissible." 2025 DCL at 2. But
as ED emphasized in the FAQs, 2025 FAQs at 8, the 2025 DCL does not prohibit
taking personal experiences (including race-related experiences) into account; it
simply informs schools that, as *SFFA* held, schools may not use personal essays as a
means to identify applicant's race and then make an admissions decision on account
of that race-based information. *Compare* 2025 DCL at 2–3 ("[A] school may not use
students' personal essays, writing samples, participation in extracurriculars, or other
cues as a means of determining or predicting a student's race and favoring or
disfavoring such students."), *with SFFA* 600 U.S. at 230–31 ("A benefit to a student
who overcame racial discrimination, for example, must be tied to *that student's*
courage and determination. Or a benefit to a student whose heritage or culture
motivated him or her to assume a leadership role or attain a particular goal must be
tied to *that student's* unique ability to contribute to the university. In other words,
the student must be treated based on his or her experiences as an individual—not on
the basis of race.").

**Consistent with prior pronouncements.** NAACP argues that the
challenged documents are inconsistent with ED's prior guidance, including the 2023
Dear Colleague Letter. *See* Prelim. Inj. Mot. at 31-35. But the 2023 guidance—like

the 2025 guidance at issue in this case—was at best an interpretative rule that does not have the force and effect of law.  ED therefore is not required to provide any explanation for its "departure" from that guidance.  But to the extent there might be any such requirement, the DCL simply explains that it would be unlawful for schools to use practices that appear race neutral as a covert means of selecting or rejecting students because of their race, 2025 DCL at 2-3—exactly what the Supreme Court held would not satisfy strict scrutiny in *SFFA*, 600 U.S. at 230-31 ("[A] student must be treated based on his or her experiences as an individual—not on the basis of race."). To the extent NAACP selectively quotes former Secretary of Education Betsy Devos as well as other ED documents that seem to espouse favorable views of diversity, equity, and inclusion, *see* Prelim. Inj. Mot. at 31-32, none of these statements are materially inconsistent with the challenged documents' concerns with DEI programs that engage in illegal discrimination.

**Important aspects of the problem.**  NAACP's argument on Defendants' alleged failure to consider important aspects of the problem fails because no such requirement applies to interpretative rules. Regardless, the issues NAACP identify do not add up to an APA violation.  As NAACP correctly states, ED is not responsible for school curricula, Prelim. Inj. Mot. at 43, *see supra* Section III.B., so, ED need not have considered the curricular implications of the challenged documents. *Contra* Prelim. Inj. Mot. at 36-37.  That is a matter for individual schools.

Because the DCL accurately states and addresses all important parts of the problem and is consistent with *SFFA* and the agency's earlier pronouncements, it is not arbitrary and capricious.

### IV.  NAACP is unlikely to succeed on the merits of its Constitutional claims.

#### A. Fifth Amendment

NAACP is unlikely to succeed on the merits of its Fifth Amendment claims. NAACP's Fifth Amendment vagueness claim is misplaced, as the framework for such claims is meant to apply to binding actions with the force of law.  In any event, the DCL is clear about the conduct that is prohibited: discrimination that treats a person differently on the basis of race.

The Fifth Amendment's "void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act [arbitrarily]." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  As a threshold matter, the DCL cannot be deemed invalid under the void for vagueness doctrine because, as explained above, it does not have the force of law.  *See supra* Section II.

A vaguely written statute or regulation raises due process concerns because people are required to comply with its dictates.  *See id.*  The same cannot be said for an agency interpretation that binds no one, having only "power to persuade, [and] lacking power to control." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 402 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Indeed, the Supreme

26

Court has previously declined to apply the void for vagueness doctrine to non-binding documents, such as the federal sentencing guidelines. *Beckles v. United States*, 580 U.S. 256, 263 (2017) (holding "the Guidelines are not subject to a vagueness challenge under the Due Process Clause" because "they merely guide the exercise of a court's discretion."). Because the DCL, like the federal sentencing guidelines, has no binding effects, any analysis of it under the void for vagueness doctrine is misplaced.

If the Court nonetheless engages in a vagueness analysis of the DCL, it should hold that the DCL is not vague because it provides more notice than required and clearly reiterates established legal standards.

### i. The DCL affords more notice than ED is required to provide before exercising its enforcement discretion.

First, the DCL affords more notice than ED is required to provide before exercising enforcement discretion. Title VI authorizes ED to take enforcement actions when it believes a recipient of federal funding may be violating individuals' civil rights. Under 42 U.S.C. § 2000d-1, "[e]ach Federal department and agency which is empowered to extend Federal financial assistance," including ED, is "authorized and directed" to effectuate Title VI by securing compliance through "the termination of or refusal to grant or to continue assistance."

There is no requirement that ED issue any notice of how it intends to use its enforcement discretion before it does so. Throughout Title VI, Congress instructs when agencies are required to give recipients notice or opportunity for a hearing. *See, e.g.*, *id.* (allowing termination of funding only "after opportunity for [a] hearing"); *id.* § 2000d-5 (requiring ED to provide recipients notice of deferred action on any

application for funds). ED's own regulations also specify when notice is to be provided to recipients, and none of these notice requirements precedes the opening of an investigation. 34 C.F.R. §§ 100.7, 100.8, 100.10.

Thus, ED could lawfully exercise its enforcement discretion under Title VI consistent with the DCL, without ever having issued the DCL. As a result, NAACP's vagueness argument is effectively that the DCL provides less notice than no notice at all. They point to no precedent supporting such a counterintuitive conclusion. Nor would it be desirable, as a policy matter, for courts to find Fifth Amendment violations based on agencies providing more notice than regulated entities are entitled to receive, which could discourage agencies from efforts to increase transparency around planned exercise of enforcement discretion.

### ii. The DCL is not vague because it clearly reiterates well-established prohibitions on discriminatory conduct.

The DCL also is not unconstitutionally vague because it clearly describes ED's understanding of Title VI's prohibition on race discrimination. As explained in the DCL, ED understands Title VI to forbid discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race." 2025 DCL at 2. NAACP relies heavily on a capacious reading of terms like "diversity," "equity," and "inclusion," arguing that the DCL's reference to those terms makes it unclear what activities will be the focus of ED's enforcement discretion. *See* Prelim. Inj. Mot. at 16. But the DCL does not define ED's understanding of the scope of prohibited conduct under Title VI by reference to "DEI." And, indeed, ED's corresponding FAQs document explains that "whether an

initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" 2025 FAQs at 6.

NAACP states that the DCL's vagueness issues stem from an alleged "lack [of] any objective parameters," Prelim. Inj. Mot. at 17, however, each purported vagueness issue it identifies is easily resolved by asking the "core" question that the DCL foregrounds: does an action "treat[] a person of one race differently than it treats another person because of that person's race[?]" 2025 DCL at 2. This simple test in no way "mak[es] it impossible for people of ordinary intelligence . . . to pinpoint . . . what the Documents prohibit." Prelim. Inj. Mot. at 16. Nor does it risk *over*simplifying the test; ED is also clear that there may be certain, albeit rare, exceptions when a school has a compelling interest in "'remediating specific, identified instances of past discrimination that violated the Constitution or a statute,'" and its use of race is "narrowly tailored" to achieving that interest. 2025 DCL at 2 (quoting *SFFA*, 600 U.S. at 207). Moreover, ED has explained that

> schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race. Nor would educational, cultural, or historical observances . . . so long as they do not engage in racial exclusion or discrimination."

2025 FAQs at 6. Thus, the DCL cannot be fairly impugned as "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (describing an invitation to

arbitrary enforcement as a failure to establish "minimal guidelines to govern law enforcement." (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

Because the DCL clearly describes a type of conduct that Title VI prohibits—differential treatment based on race—it is not vague and does not increase the risk of arbitrary enforcement, and the complaint portal does not change ED's longstanding commitment to independently investigating and assessing the facts reported in each case.

### iii.  The DCL is not contrary to the Fifth Amendment's Equal Protection guarantee.

NAACP asserts that the DCL is contrary to  the "equal protection guarantee of the Fifth Amendment's Due Process Clause. . ." because it discriminates against "Black and Latinx students." Prelim. Inj. Mot. at 21, 22.[4]  But NAACP points to no evidence of any such discrimination.

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  To show discriminatory purpose, a plaintiff must show that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  "Run-of-the-mill disparate impact—that is, the fact that a policy disproportionately hurts

---

[4] In its brief, NAACP presents its Equal Protection argument under the section addressing the merits of its APA claims. For organizational purposes, Defendants address the Equal Protection claim along with NAACP's other constitutional claims.

a certain group—does not clear this hurdle." *Smith v. Henderson*, 54 F. Supp. 3d 58, 68–69 (D.D.C. 2014) (citing *Arlington Heights*, 429 U.S. at 264–65).

Here, the DCL is race-neutral on its face, and the NAACP's equal protection argument fails. Indeed, the DCL expressly prohibits discrimination on the basis of race. The very first sentence of the letter emphasizes that "[d]iscrimination on the basis of race, color, or national origin is illegal and morally reprehensible." 2025 DCL at 1. The purpose of the letter is to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance[,]" *id.*, further underscoring that "[a]ll students are entitled to a school environment free from discrimination." *Id.* at 3. The DCL can be fairly summed by the Supreme Court's observation that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 747–48 (2007); *see* 2025 DCL at 2 ("At its core, the test is simple: If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law.").

NAACP argues that the DCL "distributes burdens or benefits on the basis of individual racial classifications and otherwise evinces discriminatory intent" by "cast[ing] 'white and Asian students' as the victims." Prelim. Inj. Mot. at 22 (internal citation and quotation marks omitted). But the DCL draws no such racial classifications. Although the DCL references discrimination against "white and Asian students," 2025 DCL at 1, "[a] government policy must do more than merely

mention race . . . to amount to a racial . . . classification." *Saunders v. White*, 191 F. Supp. 2d 95, 124 (D.D.C. 2002). Rather, the government policy must distribute benefits or burdens based on race. *See Parents Involved in Cmty. Schs.*, 551 U.S. at 747–48. Here, the DCL is explicit in its race neutrality, advising that "educational institutions may . . . no[t] distribute benefits or burdens based on race." 2025 DCL at 2.

Moreover, NAACP fails to show any discriminatory intent. It is well established that a plaintiff's burden of "[p]roving intentional discrimination is notoriously difficult . . ." *Smith*, 54 F. Supp. 3d at 68–69; *see Feeney*, 442 U.S. at 272, 274 (stating that a facially neutral policy "is unconstitutional . . . only if [a disparate] impact can be traced to a discriminatory purpose."); *see also Students for Fair Admissions v. United States Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 132–33 (S.D.N.Y. 2024) ("Plaintiff, by electing to proceed with the instant motion at this early stage and without even the benefit of an answer to its Complaint, has foisted an almost impossible burden on itself."). Critically, NAACP argues that the Court should infer discriminatory intent because Defendants "seek to leverage [anti-discrimination] laws in ways that violate controlling precedent and would harm Black students." Prelim. Inj. Mot. at 22. But whatever disagreements NAACP might have with the merits of various statements in the DCL, none of those statements support any plausible inference of intentional discrimination by Defendants or otherwise contradicts the DCL's stated anti-discriminatory purpose.

NAACP next argues that because the DCL prohibits using race in admissions, it also requires "schools to redact any indicia of race from applications[,]" which would allegedly prejudice Black applicants. Prelim. Inj. Mot. at 23. But the DCL requires no such thing. Nowhere in the DCL does it require schools to "redact" any mention of race. Rather, what the DCL prohibits is "race-based decision-making." 2025 DCL at 2. As the Supreme Court has emphasized, a school must treat a student "based on his or her experiences as an individual—not on the basis of race." *SFFA*, 600 U.S. at 231.

Next, NAACP points to the FAQs' statement that "a school cannot engage in . . . any . . . aspect of school life that allows one race but not another or otherwise separates students . . . based on race[,]" Prelim. Inj. Mot. at 24 (quoting 2025 FAQs at 5), arguing that "[b]y threatening the existence of affinity spaces known to benefit Black students, the Title VI Documents discriminate against Black Students." *Id.* At the outset, the DCL prohibits "separat[ing] or segregat[ing] students based on race," 2025 DCL at 2, not affinity spaces. But, in any event, while affinity spaces might benefit Black students, as a district court recently warned about racial affinity groups, "there's a flipside: when such groups endorse exclusionary practices—whether through restricted membership, segregated spaces, or disparate access to professional opportunities—they risk transgressing fundamental equal protection principles and other civil rights laws." *Diemert v. City of Seattle*, No. 2:22-CV-1640, 2025 WL 446753, at *17 (W.D. Wash. Feb. 10, 2025). Thus, the DCL seeks to ensure

33

that educational institutions are free from discrimination—including in any policies regarding student groups—not to harm Black students.

Finally, NAACP baldly asserts that "[t]he Title VI Documents . . . evince racially discriminatory intent by trafficking in pernicious stereotypes about Black intellectual and moral inferiority." Prelim. Inj. Mot. at 24. NAACP further accuses Defendants of using terms, such as DEI, "as pejorative dog whistles . . ." *Id.* These accusations are unfounded. The DCL references certain DEI programs as an example of how some educational programs can indirectly engage in racial discrimination—it does not thereby engage in racial discrimination. 2025 DCL at 3. Rather, the upshot of the DCL is clear: "under any banner, discrimination on the basis of race, color, or national origin is, has been, and will continue to be illegal." *Id.* at 2.

Thus, NAACP is unlikely to succeed in its claim that the DCL is contrary to the Fifth Amendment's equal protection guarantee.

## B. First Amendment

NAACP's First Amendment claims are unlikely to succeed because to the extent the documents at issue address speech or expressive activity, they simply reiterate the well-established principle that speech that amounts to racial harassment and creates a hostile environment is unlawful under Title VI; harassment—including race-based harassment—is conduct that the First Amendment does not protect.

NAACP argues that the DCL "prohibit[s] schools and universities from offering instruction and programming" regarding "disfavored viewpoints." Prelim. Inj. Mot. at 10. NAACP further assert that the DCL restricts students from associating with

34

"diversity, equity, and inclusion activities . . ." *Id.* at 13. But NAACP mischaracterizes what the DCL actually does.  The DCL is not focused on what schools may *say* about DEI—they remain entitled to take a positive view, negative view, or any other view on DEI—instead, the DCL focuses on what DEI programs often *do*—treat people differently on the basis of race in a manner that constitutes discriminatory harassment or the creation of a hostile environment.  *See* 2025 FAQs at 6 (the First Amendment does not "relieve [schools] of their duty to respond to racial harassment that creates a hostile environment").

Alternatively, NAACP argue that rather than directly suppress particular viewpoints, the letter unlawfully coerces third parties—the schools that receive federal funding—into doing so.  *See* Prelim. Inj. Mot. at 14.  This argument also fails, as it depends upon a doctrine that is limited to situations in which a government official makes a specific threat of enforcement to a third party completely unrelated to the conduct at issue.  *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024)

### i. The DCL does not censor protected speech implicating any First Amendment right to receive information.

NAACP contends that the DCL violates the First Amendment because it restricts their members' "ability to receive information and ideas about systemic racism and racial inequality—viewpoints that Defendants disfavor and are attempting to suppress."  Prelim. Inj. Mot. at 11-12. NAACP's argument is meritless.

The deprivation of the listener's "right to receive information" is merely the flipside of a speaker's more familiar chilling-effect argument: if speakers self-censor their speech, potential listeners cannot receive that speech.  "The Supreme Court

generally treats the rights of [speakers and listeners] as 'reciprocal.'" *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 560 (D.C. Cir. 2019) (en banc) (Katsas, J., concurring in part) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976)).  Although the right to receive information is not mentioned in the First Amendment, it "follows ineluctably from the *sender's* First Amendment right to send" information.  *Martin v. EPA*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002) (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (opinion of Brennan, J.))  A would-be listener's rights are therefore "derivative of the First Amendment rights of the speaker." *Id.* (citation omitted).

In essence, NAACP contends that their members' right to receive information is a corollary of the speaker's right to express it, and that the DCL's chilling of speakers corresponds to a chilling of members' ability to receive speech.  *See* Prelim. Inj. Mot. at 11 (citing *Pico*, 457 U.S. at 867).  Because the DCL does not "ban" any speech expressing any particular viewpoint, it follows that it also does not transgress any right to receive information.  The DCL describes a scope of conduct that has been long prohibited by Title VI.  It is well settled that denying a student an educational opportunity on the basis of race violates the law.  *See SFFA*, 600 U.S. 181.  It is no defense that creating a racially hostile environment or engaging in racial harassment may involve speaking.  *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI

obligations."); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) (rejecting First Amendment argument that firing teacher for his harassing use of racial epithet violated his free speech).

When speech is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) ("[T]he First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts . . . ."); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, --- F. Supp. 3d ---, 2025 WL 401109, at *12 (S.D.N.Y. Feb. 5, 2025) ("when a hostile environment claim is based on both protected speech and unprotected conduct, a court must still consider the entire record in determining whether the harassment was discriminatory in nature.") *reconsideration denied*, No. 24 CIV. 2669 (JPC), 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025).

Moreover, as ED's FAQs document makes clear, schools' implementation of policies to protect against race-based hostile environment harassment must respect First Amendment rights. 2025 FAQs at 6 ("[ED] OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution. Nothing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the [DCL] indicate as much."). To the extent NAACP or its members fear that educational institutions will take actions *not* required by Title VI or ED, based on an incorrect understanding of the

DCL, NAACP's complaints about potential infringements on the right to receive information or ideas should be directed at those institutions, not ED.

Because discriminatory conduct effectuated by words is neither protected speech nor an aspect of academic freedom, NAACP's right-to receive-information arguments lack merit.

### ii. NAACP's derivative argument is also unlikely to succeed because the DCL does not implicate any First Amendment right to associate.

NAACP asserts that the DCL violates its members First Amendment right to "association by targeting diversity, equity, and inclusion activities . . ." Prelim. Inj. Mot. at 13. This argument, however, appears to be largely derivative of NAACP's right-to-receive information claim, which focuses on fears that schools will restrict certain DEI programming. Moreover, NAACP is unlikely to succeed on this claim because this contention is underdeveloped. The substance of NAACP's argument is that its "members reasonably fear that their schools or universities will investigate or take adverse action against their student groups, voluntary affinity events, and cultural centers if they continue programming that falls within the letter of" ED's Title VI guidance. *Id*. at 14. But the text of the DCL does not specifically prohibit student affinity or cultural groups. Indeed, the guidance from the FAQs clarifies that "schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race." FAQs at 6. "Nor would, the FAQs continue, "educational, cultural or historical observances such as Black History Month, International Holocaust Remembrance Day . . ." *Id*. "[O]r similar events—that

celebrate or recognize historical events and contributions, and promote awareness, so long as they do not engage in racial exclusion or discrimination." *Id*. Thus, NAACP cannot plausibly claim that the DCL would prevent their members from joining certain affinity groups (that are open to all), thereby violating their First Amendment right to associate. Again, to the extent NAACP or its members fear that educational institutions will take actions *not* required by Title VI or ED, then they should seek relief from those institutions.

### iii. ED's longstanding conditioning of federal funding on non-discrimination is not coercive.

NAACP's argument that the DCL "penalize protected information and ideas by threatening enforcement" is also wrong. Prelim. Inj. Mot. at 14. The government is allowed to condition school funding on nondiscrimination; indeed, this is the method by which Congress intended to stop discrimination under Title VI. *Washington Legal Foundation v. Alexander*, 984 F.2d 483, 484 (D.C. Cir. 1993) ("Title VI instructs agencies to ensure compliance by aid recipients first through a system of voluntary adherence, and then, if necessary, by initiating a process leading to the termination of federal funding."); *see also Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 290 (1st Cir. 1998) ("Title VI's only express remedy is a cutoff of federal funding to the affected program."). And the government is also allowed to express its own viewpoint; "it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Moreover, the DCL does not threaten enforcement action against educational institutions that have views; it separately

commits to "vigorously enforce the law on equal terms" under the principles of *SFFA*. 2025 DCL at 3. This is the same longstanding commitment to Title VI and Equal Protection that ED has always held. *See* 2023 DCL at 3 ("We close by noting our continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 . . . . We will continue to use all enforcement tools at our disposal.").

Furthermore, *Vullo*, which sets forth a third-party coercion framework that NAACP argues should apply here, *see* Prelim. Inj. Mot. at 14, is inapposite. *See generally Vullo*, 602 U.S. 175. Unlike the DCL, *Vullo* concerned a government official's attempt to cudgel an insurance provider into no longer insuring the National Rifle Association ("NRA") because the official disagreed with the NRA's viewpoints. *Id*. If the insurer did not comply and discontinue its coverage of the NRA, the government threatened to crack down on the insurer for "technical infractions . . . unrelated to any NRA business." *Id*. at 192. With respect to enforcement, the DCL, in contrast, merely explains ED's understanding of what Title VI requires of federal funding recipients. And as the FAQs emphasize, ED's evaluation of whether a recipient is discriminating on the basis of race in its programs or activities "depends on the facts and circumstances of each case," 2025 FAQs at 6. Whatever ED's views of DEI programs generally, ED has made clear that its enforcement of Title VI will be based on whether schools are discriminating based on race, and not on any other factor. *Id*. This is easily distinguishable from *Vullo*, where the government official was not merely executing the official's enforcement responsibilities, but threatening

use of enforcement powers to coerce a specific regulated entity to disassociate from a particular organization with which the official disagreed.

Moreover, concurring in *Vullo*, Justice Ketanji Brown Jackson worried that "the effect of [the government's] alleged coercion of regulated entities on the NRA's speech [was] significantly more attenuated" than in earlier applications of the third-party coercion doctrine, signaling that *Vullo* represents the outer boundary of what it means for an enforcement agency to "establish[] 'a system of prior administrative restraints.'" *Vullo*, 602 U.S. at 202 (Jackson, J., concurring) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). This concern is particularly noteworthy given that the Supreme Court's review was in the motion to dismiss posture, where the NRA only needed to plausibly allege third party coercion while aided by the assumption that all well pleaded allegations in the complaint were true. *See id.* Plaintiff's attempt to stretch the *Vullo* doctrine any further should be rejected because ED's challenged actions here do not establish any comparable system of restraint or coercion.

No court has held that Title VI's enforcement mechanism coercively violates free speech. Because the DCL only implicates enforcement insofar as it explains ED's understanding of Title VI's requirements, it does not violate the First Amendment.

### V.    NAACP does not face irreparable harm.

The irreparable harm standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* [not merely possible] in the absence of an injunction." *Winter*, 555 U.S. at 22. To demonstrate irreparable harm, a plaintiff must meet a "high standard"—it must show that it faces injury that is

"certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008), and that is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Making that showing requires "proof" that the harm they identify "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. As explained above, NAACP has not even demonstrated an injury in fact sufficient for Article III standing. Accordingly, it also has not demonstrated irreparable harm justifying preliminary relief. *See Brown v. Colegio de Abogados de P.R.*, 613 F.3d 44, 49-50 (1st Cir. 2010) (acknowledging that a finding of irreparable harm would be erroneous if there was no injury).

The harms NAACP alleges depend on a series of speculative future events taken by third parties that may or may not come to pass. *Supra* Section I. But because "[t]he standard for irreparable harm is particularly high in the D.C. Circuit," this type of speculation is insufficient to prove "that the movant's injury is *certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015) (quoting *Power Mobility Coal. v. Leavitt*, 404 F.Supp.2d 190, 204 (D.D.C. 2005)). The Certification letter sent by ED to States on April 3, 2025, does not render NAACP's

harms any less speculative. *Contra* Suppl. Br. at 2. As noted above, by statute and regulation, numerous steps aimed at ensuring compliance must occur before ED may withdraw funding. *See* 42 U.S. Code § 2000d-1; 34 C.F.R. §§ 100.6-100.11.

**VI.    The balance of the equities weighs against an injunction.**

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) ("[T]he government's interest is the public interest."). As an initial matter, given that NAACP cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). But even if Plaintiffs could satisfy one or both of those factors, the remaining factors weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

The public interest in robust civil rights enforcement cannot be overstated. *See, e.g.*, *Ctr. for Soc. Change, Inc. v. Morgan Prop. Mgmt. Co., LLC*, No. CV JKB-19-0734, 2019 WL 1118066, at *2 (D. Md. Mar. 11, 2019) ("the public interest in penalizing and preventing discrimination against those with disabilities and those associated with disabled individuals . . . necessitates the issuance of temporary

43

injunctive relief"). In *Crosspoint Church v. Makin*, the District of Maine faced the issue of whether a government regulation of discrimination that implicated a plaintiff's free speech rights should be preliminarily enjoined. 719 F. Supp. 3d 99, 126 (D. Me. 2024). Finding the plaintiff's speech to be incidental to the conduct of discrimination, the court held that the plaintiff's First Amendment interests did not "outweigh the potential hardship the state would face from being unable to fully enforce its educational antidiscrimination laws." *Id*. Furthermore, the Court found "[t]he public also has a strong interest in the state being able to effectively combat discrimination." *Id*. This case is in a nearly identical posture—whether to enjoin ED's enforcement of a civil rights statute based on NAACP's speculative assertions of chilled speech—and the equities weigh against issuing a preliminary injunction for the same reasons.

## VII. Scope of relief.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, should the Court decide to grant preliminary relief, it should be narrowly tailored to apply only to schools attended by NAACP's members. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, any preliminary injunction should explicitly confirm that all obligations in the injunctive order apply only with respect to schools attended by NAACP's members.

Additionally, in light of the extraordinary breadth of NAACP's requested relief, to the extent the Court issues any injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Lastly, Federal Rule of Civil Procedure 65(c) mandates "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Pro. 65(c). As "it is the policy of the United States to demand that parties seeking injunctions against the Federal Government must cover the costs and damages incurred if the Government is ultimately found to have been wrongfully enjoined or restrained," The White House, *Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)*, (March 11, 2025), available at https://perma.cc/8HJZ-HCQU, Defendants respectfully request that the Court require NAACP to post as security a bond commensurate with the potential costs to ED of continuing to litigate the preliminary injunction.

## CONCLUSION

For the foregoing reasons, NAACP's motion for a preliminary injunction should be denied, or, if it is granted, should be limited to schools attended by the NAACP's members.

Dated: April 23, 2025                    Respectfully submitted,

                                         CHAD MIZELLE
                                         Acting Associate Attorney General

                                         ABHISHEK KAMBLI
                                         Deputy Associate Attorney General

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General
                                         Civil Division

                                         ELIZABETH TULIS
                                         Assistant Director
                                         Civil Division, Federal Programs Branch

                                         */s/ Eitan R. Sirkovich*
                                         EITAN R. SIRKOVICH
                                         JAMES J. WEN
                                         Trial Attorneys, U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, N.W.
                                         Washington, D.C. 20005
                                         Telephone: (202) 353-5525
                                         E-mail: eitan.r.sirkovich@usdoj.gov

                                         *Counsel for Defendants*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that, on April 23, 2025, this memorandum and accompanying exhibits were filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *Eitan R. Sirkovich*</u>
EITAN R. SIRKOVICH