**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE<br><br>        Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al*.<br><br>        Defendants | Case No. 1:25-CV-01120 (DLF) |

**BRIEF OF PEN AMERICAN CENTER, INC. IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Marcos Gonzalez (Bar: 252859)
GovSpring Legal
1629 K Street NW, Suite 300
Washington D.C. 20006
Telephone: (202) 407-3556
Marcos@govspringlegal.com


*Counsel for Amicus Curiae*

i

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Civil Rule 26.1, I, the undersigned, counsel of record for Amicus Curiae PEN American Center, Inc. (PEN America), certify that to the best of my knowledge and belief, PEN America has no parent companies, subsidiaries, affiliates, or companies which own at least 10% of its stock which have any outstanding securities in the hands of the public.


Dated: April 23, 2025                                        Respectfully submitted,

                                                                       /s/ Marcos Gonzalez

                                                            Marcos Gonzalez (Bar: 252859)
                                                            GovSpring Legal
                                                            1629 K Street NW, Suite 300
                                                            Washington D.C. 20006
                                                            Telephone: (202) 407-3556
                                                            Marcos@govspringlegal.com


                                                            *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................................ii

TABLE OF CONTENTS......................................................................................iii

TABLE OF AUTHORITIES ...............................................................................iv

I. Statement of Interest......................................................................................1

II. Introduction .................................................................................................1

III. Argument ....................................................................................................2

    A. The Guidance in the Dear Colleague Letter is Part of a Larger Wave of Educational Censorship Meant to Silence Disfavored Speech and Distort Genuine Debate for Political Purposes, Not to Address Racial Discrimination.......................................................2

        a. Rise of the "Ed Scare"................................................................3

        b. Impact of the "Ed Scare" in Maryland .....................................6

        c. The current Administration has turbocharged the "Ed Scare," building on previous Executive Orders and state legislation to expand attacks on disfavored speech...........................................................................................9

    B. Like predecessor state legislation and other recent federal policies, the Dear Colleague letter imposes unconstitutional viewpoint-based restrictions and is intentionally vague, suppressing even truthful factual statements and the reasonable exchange of ideas relating to race..................................................................................................11

        a. The Letter clearly engages in viewpoint-discriminatory censorship .........11

        b. The vague guidance in the Dear Colleague letter appears intended to chill as much disfavored speech on race and racism as possible. ..............................12

        c. The reach of the Letter, if applied like other executive actions to date, is extraordinary, reaching even truthful factual statements and expressions of personal experience.. ...................................................................................14

IV. Conclusion ...................................................................................................16

V. Certificate of Compliance ..........................................................................................17

VI. Certificate of Service ..............................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Am. Pub. Health Ass'n v. Nat. Inst. of Health*, No. 25-cv-10787, ECF No. 1, ¶¶ 93-93 (D. Mass. Apr. 2, 2025) ..................................................................................................... 10

*Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136 (W.D. Okla. 2024) ....... 13

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .............................................................. 11, 14

*Loc. 8027 v. Edelbut*, No. 21-cv-1077, 2024 WL 2722254 (D.N.H. May 28, 2024) .................... 13

*Matal v. Tam*, 582 U.S. 218 (2017) ........................................................................................ 11

*McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) ...................................................................... 11

*Nat'l Ass'n of Diversity Offs. v. Trump, et al.*, No. 25-cv-00333, 2025 WL 573764, at *46-47 (D. Md. Feb. 21, 2025) .................................................................................................. 14

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ................................................ 11

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ............................ 12

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) ........ 5, 13

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ........................................... 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ............................................................................................................ 10, 12, 14, 15

*Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024) ........................ 13

*United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921) ................................................... 14


**Statutes, Executive Orders, and Regulations**

*Ending Discrimination in Public Act of 2022*, H.B. 1256 (2022). ............................................. 6

Exec. Order No. 13950, Combating Race and Sex Stereotyping, Exec. Order of September 22, 2020, 85 Fed. Reg. 60683 (Sept. 22, 2020) ...................................................... *passim*

Exec. Order No. 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, Exec. Order of Jan. 20, 2021, 86 Fed. R. 7009 (Jan. 25, 2021) ............................................................................................................ 5

Exec. Order No. 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, Exec. Order of Jan. 20, 2025, 90 Fed. R. 8237, 8237 (Jan. 28, 2025) .............................. 10

Exec. Order 14185, Restoring America's Fighting Force, Exec. Order of Jan. 27, 2025, 90 Fed. R. 8763, 8763-64 (Feb. 3, 2025) .................................................................... 10

Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, Exec. Order of Jan. 29, 2025, 90 Fed. R. 8853, 8855 (Feb. 3, 2025) ................................................... 9

Exec. Order No. 14242, Improving Education Outcomes by Empowering Parents, States, and Communities, Exec. Order of Mar. 20, 2025, 90 Fed. R. 13679, 13680 (Mar. 25, 2025)......... 9

Exec. Order 14253, Restoring Truth and Sanity to American History, Exec. Order of Mar. 27, 2025, 90 Fed. R. 14563, 14563 (Apr. 3, 2025) ....................................................... 10


**Other Authorities**

"AP Black Studies Classes Back in Harford County," https://marylandeducators.org/ap-black-studies-classes-back-in-harford-county/. .......................................................... 8

Brenda Wintrode, "Maryland National Guard out of Frederick Douglass parade after DoD order declares Black History Month 'dead,'" Balt. Banner (Feb. 14, 2025), https://www.thebaltimorebanner.com/politics-power/maryland-national-guard-frederick-douglass-parade-UM7PE6LNMZG5NNQ3Q3OHD6E47E/. .................................... 15

Christopher Rufo, "Critical Race Theory Would Not Solve Racial Inequality: It Would Deepen It," The Heritage Foundation, March 23, 2021, https://www.heritage.org/progressivism/report/critical-race-theory-would-not-solve-racial-inequality-it-would-deepen-it ...........................................................................4, 5

Craig Trainor, Acting Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard, 1 (Feb. 14, 2025), https://tinyurl.com/r42b97se. ........................................................... *passim*

"Ed Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance," Department of Education (Apr. 3, 2025), https://www.ed.gov/about/news/press-release/ed-requires-k-12-school-districts-certify-compliance-title-vi-and-students-v-harvard-condition-of-receiving-federal-financial-assistance.................................................................................................................10

Ethan Singer, "Thousands of U.S. Government Web Pages Have Been Taken Down Since Friday," N.Y. Times (Feb. 2, 2025), https://www.nytimes.com/2025/02/02/upshot/trump-government-websites-missing-pages.html...............................................................................15

Diversity, Equity, and Inclusion, Merriam-Webster, https://perma.cc/Y879-7HB2 (last visited Apr. 3, 2025)....................................................................................................................14

Jonathan Friedman & James Tager, *Educational Gag Orders*, PEN AMERICA (Nov. 8, 2021), https://tinyurl.com/2nz58dch...............................................................................3, 5, 6

Karen Yourish et al., "These Words Are Disappearing in the New Trump Administration," N.Y. Times (Mar. 7, 2025), https://www.nytimes.com/interactive/2025/03/07/us/trump-federal-agencies-websites-words-dei.html...............................................................................16

Kristen Griffith, "An African American studies class is too 'divisive' for one Maryland school district," Baltimore Banner, July 2, 2024, https://www.thebaltimorebanner.com/education/k-12-schools/ap-african-american-studies-harford-county-OSFGW6V5ENHAJDQL37RITHSTIY/. ..........................................................7, 9

Liz Bowie, "Is African American studies 'divisive'? This school board changed its mind," Baltimore Banner (July 16, 2024), https://www.thebaltimorebanner.com/education/k-12-schools/harford-county-ap-african-american-studies-OTISUXQ2RVEPFKC2K4O2XUJ4WU/. ...........................................................8

Mark Lieberman, *McMahon Declines to Say If Black History Classes Are Allowed Under Trump Order*, Ed Week (Feb 13, 2025), https://www.edweek.org/policy-politics/mcmahon-declines-to-say-if-black-history-classes-are-allowed-under-trump-order/2025/02...............................15

Megan Sayles, "Harford County school board denies AP African American Studies course," July 8, 2024, https://afro.com/harford-county-public-schools-reject-ap-african-american-studies/...

PEN America, Ed Scare FAQ, https://tinyurl.com/mr23em2r. ..........................................3, 6

PEN America, Index of Educational Gag Orders (last updated March 6, 2025), https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yod7l01o0TCk/viw6VOxb6SUYd5nXM?blocks=hide..........................................................................5, 6

PEN America, Index of School Book Bans 2023-2024, https://pen.org/book-bans/pen-america-index-of-school-book-bans-2023-2024/ ................................................................6

PEN America, South Carolina Cancels Funding, College Credit for African American Studies in High Schools (June 11, 2024), https://pen.org/press-release/south-carolina-cancels-funding-college-credit-for-ap-african-american-studies-in-hgh-schools/. ..............................6

Sam LaFrance & Jonathan Friedman, *Educational Intimidation*, PEN America (Aug. 23, 2023), https://pen.org/report/educational-intimidation/. ......................................................6

Tara Copp et al., "War heroes and military firsts are among 26,000 images flagged for removal in Pentagon's DEI purge," Assoc. Press (Mar. 7, 2025), https://apnews.com/article/dei-purge-images-pentagon-diversity-women-black-8efcfaec909954f4a24bad0d49c78074. ................16

William Ford, "Harford County school board revives African American studies course," July 16, 2024, https://marylandmatters.org/2024/07/16/harford-county-school-board-approves-revised-african-american-studies-course/. ......................................................................7, 8, 9

## I.    INTEREST OF AMICUS CURIAE

PEN American Center, Inc. ("PEN America") is a nonprofit, nonpartisan public-policy organization that sits at the intersection of literature and human rights, seeking to protect free speech and expression for a robust and health democracy. PEN America has extensively researched efforts to suppress the expression of disfavored views in American classrooms and has filed numerous amicus curiae briefs in support of academic freedom and the right to speak without fear of reprisal. See e.g. *Mejia v. Edelblut*, No. 24-1690, 2025 WL 455892 (1st Cir. Feb. 3, 2025); *Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024).

This brief contextualizes the Office for Civil Rights' ("OCR") February 14th Dear Colleague letter (the "Letter") at issue in this case within the broader context of classroom censorship nationwide. By situating the Letter in its context, the proposed brief highlights the extensive nature of the project to remove certain forms of information from public view and to erase elements of American history. Additionally, Amicus seeks to show that this guidance will likely have the effect of turbocharging educational censorship around the country. As an organization committed to free speech, access to information, and academic freedom, Amicus is compelled to speak out against the Letter.

## II.    INTRODUCTION

The "Dear Colleague" letter ("Letter") uses anti-discrimination as a pretext to censor speech to the detriment of students, educators, and schools in Maryland and across the country. It is part of a broader backlash against efforts to address genuine discrimination, regardless of the label or substance of such efforts–anti-racism, critical race theory ("CRT"), or diversity, equity and inclusion ("DEI"). Properly understood, the Letter is a gag order modeled on classroom censorship around the country, adopted to chill academic speech, impermissibly censor content,

and institute government-mandated viewpoints about racial and other identities. Far from a good-faith guidance, the Letter is derisive, vague and threatening, misrepresenting precedent and failing to acknowledge its departure from prior Office for Civil Rights ("OCR") guidance.

Further, the Letter's viewpoint-discriminatory language will turbocharge ongoing educational censorship around the country. This movement is already stifling speech, and the Letter will accelerate the proliferation of educational gag orders, book bans, and other actions aimed at silencing certain viewpoints, including different understandings of American history. This kind of censorship disproportionately affects students whose identities are inextricably tied up in disfavored narratives about American history and deprives the broader community of the opportunity to learn from the experiences of its members.

Free speech, association and debate are critical to ensuring classrooms educate and prepare students to participate in society. The Letter seeks to foreclose that debate, politicizing genuine disagreement and distorting reasonable discussions of what should be taught. That is antithetical to the core American values enshrined in the First Amendment and critical to education of the next generation of Americans. For these reasons, the Letter should be enjoined.[1]

## III.    ARGUMENT

### A. The Guidance in the Dear Colleague Letter is Part of a Larger Wave of Educational Censorship Meant to Silence Disfavored Speech and Distort Genuine Debate for Political Purposes, Not to Address Racial Discrimination.

The Letter purports to address higher education's "embrace of pervasive and repugnant race-based preferences and other forms of racial discrimination," which OCR claims have "emanated throughout every facet of academia." U.S. Dep't of Educ., Office of Civil Rights, Dear Colleague Letter, 1 (Feb. 14, 2025), https://tinyurl.com/r42b97se. The Letter asserts that American

---

[1] *Amicus* endorses Plaintiffs' comprehensive analysis of the Letter's illegality, both procedurally and substantively.

educational institutions have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism.'" *Id*. at 2. It excoriates these institutions for "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline" under the banner of DEI. *Id*. Certainly, there has long been debate around how or what to teach students of social studies or subjects regarding history, civics, and American identity – topics which shape our understanding of this country's history and culture. What is new, however, is the extent to which political actors have appropriated these debates, distorting concepts and intentionally casting them in the worst possible light for political benefit.

### a. Rise of the "Ed Scare"

The Letter is part of what PEN America has labeled the "Ed Scare," a national movement seeking to suppress disfavored ideas about race and racism through educational censorship that has swept the nation over the past several years. *Amicus*, which has extensively researched this effort, explains: "The Ed Scare is a nationwide effort ... to foment anger and anxiety about public education; to restrict or prohibit instruction about race, sexuality, and gender; and to ban books that address these topics. Taken as a whole, it is a multi-faceted campaign to chill the freedom to read, learn, and think in public education through legislation and intimidation."[2]

The "Ed Scare" in its current form began in response to efforts to advance racial understanding in 2020 with a politicized campaign against CRT—a term that has traditionally referred to a legal theory that has been part of legal academia for half a century.[3] The campaign against CRT has since morphed into a broader, multi-pronged attack against any discussions, history, and understandings of race, gender, sexual orientation or other difference. As defined by

---

[2] *See generally*, PEN America, *Ed Scare FAQ*, https://tinyurl.com/mr23em2r.
[3] Jonathan Friedman & James Tager, *Educational Gag Orders*, PEN AMERICA (Nov. 8, 2021), https://tinyurl.com/2nz58dch.

one of its founders, Kimberlé Crenshaw, CRT is a legal framework used to understand and analyze ongoing racial disparities following the Civil Rights Movement, arguing that "the triumph of formal equality did not signify the end of racism" and identifying possible remedies.[4] In a coordinated campaign, anti-speech advocates have used CRT as a bogey to attempt to ban discussion of certain topics like "privilege" and "racial oppression" through laws like Florida's "Stop WOKE Act." Fla. Stat. § 1003.42(3). Advocates also distorted the definition of what CRT represented, using the term to refer to any discussion acknowledging structural racism, privilege, or hierarchy as a "divisive concept." Then, they sought to ban discussion of "divisive concepts" in schools, calling anything touching upon racial differences or controversy "CRT." "Divisive concepts" thus became conflated with a misrepresentation of CRT and served as a catch-all for topics related to race disfavored by the architects of this wave of educational censorship.[5]

This project found a home in the White House in 2020 when President Donald Trump issued an Executive Order ("EO") banning the use of certain "divisive concepts" in trainings in federal agencies. Exec. Order No. 13950, *Combatting Race and Sex Stereotyping*, 85 Fed. Reg. 60683 (Sept. 22, 2020) ("2020 EO"). The 2020 EO purported merely to encourage actions that would combat stereotyping on the basis of race or sex. But it also sought to prohibit workplace trainings that address the ways racism has impacted the history of the United States, claiming those discussions "perpetuat[ed] racial stereotypes" that were "contrary to the fundamental premises underpinning our Republic." *Id.* § 1. Rather than combatting discrimination, the 2020 EO distorted accepted academic and scholarly concepts to push a discriminatory, censorial agenda. Although ultimately enjoined in part, *see Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d

---

[4] *Id.*

[5] *See e.g.* Christopher Rufo, *Critical Race Theory Would Not Solve Racial Inequality: It Would Deepen It*, HERITAGE FOUND., (March 23, 2021), https://tinyurl.com/37ptfauf ("[CRT] seeks to undermine the foundations of American society and replace the constitutional system with a near-totalitarian 'antiracist' bureaucracy.").

521, 528 (N.D. Cal. 2020), and later rescinded, *see* Exec. Order No. 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, Exec. Order of Jan. 20, 2021, 86 Fed. R. 7009, 7012 (Jan. 25, 2021), the 2020 EO became the blueprint for a nationwide effort to introduce similar laws into state legislatures across the country.

Since 2020, legislative actions seeking to bar certain concepts in education entirely have proliferated, from K-12 schools to colleges and universities, focusing on concepts that address race, racism, and gender inequality. Efforts to restrict teaching these topics became known as "educational gag orders," promulgated as part of a backlash against efforts to remedy racism.[6] Over time, this censorship strategy has grown dramatically. Between January 2021 and October 2024, 365 educational gag order bills were introduced in 46 states, of which 38 were enacted.[7]

This surge in educational censorship is a direct result of a coordinated effort to advance a particular ideology that rejects as un-American any efforts to develop a more inclusive nation. *See e.g.* Office of Mgmt. & Budget, Exec. Office of President, Opinion Letter on Training in the Federal Government (Sep. 4, 2020), https://tinyurl.com/5ftamd4m ("It has come to the President's attention that Executive Branch agencies have spent millions of taxpayer dollars to date 'training' government workers to believe divisive, anti-American propaganda."). Numerous politicians and advocates, including South Carolina Representative Nancy Mace (linking concerns on CRT to GOP electoral goals to "lay the groundwork for November 2022") and former Trump advisor Steve Bannon (calling CRT "how we are going to win"), sought to use the "bogey" of CRT to mobilize conservative voters in upcoming elections.[8] Chris Rufo, a conservative activist widely considered to be the architect of this wave of educational censorship, "acknowledges that he intentionally uses

---

[6] Friedman & Tager *supra* note 3.
[7] PEN America, *Index of Educational Gag Orders* (last updated April 3, 2025), https://tinyurl.com/4xktp36x.
[8] Friedman & Tager *supra* note 3.

the label to rally political support, saying that CRT is 'the perfect villain' and a useful 'brand category' to build opposition."[9] *Amicus* and others sounded the alarm that these measures "amount to a sweeping crusade for content- and viewpoint-based state censorship."[10]

This wave of educational censorship has not been limited to speech related to race and racism. At the state level, the attacks on education have expanded to include a sustained attack on content about LGBTQ+ identities.[11] State level prohibitions on classroom discussion of gender and sexual orientation, race, "critical race theory," or "divisive concepts" have now been enacted in at least 24 states.[12] These policies have resulted in the removal of beloved classics like *The Bluest Eye* by Toni Morrison and picture books like *And Tango Makes Three*, a true story about two male penguins who raise a chick together, by Justin Richardson and Peter Parnell, from classes and school libraries;[13] the suspension of courses like AP African American Studies;[14] and, the dismissal of educators for teaching about race and racism or reading LGBTQ+ friendly books.[15]

### b. Impact of the "Ed Scare" In Maryland

Maryland has not been immune to these efforts to dictate classroom speech. In 2022, HB 1256 was introduced in the Maryland legislature. *Ending Discrimination in Public Act of 2022*, H.B. 1256 (2022). Drafters borrowed heavily from the 2020 EO. *Compare* 2020 EO § 2(a) (defining "divisive concepts") *with* H.B. 1256 (prohibiting teachers, administrators, or other school

---

[9] *Id.*

[10] *Id.*

[11] In addition to educational gag orders, the Ed Scare has included a wave of book bans targeting similar issues. In the 2023-2024 school year alone, *Amicus* recorded 10,046 instances of book-banning across the country, with a disproportionate number of the banned books including characters of color or LGBTQ+ characters. *Index of School Book Bans 2023-2024*, PEN AMERICA, https://tinyurl.com/mr45bzea.

[12] Index of Educational Gag Orders, *supra* note 7.

[13] Book Ban Index *supra* note 11.

[14] *See, e.g.*, *South Carolina Cancels Funding, College Credit for African American Studies in High Schools*, PEN AMERICA (June 11, 2024), https://tinyurl.com/ydv3ku85/.

[15] Sam LaFrance & Jonathan Friedman, *Educational Intimidation*, PEN AMERICA (Aug. 23, 2023), https://tinyurl.com/659bx87v.

employees from including "discriminatory concepts" in a unit of instruction and defining discriminatory concepts using the 2020 EO's definition of "divisive concepts").

A recent censorship controversy in Harford County illustrates how the Ed Scare has harmed Maryland communities. During the 2023-24 school year, Harford County educators selected an Advanced Placement ("AP") African American Studies course to pilot among the school system's elective offerings for high-level students. The course was extremely well-received. Indeed, nearly 200 Harford students enrolled for the second year – more than three quarters of students who registered for the course were students of color[16] and 39 percent would be taking an AP class for the first time.[17]

During the 2024 summer break, the Ed Scare reached Board of Education members, who began distorting and mischaracterizing the African American studies course as highly politicized and not "adequately or accurately captur[ing] the progress this country has made."[18] One Board member said the "topics are heavily politically oriented and perpetuate the message of oppressed versus oppressor."[19] Instead, the Board Member wanted "to present positive messages of unity and great American contributions."[20] Board members also appeared offended by the course's handling of topics like the Black Panther Party and Malcom X.[21] As a result, a divided School Board overrode Harford educators and prohibited the school system from including the African American Studies course as an AP option while allowing all other AP courses to continue.

---

[16] Kristen Griffith, *An African American studies class is too 'divisive' for one Maryland school district*, BALTIMORE BANNER (Jul. 2, 2024), https://tinyurl.com/72m7uyy7.
[17] William Ford, *Harford County school board revives African American studies course*, MARYLAND MATTERS (Jul. 16, 2024), https://tinyurl.com/y8j77w4v.
[18] Megan Sayles, *Harford County school board denies AP African American Studies course*, AFRO (Jul. 8, 2024), https://tinyurl.com/tdb6ts7e.
[19] Griffith *supra* note 16.
[20] *Id.*
[21] Ford *supra* note 17.

Public outcry from local educators and families was swift and forceful, with a large and unified coalition of teachers, parents, students, administrators, staff, and the local NAACP appearing at a county school board meeting to challenge the Board's censorship of the course. Student Hayven Rowson, 16, then a rising senior at Aberdeen High School, spoke for many students disputing the censors' mischaracterizations of the course as negative or one-sided. Far from being divisive, Ms. Rowson said, the course "has bridged the gap between Black and white, left and right, or right and wrong by creating a safe space for open dialogue, discussion and communication. Having this course available has meant everything to me and more."[22]

Teachers echoed this sentiment from their perspective as educators, challenging the Board's decision as inconsistent with the core goals of public schools in serving all students.[23] As attested by Maryland State Education's former President Cheryl Bost:

> The messages we send to students matter. When we tell them that we want to empower them through learning about diverse and challenging subjects so they can be a part of building a better future, that sends a strongly positive message. … When we tell them they can't learn about people who look like them and can't be trusted with understanding the complexity of our history, that sends a strongly negative message about our schools, our history, and our belief in the potential of the next generation.[24]

Longtime Harford AP teacher Rodney Johnson agreed, drawing attention to how important courses like this can be for contextualizing other material students encounter in the classroom. He observed that as a Black high schooler, he, along with generations of Harford students, read "The Adventures of Huckleberry Finn," a classic book that also frequently uses the N-word. "If students of color and every student can read Huck Finn, then certainly reading about African American history and

---

[22] *Id.*

[23] Liz Bowie, *Is African American studies 'divisive'? This school board changed its mind,* BALTIMORE BANNER (Jul. 16, 2024), https://tinyurl.com/4p4wyj7b.

[24] *AP Black Studies Classes Back in Harford County,* Maryland State Ed. Assoc. (Oct. 9, 2024), https://tinyurl.com/2zx7vahm.

African American experiences is not a bridge too far," he said.[25] Likewise, Harford School Superintendent Sean Bulson urged the Board to reinstate the course, saying its authentic portrayal of American history demonstrates the school system's "commitment to providing an education that reflects the diversity of our student body and community. When we remain true to that commitment, it is unifying, not divisive."[26]

As a result of the overwhelming pushback, the Board reversed its decision, allowing the school system to offer the AP course as planned. But now, the Letter presents the same kind of threat to students. Unlike the AP course in Harford County, the Letter usurps any role for communities to engage with the substance of these debates.

### c.   The Current Administration Has Built on Previous EOs and State Legislation to Expand Attacks on Speech and Turbocharge the "Ed Scare."

The most recent executive actions unilaterally enact these Ed Scare policies on a federal level, substituting a vilified characterization of "DEI" for "critical race theory," with the aim of censoring speech in every classroom and school-related setting across the country, through the Letter, EOs, and other actions. *See* Exec. Order No. 14242, *Improving Education Outcomes by Empowering Parents, States, and Communities*, Exec. Order of Mar. 20, 2025, 90 Fed. R. 13679, 13680 (Mar. 25, 2025) (requiring that Department of Education funds be spent in compliance with the "requirement that any program or activities receiving Federal assistance terminate illegal discrimination obscured under the label 'diversity, equity, and inclusion'"); Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, Exec. Order of Jan. 29, 2025, 90 Fed. R. 8853, 8855 (Feb. 3, 2025) (requiring the promulgation of strategies to end "indoctrination" based on "discriminatory equity ideology," using the definition of "divisive concepts" from the

---

[25] Ford *supra* note 17.
[26] Griffith *supra* note 16.

2020 EO); Exec. Order No. 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, Exec. Order of Jan. 20, 2025, 90 Fed. R. 8237, 8237 (Jan. 28, 2025) (revoking Exec. Order 12985, which had revoked the 2020 EO). A number of these recent efforts, like the Letter itself, rely on *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"), to adopt a veneer of anti-discrimination, claiming that the narrow ruling in that case barring use of race-conscious factors in admissions criteria in higher education applies far more broadly. *See* "Ed Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance," *Dept. of Educ.* (Apr. 3, 2025), https://tinyurl.com/hhd5ufpj.

These efforts extend beyond K-12 and college classrooms and seek to impact learning that occurs in research, museums, military academies, health resources, and online by everyday Americans. *See Am. Pub. Health Ass'n v. Nat. Inst. of Health,* No. 25-cv-10787, ECF No. 1, ¶¶ 92-93 (D. Mass. Apr. 2, 2025) (discussing guidance that the "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity, and Inclusion (DEI)" and instructing officials to "completely excise all DEI activities," including the mere mention of any DEI language in any proposed grant materials"); Exec. Order 14253, *Restoring Truth and Sanity to American History*, Exec. Order of Mar. 27, 2025, 90 Fed. R. 14563, 14563 (Apr. 3, 2025) (asserting that "the Smithsonian Institution has, in recent years, come under the influence of a divisive, race-centered ideology" that subjects individuals to "ideological indoctrination [and] divisive narratives that distort our shared history"); Exec. Order 14185, *Restoring America's Fighting Force*, Exec. Order of Jan. 27, 2025, 90 Fed. R. 8763, 8763-64 (Feb. 3, 2025) (incorporating divisive concepts definition from Exec. Order 13950 and stating that no branch of the Armed Forces, including educational institutions, could promote or advance divisive concepts).

These measures contend that anything other than a "positive" telling of history is false and un-American and have been accompanied by other sweeping actions reinforcing this view.

**B. Like Predecessor State Legislation and Other Recent Federal Policies, the Letter Imposes Unconstitutional Viewpoint-Based Restrictions and is Intentionally Vague, Suppressing Factual Statements and Exchanges of Ideas Regarding Race.**

This Letter, like the legislation and executive actions on which it is based, functions as a gag order because it chills academic speech and imposes state-controlled viewpoint discrimination. Those looking to avoid penalties for the Administration's distorted view of discrimination under Title VI will, as they have in state and local jurisdictions faced with similar orders, self-censor, cancel programs, dismantle offices, change curricula, and avoid any topics that deal with realities of race and racism in this country. Where violating such policy may have real consequences for institutions, it is inevitable that they will interpret broadly and err on the side of self-censorship. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (finding where a vague rule "abuts upon sensitive areas of basic First Amendment freedoms ... [u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone.") (internal quotations omitted).

### a. The Letter Clearly Engages in Viewpoint-Discriminatory Censorship.

The Supreme Court has repeatedly reaffirmed the "bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 582 U.S. 218, 223 (2017). "The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004). Viewpoint discrimination, including in the provision of public funds for private expression, is always impermissible.[27] "The dangers of viewpoint discrimination are *heightened*

---

[27] *See, e.g., Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("[E]ven in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas," especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'"

in the university setting," *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022), where suppression of specific views undermines the universities' "chief mission … to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic," *id.* at 1128.

The Letter seeks to suppress certain ideas about racial justice in favor of other narratives, as Plaintiffs clearly demonstrate. *See* Pls.' Br. 15-19. The Letter announces that "DEI programs" are unlawful because, in OCR's view, such speech "toxically indoctrinate[s] students with the false premise that the United States is built upon 'systemic and structural racism,'" Letter at 2, and "teach[es] students that certain racial groups bear unique moral burdens that others do not," *id.* at 3. Prohibiting this speech is straightforward viewpoint discrimination. Further, although the Letter purports to ground its analysis in *SFFA*, its language about "systemic and structural racism" and its tone plainly draw from the educational gag order framework used to suppress disfavored speech. The language in the Letter (and in other recent EOs) mirrors that found in the 2020 EO and the flurry of bills that relied upon its framework of "divisive concepts." *See, e.g.*, 2020 EO (establishing the idea of "divisive concepts"); *K-12 Schooling EO*, 90 Fed. R. at 8855 (reusing the same definition of "divisive concepts" as examples of "discriminatory equity ideology"). In relying on this language, the Letter is clearly engaging in viewpoint discrimination.

### b. The Vague Guidance in the Dear Colleague Letter Appears Intended to Chill as Much Disfavored Speech on Race and Racism as Possible.

Throughout the country, state legislation to censor "divisive concepts" has been drafted with unconstitutionally vague language, create a chilling effect that encourages educators to self-

---

(cleaned up)); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (holding that a public university may not discriminate against religious viewpoints in the provision of funds for student groups).

censor. The Letter is similarly vague, including, for example, in its failure to define what a DEI program actually is or what it means for something to be done "under the banner of" DEI.

Courts considering state laws prohibiting teaching similar concepts have found these to be unconstitutionally vague, enjoining or striking down educational gag orders in New Hampshire, Oklahoma and Tennessee. *See Loc. 8027 v. Edelblut*, No. 21-cv-1077, 2024 WL 2722254, at *12 (D.N.H. May 28, 2024) ("All told, the banned concepts speak only obliquely about the speech that they target ... This lack of clarity sows confusion and leaves significant gaps that can only be filled in by those charged with enforcing the Amendments."); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1149 (W.D. Okla. 2024) ("The Court concludes that Plaintiffs have made a strong showing that [the] prohibition of '[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex' . . . is so indefinite 'that persons of common intelligence must necessarily guess at its meaning and differ as to its application.'") (internal citation omitted); *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024) ("[T]he practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it."); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543–44 (N.D. Cal. 2020) (finding prohibition on trainings that "inculcate," "promote," "teach[] or imply[]" certain concepts related to race and diversity unconstitutionally vague).

There are a wide range of viewpoints on what DEI encompasses, or what the values of diversity, equity, and inclusion mean. Individuals may disagree not only about whether these values are a good thing, but also about what constitutes a DEI program at all. The Letter does not define the term. But applying the ordinary meaning from dictionary definitions confirms its breadth and subjectivity. "Diversity, Equity, and Inclusion," is defined as "a set of values and

related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against."[28]

Deciding what constitutes an impermissible "DEI program" necessarily requires a subjective assessment of values. As such, it sweeps in a wide range of speech and activity, and enforcement will necessarily and impermissibly turn on subjective evaluation of, for example, toxicity, falsehood, and the assignment of moral burdens. *Grayned,* 408 U.S. at 108–09 ("A vague law impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis."); *see also Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983) (striking down requirement to provide "credible and reliable" identification); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921) (stating prohibition on "unjust and unreasonable" rates was unconstitutionally vague).

### c. The Reach of the Letter, If Applied Like Other Executive Actions to Date, is Extraordinary, Reaching Even Truthful Factual Statements and Expressions of Personal Experience.

The scope of what could be prohibited by the Letter is so broad, vague, and untethered from context that it encourages censorship of facts, as well as expressions about personal experiences. *See Nat'l Ass'n of Diversity Offs. v. Trump*, No. 25-cv-00333, 2025 WL 573764, at *46-47 (D. Md. Feb. 21, 2025) ("Indeed, when the Court asked the government during the hearing a series of questions regarding hypothetical implementation of DEI …, the government … merely reiterated that promoting DEI can be unlawful and that there is uncertainty about whether programs or policies … are lawful after … [*SFFA*]."). For example, the Letter accuses educators of "smuggling … explicit race-consciousness into everyday training, programming, and discipline." Letter at 2. This wording could reasonably be interpreted to suggest that merely acknowledging

---

[28] *Diversity, Equity, and Inclusion*, MERRIAM-WEBSTER, https://perma.cc/Y879-7HB2 (last visited Apr. 3, 2025).

race-based differences or race at all could be considered discriminatory. Such guidance would prevent educators from teaching truthfully about slavery, Jim Crow, the Civil Rights Movement, antisemitism, Japanese internment, and other historical developments that require acknowledging disparate treatment of racial groups and the existence of race-based discrimination.[29]

Even where referencing the Supreme Court's guidance, the Letter sows confusion. The Letter instructs against using students' self-expression, including through essays and writing samples, "as a means of determining or predicting a student's race and favoring or disfavoring such students." Letter at 2 (citing *SFFA*, 600 U.S. at 230). While citing *SFFA* for this rule, the Letter omits the Supreme Court's specific guidance regarding what schools can do consistent with its holding. In fact, the Supreme Court in *SFFA* advised that "nothing in [its] opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." 600 U.S. at 230. But OCR suggests the contrary. At a minimum, OCR leaves schools and educators to question unnecessarily whether they can consider students' self-expression at all.

Certainly, recent attempts to implement or comply with similar EOs and guidance illustrate how broadly such censorship sweeps. After the Department of Defense issued guidance declaring all months celebrating culture and identity "dead," the Maryland National Guard declined to participate in an Eastern Shore parade held in honor of Frederick Douglass' 207th Birthday because it was scheduled during Black History Month.[30] The Department of Justice has removed more than 180 pages of data from their website, including all state-level hate crime data.[31] Agency

---

[29] *See, e.g.,* Mark Lieberman, *McMahon Declines to Say If Black History Classes Are Allowed Under Trump Order*, EDUC. WEEK (Feb. 13, 2025), https://tinyurl.com/2swpaxxb.
[30] Brenda Wintrode, *Maryland National Guard out of Frederick Douglass parade after DoD order declares Black History Month "dead,"* BALTIMORE BANNER (Feb. 14, 2025), https://tinyurl.com/4hj6re4c.
[31] Ethan Singer, *Thousands of U.S. Government Web Pages Have Been Taken Down Since Friday*, N.Y. TIMES (Feb. 2, 2025), https://tinyurl.com/2c89m4mh.

memoranda guiding the creation of websites have flagged hundreds of words to limit or avoid, including: "bias," "Black," "discrimination," "ethnicity," "equality," "injustice," "race," "racism," "segregation," and "tribal."[32] The Department of Defense has removed references to tens of thousands of photos and online posts that celebrate military milestones, including mentions of the Tuskegee Airmen, an image of Pfc. Harold Gonsalves, a Black World War II Medal of Honor Recipient, and a photo from the Army Corps of Engineers titled "Engineering pioneer remembered during Black History Month."[33] Far from prohibiting racial discrimination, these actions seek to prohibit any recognition of racial discrimination or any mention of race at all.

\*\*\*

It is beyond question that, by failing to define its terms, relying on abstract hand-waving, and borrowing from the playbook of a national campaign of censorship, the Letter will result in self-censorship of a wide swath of protected speech. As such, it offends the Constitution and the fundamental rights of students across the country.

## IV.    CONCLUSION

For the reasons stated above, *Amicus* respectfully urges that the Letter be enjoined.

Dated: April 23, 2025

Respectfully submitted,

/s/  Marcos Gonzalez
Marcos Gonzalez (Bar: 252859)
GovSpring Legal
1629 K Street NW, Suite 300
Washington D.C. 20006

*Counsel for Amicus Curiae*

---

[32] Karen Yourish *et al.*, *These Words Are Disappearing in the New Trump Administration*, N.Y. TIMES (Mar. 7, 2025), https://tinyurl.com/y3temm2z.
[33] Tara Copp *et al.*, *War heroes and military firsts are among 26,000 images flagged for removal in Pentagon's DEI purge*, ASSOC. PRESS (Mar. 7, 2025), https://tinyurl.com/5f5aa3nv.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Local Civil Rule 7(o)(4), as it does not exceed twenty-five pages, as well as the typeface requirements of Local Civil Rule 5.1(d), as it has been prepared using Microsoft Word in 12-point Times New Roman font.

Dated: April 23, 2025

Respectfully submitted,

*/s/* Marcos Gonzalez

Marcos Gonzalez

GovSpring Legal

1629 K Street NW, Suite 300

Washington D.C. 20006

*Counsel for Amicus Curiae*

17

## **<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that on April 23, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

/s/  Marcos Gonzalez
Marcos Gonzalez (Bar: 252859)
GovSpring Legal
1629 K Street NW, Suite 300
Washington D.C. 20006
Telephone: (202) 407-3556
Marcos@govspringlegal.com

*Counsel for Amicus Curiae*