UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.*,<br><br>*Defendants*. | No. 25-cv-1120 (DLF) |

## ORAL RULING

This decision memorializes the oral ruling the Court issued from the bench on April 24, 2025, on the plaintiff's Motion for Preliminary Injunction, Dkt. 13.

The plaintiff, the NAACP, filed the instant suit on April 15, 2025, on behalf of its members who are black students across the country enrolled in educational institutions subject to the Department of Education's policies. Compl., Dkt. 1. In its motion, the NAACP requests that the Court enjoin the Department from enforcing various documents—a Dear Colleague Letter, an FAQ document, and a Certification—that the Department recently issued. These challenged documents purport to provide educational institutions guidance about the lawfulness of educational initiatives and programs.

The plaintiff filed this motion for emergency relief on April 20, 2025, seeking a decision by today, April 24, 2025—the date by which educational institutions are required to complete the certification requirement.

For purposes of this motion, the Court has considered the partial record before it which includes the plaintiff's motion and defendant's opposition, as well as the arguments presented by counsel during today's hearing.

## FACTS

On February 14, the Department of Education issued a Dear Colleague Letter directing federally funded educational institutions to cease all racially discriminatory initiatives and unlawful DEI programs, including in admissions, financial aid, hiring, training, and classroom instruction. *See* Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* (Feb. 14, 2025). The letter purports to "reiterate[] existing legal requirements" under Title VI of the Civil Rights Act and the United States constitution. *Id.* at 1. It asserts that educational institutions have been engaging in racially discriminatory practices "under the banner of 'diversity, equity, and inclusion' (DEI)" and directs schools to cease all such practices. *Id.* at 2. Specifically, schools are directed to "(1) ensure that their policies and actions comply with existing civil rights law"; "(2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends"; and (3) "cease all reliance on third-party contractors" that implement such initiatives. *Id.* at 3.

In a follow-on "Frequently Asked Questions" document issued on February 28, the Department defined in more detail the practices it considers illegally discriminatory. *See* Office for Civil Rights, U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Mar. 1, 2025). The FAQ set forth the administration's legal interpretation of the Equal Protection Clause of the Constitution, Title VI of the Civil Rights Act, and the Supreme Court's decision in *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023). It asserts that schools are prohibited from creating racially hostile

2

environments and from supporting "any other aspect of school life that allows one race but not another." FAQ at 5.  While schools may explore racial themes in a classroom discussions, they may not engage in more "extreme practices" that "act[] to shame students of a particular race or ethnicity"—for example, by requiring students to participate in "'privilege walks' that are designed make them feel guilty about being part of a certain race"; by segregating students by race for presentations or discussion with guest speakers; or by pressuring students to "participate in protests or take certain positions on racially charged issues." *Id*. at 6–7.  It clarified that whether a particular policy or program is prohibited will depend on the "facts and circumstances of each case, including the nature of the educational institution, the age of the students, and the relationships of the individuals involved."  FAQ at 6.  Since the issuance of the letter and FAQ, the Department has initiated over fifty Title VI investigations into educational institutions, and has set up an online portal inviting reports of alleged discrimination.  Mot. for Prelim. Inj. at 5, Dkt. 13.

On April 3, the Department issued a certification requirement, under which state educational agencies must certify compliance with the Dear Colleague Letter by April 24 or lose federal funding.  *See* U.S. Dep't of Educ., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025).  The Certification defines actionable violations to include the "use of Diversity, Equity, & Inclusion ('DEI') programs to advantage one[] race over another" and imposes liability under the False Claim Act on non-compliant schools.  Certification at 3.

On April 15, the NAACP filed the instant suit on behalf of its members, who are black students enrolled in educational institutions subject to the Department's policies.  Compl., Dkt. 1.  On April 20, it filed the instant motion for a preliminary injunction requesting that the Court enjoin the Department from enforcing the Dear Colleague Letter, FAQ, and certification requirement.

3

## ANALYSIS

As the parties know, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quotation omitted). To obtain a preliminary injunction, "[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction," including standing to sue. *Food & Water Watch v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). And where a federal agency is the defendant, the last two preliminary injunction factors merge. *Am. Immigration Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

The NAACP seeks preliminary relief on three grounds: first, it claims that the challenged documents violate its student members' First Amendment rights to receive information and to freely associate. Second, it claims that they procedurally and substantively violate the Administrative Procedure Act. Third, it claims they violate the Fifth Amendment Due Process clause by being unconstitutionally vague. The Court will address the First Amendment, APA, and Fifth Amendment claims in turn, addressing standing, the merits, and the remaining preliminary injunction factors as to each.

## FIRST AMENDMENT

The Court will start with the First Amendment claims, beginning with standing. The irreducible elements of standing are (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation omitted). When an organization seeks to bring suit on behalf of its members—that is, to assert associational

4

standing—it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "A plaintiff must demonstrate standing for each claim he seeks to press." *Davis v. FEC*, 554 U.S. 724, 734 (2008).

The plaintiff asserts that the challenged documents will violate (1) their First Amendment right to receive information and (2) their right to freely associate. A plaintiff may establish an injury-in-fact by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (quotation omitted). The First Amendment unquestionably protects a listener's right to receive information and ideas. *Murthy v. Missouri*, 603 U.S. 43, 75 (2024). It also protects an individual's right to "associate to further their personal beliefs." *Healy v. James*, 408 U.S. 169, 181 (1972). To assert a First Amendment right-to-receive claim, a plaintiff must specifically identify information it is denied access to by reason of a government action. But even assuming that the plaintiff has sufficiently identified the particular students whose rights to listen and associate are imminently threatened, it has not shown that its requested relief "will likely alleviate the particularized injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996). When, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*"—here, the schools—"redressability . . . hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 562. "[S]tanding theories that require guesswork as to how independent decisionmakers will exercise their judgment" are not sufficient. *Murthy*, 603 U.S. at 57–58.

Here, the NAACP relies too much on guesswork. Its alleged First Amendment injury stems from the independent decisions of school boards and administrators to end certain programs implicating DEI. For instance, the plaintiff alleges that one member's son will be injured by a resolution from the Virginia Beach School Board directing schools to remove "social emotional learning" programs. Bailey Decl. ¶ 22, Dkt. 13-4. But an injunction from this Court would not eliminate the resolution that the School Board passed. Nor does the plaintiff provide evidence that the Virginia School Board would reverse course if the challenged documents were enjoined. At the hearing, they pointed out that the resolution mentioned the Title VI documents. But the resolution also pointed to President Trump's executive order on DEI. And nothing in the resolution itself suggests that the Board would change its vote and withdraw the resolution based on an injunction of just the documents. More broadly, the plaintiff has submitted no declarations from any schools or administrators stating that they would return programming. *Hecate Energy LLC v. FERC*, 126 F.4th 660, 667 (D.C. Cir. 2025) (finding no standing a plaintiff did not show "its requested relief would spur [a third party] to take the additional steps necessary to remedy the injury" (*quoting Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Causality is particularly lacking because the plaintiff identifies a host of other allegedly coercive actions that the Court could not enjoin. A remedy from this Court would not end Harvard's funding freeze. Pls. Mot. at 6. Nor would it return Columbia's grants. *Id.* at 7. And it could not stop the ongoing Title VI investigations into 45 universities with ties to the Ph.D Project. *Id.* at 5. If, as the plaintiff claims, schools have removed certain programs for fear of enforcement under *existing* federal law including Title VI, that fear would continue even if the Court were to enjoin these particular documents.

Thus, at least at this stage of the litigation, the Court cannot conclude that the requested relief would be substantially likely to remedy the broad coercive effect on schools that the plaintiff alleges, when that effect comes from actions far outside the scope of this lawsuit. Accordingly, it will deny the preliminary injunction motion for lack of standing with respect to the First Amendment claims.

## APA CLAIMS

### Notice and Comment

Next, the Court turns to the claim that the Department unlawfully issued the documents without notice-and-comment in violation of the APA. Because the plaintiff alleges its members were deprived of the "procedural right to protect [their] concrete interests" under at least the Fifth Amendment, it has shown a likeliness of standing to assert that claim. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Turning to the merits, to issue a legislative rule carrying the force of law, an agency must abide by the notice-and-comment procedures set forth in the APA. But the notice-and-comment requirement does not apply to an "interpretive rule," 5 U.S.C § 553(b)(4)(A), which is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995). This is because interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id*. To determine whether a rule is legislative or interpretive, we ask whether the agency "intended" to speak with the force of law, *Encino Motorcars v. Navarro*, 579 U.S. 211, 220 (2016); "whether the agency has published the rule in the Code of Federal Regulations"; and "whether the agency has explicitly invoked its general legislative authority," *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). Here, the

challenged documents have not been published in the Code of Federal Regulations and the Education Department did not explicitly invoke its general legislative authority.

The language of the documents also makes clear that these documents were issued "to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted). The introduction of the letter states its purpose to "clarify and reaffirm" nondiscrimination requirements for schools. Dear Colleague Letter at 1. It further states that the letter "provides notice of the Department's existing interpretation of federal law." *Id.* at 3. The FAQ also confirms this, noting that the document "seeks to provide helpful information about… how OCR interprets the ruling" in *SFFA*. FAQ at 1.

The conditional language throughout underscores that these are guidance documents. *See Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 809 (D.C. Cir. 2006). The FAQ emphasizes that the agency's assessment "depends on the facts and circumstances of each case." FAQ at 6. It provides a "non-exhaustive list" of how it may assess those facts and circumstances and examples that "could" violate Title VI or would be "less likely" to create problems. FAQ at 6–7, 9. True, as the NAACP points out, the letter also advises recipients to "ensure" their policies comply and "cease" all discriminatory actions. Dear Colleague Letter at 3. But the letter does not purport to *impose* that obligation, it merely reminds readers of the preexisting obligation to ensure their policies comply with Title VI. In context, the documents offer "nothing more than a privileged viewpoint in the legal debate." *Ctr. for Auto Safety*, 452 F.3d at 432.

The plaintiff responds that the challenged documents depart from previous interpretations and "impose new obligations," rendering it a legislative rule. Pls. Mot. at 20. In support, the NAACP relies on a Sixth Circuit opinion, *Tennessee v. Department of Education*, which found a

8

"Dear Educator" Letter and Fact Sheet to be a legislative rule. 105 F.4th 577, 609 (6th Cir. 2024). In that case, the Biden administration purported to apply the Supreme Court's Title VII decision in *Bostock v. Clayton County*, to change schools' obligations in the Title IX context. *Id.* at 587. This letter not only purported to apply a Supreme Court opinion to an entirely different context—Title IX rather than Title VII—but it also did so after offering the "opposite take" two years earlier, *id.* at 586.

By contrast, the documents here do not extend *SFFA* to an entirely new statutory provision but rather continue to focus on Title VI. Moreover, the type of changes that the NAACP points to do not amount to the type of reverse-course that requires a legislative rule. The plaintiff points out that the Education Department has previously "embrace[d] diversity, equity, and inclusion activities." Pls. Mot. at 31. But the challenged documents do not fully reject DEI activities. Instead, the FAQ clarifies that the determination of unlawful discrimination "does not turn solely" on the DEI label. FAQ at 6. And the documents also note that celebrating cultural and historical events such as Black History Month, or discussing themes such as racism in class would not be inherent violations. *Id.* at 6, 7. Not all departures from a previous interpretation renders a document a legislative rule. The D.C. Circuit has "time and again, upheld interpretive rules that narrow or remove leeway afforded to regulated parties under a prior interpretation." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 408 (D.C. Cir. 2020).

Moreover, unlike in *Tennessee*, nothing in the letter creates a safe harbor. A safe harbor allows regulated parties to "rely on it" to ensure protection. *Scenic America, Inc. v. DOT*, 836 F.3d 42, 52 (D.C. Cir. 2016). The NAACP points to sentences instructing recipients to "cease all reliance on third-party contractors, clearinghouses, or aggregators." Pls. Mot. at 19 n.18. But nothing in that statement provides a safe harbor. Even if schools eliminated all third-party

9

contractors, they could still be found in violation of Title VI. Thus, the safe harbor analysis in *Tennessee v. Education Department* is inapplicable here.

Because the documents do not create new law but merely narrow leeway previously afforded regulated parties, they are interpretive rules not subject to notice and comment rulemaking. Accordingly, the Court finds the plaintiff has not established a likeliness of success on the merits of its notice-and-comment claim.

### Arbitrary and Capricious; Contrary to Law

Next, the Court will address the claims that the agency acted contrary to law, and arbitrary and capriciously, in violation of the APA. The plaintiff relies largely on the same injuries asserted under the First Amendment and Fifth Amendment claims. For those injuries, for reasons the Court will explain, the Court finds standing only with respect to the void for vagueness challenge. It will provide further analysis on the merits in the discussion to follow under the Fifth Amendment.

The NAACP also asserts an additional injury under the APA arising from a violation of the Equal Protection Clause. Pls. Suppl. Br. at 4, Dkt. 14. It alleges that the challenged documents injure black students by treating them differently. It is axiomatic that regulations classifying individuals based on race, or motivated by a racially discriminatory purpose, injure individuals. *Rothe Dev., Inc. v. DOD*, 836 F.3d 57, 63 (D.C. Cir. 2016). But a plaintiff alleging such an injury must connect the injury to particular discriminatory regulations. *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 52 (D.C. Cir. 2016). On this limited record, the Court cannot conclude that the plaintiff has done so. The challenged documents direct the schools to *eliminate* all illegally racial classifications under existing laws and purport to mandate compliance with Title VI and the Equal Protection Clause. The Court cannot conclude that they are discriminatory on their face. And without more specific evidence, at this preliminary stage, the Court finds that the plaintiff has not

10

identified any discriminatory purpose or implementation. Accordingly, it finds that the plaintiff does not have standing to raise APA claims based on an equal protection violation, and it will deny the motion for a preliminary injunction with respect to those claims.

## FIFTH AMENDMENT

### Standing

Finally, the Court turns to the Fifth Amendment claim. The NAACP asserts that the challenged documents are unconstitutionally vague because they prohibit certain DEI-related initiatives without identifying the *specific* programs or courses that might give rise to Title VI enforcement actions or the withdrawal of federal funding. The Supreme Court has explained that the "general test of vagueness applies with particular force in review of laws dealing with speech." *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976). In *Hynes*, the Supreme Court allowed plaintiffs who were registered voters to challenge a local ordinance that prevented political or charitable canvassers from going house-to-house without first notifying the police. *Id.* at 611. The Court held that even though the individual voters were not directly targeted, the vagueness of the ordinance meant that "persons canvassing for political causes would be uncertain whether the ordinance covered them." *Id.* at 621 n.5.

Like in *Hynes*, the plaintiff here alleges that the provisions of the challenged documents are so vague that schools would be uncertain whether the documents covered them. Moreover, the certification requirement goes beyond merely articulating general guidance on legal educational offerings. Rather, it emphasizes that non-compliance with the administration's interpretation of unlawful DEI will result in liability under the False Claims Act, for which "violators face penalties including treble damages and civil penalties of thousands of dollars per violation." Certification at 4. The certification requirement further provides that compliance with

11

the administration's interpretation of prohibited DEI constitutes a "material condition" for federal funding.  *Id.* at 1.  In other words, it purports to stipulate to the element of materiality in a false claims action, which concretely alters schools' litigation posture and susceptibility to monetary penalties.  As the government conceded in the preliminary injunction hearing, it is aware of no other comparable certification mandating that signers conceded to materiality.  Rough Tr. at 20.  As alleged by the plaintiff, those conditions will force "schools and teachers . . . to steer clear of offering courses and teaching topics that touch on undefined concepts such as 'diversity, equity, and inclusion' to comply" with the challenged documents.  Pls. Suppl. Br. at 7.  This is sufficient to establish an injury-in-fact.

Moreover, unlike the First Amendment injuries, which are insufficiently tied the challenged documents, the vagueness injury *does* flow directly from the certification requirement's effect on schools' legal obligations, and thus affects their offerings to students.  *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 24 (D.D.C. 2020) (noting that this Circuit routinely finds causation when "the relevant third-party conduct is voluntary but reasonably predictable" (quotation omitted)).  Accordingly, the Court finds that causation is satisfied.  *See also Biotechnology Industry Organization v. D.C.*, 496 F.3d 1362, 1371 (D.C. Cir. 2007) (finding causation when "the injury flows directly from the" challenged act).  For the same reason, it finds that the plaintiff's requested injunction would likely redress the unconstitutional vagueness.  *See Arce v. Douglas*, 793 F. 3d 968, 988 (9th Cir. 2015) (finding a right-to-receive injury where a plaintiff challenged a vague statute alleged to have "a direct impact on plaintiffs' right to receive information").

Because the plaintiff has shown a sufficient likelihood of standing to challenge the certification requirement on vagueness grounds, the Court will turn to the merits of that challenge.

**<u>Success on the Merits</u>**

The Supreme Court has held that an "enactment is void for vagueness if its prohibitions are not clearly defined" and the enactment fails to "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Fifth Amendment vagueness doctrine addresses two due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012). These concerns are particularly acute in the First Amendment context because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up). Thus, when a vague regulation is apt to chill protected speech, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Here, the certification requirement threatens serious consequences for schools' failure to comply with vaguely-defined prohibitions on DEI initiatives. Those consequences include the termination of federal funding, breach of contract suits brought by the Department of Justice, and liability under the False Claims Act, 31 U.S.C. § 3729(a). The Court finds that threatening penalties under those legal provisions, without sufficiently defining the conduct that might trigger liability, violates the Fifth Amendment's prohibition on vagueness.

Although the challenged documents place a particular emphasis on "certain DEI practices," they fail to provide an actionable definition of what constitutes "DEI" or a "DEI" practice, or delineate between a lawful DEI practice and an unlawful one. Certification at 3. Indeed, the FAQ asserts that "whether an initiative constitutes unlawful discrimination does not turn solely on

13

whether it is labeled DEI or uses terminology such as diversity, equity, or inclusion"; and that the Department's "assessment of school policies and programs depends on the facts and circumstances of each case." FAQ at 6.

The most specific provision in the Certification prohibits "the use of diversity, equity, and inclusion programs to advantage one[] race over another." Certification at 3. But it is unclear what it means to use such a program to "advantage" one race over another. And the Dear Colleague Letter and FAQ do not provide the necessary additional clarity. The Department argues any vagueness issue is "easily resolved by asking the 'core' question that the DCL foregrounds: does an action 'treat[] a person of one race differently than it treats another person because of that person's race[?]'" Opp'n at 29, Dkt. 19. But this "core" question hardly provides sufficient guidance.

For example, is the decision to host events featuring black scholars (open to all students) an impermissible advantaging of black students over students of other races? *See Nat'l Assoc. of Diversity Offs. in Higher Educ. v. Trump*, ---F. Supp. 3d---, 25-cv-333 (ABA), 2025 WL 573764, at *21–22 (D. Md. Feb. 21, 2025). Would courses taught by professors who promote the view that systemic racism exists, and that race can be central to one's experiences and identity, be unlawful? Does a school's Black Pre-law Student Union, open to all students, nonetheless treat black students differently on the basis of race? The challenged documents provide no answers to those questions and no clear "boundaries of the forbidden areas" to guide schools' compliance with the certification or to limit the Department's enforcement actions. *Grayned*, 408 U.S. at 109. "[T]he lack of clarity on these and other questions makes unavoidable that agency decisionmakers will 'shap[e] a vague [order's] contours though their enforcement decisions.'" *Diversity Offs.*, 2025 WL 573764, at *19 (quoting *Sessions v. Dimaya*, 584 U.S. 148, 182 (Gorsuch, J., concurring)).

The shortened timeframe for certifying compliance further exacerbates vagueness concerns. Recipients were originally given only ten days to return the completed Certification—hardly enough time for schools to consult with the Department or determine which specific policies constitute prohibited DEI. The plaintiff alleges that many school districts rushed to indiscriminately cancel programming to comply with the Department's deadline. *See*, *e.g.*, Graves Decl. ¶¶ 8–10 (Waterloo School District opted out of 19th Annual African American Read-In), Dkt. 13-2; Resolution of Virginia Beach City Public Schools (Apr. 8, 2025), Dkt. 13-6 (directing the Superintendent to, among other things, suspend all educational program offerings that do not comply with the challenged documents, including the district's "Equity Plan."). As a result, students have lost access to programming, curricular offerings, and other initiatives, some of which undoubtedly constitute protected speech.

In sum, because the certification requirement conditions serious financial and other penalties on insufficiently defined conduct, the Court concludes that the plaintiff has shown a likeliness of success on the merits of its Fifth Amendment void for vagueness claim.

## Irreparable Harm

Turning next to irreparable harm, it is well settled that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). "[A] *prospective* violation of a constitutional right constitutes irreparable injury for . . . purposes" of "seeking equitable relief." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (emphasis added). Because the plaintiff has established a likelihood that the certification requirement impinges on its members' liberty interest in receiving protected speech, it has shown irreparable harm.

**Balance of Harms and Public Interest**

The two remaining factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also favor a preliminary injunction. As the D.C. Circuit has noted, the "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon*, 721 F.3d at 653, and the plaintiff raises a likely meritorious Fifth Amendment claim that tips the balance of equities in its favor. That is sufficient to satisfy the final two factors.

Accordingly, the Court finds that the plaintiff has shown it is entitled to a preliminary injunction on Fifth Amendment grounds, and it will enjoin the enforcement of the Certification. A separate order consistent with this decision accompanies this oral ruling.

_____
DABNEY L. FRIEDRICH
United States District Judge

April 24, 2025