**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, |
| *Plaintiff,* |
| v. |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, |
| *Defendants.* |

Case No. 1:25-cv-01120-DLF

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION  TO DISMISS**

### TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.    ED's Authority to Effectuate Equal Education Opportunities ................................ 2

II.   ED's Initial Guidance Following the *SFFA* Decision in 2023. ............................. 3

III.  ED's Further Guidance in the DCL Issued in February 2025. ................................ 4

IV.  This Litigation .......................................................................................................... 6

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT .................................................................................................................... 8

I.    THIS COURT LACKS JURISDICTION BECAUSE NAACP FAILS TO
ESTABLISH STANDING. ....................................................................................... 8

II.   THIS COURT SHOULD DISMISS THE AMENDED COMPLAINT FOR
FAILURE TO STATE A CLAIM ........................................................................... 13

    A.   NAACP's APA Claims Fail (Counts V–VIII) ................................................. 13

       1.   The Title VI Documents Are Not Final Agency Action ............................... 13

       2.   The Title VI Documents Are Not Subject to Notice and Comment ............. 16

    B.   NAACP's Fifth Amendment Claims Fail (Counts I and II) .............................. 17

       1.   NAACP Fails to State an Equal Protection Claim (Count I) ........................ 17

       2.   The Title VI Documents Are Not Unconstitutionally Vague (Count II) ........ 21

    C.   NAACP's First Amendment Claims Fail (Counts III and IV) ......................... 28

       1.   NAACP's Right-to-Receive Information Claim Fails (Count III) ............... 29

       2.   NAACP's Freedom of Association Claim Fails (Count IV) ........................ 31

CONCLUSION ................................................................................................................ 34

**INTRODUCTION**

Following the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"), the U.S. Department of Education ("ED") issued a series of guidance documents—chief among them, a Dear Colleague Letter ("DCL") issued on February 14, 2025, as well as a related "Frequently Asked Questions" document ("FAQ"), and a certification requirement ("Certification")—to explain its enforcement priorities based on preexisting requirements of the Equal Protection Clause of the Constitution and Title VI of the Civil Rights Act.  As the DCL states explicitly, it does not have the force or effect of law, and it does not bind the public or create new legal standards.

Nonetheless, Plaintiff, the National Association for the Advancement of Colored People ("NAACP"), has filed suit challenging the DCL, the FAQ, and the Certification (collectively the "Title VI Documents"), arguing that they violate the First and Fifth Amendments to the U.S. Constitution and the Administrative Procedure Act ("APA").

But this Court should dismiss NAACP's Amended Complaint. First, NAACP is unable to establish standing.  NAACP relies solely on an associational standing theory, but it has not shown that any one of its members would have standing to sue in his or her own right.  All the alleged injuries are all based on speculation about independent actions by non-member, third-party educational institutions. NAACP does not establish that any of its members face an actual or imminent, concrete and particularized injury fairly traceable to the challenged documents.  It cannot establish associational standing, and the Court should grant Defendants' motion to dismiss this case.

Second, NAACP's APA claims fail because the DCL and other challenged documents are not final agency action and lacks the force of law. The DCL explains ED's interpretation of federal antidiscrimination laws, including Title VI, in light of the Supreme Court's decision in *SFFA*.

1

Third, even assuming NAACP alleged a final agency action, these documents were not required to go through notice-and-comment rulemaking because they are interpretive rules.

Fourth, NAACP's constitutional claims—whether reviewed under the APA or as standalone claims—fail as a matter of law. Their equal protection claim fails because the Title VI Documents are facially neutral. Moreover, NAACP does not plausibly allege facts beyond pure conjecture to show any discriminatory intent, particularly considering the DCL's plain anti-discriminatory purpose. NAACP's vagueness claims fare no better because the challenged documents reiterate well-established principles of federal antidiscrimination laws and gives reasonable notice of unlawful, discriminatory conduct. And finally, NAACP's right-to-receive-information and free association claims cannot proceed because their allegations do not implicate speech protected by the First Amendment.

Accordingly, the Court should dismiss NAACP's Amended Complaint.

## BACKGROUND

### I.     ED's Authority to Effectuate Equal Education Opportunities

The opportunity to receive an education, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954). In that landmark decision, the Supreme Court held that "[t]o separate [students] from others of similar age and qualifications solely because of their race" not only irreparably harms the hearts and minds of students, but also violates the Equal Protection Clause of the Fourteenth Amendment. *Id.* Soon thereafter, Congress reinforced this constitutional guarantee by enacting Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. §§ 2000d–2000d-7. To implement this mandate, ED issues regulations and guidance designed to ensure equal access to education. *See* 20 U.S.C. § 3402(1); *see generally*

*Nondiscrimination in Federally-Assisted Programs at the Department of Health Education, and Welfare—Effectuation of Title VI of the Civil Rights Act of 1964*, 29 Fed. Reg. 16298–305 (Dec. 4, 1964).

## II.    ED's Initial Guidance Following the *SFFA* Decision in 2023.

In 2023, the Supreme Court decided *SFFA*, a challenge to two schools' consideration of applicants' race as a plus factor in their higher-education admissions processes for the purposes of obtaining a diverse student body.  600 U.S. 181.  The Court held that the schools' use of race violated the Equal Protection Clause of the Fourteenth Amendment. *Id*.  The decision noted that the Court has to date recognized only two compelling interests the government may have in considering a person's race for purposes of satisfying strict scrutiny; the first is an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the second is in "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id*. at 207.  In handing down its ruling, the Court announced that "[t]he time for making distinctions based on race had passed" and that "[e]liminating racial discrimination means eliminating all of it."  *Id*. at 204, 206.  The Court noted that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."  *Id.* at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)).

Following the decision in *SFFA*, the Departments of Education and Justice co-authored a Dear Colleague Letter, and Frequently Asked Questions document, that were sent to schools receiving federal funding in an effort to provide compliance guidance on how to "pursue *lawful* steps to promote diversity and full inclusion[,]" 2023 DCL at 1 (emphasis added), but also "noting [ED's] continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 from early childhood through postsecondary education."  *Id*. at 3.

3

### III.     ED's Further Guidance in the DCL Issued in February 2025.

On February 14, 2025, ED issued the Dear Colleague Letter challenged in this case. U.S. Dep't of Educ., Off. C.R, Dear Colleague Letter ("2025 DCL") (Feb. 14, 2025), https://perma.cc/J5PJ-DTKG**.**   In this letter, ED explains that, in light of *SFFA*, the agency interprets Title VI to forbid discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race[.]" *Id*. at 2.   ED noted that any strict scrutiny analysis of an Equal Protection issue, as well as the analysis of compliance with Title VI, will turn on a central question: does the school "treat[] a person of one race differently than it treats another person because of that person's race[?]" *Id*. at 2.   The DCL also provides further detail regarding how ED understands Title VI to apply following *SFFA*. However, the DCL is explicit that its "guidance does not have the force and effect of law and does not bind the public or create new legal standards." *Id*. at 1 n.3.

On February 27, 2025, ED launched a public portal, https://enddei.ed.gov/, for parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in publicly-funded K-12 schools, which ED could subsequently investigate to determine whether those schools were engaging in discriminatory behavior. *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://perma.cc/QT6V-68L7.

On March 1, 2025, ED released a Frequently Asked Questions document "to anticipate and answer questions that may be raised in response to the [DCL]." U.S. Dep't of Educ. Off. For C.R., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act at 1 (Mar. 1, 2025), https://perma.cc/WK7Z-JBC2.   On April 9, 2025, ED issued a revised version of the FAQs.  U.S Dep't of Educ. Off. For C.R., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Apr. 9, 2025) ("2025

4

FAQs"), https://perma.cc/43EZ-ME6A.  The FAQ reiterates that ED's interpretations "do not have the force and effect of law and do not bind the public or impose new legal requirements." *Id*. at 1 n.3.  ED also reaffirms its commitment to "enforce[] federal civil rights law consistent with the First Amendment" and confirms that "[n]othing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the [DCL] indicate as much." *Id*. at 6.

The DCL and FAQs do articulate ED's concerns regarding certain diversity, equity, and inclusion ("DEI") *programs*—not concepts—and their susceptibility to treating individuals differently on the basis of race.  But as the FAQ emphasize, "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" *Id*.  Rather, all school programs—DEI or otherwise—must not "intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races." *Id*.

On April 3, 2025, ED's Office for Civil Rights ("OCR") emailed a certification letter to every State Department of Education.  *See* U.S. Dep't. of Educ., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AL43-BUMH ("Certification Letter").  The Certification asked recipients to certify their compliance with the legal obligations imposed by Title VI and SFFA in exchange for receiving federal financial assistance. *Id.* at 2–4. The email directed:

> Within ten (10) days, please sign and return the attached certification along with the certifications of your Local Education Agencies (LEAs).  Furthermore, within these ten (10) days, please report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs.

Defs.' Opp'n to Pls.'s Mot. for Prelim. Inj., Ex. C, ECF No. 19-3. On April 7, 2025, OCR sent a follow-up email to the same State Departments of Education notifying the recipients that ED had granted all States and LEAs a 10-day extension to provide the certifications requested in the April 3 Email.

### IV.    This Litigation.

On April 15, 2025, NAACP filed a complaint for declaratory and injunctive relief against the United States Department of Education, as well as Education Secretary Linda McMahon and Acting Assistant Secretary for Civil Rights Craig Trainor in their official capacities. *See* Compl., ECF No. 1. NAACP is a nonprofit organization that operates, *inter alia*, "to ensure the political, educational, social, and economic equality of all citizens . . ." *Id*. at 4. The complaint alleges violations of the First Amendment, Fifth Amendment, and various provisions of the APA. *Id.* at 50–59. On April 20, 2025, NAACP filed a motion for a preliminary injunction, seeking to enjoin ED from implementing or enforcing the DCL, FAQs, or Certification. *See* Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 13; [Proposed] Order Granting Prelim. Inj., ECF No. 13-8. Soon after, the Court directed NAACP to file a supplemental briefing on the issue of standing, which it did on April 21, 2025. *See* Pl.'s Suppl. Br. Regarding Standing, ECF No. 14.

On April 24, 2025, this Court granted in part and denied in part NAACP's motion for a preliminary injunction. ECF No. 31. Concluding NAACP demonstrated a substantial likelihood of standing to challenge the Certification under the Fifth Amendment, and a likelihood of success on the merits of its void for vagueness claim, this Court preliminarily enjoined Defendants from implementing and enforcing the Certification. NAACP's other claims suffered from pleading defects. In particular, the Court found a lack of substantial likelihood of standing to challenge the Dear Colleague Letter and FAQs under either the First or the Fifth Amendment. Finally, this Court determined that NAACP demonstrated a substantial likelihood of standing for its APA claims, but

held those claims were unlikely to succeed on the merits. This Court further determined that NAACP would be irreparably harmed absent a preliminary injunction and that the balance of equities and the public interest tipped in its favor.

On May 9, 2025, NAACP amended its complaint. First Am. Compl. ("Am. Compl."), ECF No. 34. The Amended Complaint asserts the same causes of action as the original Complaint but adds new allegations.

### LEGAL STANDARD

To survive a Rule 12(b)(1) motion a plaintiff must prove that the court has subject matter jurisdiction. *Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*, 656 F. Supp. 3d 158, 162 (D.D.C. 2023). While the Court will accept factual allegations in the Complaint as true, those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 25 (D.D.C. 2016) (citation omitted). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Plausibly pled factual allegations are accepted as true, but "bare assertions" and "conclusory" allegations are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. The Complaint must allege facts that are "enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp.*, 550 U.S. at 555. "Where a

complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation omitted).

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION BECAUSE NAACP FAILS TO ESTABLISH STANDING.

Where an association asserts "associational standing" to sue on behalf of its members, the association must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

To establish standing, an individual member of the association must prove that (1) it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992) (cleaned up).

Here, NAACP fails to demonstrate that at least one of its members has standing to sue in his or her own right. NAACP is suing on behalf of its members in challenging the Title VI Documents, asserting a host of claims under the First Amendment, Fifth Amendment, and the APA. Am. Compl. ¶ 6 (alleging that "[t]he Title VI Documents, which are final agency action contrary to law enacted without proper process, intentionally discriminate against [its] members, violate

due process with unconstitutionally vague terms, and infringe upon [its] members' First Amendment rights to freely assemble and continue receiving instruction and programming free from viewpoint discrimination.").

But NAACP's theory that the Title VI Documents is causing educational institutions to harm its members fails because NAACP is not "the object of the government action or inaction" it is "challeng[ing]." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Lujan*, 504 U.S. at 562). In other words, NAACP's alleged injuries "result[] from the independent action of some third party"—the educational institutions—"not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"). These injuries are not traceable to Defendants, and when "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" it becomes "'substantially more difficult' to establish" standing. *See Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 48–49 (D.C. Cir. 2016) (quoting *Lujan,* 504 U.S. at 562). A plaintiff may establish a theory of standing that relies on "third parties . . . react[ing] in predictable ways." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). NAACP bases its claims on the alleged actions of certain independent educational institutions that adopted an erroneous view of the Title VI Documents, thereby breaking the causal chain. *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) ("Having outlined the alleged causal chain, we conclude that the connection between the beginning and end of the purported chain remains so attenuated that we

cannot hold the alleged injury to be 'fairly traceable to' the final agency rules 'and not the result of the independent action' of the State of Illinois." (citation omitted)).

For example, NAACP alleges that in response to the DCL, "an Iowa school district withdrew its students . . . from the 19th Annual African American Read-In," thereby forcing "teachers to return 808 books intended for students." Am. Compl. ¶ 4. But, critically, the school district's decision to withdraw from that event derived from an unreasonable interpretation of the Title VI Documents. The plain text of the DCL aims at racial discrimination—not African American literary events—underscoring that "educational institutions may neither separate or segregate students based on race, nor distribute benefits or burdens based on race." DCL at 2. The FAQ further explains that "schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race." FAQ at 6. And "[n]or would educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate or recognize historical events and contributions, and promote awareness, so long as they do not engage in racial exclusion or discrimination." *Id.* Accordingly, based on that explanation in the FAQs, the Iowa school's Read-In event would not violate Title VI so long as it was open to all students in the school district. Withdrawing all its students from the Read-In event appears to have been a drastic overreaction by the school district and disconnected from a plain reading of the Title VI Documents. Other school districts did not share in this overreaction; the news article that NAACP cites in its Amended Complaint, Am.

Compl. ¶ 4 n.3, indicates that "[n]early 3,500 from first graders from 73 schools across Iowa" participated in the Read-In event.[1]

Similarly, NAACP alleges that "to comply with the Title VI Documents, the Board of the City Schools of Decatur in Georgia voted . . . to rescind its Equity Policy and its School Board Governing Policy outlining "City Schools of Decatur's Theory of Action for Exceptional and Equitable Outcomes for Students." Am. Compl. ¶ 90. "As a result of the recission of th[o]se two policies," NAACP further alleges, "[its] members . . . whose children intended to enroll in . . . an African-American History course offered by the City Schools of Decatur reasonably feared that the course would be substantially and detrimentally modified or would no longer be offered." *Id.* But the FAQ states that Defendants cannot "exercise[e] control over the content of the school curricula." *Id.* And, according to the FAQ, teaching African-American history, provided that it is open to all students, would not "create[] a hostile environment based on race," thereby implicating any Title VI concerns. FAQ at 6. The FAQ further provides examples of the sorts of practices that would establish a "racially hostile environment," such as shaming and accusing elementary school students of being "oppressors in a racial hierarchy[.]" *Id.* at 6–7. Thus, any decision by the Decatur school board to cancel classes or otherwise terminate programming or instruction that is open to all students and does not create a hostile environment based on race could not have reasonably flowed from the Title VI Documents.

Same goes for the alleged actions of the Haldane Central School District to suspend its "Diversity, Equity, and Inclusion Policy." Am. Compl. ¶ 93. By NAACP's own telling, the school district's policy sought to "foster tolerance, respect and appreciation of the cultural diversity of the

---

[1] Kyle Werner, *Fearing Federal DEI Policies, Waterloo Schools Withdrew from African American Reading Event*, Des Moines Reg. (Mar. 11, 2025), https://perma.cc/V3BS-XFBQ.

United States . . ." *Id.* (citation omitted). But such policy would seem to be in keeping with Title VI and the challenged guidance documents. After all, the FAQ explains that "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" FAQ at 6. Instead, Defendants' "assessment of school policies and programs depends on the facts and circumstances of each case." *Id.* What schools cannot do, the FAQ emphasizes, is "operate policies or programs under any name that intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races." *Id.* Accordingly, so long as the school district's policy does not engage in racial discrimination, the policy would be consistent with Title VI. The school district's decision to suspend its policy, however, cannot plausibly be based on a fair reading of the Title VI Documents.

Thus, the overreactions of those third-party educational institutions due to their unreasonable interpretation of the Title VI Documents fail to show that those independent actors "will likely react in predictable ways." *Dep't of Com.*, 588 U.S. at 768. The Amended Complaint cites other educational institutions that chose to take less-drastic measures in response to the Title VI Documents. Take NAACP's allegations regarding Rowan University. According to NAACP, Rowan University "reorganized and realigned the departments within the former Division of Inclusive Excellence, Community & Belonging." Am. Compl. ¶ 4 (citation omitted). Although NAACP asserts that "[t]he 'reorganization' directly affects the lives of Black students, including NAACP members, by stripping programming that many find essential," *id.*, Rowan University's website—which NAACP cites to in the Amended Complaint, *id.* n.4—tells another story, showing that the university shifted its personnel, and remains committed to "strengthening existing student support programs." Ali A. Houshmand and Anthony M. Lowman, *Ensuring We Are Inclusive To*

12

*All*, Rowan Today (Feb. 27, 2025), https://perma.cc/DJK2-A47P. Rowan's—like the other Iowa schools that chose to participate in the Read-In event—demonstrates that any purported injury to NAACP's members is due to the independent decisions of the educational institutions, not the Title VI Documents. NAACP, therefore, "cannot rely on 'the predictable effect of Government action on the decisions of third parties'; rather, [it] can only 'speculat[e] about the decisions of third parties.'" *Murthy v. Missouri*, 603 U.S. 43, 72 (2024) (second alteration in original) (citation omitted).

NAACP cannot show any cognizable injury traceable to the Title VI Documents; the asserted injuries stem from the independent actions of the third-party educational institutions that misapprehended the Title VI guidance. That jurisdictional defect forecloses NAACP's substantive claims—Counts I, II, III, IV, V, VI, VII—under the First Amendment, Fifth Amendment, and the APA.

## II.    THIS COURT SHOULD DISMISS THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM.

### A.    NAACP's APA Claims Fail (Counts V–VIII)

#### 1.    The Title VI Documents Are Not Final Agency Action

The APA directs courts to review "[a]gency action made reviewable by statute and final agency action."  5 U.S.C. § 704.   Unless agency action is made reviewable by statute, a plaintiff who fails to challenge final agency action thus lacks a cause of action under the APA.  *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action here, there is no doubt that appellant would lack a cause of action under the APA."). Final agency actions are those that (1) "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined,

or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).

Guidance documents—like the Title VI Documents at issue here—do not satisfy *Bennett*'s two-part test for finality because such documents "neither announced a new interpretation of the regulations nor effected a change in the regulations themselves[,]" was "purely informational in nature[,]" and had "no binding effect . . ." *E.g.*, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("[I]nterpretative rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'"); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 352 F.3d 798, 807 (D.C. Circ. 2006) (holding that a policy statement set forth in an agency letter to regulated entities outlining the agency's automobile regional recall standards was not a final agency action under the APA.). Applying *Bennett*'s two-part test, the D.C. Circuit in *Holistic Candlers* held that FDA warning letters directing manufacturers to take prompt action to comply with their statutory obligations was not final agency action because they were an "informal and advisory" means of achieving "voluntary compliance" that did "not commit FDA to taking enforcement action." *Holistic Candlers & Consumer Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (citations omitted). Nor did a Consumer Product Safety Commission letter indicating that a company's product likely presented a substantial product hazard and requesting "voluntary corrective action" constitute final agency action because the letter carried no legal consequences even though "there may be practical consequences" of refusing "voluntary compliance with the agency's request for corrective action." *Id.* at 731–32. So too here. The Title VI Documents are consistent with this D.C. Circuit's view that such agency guidance documents are not final agency action. The DCL expressly states it is

14

meant to "provide clarity to the public regarding *existing* legal requirements under Title VI, the Equal Protection Clause, and other federal civil rights and constitutional principles." DCL at 1 n.2 (emphasis added); *see Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007) (noting that non-binding disclaimers are "relevant to the conclusion that a guidance document is non-binding"). Moreover, the DCL is explicit that it "does not have the force and effect of law and does not bind the public or create new legal standards." *Id*. As such, the DCL does not determine anyone's rights or obligations or have direct legal consequences.

The same is true for the FAQ, which anticipates questions recipients may have regarding the DCL and expressly notes that its "contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements." FAQ at 1 n.3. And it seeks only to "provide clarity about *existing law* for the benefit of the public." *Id*. (emphasis added). Accordingly, the FAQ is not final agency action because it "creates no new legal obligations beyond those the [statute] already imposed." *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016).

As the Certification does not create any binding consequences independent from those that are already imposed by Title VI and the ED's enforcement regulations, it too is not final agency action. Title VI and the regulations prohibit discrimination "on the ground of race color or national origin." 8 C.F.R. § 100.3. The Certification reiterates the longstanding requirements that, "[e]very application for Federal financial assistance . . . shall, as a condition to its approval and the extension of any Federal financial assistance, contain assurances that the program will be conducted . . . with all requirements imposed by . . . this part." 8 C.F.R. § 100.3(a)(1); *see also* Certification at 2 (quoting *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629–30 (1983) (Marshall, J. dissenting)); *cf. Grove City Coll. v. Bell*, 465 U.S. 555, 574 (1984)

15

("Since Grove City operates an 'education program or activity receiving Federal financial assistance,' the Department may properly demand that the College execute an Assurance of Compliance with Title IX."). Accordingly, *Reliable Automatic Sprinkler Co*. forecloses any claim that the Certification is final agency action merely because it seeks voluntary compliance with existing statutory and regulatory requirements and warns of consequences for refusing to comply. *See* 324 F.3d at 731.

Because the Title VI Documents do not determine rights or obligations or have legal consequences, NAACP does not challenge a "final agency action" within the meaning of the APA and lacks a valid cause of action under the APA. *See Am. Tort Reform Ass'n*, 738 F.3d at 395.

### 2.    The Title VI Documents Are Not Subject to Notice and Comment

An interpretive rule is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). While legislative rules must go through notice and comment, the APA explicitly exempts interpretive rules from such procedures. 5 U.S.C. § 553(b)(4)(A) ("Except when notice or hearing is required by statute, this subsection does not apply . . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice[.]"); *see Perez*, 575 U.S. at 105 ("the text of the APA makes plain: 'Interpretive rules do not require notice and comment.'" (quoting *Shalala*, 514 U.S. at 99).

Here, even if the Title VI Documents satisfy the APA's finality requirement—which they do not—they fit comfortably within the APA's definition of an "interpretative rule[s]." 5 U.S.C. §§ 553(b)(4)(A), (d)(2). An interpretive rule "advise[s] the public of the agency's construction of the statutes and rules which it administers[.]" *Perez*, 575 U.S. at 97 (quoting *Shalala*, 514 U.S. at 99). Such rules do not have the force and effect of law, which distinguishes them from "legislative

rules" that are subject to more rigorous procedures. *Id.* Where the purpose of interpretive rules is to provide notice to regulated entities of how an agency intends to exercise its enforcement discretion, *see Ctr. For Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 24 (D.D.C. 2004), *aff'd*, 452 F.3d 798 (D.C. Cir. 2006), the DCL does just that: it simply reiterates the agency's interpretation of Title VI and other provisions of federal antidiscrimination laws. *See* DCL at 1 ('This letter explains and reiterates *existing legal requirements* under Title VI of the Civil Rights Act of 1964," (emphasis added)). The same is true for the FAQ. FAQ at 1 n.3.

For the reasons just discussed, the Title VI Documents are interpretive rules; therefore, they are exempt from notice and comment. *See Perez*, 575 U.S. at 105.

### B.    NAACP's Fifth Amendment Claims Fail (Counts I and II)

As well as bringing constitutional claims under the APA (Count VI), NAACP advances identical claims directly under the First and Fifth Amendments (Counts I–IV). Because there is no final agency action, *supra*, Point II(A)(1), those APA claims alleging constitutional violations are deficient. Even if cognizable outside of the APA context, *see generally DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts"), NAACP's standalone constitutional challenges also fail as a matter of law and should be dismissed for failure to state a claim.

### 1.    NAACP Fails to State an Equal Protection Claim (Count I)

A plaintiff can assert an equal protection claim in various ways, including, for example that (1) "the government has expressly classified individuals based on their [protected characteristic]"; (2) "the government has applied facially neutral laws or policies in an intentionally discriminatory manner"; or (3) "facially neutral laws or policies result in . . . disproportionate impact and are motivated by a . . . discriminatory purpose." *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 63 (D.C. Cir. 2016) (cleaned up).

At bottom, equal protection directs "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).   To show discriminatory purpose, a plaintiff must show that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).   "Run-of-the-mill disparate impact—that is, the fact that a policy disproportionately hurts a certain group—does not clear this hurdle."   *Smith v. Henderson*, 54 F. Supp. 3d 58, 68–69 (D.D.C. 2014) (citing *Arlington Heights*, 429 U.S. at 264–65). Same goes for "an unadorned, the-defendant-unlawfully-harmed-me accusation . . . . that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . .'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Facts that are "merely consistent with" a defendant's liability "stop[] short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

NAACP's equal protection claim fails at the threshold. For starters, the Title VI Documents are race-neutral on their face. In fact, the DCL goes further by expressly prohibiting discrimination on the basis of race. The very first sentence of the letter emphasizes that "[d]iscrimination on the basis of race, color, or national origin is illegal and morally reprehensible."   DCL at 1. ED issued the DCL to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance[,]" *id.*, further underscoring that "[a]ll students are entitled to a school environment free from discrimination." *Id.* at 3. The DCL can be fairly summarized by the Supreme Court's observation that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No.*

*1*, 551 U.S. 701, 747–48 (2007); *see* DCL at 2 ("At its core, the test is simple: If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law.").

NAACP's equal protection claim principally relies on a distorted and mistaken view of the Title VI Documents. Take NAACP's contention that "Defendants' Title VI Documents evince discriminatory intent by relying upon and perpetuating pernicious racial stereotypes about alleged Black intellectual and moral inferiority." NAACP, tellingly, provides no examples of any such offending language on the face of the Title VI Documents to support this bald allegation. To the extent that NAACP believes that mere mention of terms, such as "DEI," "racial preferences", and "racial balancing" "impugn[s] the qualifications of . . . Black students . . ." Am. Compl. ¶ 118, that accusation finds no support within any of the Title VI Documents. The DCL references certain DEI programs as an example of how some educational programs can indirectly engage in racial discrimination. DCL at 3. And the use of terms such as "racial preferences" and "racial balancing" is consistent with the Supreme Court's decision in *SFFA*. *E.g.*, 600 U.S. at 214 ("Even if these goals could somehow be measured, moreover, how is a court to know when they have been reached, and when the perilous remedy of racial preferences may cease?"); *id*. at 223 ("'[O]utright racial balancing' is 'patently unconstitutional.'" (citation omitted)).

Moreover, NAACP has not pled "sufficient factual matter" permitting the plausible inference "that the defendant[s] acted with discriminatory purpose," *Iqbal*, 556 U.S. at 676, in promulgating the Title VI Documents. *See, e.g.*, *Frederick Douglass Found., Inc*, 82 F.4th at 1147–48 (affirming dismissal of a plaintiff's equal protection claim for failing to allege sufficient facts that defendants took action "because of, not merely in spite of" plaintiffs' viewpoint (quoting *Iqbal*, 556 U.S. at 681)); *Mesumbe v. Howard University*, 706 F. Supp. 2d 86, 92 (D.D.C. 2010) ("To

19

plead intentional discrimination, plaintiff cannot merely invoke his race in the course of a claim's narrative and automatically be entitled to pursue relief. Rather, plaintiff must allege some facts that demonstrate that race was the reason for defendant's actions." (cleaned up)), *summarily aff'd*, 2010 WL 4340401 (D.C. Cir. 2010). As the Supreme Court has recognized, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And it is well established that a plaintiff's burden of "[p]roving intentional discrimination is notoriously difficult . . ." *Smith*, 54 F. Supp. 3d at 68–69; *see Feeney*, 442 U.S. at 272, 274 (stating that a facially neutral policy "is unconstitutional . . . only if [a disparate] impact can be traced to a discriminatory purpose."). NAACP asserts outright, with not much else, that "Defendants' [actions] evince discriminatory intent . . ." Am. Compl. ¶ 118; *see id.* ¶ 119 ("Defendants' actions also evince racially discriminatory intent by attempting to chill lawful activities known to benefit Black students . . ."); *id.* ¶ 121 ("The events surrounding the promulgation of the Title VI Documents . . . also demonstrate that they are intended to harm Black students."); *id.* ¶ 122 ("The reasonably foreseeable discriminatory impacts of the Title VI Documents . . . raise a strong inference of discriminatory purpose."). These are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which "do not suffice[]" to defeat a motion to dismiss. *Iqbal*, 556 U.S. at 678. They are also classic examples of legal conclusions couched as factual allegations. *See id.* Notably, NAACP does not even allege any dissimilar treatment of non-Black students. *See Gordon College v. U.S. Small Bus. Admin.*, No. 23-cv-614 (BAH), 2025 WL 1517208, at *15 (D.D.C. May 28, 2025) ("[t]he threshold inquiry in evaluating an equal protection claim is, therefore, to determine whether a person is similarly situated to those persons who allegedly received favorable treatment. Plaintiff has failed to make this threshold showing." (cleaned up)). Nor could they, given the DCL's emphasis that "educational

institutions may neither separate or segregate students based on race, nor distribute benefits or burdens based on race." DCL at 2.

As the Supreme Court held, "[e]liminating racial discrimination means eliminating all of it." *SFFA*, 600 U.S. at 206. "For the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Id*. (cleaned up). Thus, whatever policy disagreements NAACP might have with the merits of various statements in the Title VI Documents, none of those statements support any plausible inference of intentional discrimination by Defendants or otherwise contradicts the DCL's stated anti-discriminatory purpose.

### 2.    The Title VI Documents Are Not Unconstitutionally Vague (Count II)

The "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008). That doctrine recognizes two due process concerns. The first rests on a "fundamental principle" of "our legal system": laws "regulat[ing] persons or entities must give fair notice of conduct that is forbidden or required." *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (citation omitted). To do so, the law must "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The second kind of vagueness arises if the law "authorizes or even encourages arbitrary and discriminatory enforcement." *Id*. Typically, a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others[]" when he "engages in some conduct that is clearly proscribed[.]" *Williams*, 553 U.S. at 304 (citation omitted). That "requirement" is "relaxed[,]" however, "in the First Amendment context," where plaintiffs may "argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of . . . speech." *Id*. And cases involving speech require "rigorous adherence" to vagueness principles "to ensure that ambiguity does not chill protected

speech." *FCC v. Fox Tel. Stations Inc.*, 567 U.S. 239, 253–54 (2012).  Still, neither "perfect clarity" nor "precise guidance" is "required"—even when "regulations . . . restrict expressive activity." *Williams*, 553 U.S. at 304 (citation omitted). So a regulation may pass constitutional muster if it is "marked by flexibility and reasonable breadth[] rather than meticulous specificity." *Grayned v. City of Rockford*, 408 U.S. 104, 111 (1972) (internal quotation marks and citation omitted). And in the context of a facial challenge, a plaintiff must show that the provisions are not "valid 'in the vast majority of [their] intended applications.'" *Hill*, 530 U.S. at 733 (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)).

The Title VI Documents are not unconstitutionally vague. The DCL "clarif[ies] and reaffirm[s] the nondiscrimination obligations of schools and other entities that receive federal financial assistance from the United States Department of Education." DCL at 1.  The bottom-line message is that "discrimination on the basis of race, color, or national origin, has been, and will continue to be illegal" and, consequently, "educational institutions may neither separate or segregate students based on race, nor distribute benefits or burdens based on race." *Id*. at 2. Emphasizing that Title VI forbids racial discriminatory practices in educational settings, the DCL provides a simple test: "If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law." *Id*.  This test allows "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732. NAACP advances three vagueness theories, none of which plausibly states a claim under the Fifth Amendment.

First, NAACP's Amended Complaint chiefly contends that "[t]he Title VI Documents' key terms and standards are so vague that recipients [of federal funds] cannot determine what activities are affected and thus do not know how to conform their activity to the Documents' requirements."

Am. Compl. ¶ 28. Specifically, NAACP asserts that certain terms used in the Title VI Documents are "nebulous and undefined," *id*. ¶ 31, including "DEI," *id*. ¶ 29, "racial preferences," *id*. ¶ 31, and "hostile environment." *Id*. ¶ 32.  But, as the Supreme Court has observed, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. Consequently, words "marked by 'flexibility and reasonable breadth, rather than meticulous specificity'" are generally "not unconstitutionally vague." *Id*. (citation omitted); *see also Fabrizius v. Dep't of Agric*., 129 F.4th 1226, 1238 (10th Cir. 2025) ("And the regulation contains only 'words of common understanding.' That it does not 'spell out all situations where activity is' prohibited does not render it unconstitutional.") (citations omitted). For that reason, a "vagueness challenge will fail" so long as the Title VI Documents provide a "comprehensible normative standard," even if "imprecise." *Nat'l Urb. League v. Trump*, No. CV 25-471 (TJK), 2025 WL 1275613, at *19 (D.D.C. May 2, 2025) (citation omitted); *see United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) ("[W]e are not concerned with vagueness in the sense that the term requires a person to conform his conduct to an imprecise but comprehensible normative standard . . ." (cleaned up)). Against that backdrop, none of the complained-of terms that NAACP cites in the Amended Complaint are "so vague that it fails to give ordinary people fair notice" of the conduct that the Title VI Documents prohibit. *Johnson v. United States*, 576 U.S. 591, 595 (2015).

Again, the DCL's test, along with the other Title VI Documents, provides a comprehensible normative standard by contextualizing the meaning of those terms. DCL at 2 ("If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law."). Any alleged confusion over the scope of the term "DEI" is not a fatal vagueness issue. In fact, the FAQ explains that "whether an

initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" FAQ at 6. So for the inquiry about whether a school program runs afoul of Title VI, the term "DEI" is not dispositive; rather the touchstone is whether that program discriminates on the basis of race. Similarly, the DCL's test, along with its discussion about *SFFA*, provides reasonable guidance as to the term "racial preferences" or "race-based decision-making."

And references to "hostile environment[]" do not render the Title VI Documents unconstitutionally vague. The FAQ even provides examples and sets out what appears to be a sliding scale regarding "whether a racially hostile environment exists[.]" FAQ at 6. The FAQ illustrates that "an elementary school that sponsors programming that acts to shame students of a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy . . . or deliberately assign them intrinsic guilt based on the actions of their presumed ancestors . . . could create a racially hostile environment," whereas "exploration of similar themes in a class discussion at a university . . . would be less likely to create a racially hostile environment." FAQ at 6–7. That more than adequately provides "people of ordinary intelligence a reasonable opportunity to understand what conduct [the Title VI Documents] prohibit[]." *Hill*, 530 U.S. at 732.

Notably, NAACP complains of terms that are common throughout federal civil rights law. For example, the Supreme Court used the term "racial preferences" in the Title VI context in *Regents of University of California v. Bakke*, 438 U.S. 265, 301 (1978) ("The Courts of Appeals have fashioned various types of *racial preferences* as remedies for constitutional or statutory violations resulting in identified, race-based injuries to individuals held entitled to the preference." (emphasis added)). Similarly, "hostile environment" comes up frequently in the Title VII context. *E.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("The phrase 'terms, conditions, or

privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a *discriminatorily hostile or abusive environment*." (emphasis added)). Were NAACP correct, common terms throughout federal civil rights law would be unconstitutionally vague.[2]

To be sure, there might be some edge cases. This Court, in its preliminary injunction order, posed a number of hypotheticals regarding potential uncertainty about the scope of the Title VI Documents. ECF No. 30 at 14. But, again, any "uncertainty about the correct resolution of edge cases 'will not warrant facial invalidation if it is clear what the [policy] proscribes 'in the vast majority of its intended applications.'" *Hernandez v. City of Phoenix*, 43 F.4th 966, 983 (9th Cir. 2022) (citing *California Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (alteration in *Hernandez*)).

Second, NAACP also asserts that the Title VI Documents are unconstitutionally vague because "those at ED tasked with enforcement are unable to fairly and consistently enforce the law." Am. Compl. ¶ 28. NAACP, however, offers no facts to show any actual instances of arbitrary enforcement of the Title VI Documents. And "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack when the provisions are valid in the vast majority of their intended applications." *Nat'l Urb. League*, 2025 WL 1275613 at *19 (citing *Hill*, 530 at 733) (cleaned up). On top of that, NAACP's vagueness theory, based on the possibility of arbitrary enforcement, is inapposite because that aspect of vagueness "is

---

[2] Notably, such an outcome would seem to frustrate NAACP's mission "to ensure the political, educational, social, and economic equality of all citizens; to eliminate racial prejudice; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state, and local laws securing civil rights; and to inform the public of the continued  adverse effects of racial discrimination." Am. Compl. ¶ 10.

concerned about '*law enforcement authorities*' lacking 'adequate guidance.'" *Id*. (citing *Hill*, 530 U.S. at 733). In other words, ED is not a law enforcement agency, so this theory has no relevance in this challenge. "So courts have greater tolerance for enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less serious." *Id*. (cleaned up) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982)).

Third, NAACP raises vagueness concerns specifically related to the Certification due to potential liability under the False Claims Act (or "FCA"). NAACP contends that "[r]ecipients are either forced to end lawful activities, including activities to address racial inequality, or risk the loss of federal funds, breach of contract litigation, or liability under the False Claims Act." Am. Compl. ¶ 28. This Court, in its PI Order, similarly found that "threatening [those] penalties under those legal provisions, without sufficiently defining the conduct that might trigger liability, violates the Fifth Amendment's prohibition on vagueness." ECF No. 30 at 13. These concerns are overstated. Importantly, this provision imposes no new requirements. Rather, it simply requires recipients to certify their compliance with existing legal obligations under federal antidiscrimination laws—including Title VI, 42 U.S.C. § 2000d-1—laws that are binding independent of any certification requirement. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a condition to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI and with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n*, 463 U.S. at 629–30 & n.22 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury).

Recently, Judge Kelly rejected a similar claim by an organizational plaintiff that a certification requirement of an executive order[3] was unconstitutionally vague under the Fifth Amendment. *Nat'l Urb. League*, 2025 WL 1275613 at *20. Specifically, Judge Kelly rebuffed the organizational plaintiff's argument that any vagueness stemmed from the difficulty of determining "whether a DEI program violates federal antidiscrimination law[.]" *Id.* Seeing past the DEI gloss, Judge Kelly concluded that the certification requirement at issue in that case "is straightforward[.]" *Id.* The inquiry, Judge Kelly reasoned, boils down to whether "the counterparty [is] violating federal anti-discrimination law[s]." *Id.* And "any difficulty in determining [] that fact . . . does not render the provision unconstitutionally vague." *Id.* (citing *Williams*, 553 U.S. at 306). That same reasoning applies here. The Certification states that "[t]he use of certain DEI practices can violate federal law" and "[t]he continued use of *illegal* DEI practices"—*i.e.* those that violate Title VI— "may subject the individual or entity using such practices to serious consequences . . ." Certification at 3 (emphasis added). Whether a DEI program violates federal antidiscrimination laws might "sometimes be difficult to determine." *Williams*, 553 U.S. at 306. But a provision is vague "not when that determination is hard" but "when there is indeterminacy as to precisely what the fact is that triggers the provision." *Nat'l Urb. League*, 2025 WL 1275613 at *19 (cleaned up) (citing *Williams*, 553 U.S. at 306).

Moreover, the Certification—on its face—makes clear that the False Claims Act "imposes liability on anyone who *knowingly* submits a false claim to the Government." Certification at 4 (emphasis added) (cleaned up). And that scienter "requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA

---

[3] *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

liability[.]" *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015); *see also id*. at 288 (FCA does not "reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations"). Thus, the FCA's heightened scienter requirement further ameliorates any vagueness concerns in connection to the Certification. *Vill. of Hoffman Ests.*, 455 U.S. at 499 ("And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.").[4]

Because the Title VI Documents clearly describe a type of conduct that Title VI prohibits— differential treatment based on race—it is not vague and does not fail to provide reasonable notice or increase the risk of arbitrary enforcement. NAACP's cause of action under the Fifth Amendment, therefore, fails as a matter of law.

## C.    NAACP's First Amendment Claims Fail (Counts III and IV)

The First Amendment prohibits governments from "abridging the freedom of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). But the Supreme Court has "reject[ed] the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546 (1983) (internal quotation marks and citation omitted). In other words, "even where the Constitution prohibits coercive governmental interference with specific individual rights, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Lyng v. UAW*, 485 U.S. 360, 369 (1988) (internal quotation marks and citations omitted).

---

[4] Furthermore, the Supreme Court has held that "the materiality standard is demanding" and that "[t]he False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) (citation omitted). Materiality is, therefore, assessed under *Escobar* using a comprehensive inquiry.

That is why the "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality opinion) (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). And for that reason, the typical "recourse" for a "party" that "objects to a condition on the receipt of federal funding" is "to decline the funds[.]" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

NAACP brings a facial First Amendment challenge. Consequently, it must show that "a substantial number of" the Title VI Documents' "applications are unconstitutional, judged in relation to [their] plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 708 (2024) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). This standard is "rigorous." *Id.* at 723.

### 1. NAACP's Right-to-Receive Information Claim Fails (Count III)

The Supreme Court recognize[s] a "First Amendment right to 'receive information and ideas.'" *Murthy*, 603 U.S. at 75; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). The Court "generally treats the rights of [speakers and listeners] as 'reciprocal.'" *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 560 (D.C. Cir. 2019) (en banc) (Katsas, J., concurring in part) (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 757). Put simply, "the right of one party to speak implies the right of another party to listen." *See id.* Although the right to receive information is not mentioned in the First Amendment, it "follows ineluctably from the sender's First Amendment right to send" information. *Martin v. EPA*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002) (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (opinion of Brennan, J.)) A would-be listener's rights are therefore "derivative of the First Amendment rights of the speaker." *Id.* (citation omitted).

NAACP alleges that "[b]y infringing on schools' ability to provide instruction, trainings, and programming on certain topics disfavored by Defendants, the Title VI Documents unlawfully deny students, including NAACP members, the right to receive information free from viewpoint and content-based restrictions." Am. Compl. ¶ 134. But, again, the Title VI Documents are concerned with programs that engage in "racial discrimination in public education[.]" *SFFA*, 600 U.S. at 204 (citing *Brown v. Board of Education*, 349 U.S. 294, 298 (1955)). And for a First Amendment violation concerning the right to receive information, NAACP must show that the Title VI  Documents impermissibly restrict "*protected speech*." *Nat'l Urb. League*, 2025 WL 1275613 at *1. NAACP's Amended Complaint alleges little regarding the content and nature of the instruction or programs that its members fear will be terminated as result of the Title VI Documents. The Title VI Documents prohibit educational institutions from "separat[ing] or segregat[ing] students based on race," or "distribut[ing] benefits or burdens based on race[,]" DCL at 2.  The Amended Complaint says nothing to indicate that NAACP members intend to participate in programs that engage in those sorts of practices.

If, however, that is NACCP's desire, the claim fails, as "there is no constitutional right to operate DEI programs that violate federal antidiscrimination law." *Nat'l Urb. League*, 2025 WL 1275613 at *24.  NAACP's members have no First Amendment right to participate in certain school instruction or programs  involving such unlawful practices. *See id*. To the contrary, as the Eleventh Circuit has observed, "the Supreme Court has clearly held that the First Amendment does not protect the very act of discriminating on the basis of race." *Am. All. For Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024) (discussing *Runyon v. McCrary*, 427 U.S. 160 (1976) and *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992)); *see also Kestenbaum v. President & Fellows of Harvard Coll*., 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court

consequently is dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations."); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185–92 (6th Cir. 1995) (rejecting First Amendment argument that firing educator for his harassing use of racial epithet violated his free speech). When speech is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. *See*, *e.g.*, *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) ("[T]he First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts . . . ."). Moreover, NAACP's right-to-receive information claim runs headlong into the FAQ that makes clear "[n]othing in Title VI . . . authorizes a school to restrict any rights otherwise protected by the First Amendment . . ."  FAQ at 6; *see id*. ("[ED] OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution.").

Because discriminatory conduct effectuated by words is not protected speech, NAACP's right-to receive-information arguments fail to state a claim.

### 2.    **NAACP's Freedom of Association Claim Fails (Count IV)**

The Supreme Court has "recognized a First Amendment right to associate for the purpose of speaking, which it has termed a right of expressive association." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006) (cleaned up). But the right to associate does not mean "that in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution." *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988).

NAACP asserts that the Title VI Documents violate its members First Amendment right to "freely associate in pursuit of disfavored topics," Am. Compl. ¶ 140, "impacting student[s] groups' use of campus space, speech, and resources." *Id*. ¶ 141. But this claim, which restates NAACP's

31

right-to-receive information claim, fails substantially for the same reasons: Again, the Title VI Documents states that "[a]ll students are entitled to a school environment free from discrimination. The Department is committed to ensuring those principles are a reality." DCL at 3.

NAACP's Amended Complaint lacks sufficient factual allegations regarding how the Title VI Documents affect various student groups. *Iqbal*, 556 U.S. at 678. One NAACP member "believes that . . . student groups . . . that improve Black students' experience at their Washington, DC university and foster a sense of inclusivity will be discontinued . . . As result, Black students will feel less comfortable, and the school might become 'unbearable.'" Am. Compl. ¶ 30. That allegation is vague, conclusory, and speculative. It is not "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56.

NAACP further alleges that "[o]ne NAACP member who attends the City Schools of Decatur reasonably feared that their student group, which "conducts educational programming open to all students about the history of Decatur, including systemic racism and Black history," "would be forced to terminate some or all of its activities . . ." *Id*. ¶ 113. In a similar vein, "[a]nother NAACP member's child participates in an after-school program in the City Schools of Decatur that is open to all but is focused on empowering Black girls. . . . This member reasonably feared that her child's program would be cancelled . . ." *Id*. ¶ 114. But those allegations are plainly insufficient because the FAQ that clarifies that "schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race." FAQ at 6. So long as those student groups "do not engage in racial exclusion or discrimination[,]" *id*.—which, notably, NAACP does not allege—the Title VI Documents should pose no First Amendment issue for those student groups. *Cf. Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v.*

*Martinez*, 561 U.S. 661, 696–97 (2010) (holding that a school nondiscrimination policy mandating that all student groups take "all-comers" does not violate a student group's First Amendment rights, including free association).

If, however, these student groups "distribute benefits or burdens based on race," DCL at 2, Defendants' enforcement of Title VI would not violate any NAACP members' free association rights. That is because the Supreme Court has held that while the First Amendment guarantees a right "to engage in association for the advancement of beliefs and ideas," it does not extend to the act of discriminating on the basis of race. *Runyon*, 427 U.S. at 175–76; *see id*. ("the Constitution . . . places no value on discrimination . . ." (quoting *Norwood v. Harrison*, 413 U.S. 455, 469 (1973))). Thus, NAACP cannot plausibly claim that the DCL would prevent their members from joining certain student groups (that are open to all), thereby violating their First Amendment right to associate.

Accordingly, NAACP's free association claim fails.

## CONCLUSION

For the foregoing reasons, this Court should dismiss NAACP's First Amended Complaint.


Dated: June 23, 2025                    Respectfully submitted,

                                        CHAD MIZELLE
                                        Acting Associate Attorney General

                                        ABHISHEK KAMBLI
                                        Deputy Associate Attorney General

                                        BRETT A. SHUMATE
                                        Assistant Attorney General
                                        Civil Division

                                        DIANE KELLEHER
                                        Director
                                        Civil Division, Federal Programs Branch

                                        /s/ *James J. Wen*
                                        JAMES J. WEN
                                        EITAN R. SIRKOVICH
                                        Trial Attorneys, U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, N.W.
                                        Washington, D.C. 20005
                                        Telephone: (202) 598-7361
                                        E-mail: james.j.wen@usdoj.gov

                                        *Counsel for Defendants*

## CERTIFICATION OF SERVICE

I hereby certify that, on June 23, 2025, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *James J. Wen*
JAMES J. WEN