## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION,
LINDA MCMAHON *in her official capacity as*
*U.S. Secretary of Education*, and CRAIG
TRAINOR, *in his official capacity as Acting*
*Assistant Secretary for Civil Rights of the U.S.*
*Department of Education*,

*Defendants*.

Civil Action No. 25-1120 (DLF)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION ......................................................................................................... 1

I.      FACTUAL BACKGROUND ............................................................................... 1

II.     LEGAL STANDARD .......................................................................................... 6

III.    ARGUMENT ...................................................................................................... 7

        A.      NAACP HAS ESTABLISHED STANDING. ............................................ 7

                1.      Plaintiff NAACP Properly Alleged Standing for its APA Claims............... 8

                2.      Plaintiff NAACP Properly Alleged Standing for its First
                        Amendment Claims. ................................................................... 8

                3.      Plaintiff NAACP Properly Alleged Standing for its Fifth
                        Amendment Equal Protection Claim. ......................................... 10

                4.      Plaintiff NAACP Properly Alleged Standing for its Fifth
                        Amendment Vagueness Claim. ................................................. 11

        B.      DEFENDANTS' RULE 12(B)(6) ARGUMENTS ARE MERITLESS................ 13

                1.      The NAACP Has Sufficiently Pled Its APA Claims (Counts V-
                        VIII). ........................................................................................ 13

                2.      NAACP Has Sufficiently Alleged its Fifth Amendment Claims
                        (Counts I and II)....................................................................... 17

                3.      NAACP Sufficiently Pled its First Amendment claims (Counts III
                        and IV). .................................................................................... 35

IV.     CONCLUSION.................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Act Now to Stop War and End Racism Coal. & Muslim Am. Soc'y Freedom
    Found. v. District of Columbia,*
    846 F.3d 391 (D.C. Cir. 2017) ..............................................................................29

*Agnew v. Gov't of D.C.,*
    263 F. Supp. 3d 89 (D.D.C. 2017) ........................................................................29

*Air Excursions LLC v. Yellen,*
    66 F.4th 272 (D.C. Cir. 2023) ...........................................................................6, 26

*Am. Fed'n of Tchrs v. Dep't of Educ.,*
    No. SAG-25-628, 2025 WL 1191844 (D. Md. April 24, 2025) .......................16, 37

*Am. Hosp. Ass'n v. Bowen,*
    834 F.2d 1037 (D.C. Cir. 1987) ............................................................................16

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health,*
    No. 25-10787-WGY, 2025 WL 1548611 (D. Mass. May 30, 2025) .....................29

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ..............................................................................................40

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ............................................................................14

*Arce v. Douglas,*
    793 F. 3d 968 (9th Cir. 2015) ...............................................................................12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................................27

*Ashtari v. Pompeo,*
    496 F. Supp. 3d 462 (D.D.C. 2020) ........................................................................6

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
    785 F.3d 710 (D.C. Cir. 2015) ..............................................................................13

*Baggett v. Bullitt,*
    377 U.S. ..................................................................................................................27

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980) ..............................................................................16

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)..........................................................................................35, 36

*Bd. of Educ. v. Mergens*,
  496 U.S. 226 (1990)...................................................................................................43

*Bellinger v. Bowser*,
  No. CV 17-2124 (TJK), 2018 WL 4705808 (D.D.C. Sept. 30, 2018)....................................24

*Bennett v. Spear*,
  520 U.S. 154 (1997)..........................................................................................13, 14, 15

*Bissett v. Beau Rivage Resorts Inc.*,
  442 F. App'x 148 (5th Cir. 2011) ................................................................................4

*Bolling v. Sharpe*,
  347 U.S. 497 (1954)...................................................................................................19

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)...................................................................................................40

*Brown v. Bd. of Educ. of Topeka*,
  347 U.S. 483 (1954)...................................................................................................20

*Chi. Women in Trades v. Trump*,
  No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025)...............................................34

*Christian Legal Soc. Chap. of the Univ. of Cal., Hastings Coll. of L. v. Martinez*,
  561 U.S. 661 (2010)...................................................................................................43

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010)...................................................................................................18

*Cmty. Nutrition Inst. v. Young*,
  818 F.2d 943 (D.C. Cir. 1987) ....................................................................................17

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971)...................................................................................................28

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)...................................................................................................9

*DeVillier v. Texas*,
  601 U.S. 285 (2024)..............................................................................................17, 18

*Duffy v. Wolle*,
  123 F.3d 1026 (8th Cir. 1997), *abrogated on other grounds by Torgerson v.
  City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).........................................................4

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ..................................................................................6, 13

*Farmer v. Ramsay*,
    41 F. Supp. 2d 587 (D. Md. 1999) ......................................................................................19

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ............................................................................................14

*Hamilton v. Paulson*,
    542 F. Supp. 2d 37 (D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344
    (D.C. Cir. 2012) ...................................................................................................................13

*Healy v. James*,
    408 U.S. 169 (1972) .............................................................................................................40

*Hill v. Colorado*,
    530 U.S. 703 (2000) .............................................................................................................27

*Holder v. Humanitarian L. Project*,
    561 U.S. 1, 20 (2010) ..........................................................................................................29

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2014) ..............................................................................................14

*Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*,
    502 F. App'x 523 (6th Cir. 2012) ..........................................................................................4

*Johnson v. U.S.*,
    576 U.S. 591 (2015) .......................................................................................................28, 29

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) .............................................................................................................36

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    567 U.S. 298 (2012) .............................................................................................................40

*Lamont v. Postmaster Gen. of U.S.*,
    381 U.S. 301 (1965) .............................................................................................................35

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................................................7

*Martin v. City of Struthers*,
    319 U.S. 141 (1943) .............................................................................................................35

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
    No. 25-CV-00403 (DLF), 2025 WL 1094223 (D.D.C. Apr. 11, 2025) ...............................9

*Mlynczak v. Bodman*,
   442 F.3d 1050 (7th Cir. 2006) ...................................................................................4

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)................................................................................................35

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ...................................................................23, 24, 26

*NAACP v. Button*,
   371 U.S. 415 (1963)................................................................................................27

*NAACP v. U.S. Dep't of Educ.*,
   No. 25-CV-1120 (DLF), 2025 WL 1196212 (D.D.C. Apr. 24, 2025)..8, 11, 12, 17, 24, 27, 31, 32, 33, 38, 42

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) ..................33

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
   No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. April 24, 2025) .....16, 17, 22, 35, 37, 39, 42

*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*,
   979 F.2d 227 (D.C. Cir. 1992) ................................................................................13

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014).........................................................................13, 14

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)..........................................................................................44, 45

*Nat'l Urb. League v. Trump*,
   No. 25-471 (TJK), 2025 WL 1275613, at *24 (D.D.C. May 2, 2025) ...................38

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
   506 F.2d 33 (D.C. Cir. 1974)..................................................................................17

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007)..................................................................................................7

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   2025 WL 1276857 (D.D.C. May 2, 2025).............................................................33

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
   641 F. Supp. 3d 1218 (N.D. Fla. 2022)............................................................36, 37

*POET Biorefining, LLC v. E.P.A.*,
   970 F.3d 392 (D.C. Cir. 2020).................................................................................14

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..............................................................................................36

*Regan v. Tax'n With Representation of Wa.*,
    461 U.S. 540 (1983).......................................................................................24, 43

*Reno v. ACLU*,
    521 U.S. 844 (1997).......................................................................................27, 28

*Rogers v. Lodge*,
    458 U.S. 613 (1982)..............................................................................................23

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)..............................................................................................36

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2016)................................................................................19

*S. Educ. Found. v. U.S. Dep't of Educ.*,
    No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025)....................34

*S.F. A.I.D.S. Found. v. Trump*,
    No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025) ..................34

*S.F. Unified Sch. Dist. v. AmeriCorps*,
    No. 25-CV-2425-EMC, 2025 WL 1713360 (N.D. Cal. June 18, 2025)................34

*Sessions v. Dimaya*,
    584 U.S. 148 (2018)..............................................................................................28

*Shands v. Comm'r of Internal Revenue*,
    111 F.4th 1 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 1178 (2025) ...................40

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ...............................................................................7

*Sierra Club v. EPA*,
    955 F.3d 56 (D.C. Cir. 2020) .................................................................................15

*Sierra Club v. FERC*,
    827 F.3d 59 (D.C. Cir. 2016) ..................................................................................7

*Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*,
    882 F.3d 988 (11th Cir. 2018) ..............................................................................20

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
    600 U.S. 181 (2023)...............................................................................1, 3, 5, 22

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149, 148-59 (2014) ...............................................................8

*Susman Godfrey LLP v. Exec. Off. of President*,
No. CV 25-1107 (LLA), 2025 WL 1779830 (D.D.C. June 27, 2025)......................4

*Thompson v. U.S. Dep't of Hous. & Urb. Dev.*,
348 F. Supp. 2d 398 (D. Md. 2005)...................................................18

*Tomaszewski v. City of Phila.*,
460 F. Supp. 3d 577 (E.D. Pa. 2020) .................................................4

*U. S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973)...............................................................18

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
578 U.S. 590 (2016)...........................................................14, 17

*United States v. Cook*,
914 F.3d 545 (7th Cir. 2019), *judgment vacated on other grounds*, 140 S. Ct.
41...............................................................................28

*United States v. Hasson*,
26 F.4th 610 (4th Cir. 2022) ......................................................28

*United States v. Picciotto*,
875 F.2d 345 (D.C. Cir. 1989) .................................................16, 17

*Va. State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*,
No. 5:24-CV-040 2025 WL 271705 (W.D. Va. Jan. 22, 2025)...........................24

*Vavra v. Honeywell Int'l Inc.*,
688 F. Supp 3d 758 (N.D. Ill. 2023) ..................................................4

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)..................................................10, 11, 19, 22, 23

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)...............................................................36

*Washington v. Davis*,
426 U.S. 229 (1976)...............................................................23

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) ..................................................9, 10

*Young v. Colo. Dep't of Corr.*,
No. 22-CV-00145-NYW-KLM, 2023 WL 1437894 (D. Colo. Feb. 1, 2023).................4

## Statutes

5 U.S.C. § 702 ......................................................................................................... 8

5 U.S.C. § 706 ......................................................................................................... 13

18 U.S.C. § 287 ....................................................................................................... 33

20 U.S.C. § 7231(a)(4)(A), (b), b(3) ...................................................................... 5

Administrative Procedure Act .............................................................. 5, 8, 13, 17

## Other Authorities

Devon W. Carbado & Cheryl I. Harris, *The New Racial Preferences*, 96 Cal. L.
    Rev. 1139, 1162 (2008) ................................................................................... 21

Elise Boddie, *The Indignities of Color Blindness*, 64 UCLA L. Rev. Discourse 64
    (2016) ............................................................................................................... 21

Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives
    Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025) .............................. 5

Fed. R. Evid. 201(b) ............................................................................................... 13

*Hearing Examining the Policies and Priorities of the Dep't of Educ. Before the S.
    Comm. on Health, Educ., Lab. and Pensions*, 119th Cong., at 1:38:28 (June 4,
    2025),
    https://edworkforce.house.gov/calendar/eventsingle.aspx?EventID=412504 ...................... 31

*Hearing on the Nomination of Linda McMahon to be Educ. Sec'y Before the S.
    Comm. on Health, Educ., Lab. and Pensions*, 119th Cong., 2025 WL 502955
    (Feb. 13, 2025) ................................................................................................ 31

Off. for C.R., U.S. Dep't of Educ., Fact Sheet: Diversity and Inclusion Activities
    Under Title VI 1–2, available at
    https://web.archive.org/web/20241203144143/https://www.ed.gov/sites/ed/file
    s/about/offices/list/ocr/docs/ocr-factsheet-tvi-dia-202301.pdf ........................... 5

Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department
    Establishes Civil Rights Fraud Initiative* (May 19, 2025),
    https://www.justice.gov/opa/pr/justice-department-establishes-civil-rights-
    fraud-initiative .................................................................................................. 33

Va. Commonwealth Univ., Interdisciplinary Developmental Disability Studies,
    https://bulletin.vcu.edu/azcourses/idds/ (last visited July 14, 2025) ................. 38

## INTRODUCTION

Plaintiff NAACP respectfully submits this response to Defendants' motion to dismiss, ECF No. 36. Defendants' motion should be denied in its entirety because NAACP's First Amended Complaint ("FAC") plausibly alleges that it has standing to assert its claims and sets forth detailed factual allegations sufficient to plausibly state each of its claims.

## I.    FACTUAL BACKGROUND

The U.S. Department of Education ("ED") is charged with enforcing anti-discrimination laws and ensuring that every child enjoys equal access to educational opportunities. Yet, in abdication of that responsibility, on February 14, 2025, ED sent a "Dear Colleague" letter ("DCL") misstating the law and threatening to cut funding to PK-12 schools, colleges, and universities that engage in certain policies and practices—including policies and practices that help ensure that Black students are afforded equal access to a quality education, including truthful and inclusive curricula; efforts to remove obstacles that deny Black students a fair chance to compete for selective academic programs; and school-related programming, training, and affinity groups that support Black students. FAC ¶¶ 2–4, 53–54, 62–115. ED issued an accompanying Frequently Asked Questions ("FAQs") document on February 28, 2025. *Id.* ¶ 2. ED subsequently sent a follow-up letter to PK-12 State Education Agencies ("SEAs") on April 3, 2025, directing them to certify their compliance (and the compliance of their Local Education Agencies ("LEAs")) with ED's misstatement of the law ("Certification"), as expressed in the DCL and FAQs. *Id.* ¶ 25.

ED's Letter stated, without explanation, that "racial discrimination ha[s] emanated throughout every facet of academia," victimizing white and Asian-American students, and running afoul of *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023). DCL at 1. The DCL, however, did not acknowledge or address racial

discrimination and other inequalities faced by Black students in education. FAC ¶¶ 34–37. The DCL declared that ED considers a wide range of lawful activities to be de facto illegal discrimination, including voluntary affinity group "graduation ceremonies[,] . . . dormitories[,] and other facilities"; instruction concerning "systemic and structural racism" in the United States; "programs . . . motivated by racial considerations," including efforts to advance equal opportunity that are "neutral on their face" and "increase racial diversity," such as "eliminat[ing] standardized testing"; and "using race in decisions pertaining to admissions, hiring, promotion, compensation, financial aid, scholarships, prizes, administrative support, discipline, housing, graduation ceremonies, and all other aspects of student, academic, and campus life." DCL at 1–3; FAC ¶ 15. Notably, most—if not all—of these lawful activities benefit Black students by creating racially inclusive environments, addressing systemic and structural discrimination that unfairly disadvantages Black students, and implementing race-neutral reforms to break down barriers to opportunities and resources for Black students. FAC ¶¶ 62–115. The DCL also described "diversity, equity, and inclusion" ("DEI") programs as discrimination without providing a definition for those terms. DCL at 2–3; FAC ¶ 16. The DCL further stated that OCR "intends to take appropriate measures to assess compliance with the applicable statutes and regulations based on the understanding embodied in this letter beginning no later than 14 days from today's date." DCL at 3; FAC ¶ 17. The DCL instructed recipients to "cease all efforts" that violate its prohibitions or else "face potential loss of federal funding" within weeks. DCL at 3–4; FAC ¶ 17.

Following the release of the DCL, on February 27, 2025, ED launched an EndDEI portal inviting people to report alleged discrimination or promotion of "divisive ideologies and indoctrination," without defining those terms. FAC ¶ 18. "[S]ubmissions w[ould] be used to identify potential areas for investigation" to determine whether schools were engaging in

"discriminatory" behavior. *Id.* The next day, ED's Office for Civil Rights ("OCR") released its FAQs, which echoed the DCL's apparent prohibition on programs seen as *de facto* discrimination, including "DEI" initiatives, socio-emotional learning and culturally responsive teaching that, per ED, may "veil racially discriminatory policies," and courses, orientation programs, or trainings "that are designed to emphasize and focus on racial stereotypes." FAQs at 6–7; FAC ¶ 20. The FAQs seemingly prohibited other activities, such as the "use of 'bias response teams,' mandatory trainings, or compelled statements." FAQs at 7. They also called into question admissions interviews that allow an interviewer "to visually assess an applicant's race" to prevent "illegally attempting to do indirectly what cannot be done directly." FAQs at 8.

On March 14, 2025, pursuant to the DCL, ED announced investigations into six universities due to "alleged impermissible race-based scholarships and race-based segregation," and forty-five universities due to their alleged involvement with The Ph.D. Project. FAC ¶ 22. In the press release announcing the investigations that were launched "following [ED's] February 14 [DCL]," Defendant Secretary McMahon said, "[ED] is working to reorient civil rights enforcement." *Id.* ¶ 23.

On April 3, 2025, citing the DCL and FAQs, ED announced that SEAs must certify compliance with Title VI as interpreted in the DCL. The Certification stated that engaging in "certain DEI practices" and using "DEI[] programs to advantage one's race over another" may result in the loss of federal funding, but it did not define terms like "certain DEI practices" or "illegal DEI practices." Certification at 3; FAC ¶ 26. The Certification gave SEAs ten days to collect compliance certifications from LEAs and submit them to ED. FAC ¶ 25. On April 8, 2025, ED extended the deadline to April 24. Per ED, SEAs that failed to comply with the Certification might lose federal funding and "incur substantial liabilities, including the potential initiation of

litigation for breach of contract by the Department of Justice" and treble damages under the False Claims Act. Certification at 2–4.

The DCL, the FAQs, and the Certification (the "Title VI Documents") also characterize diversity, equity, and inclusion efforts as illegal "discriminatory practices," DCL at 2, despite courts having routinely upheld the legality of various diversity, equity, and inclusion efforts, including diversity statements,[1] anti-bias trainings,[2] targeted recruiting,[3] and aspirational diversity goals.[4] Per the Title VI Documents, "programs focused on interests in particular cultures, heritages, and areas of the world" may run afoul of the law if they create a "hostile environment" or "deny students the ability to participate fully in the life of a school." DCL at 3; FAQs at 6. ED noted, "[a] school's history and stated policy of using racial classifications and race-based policies to further DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals will be probative in OCR's analysis of the facts and circumstances of an individual case." FAQs at 9.

Although the *SFFA* decision did not concern race-neutral policies and practices and, in fact, noted the availability of race-neutral policies and practices in lieu of race-conscious

---

[1] *See, e.g.*, *Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 502 F. App'x 523, 535 (6th Cir. 2012); *Bissett v. Beau Rivage Resorts Inc.*, 442 F. App'x 148, 152–53 (5th Cir. 2011); *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 594 (E.D. Pa. 2020); *Susman Godfrey LLP v. Exec. Off. of President*, No. CV 25-1107 (LLA), 2025 WL 1779830, at *13 (D.D.C. June 27, 2025).

[2] *Young v. Colo. Dep't of Corr.*, No. 22-CV-00145-NYW-KLM, 2023 WL 1437894 (D. Colo. Feb. 1, 2023).

[3] *Vavra v. Honeywell Int'l Inc.*, 688 F. Supp 3d 758 (N.D. Ill. 2023).

[4] *See, e.g.*, *Mlynczak*, 442 F.3d at 1050 (finding that U.S. Department of Energy's recruitment policy was intended to "ensur[e] diversity in the applicant pool for positions at the agency" and was not evidence of discrimination because they "were of the type that expand the pool of persons under consideration, which is permitted"); *Duffy v. Wolle*, 123 F.3d 1026, 1038–39 (8th Cir. 1997), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (finding that efforts to recruit minority and female applicants do "not constitute discrimination" but "enable[] employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment.").

affirmative action, *SFFA*, 600 U.S. at 284 (Thomas, J. concurring); *id.* at 317 (Kavanaugh, J., concurring), the Title VI Documents nonetheless characterize race-neutral efforts to advance equal opportunity as unlawful. FAC ¶ 40. The Title VI Documents also categorically prohibit instruction on "systemic and structural racism," DCL at 2, which the Title VI Documents deem to be "discriminatory," "stereotyping," and "stigmatiz[ing]," and thus prohibited, FAQs at 6; FAC ¶ 44. The Title VI Documents directly contradict a long line of cases upholding the use of race-neutral measures to equalize opportunities at all levels of education. FAC at 15 n.32.The prohibitions in the Title VI Documents conflict with past ED guidance and statements, including those issued during the tenure of former Secretary of Education Betsy DeVos [5], and congressional actions that embraced diversity, equity, and inclusion activities as consistent with Title VI and public education goals. FAC ¶¶ 47–57. ED has provided no explanation for its deviation from clearly established law. *Id.* ¶¶ 49–50, 56–57.

On April 15, 2025, the NAACP filed a complaint against ED, as well as Education Secretary Linda McMahon and Acting Assistant Secretary for Civil Rights Craig Trainor ("Defendants") in their official capacities alleging violations of the First Amendment, Fifth Amendment, and various provisions of the Administrative Procedure Act ("APA"). ECF No. 1.

---

[5] Off. for C.R., U.S. Dep't of Educ., Fact Sheet: Diversity and Inclusion Activities Under Title VI 1–2, available at https://web.archive.org/web/20241203144143/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocr-factsheet-tvi-dia-202301.pdf; see, e.g., Grants/Cibola County Schools Resolution Agreement, OCR Case No. 08-19-1269 (Sept. 18, 2020) (to remedy patterns of discrimination against Native American students, district agreed to conduct a self-assessment of racial equity in gifted and talented education); East Side Union High School District Resolution Agreement, Case No. 09-14-1242 (to remedy racially disparate discipline of Black, Latino, and LEP students, district agreed to establish Equity Committee); 20 U.S.C. § 7231(a)(4)(A), (b), b(3) (the purpose of the Magnet Schools Assistance Program is, *inter alia*, to "desegregate and diversify schools"); Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/trump-diversity-education-department.html.

On April 20, 2025, the NAACP filed a motion for a preliminary injunction, seeking to enjoin ED from implementing or enforcing the Title VI Documents. ECF No. 13. Soon after, the Court requested a supplemental brief on the issue of standing, which NAACP filed on April 21, 2025. ECF No. 14.

On April 24, 2025, this Court granted in part and denied in part NAACP's motion for a preliminary injunction. ECF No. 31. In its ruling, the Court concluded that NAACP demonstrated a substantial likelihood of standing to challenge the Certification under the Fifth Amendment and a substantial likelihood of success on the merits of its void for vagueness claim. ECF No. 30. Accordingly, this Court preliminarily enjoined Defendants from implementing and enforcing the Certification. ECF No. 31.

On May 9, 2025, NAACP filed its FAC, asserting the same causes of action. ECF No. 34.

## II.    LEGAL STANDARD

When resolving a 12(b) motion to dismiss, a court can consider "the facts alleged in the complaint [and] any documents[,] either attached to or incorporated in the complaint and matters, of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A complaint survives a 12(b)(1) motion if the alleged facts, accepted as true, "support an inference of standing 'that is plausible on its face." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint survives a 12(b)(6) motion to dismiss when it "contain[s] sufficient factual matter, if accepted as true, to state a claim to relief that is plausible on its face." *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (quoting *Iqbal*, 556 U.S. at 678).

6

## III.    ARGUMENT

### A.    NAACP HAS ESTABLISHED STANDING.

"An organization has associational standing to bring suit on its members' behalf when: (1) at least one of its members would have standing to sue in their own right; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016). Defendants do not contest the second and third prongs, nor could they. NAACP's litigation goal—defending policies and practices that help Black students have more equal access to a quality education and educational opportunities—is central to its purpose, and neither the claims asserted nor the relief requested require member participation.

To establish a member's standing, the plaintiff must demonstrate that: (1) the member has suffered an "injury in fact," (2) caused by the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). Organizations with members who are parents seeking relief on behalf of their children have associational standing. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007). NAACP has properly alleged all three factors for each of its claims.

Importantly, at the motion to dismiss stage, "'general factual allegations of injury resulting from the defendant's conduct may suffice,' and the court 'presum[es] that general allegations embrace the specific facts that are necessary to support the claim.'" *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561). NAACP has established as much for each of its claims.

### 1.    Plaintiff NAACP Properly Alleged Standing for its APA Claims.

NAACP alleges that its members have suffered concrete, particularized harms as a result of Defendants' promulgation of the Title VI Documents, in violation of the APA. As this Court recognized, NAACP was "deprived of the 'procedural right to protect [their] concrete interests'" when Defendants issued the Title VI Documents without notice-and-comment, demonstrating a "likeliness of standing to assert that claim." *NAACP v. U.S. Dep't of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212, at *3 (D.D.C. Apr. 24, 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). NAACP similarly has standing for its APA claims, based on allegations that the Title VI Documents are arbitrary and capricious and contrary to law, because it sufficiently pled that members have already suffered injury and will suffer future injury from the loss of academic and extracurricular programing, as well as the potential loss of federal funding for their schools, as a direct result of the Title VI Documents. FAC ¶¶ 58–77, 142–75.

Moreover, NAACP's members are entitled to judicial review of the Title VI Documents under the broad judicial review provision of 5 U.S.C. § 702 as they have themselves suffered and will continue to "suffer[] legal wrong because of agency action," or, at minimum, have been "adversely affected or aggrieved by agency action" due to the promulgation of the Title VI Documents. 5 U.S.C. § 702.

### 2.    Plaintiff NAACP Properly Alleged Standing for its First Amendment Claims.

NAACP has plausibly alleged standing for its First Amendment claims. First, NAACP has alleged concrete, particularized, and imminent First Amendment injuries. A plaintiff satisfies the injury-in-fact requirement where they allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 148–59 (2014). Plaintiff alleges that the Title VI Documents ban "certain DEI"

activities and instruction on systemic racial inequalities that NAACP members' children wish to participate in and receive information about in violation of members' First Amendment rights. FAC ¶¶ 15, 34, 44, 48, 64–65, 79, 84, 87, 129–41. NAACP members have been, and will continue to be, denied access to information and events like, *inter alia*, Waterloo's 19th Annual African American Read-In, courses and lectures on systemic inequalities, including racial discrimination, and student groups that discuss these topics and host similar events. *Id.* ¶ 4.

In addition, NAACP has plausibly alleged that these injuries are fairly traceable to the Title VI Documents. NAACP alleges "substantial evidence of a causal relationship between the government policy and [their schools'] conduct, leaving little doubt as to causation and the likelihood of redress." *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, No. 25-CV-00403 (DLF), 2025 WL 1094223, at *5 (D.D.C. Apr. 11, 2025). For example, in an effort to comply with the Title VI Documents, the Board of the City Schools of Decatur, Georgia, rescinded its policies promoting equity and inclusive curricula, causing NAACP members to reasonably fear that an African American History course and two student groups focused on empowering minority students would be terminated or detrimentally modified. FAC ¶¶ 90, 92, 112–14. The Board specifically rescinded this policy because of the promulgation of the Title VI Documents. *Id.* ¶ 90.

That NAACP members' schools rescinded "DEI" policies pre-enforcement does not undermine Plaintiff's standing. The Title VI Documents and their threatened enforcement had the "predictable effect" of infringing upon NAACP members' First Amendment rights to avoid enforcement. *Id.* at 23–24; *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (concluding that "primarily future injuries" dependent, in part, on the conduct of third parties are sufficient to confer standing); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 24 (D.D.C. 2020) (noting that this Circuit has "routinely found causation

established in cases where the relevant 'third-party conduct is voluntary but reasonably predictable'").Contrary to Defendants' assertions, it was not unreasonable for the City Schools of Decatur—as well as other schools that took similar action—to rescind its Equity policies because, although it was impossible to determine the bounds of the prohibition, the policies seemed likely to be covered by the documents. *See infra* § III(A)(4). NAACP's injuries are thus traceable to the Title VI Documents issued by Defendants. *Id.*

Finally, NAACP plausibly alleges that their members' injuries will be redressed by an order from this Court enjoining the Title VI Documents. As alleged in the FAC, after this Court entered an order preliminarily enjoining enforcement of the Title VI Documents, at least two school districts, including the City Schools of Decatur, cited the Court's order when they reversed their prior decisions to rescind policies to comply with the Title VI Documents. FAC ¶¶ 91, 115. As a result, NAACP members do not fear that their schools' DEI programs, equity-related policies, and student groups serving under-resourced and disadvantaged Black students will be terminated as long as the Court's injunction remains in place. *Id.* ¶ 92. Accordingly, the NAACP has plausibly alleged standing for its First Amendment claims.

### 3.   Plaintiff NAACP Properly Alleged Standing for its Fifth Amendment Equal Protection Claim.

To establish standing for constitutional claims, the operative question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' [as] to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–61 (1977). A plaintiff is harmed when they are the target of the defendant's discrimination. *See id.* at 263–64. "The injury may be indirect." *Id.* at 261. If there is at least a "substantial probability" that the court

could provide relief, a plaintiff has standing. *Id.* at 264 (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)).

NAACP sufficiently alleges that Black students are the target of ED's Title VI Documents. The Title VI Documents specifically prohibit policies and practices that ED itself has long recognized are necessary to ensure that Black students, including NAACP members and NAACP members' children, are afforded equal access educational resources and opportunities. *See, e.g.*, FAC ¶¶ 3, 5, 30, 32–38, 62–77, 98–102, 119, 146, 157, 165–66 (discussing Title VI Documents' prohibition of truthful, inclusive curricula; efforts to remove obstacles that deny Black students a fair chance to compete for selective programs; and programming and training that support Black students, ensure an inclusive learning environment, and combat disproportionate disciplinary outcomes for Black students). NAACP members and their children benefit from these programs and policies and will be harmed by their removal. *Id.* NAACP members are therefore threatened by "official action that is racially discriminatory." *Vill. of Arlington Heights*, 429 U.S. at 264. And, as discussed *supra* Section III(A)(2), Plaintiff sufficiently alleges its injuries are traceable to the Title VI Documents and redressable by an order from this Court enjoining the Documents.

### 4. Plaintiff NAACP Properly Alleged Standing for its Fifth Amendment Vagueness Claim.

As this Court previously held, NAACP "has shown a sufficient likelihood of standing to challenge the certification requirement on vagueness grounds." *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6. In particular, this Court held that the NAACP established injury-in-fact by alleging that "the provisions of the challenged documents are so vague that schools would be uncertain whether the documents covered them." *Id.* at *5. Yet "non-compliance with the administration's interpretation of unlawful DEI will result in liability under the False Claims Act" because the Certification Requirement requires education agencies to stipulate to the element of

materiality in a false claims action, thereby "forc[ing] 'schools and teachers . . . to steer clear of offering courses and teaching topics that touch on undefined concepts such as 'diversity, equity, and inclusion' to comply' with the challenged documents." *Id.* at \*5 (quoting Pls.' Suppl. Br. at 7, ECF No. 14). This Court further held that NAACP established causation and redressability because "the vagueness injury does flow directly from the certification requirement's effect on schools' legal obligations, and thus affects their offerings to students." *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at \*5 (citing *Whitman-Walker Clinic, Inc.*, 485 F. Supp. 3d at 24 (noting that the D.C. Circuit routinely finds causation where the relevant third party conduct is voluntary but reasonably predictable)); *Arce v. Douglas*, 793 F. 3d 968, 988 (9th Cir. 2015) (recognizing plaintiff's injury in challenge to a vague statute alleged to "have a direct impact on plaintiffs' right to receive information").

NAACP's FAC alleges that Defendants harmed its members and its members' children by denying them equal access to educational resources and opportunities when Defendants caused federally funded educational institutions to cease lawful policies and practices that benefited disadvantaged and under-resourced Black students, including, "*inter alia*, (a) instruction and programming concerning systemic racism and Black history and culture, (b) supportive spaces that help Black students foster a healthy sense of belonging, (c) services geared towards supporting marginalized students, and (d) an equal opportunity to compete for admission to selective programs." *See, e.g.*, FAC ¶¶ 2–5, 28–33, 62–66, 73–77, 80–83, 87–90, 105–15, 123. And the NAACP has more clearly established causation and redressability in its FAC by alleging that school districts rescinded their equity-related policies and practices to comply with the Title VI Documents, only to later reinstate those same policies and practices as a direct result of preliminary

injunctions barring enforcement of the Title VI Documents. *See Id.* at 4 nn. 6–7 & ¶¶ 75, 90–94,

110, 112–15.[6] Thus, NAACP has standing to challenge the vagueness of the Title VI Documents.

### B.    DEFENDANTS' RULE 12(B)(6) ARGUMENTS ARE MERITLESS.

#### 1.    The NAACP Has Sufficiently Pled its APA Claims (Counts V–VIII).

Final agency actions are subject to judicial review. 5 U.S.C. § 706. An agency action is

considered final when an agency issues documents that (1) represent "the 'consummation' of the

agency's decisionmaking process," and (2) conclusively determine legal "rights or obligations."

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). Further, "[a]n agency action that

purports to impose legally binding obligations or prohibitions on regulated parties—and that would

be the basis for an enforcement action for violations of those obligations or requirements—is a

legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014); *see also*

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) ("In

litigation over guidance documents, the finality inquiry is often framed as the question of whether

the challenged agency action is best understood as a non-binding action, like a policy statement or

interpretive rule, or a binding legislative rule."). "[A] rule which 'effect[s] a change in existing

law or policy' is legislative." *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d

227, 237 (D.C. Cir. 1992) (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)).

"[E]ven if a specific document does not formally operate with independent legal force, a purported

---

[6] Judicial notice enables courts to accept as true facts "not subject to reasonable dispute," Fed. R. Evid. 201(b), such as the fact that these school districts rescinded and reinstated policies and practices, since these facts are substantiated by "public records and government documents available from reliable sources" cited in the amended complaint. *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012) (taking judicial notice of a document located on a United States government website and thus "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). *See also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider . . . matters of which we may take judicial notice.").

guidance document can be practically binding and qualify as a legislative rule." *See* Jared P. Cole & Todd Garvey, Cong. Rsch. Serv., R44468, General Policy Statements: Legal Overview (2016) (citing *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987)).

The two-step *Bennett* inquiry is a "pragmatic" one. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). An agency's characterization of its own action is not dispositive. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (disregarding such disclaimers as "boilerplate" when the guidance had the practical effect of governing conduct). An agency's action is considered final if, looking to the practical effects, it "appears on its face to be binding" or if it "is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). The "most important factor" is "the actual legal effect (or lack thereof) of the agency action . . . on regulated entities." *Nat'l Mining Ass'n*, 758 F.3d at 252. When parties have been "reasonably led to believe that failure to conform will bring adverse consequences," an agency statement is practically binding. *Gen. Elec. Co.*, 290 F.3d at 383; *see also Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2014); *Appalachian Power*, 208 F.3d at 1021.

NAACP sufficiently pleads that the Title VI Documents individually and collectively constitute final agency action subject to judicial review because they are a legislative rule. *See, e.g.*, FAC ¶¶ 14–27, 33, 39–61, 142–75. First, as alleged, the DCL represents the "consummation of the agency's decision making process" as it was signed by the Acting Assistant Secretary for Civil Rights. *POET Biorefining, LLC v. E.P.A.*, 970 F.3d 392, 404 (D.C. Cir. 2020) (finding approval by agency official who was "no mere subordinate" to be evidence of finality). Both the

FAQs and Certification were issued in furtherance of, and inextricably linked to, the mandates contained within the DCL.[7]

Second, the Title VI Documents have a legally binding effect. NAACP alleges that the DCL and FAQs create new prohibitions for school curriculum and activities. FAC ¶¶ 15–16, 20–21. NAACP also alleges that the DCL asserts Defendants' intention to take "appropriate measures" and instructs recipients of federal funding to "cease all efforts" that violate the new prohibitions included in the letter or else "face potential loss of federal funding." *Id.* ¶ 17. NAACP further alleges that the Certification warns federally-funded educational institutions that if they "fail to comply with the Certification," they "may lose federal funding and incur 'substantial liabilities, including the potential initiation of litigation for breach of contract' . . . and treble damages under the False Claims Act." *Id.* ¶ 27. In its FAC, NAACP additionally alleges that the Title VI Documents have already been the basis for enforcement actions, such as ED's announcement that it initiated investigations of multiple universities pursuant to the DCL and the FAQs. *Id.* ¶¶ 22–24. In fact, ED's own enforcement actions, which were explicitly based on the Title VI Documents, make clear that the Documents are a legislative rule subject to judicial review. *Id.* ¶¶ 145, 149. *See Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) ("[W]hether the agency has applied the guidance as if it were binding on regulated parties" is relevant to prong two of the *Bennett* test.) (quoting *Nat'l Mining Ass'n*, 758 F.3d at 253).

Recent decisions by other courts affirm Plaintiff's allegations that that the Title VI Documents constitute legislative rulemaking. One court held that the DCL is a legislative rule,

---

[7] *See* FAQs at 1 ("This frequently asked questions document is intended to anticipate and answer questions that may be raised in response to the Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard issued by the U.S. Department of Education's Office for Civil Rights (OCR) on February 14, 2025.").

reasoning that it "impose[d] [new] substantial obligations" that the defendants claimed would be "'vigorously enforce[d].'" *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *28 (D.N.H. April 24, 2025). That court also rejected Defendants' argument that the DCL was a mere interpretation of *SFFA* because the DCL imposed new obligations that were not required by that decision, rather than interpreting existing legal requirements—for example, in *SFFA*, "the Court did not hold that the Constitution commands color-blindness." *Id.* at *29 (citing *SFFA*, 600 U.S. at 230). *See also id.* at *72–73 ("[B]ecause the [DCL] 'attempts to supplement [the law], not simply to construe it,' it is a legislative rule." (quoting *Sullivan*, 979 F.2d at 237)). Another court reasoned that the DCL is a final agency action and subject to judicial review because they are binding on their face and the agency has applied the documents "in a way that indicates it is binding." *Am. Fed'n of Tchrs v. Dep't of Educ.*, No. SAG-25-628, 2025 WL 1191844 at *13 (D. Md. April 24, 2025). The court reasoned that, facially, the DCL binds any "entity subject to [ED] regulations" to the "agency's position on what the law means," and threatens the loss of funding. *Id.* In practice, ED "has referenced the Letter as the basis for its investigations of 51 colleges," "implement[ed] the [DCL] via the FAQs, the end DEI portal, and the Certification Requirement," and treated the "directives" like "changes from prior law that appeared legally binding." *Id.*

Even if the Title VI Documents constitute an interpretive rule, as Defendants argue, they still impose legal obligations and are, thus, substantive rules subject to notice and comment requirements. *See, e.g.*, *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989); *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980). The APA's notice and comment exemptions must be narrowly construed. *Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1044–45 (D.C. Cir. 1987) ("In light of the obvious importance of these policy goals of maximum participation and full information, we have consistently declined to allow the exceptions itemized in § 553 to swallow

the APA's well-intentioned directive."). Because nonlegislative rules cannot be legally binding, agencies may not rely on them to support enforcement action. *See, e.g.*, *Picciotto*, 875 F.2d at 349. ED's own stated reliance on the Title VI Documents to support its enforcement proceedings demonstrates that they are not merely guidance documents, but are substantive rules subject to judicial review. *See Cmty. Nutrition Inst*, 818 F.2d at 952–53 (Starr, J., concurring in part and dissenting in part); *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974).

Here, NAACP alleges that the Title VI Documents impose an obligation on schools to comply with their terms. The Certification binds signatories to its terms and creates significant legal penalties for lack of compliance. FAC ¶¶ 17, 26–27; *see NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6 (acknowledging that the Certification "threaten[s] penalties" such as "termination of federal funding, breach of contract suits . . . and liability under the False Claims Act"); *see also U.S. Army Corps Of Eng'rs*, 578 U.S. at 600 (finding final agency action where failure to conform leaves the regulated party at risk of significant criminal and civil penalties). Similar to NAACP's allegations in the FAC, the Court in *National Education Association v. United States Department of Education* held that "[b]ecause the plaintiffs face substantial threat of consequences for failing to comply with the 2025 Letter, the actual legal effect component of the finality inquiry is satisfied." 2025 WL 1188160, at *16. Accordingly, NAACP has stated a claim under the APA.

## 2. The NAACP Has Sufficiently Alleged its Fifth Amendment Claims (Counts I and II).

As a preliminary matter, NAACP properly seeks declaratory and injunctive relief from federal officials for violations of the U.S. Constitution. While Defendants cite *DeVillier v. Texas*, 601 U.S. 285, 291 (2024), for the proposition that "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts," they fail to acknowledge

17

that statement was dicta. The Court resolved the case without any analysis as to whether plaintiffs may generally vindicate their constitutional rights by suing directly under the U.S. Constitution. *See generally DeVillier*, 601 U.S. 285, 290 (declining to resolve the issue of "whether a property owner may sue for just compensation directly under the Takings Clause," instead vacating and remanding for further proceedings because the plaintiff could pursue his claims through a state law cause of action). Moreover, when stating that dicta, the *DeVillier* Court cited a case raising concerns about *damages* actions against federal officials under the Fourth Amendment, *id.* at 291 (citing *Egbert v. Boule*, 596 U.S. 482, 490–491 (2022)), while noting other takings cases where property owners properly sought *equitable* relief under the Constitution, *id.* at 292 (collecting cases). Notably, NAACP's lawsuit does not seek damages, but rather injunctive and declaratory relief, which has been expressly allowed by the U.S. Supreme Court. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (involving a claim for declaratory and injunctive relief against a federal agency brought under the First Amendment); *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) (involving a claim for declaratory and injunctive relief against a federal agency brought under the due process clause of the Fifth Amendment). Indeed, "[i]t is settled that provisions of the U.S. Constitution setting forth individual rights generally also empower individuals to sue federal officers and agencies for violations of these rights, particularly if (as here) the relief sought is injunctive." *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 348 F. Supp. 2d 398, 420 (D. Md. 2005) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949); *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388

(1971)); *Farmer v. Ramsay*, 41 F. Supp. 2d 587, 591 (D. Md. 1999) ("Suits for injunctive relief are permissible directly under the 14th Amendment.").

<p style="text-align:center"><strong>a)    The Complaint states a claim under the Equal Protection Clause (Count I).</strong></p>

The Due Process Clause of the Fifth Amendment guarantees all persons equal protection under the law and prohibits the government from treating any person differently on the basis of race. *Bolling v. Sharpe*, 347 U.S. 497 (1954). "[A] plaintiff can plead an equal protection violation [by alleging] that the government has expressly classified individuals based on their race, . . . that the government has applied facially neutral laws or policies in an intentionally discriminatory manner, . . .or that facially neutral laws or policies 'result in racially disproportionate impact and are motivated by a racially discriminatory purpose.'" *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 63 (D.C. Cir. 2016) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 213 (1995); *see also Vill. of Arlington Heights*, 429 U.S. at 265. NAACP alleges sufficient facts which—when taken as true, as they must be at this stage—support inferences that (a) the government has expressly classified individuals based on their race, (b) promulgation of the Title VI Documents demonstrates disparate treatment based on race, and (c) the Title VI Documents were adopted with discriminatory purpose and have a discriminatory effect on Black students.

First, NAACP plausibly alleges that the DCL expressly classifies individuals by their race because it ignores longstanding and well-documented discrimination against Black students and instead focuses exclusively on schools' purported racial discrimination against white and Asian-American students. DCL at 1–2; FAC ¶ 37. By willfully dismissing the unfair disadvantages experienced by Black students—products of centuries of racial exclusion, stereotyping, and segregation—ED mischaracterizes policies and practices intended to address racial inequalities as "pervasive and repugnant race-based preferences and other forms of racial discrimination" that

<p style="text-align:center">19</p>

benefit non-white and non-Asian students, namely Black students and other students of color. DCL at 1. ED accuses Black students of benefitting from widespread racial preferences, necessarily relying on entrenched racial stereotypes that Black students lack the talent or work ethic to have credibly earned their achievements—stereotypes that injure Black students with dignitary and psychological harms. *See, e.g., Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1012 (11th Cir. 2018) (noting that a predominantly-white city's racially-motivated secession from a more diverse county school system sent "messages of inferiority," which could not have "escaped the [Black] children in the [C]ounty") (quoting *Wright v. Council of Emporia*, 407 U.S. 451, 466 (1972)); *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493–94 (1954) (recognizing "intangible" harms to Black students, including "a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

Second, if the Court declines to find an express racial classification in the Title VI Documents, NAACP sufficiently alleges that the adoption of the Documents demonstrates disparate treatment based on race, given the intended benefits to white and Asian-American students at the expense of other students of color, including Black students. It is clear from the language in the Title VI Documents themselves that they are meant to benefit white students— and, to some degree, certain Asian-American students—while at the same time disfavoring Black students and other students of color. For example, the Documents assert that instruction on race is unlawful under Title VI if it acts to shame or guilt students or "accuse them of being oppressors in a racial hierarchy," FAQs at 6, with the clear message that Defendants are exclusively concerned about the "shame or [] guilt" they baselessly allege *could be* experienced by *white* students and not any negative feelings experienced by students of other races, including Black students. FAC ¶¶ 84, 120. Similarly, the Title VI Documents' prohibition of measures designed to equalize access

for Black students demonstrates disparate treatment based on race. *Id.* ¶¶ 79–80. Tellingly, ED has long permitted and sometimes required schools to adopt the very race-neutral measures now prohibited by the Title VI Documents in order to advance Black students' equal access to educational resources and opportunities. *Id.* ¶¶ 47–57. Such measures include eliminating or reducing reliance on standardized tests because they underpredict the potential of Black and Latinx students. *Id.* ¶¶ 67–68. Indeed, Thomas Jefferson High School for Science and Technology's decision to eliminate its admission test, among other race-neutral reforms of the school's admissions process in 2020, significantly expanded the applicant pool and led to an increase in the average GPA of admittees and an increase in the number of Black and Hispanic students admitted. *Id.* ¶ 71. Yet, the Title VI Documents appear to prohibit these kinds of lawful efforts to advance equal access and opportunity under Title VI, *id.* ¶ 40, if remedying unfairness and inequality for Black students in the application processes increases their admission and the racial diversity of admitted students overall. DCL at 3.

The Title VI Documents disparately treat Black students in several other ways. The Documents' requirement that schools redact any indicia of race from applications, which is not required by the *SFFA* decision, prejudices applicants whose experiences are inextricably intertwined with race, including Black students, as admissions officers would not be able to fully consider those applicants' credentials.[8] *See, e.g.*, FAC ¶¶ 15, 43. In fact, such a mandate conflicts with the Supreme Court's recognition in *SFFA* that a student's experiences with race, which

---

[8] *See, e.g.*, Devon W. Carbado & Cheryl I. Harris, *The New Racial Preferences*, 96 Cal. L. Rev. 1139, 1162 (2008) (discussing difficulty for college applicants who racially identify to "come up with a meaningful account of [their] life without referencing race" and without "captur[ing] who [they] imagine[] [themselves] to be")); Elise Boddie, *The Indignities of Color Blindness*, 64 UCLA L. Rev. Discourse 64 (2016).

necessarily requires identification of that student's race, could be properly considered by an admissions officer if related to the student's qualifications. *SFFA*, 600 U.S. at 230–31.

In addition, Defendants' EndDEI portal encourages complaints about anything perceived as diversity, equity, and inclusion—lawful or not. FAC ¶ 85. Because diversity, equity, and inclusion policies and practices aim to equalize access and opportunities for students who have been historically disadvantaged and treated unfairly, including and especially Black students, the prohibition against "DEI" would naturally harm Black students in particular—providing further evidence of disparate treatment on the basis of race. *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *21 (rejecting ED's argument that the Title VI Documents merely announce "the uncontroversial proposition that discrimination is unlawful" because ED is not merely using the EndDEI portal to "solicit[] complaints about only those DEI programs or teaching practices that discriminate based on race. By its own admission, it seeks to 'End DEI.'"); *see also* FAC ¶ 37 (alleging Black students experience disproportionate harm from Title VI Documents' prohibitions against DEI efforts because Black students are more likely to attend segregated and underfunded schools and schools with high percentages of novice teachers and are disproportionately disciplined though they do not misbehave more than other students).

Third, NAACP sufficiently alleges that Defendants issued the Title VI Documents with a discriminatory purpose. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266. *Arlington Heights* provides several non-exhaustive factors courts should consider in assessing discriminatory intent including: "the historical background of the [challenged] decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and whether the

challenged decisions' impact "bears more heavily on one race than another." *Id.* 266–68 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Discriminatory purpose is determined "from the totality of the relevant facts," and courts must weigh the evidence as a whole. *Davis*, 426 U.S. at 242.

NAACP plausibly alleges that the historical background of the Title VI Documents supports an inference of a discriminatory purpose. As the result of past and ongoing discrimination, Black students face unequal access to educational opportunities. FAC ¶ 37. The Title VI Documents' prohibition of lawful policies and practices that work to dress this inequality therefore raises an inference of intentional discrimination. *See Rogers v. Lodge*, 458 U.S. 613, 625 (1982) ("Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination"); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) (describing state's long history of race-based voter suppression as relevant to state's discriminatory intent in passing voting restrictions). Moreover, the Title VI Documents further the administration's track record of using the terms "DEI," "racial preferences," and "racial balancing" as pejorative dog whistles to impugn the qualifications, competence, talents, and ethics of Black students, as well as Black people in general. FAC ¶ 118.

In addition, NAACP adequately alleges that the sequence of events leading up to the adoption of the Title VI Documents supports an inference of discriminatory intent. In response to the racial justice protests in 2020, some school districts and universities established policies to equalize access to selective programs, adopted curriculum addressing race and systemic racism, and expanded programming to ensure Black students' equal access to a supportive and inclusive learning environment. *Id.* ¶¶ 64, 81–84. Longstanding ED guidance and enforcement, even under the first Trump administration, encouraged these efforts. *Id.* ¶ 47. The Title VI Documents seek to

reverse and undermine those efforts by targeting for prohibition the very programs and policies that acknowledge the existence of, and attempt to redress, systemic and structural racism. *Id.* ¶ 65; *see*, *e.g.*, *McCrory*, 831 F.3d at 230 (finding discriminatory intent where legislature targeted, for prohibition, voting mechanisms used by Black voters); *Va. State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*, No. 5:24-CV-040 2025 WL 271705 at *14 (W.D. Va. Jan. 22, 2025) (noting a school district's "about-face" in reinstating Confederate names for schools, after removing those names two years earlier, as evidence of discriminatory intent).

NAACP further plausibly alleges that departures from normal procedures support an inference of discriminatory intent. The DCL and Certification both imposed very short timelines. The DCL gave recipients 14 days to "cease all efforts" that violate its prohibitions or else "face potential loss of federal funding," FAC ¶ 17, and the Certification gave state educational agencies only ten days to collect and submit compliance certifications from local educational agencies, *id.* ¶ 25. *Compare McCrory*, 831 F.3d at 214–17 (describing the "rushed" legislative process as probative of discriminatory intent) *with NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *7 (describing the "shortened timeframe for certifying compliance" which was "hardly enough time for schools to consult with [ED] or determine which specific policies constitute prohibited DEI" and acknowledging NAACP's allegation "that many school districts rushed to indiscriminately cancel programming to comply with [ED's] deadline"). Moreover, the Certification emphasizes that compliance with the Title VI Documents constitutes a "material condition" for federal funding and threatens violators with False Claims Act liability. Certification at 1, 4. As this Court noted, the government conceded that "it is aware of no other comparable certification mandating that signers conceded to materiality." *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *5; *see also Bellinger v. Bowser*, No. CV 17-2124 (TJK), 2018 WL 4705808, at *10 (D.D.C. Sept. 30,

2018) (explaining that "out of the ordinary" departures from procedure raise an inference of discriminatory intent).

Finally, NAACP clearly alleges that the Title VI Documents have a racially discriminatory effect on Black students. The programs targeted by the Title VI Documents, including "diversity, equity, and inclusion programs; voluntary affinity groups and their programming; voluntary affinity housing and other dedicated spaces; school-wide cultural and heritage programs; a diverse faculty; affinity graduations and award ceremonies; and efforts to reduce racial disparities in discipline," help overcome unfair barriers and other inequalities that deny Black students equal access to a quality education. FAC ¶ 99. In an effort to support Black students (and other students of color and low-income students), schools and universities have adopted and expanded these types of programming and policies. *Id.* ¶ 100. While all students benefit from diversity, equity, and inclusion and related programming and policies, *id.* ¶ 102, they have been shown to be especially helpful in improving educational outcomes for Black students. *Id.* ¶¶ 66, 71–74, 77–79, 83. Indeed, without these supports, Black students are more likely to face challenges in school. *Id.* ¶¶ 95–101. As discussed *supra*, the FAC alleges that the Title VI Documents specifically target programs known to benefit Black children and equalize their access to quality education, while also stating that such programs and policies discriminate against white and Asian-American children. DCL at 1–2; FAC ¶ 37. These facts plausibly support Plaintiff's allegations that Defendants' enforcement of the Title VI Document will have a discriminatory effect on Black students.

NAACP sufficiently alleges that the Title VI Documents disproportionately harm Black students by restricting programs and services known to help them thrive. By forcing school districts to discontinue "(a) instruction and programming concerning systemic racism and Black history and culture, (b) supportive spaces that help Black students foster a healthy sense of

belonging, (c) services geared towards supporting marginalized students, and (d) an equal opportunity to compete for admission to selective programs," all of which are proven to improve educational outcomes for Black children, ED knowingly injures Black children. FAC ¶ 123. For example, the Title VI documents likely prohibit school recognition of affinity groups and related programming. *Id.* ¶ 104. The FAC alleges how this programming benefits Black students in particular by providing them a dedicated space to discuss and celebrate their cultural identities, discuss their experiences with systemic racism and discrimination, and foster an inclusive atmosphere. *Id.* ¶¶ 96, 99–101, 104. Plaintiff also sufficiently alleges that discontinuing such programs disproportionately harms Black students by removing the supports that make them feel safe, supported, and welcome at school and therefore more able to benefit from their educational experience. *Id.* ¶ 105. Further, Plaintiff specifically alleges that the removal of such supports will lead to Black students feeling "more racially isolated," *id.* ¶ 107, and could make student life "unbearable" for them. *Id.* ¶ 109. Therefore, the effects of the Title VI Documents "bear more heavily" on Black students. *McCrory*, 831 F.3d at 231.

Defendants' argument that Title VI Documents cannot be discriminatory because they expressly prohibit discrimination is unavailing. ECF No. 36-1 at 18. At this stage of the case, the court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Air Excursions LLC*, 66 F.4th at 277 (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Defendants may have their own characterization of the Title VI Documents, and their own interpretations of the Documents' mandates, but courts do not credit such interpretations when adjudicating a motion to dismiss. And any suggestion that "race-neutral" language and denunciations of discrimination in the Title VI Documents somehow immunizes Defendants from claims of intentional discrimination is belied

by the facts and the law. As discussed *supra*, NAACP alleges that the Title VI Documents purposely target, for termination or significant modification, practices and policies known to benefit Black students. Plaintiff further alleges that Defendants issued the Title VI Documents with a discriminatory motive, irrespective of any purported racial neutral language. Thus, Plaintiff has pled more than enough to satisfy multiple theories of an Equal Protection violation.

Taken together, all these allegations more than "nudge[]" Plaintiff NAACP's Equal Protection claim "across the line from conceivable to plausible." *Ashcroft*, 556 U.S. at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Defendants fail to engage with these facts and thus fail to satisfy the requirements for a motion to dismiss.

> **b)    Plaintiff NAACP plausibly alleged that the Title VI Documents are unconstitutionally vague (Count II).**

A law is impermissibly vague in violation of the Due Process Clause of the Fifth Amendment of the U.S. Constitution if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). As this Court acknowledged, "[t]he Supreme Court has explained that the 'general test of vagueness applies with particular force in review of laws dealing with speech.'" *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *5 (quoting *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)); *see also Baggett v. Bullitt*, 377 U.S. at 372; *NAACP v. Button*, 371 U.S. 415, 433 (1963) (holding, *inter alia*, that the "objectionable quality of vagueness" depends upon "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application"); *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech."). Courts tend to invalidate laws on void-for-vagueness

27

grounds where liability is tied to subjective standards. *See, e.g.*, *Coates v. City of Cincinnati*, 402 U.S. 611, 612, 614 (1971) (invalidating a statute which prohibited "conduct . . . annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others"); *Reno*, 521 U.S. at 871–74 (invalidating a statute which prohibited the transmission of "indecent" and "patently offensive" communications on void-for-vagueness grounds because these terms "will provoke uncertainty among speakers" and "unquestionably silence[] some speakers whose messages would be entitled to constitutional protection").

Notably, a law does not have to be vague in all of its applications to be unconstitutionally vague. As the Supreme Court made clear, "although statements in some of our opinions could be read to suggest otherwise, our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. U.S.*, 576 U.S. 591, 602 (2015); *Sessions v. Dimaya*, 584 U.S. 148, 159 (2018) (same); *see also United States v. Hasson*, 26 F.4th 610, 618 (4th Cir. 2022) (recognizing that the "the [Supreme] Court reiterated that a statute need not be vague in all its applications to be unconstitutional."); *United States v. Cook*, 914 F.3d 545, 553 (7th Cir. 2019), *judgment vacated on other grounds*, 140 S. Ct. 41 ("*Johnson* puts to rest the notion . . . that a litigant must show that the statute in question is vague in *all* of its applications in order to successfully mount a facial challenge. Indeed, as the Supreme Court has pointed out, it has, for example, "deemed a law prohibiting grocers from charging an 'unjust or unreasonable rate' void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable." *Johnson*, 576 U.S. at 602–03 (citation omitted). Likewise, the Supreme Court has "deemed void for vagueness a law prohibiting people on sidewalks from 'conduct[ing] themselves

in a manner annoying to persons passing by'—even though spitting in someone's face would surely be annoying." *Id.* (citations omitted).

In *Holder v. Humanitarian Law Project*, the Supreme Court held that a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." 561 U.S. 1, 20 (2010). However, the D.C. Circuit has made clear that the *Humanitarian Law Project* rule does not apply where, as here, NAACP alleges that the challenged Title VI Documents are so vague as to encourage arbitrary and discriminatory enforcement. *See Act Now to Stop War and End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) ("[I]t is not apparent how the *Humanitarian Law Project* rule—barring a person to whom a legal provision clearly applies from challenging its facial failure to give sufficient notice to others . . . could apply to a claim that a law is so vague as to fail to guide the government's enforcement discretion."); *Agnew v. Gov't of D.C.*, 263 F. Supp. 3d 89, 95 (D.D.C. 2017) (recognizing inapplicability of *Humanitarian Law Project* rule in D.C. Circuit where the plaintiff alleges that vagueness will lead to arbitrary and discriminatory enforcement).

Courts have found that a plaintiff sufficiently states a vagueness claim where the plaintiff provides examples of the lack of explanation. *See, e.g.*, *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-10787-WGY, 2025 WL 1548611, at *11 (D. Mass. May 30, 2025). Similarly, the FAC provides detailed allegations that the Title VI Documents are vague with specific examples of that vagueness. *See, e.g.*, FAC ¶¶ 6, 28–33, 124–28. First, NAACP alleges that the "Title VI Documents' key terms and standards are so vague that recipients cannot determine what activities are affected and thus do not know how to conform their activity to the Documents' requirements." *Id.* ¶ 28. Moreover, "those at ED tasked with enforcement are unable to fairly and consistently

29

enforce the law," thereby "deter[ing] lawful activities by forcing institutions and their students to steer clear of almost anything involving race." *Id*. NAACP then provides detailed examples of those undefined terms and standards. For example, NAACP pled that the Title VI Documents fail to define key terms like "diversity," "equity," "inclusion," or "DEI." *Id*. ¶ 29. NAACP further alleged that the Title VI Documents were vague because they implied, through examples, that those undefined terms "include everything from courses to 'privilege walks'—another term ED does not define—to investigations." *Id*. NAACP alleged that the FAQs are vague by barring any "'aspect of school life that allows one race but not another or otherwise separates students, faculty, or staff based on race,'" while failing to "explain what 'otherwise separates' means." *Id*. ¶ 30. NAACP further alleged that the DCL and FAQs are vague because they "reference 'racial considerations,' 'race-based decision-making,' 'racial preferences,' and 'race consciousness,'" but fail to define these terms, leaving readers unable to "tell whether mere awareness of any indicia of race would convert a decision into one that is 'race-based,' is motivated by 'racial considerations,' or 'uses race.'" FAC ¶ 31. While terms like "racial preference" may be used in certain court opinions, as noted by Defendants, ECF No. 36-1 at 24, the Title VI Documents' departure from the legal analyses set forth in those court opinions and other relevant precedent raise confusion about the terms' meaning.[9] NAACP further alleges that the Title VI Documents are vague because they suggest that Black History Month observances and instruction that focuses on particular cultures may run afoul of the law if they create a hostile environment or "deny students the ability

---

[9]    *See* Apr. 24, 2025 Prelim. Inj. Hr'g Tr. 22:3–4 ("THE COURT: These documents certainly go beyond existing law, do they not?")'; *id.* at 22:9–12 ("THE COURT: The Dear Colleague letter . . . certainly extends the holding of [*SFFA*] to other areas that have not yet been addressed by the Court. Does it not?"); *id.* at 38:11–14 ("THE COURT: You agree that the Supreme Court -- neither the Supreme Court, the D.C. Circuit or perhaps any other circuit has addressed some of these issues that are discussed in the Dear Colleague letter?").

to participate fully in the life of a school" without explaining how such programs could result in either. FAC ¶ 32.

Defendants' argument that the Title VI Documents provide a "comprehensible normative standard" lacks merit. ECF No. 36-1 at 23. As this Court has already held, the Certification likely "violates the Fifth Amendment's prohibition on vagueness" by "threatening penalties," such as "termination of federal funding, breach of contract suits . . . and liability under the False Claims Act," "without sufficiently defining the conduct that might trigger liability." *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6.[10] As this Court explained, and as NAACP alleges, "[a]lthough the challenged documents place a particular emphasis on 'certain DEI practices,' they fail to provide an actionable definition of what constitutes 'DEI' or a 'DEI' practice, or delineate between a lawful DEI practice and an unlawful one." *Id.*[11] Likewise, as this Court observed, while "the Certification prohibits 'the use of diversity, equity, and inclusion programs to advantage one[ ] race over another,'" "it is unclear what it means to use such a program to 'advantage' one race over another," and "the [DCL] and FAQ do not provide the necessary additional clarity." *Id*. This

---

[10]    Defendants' contend that the Court's concerns are overstated because the Certification "imposes no new requirements." ECF No. 36-1 at 26. However, "the government conceded in the preliminary injunction hearing [that] it is aware of no other comparable certification mandating that signers concede[] to materiality," essentially "stipulat[ing] to the element of materiality in a false claims action, which concretely alters schools' litigation posture and susceptibility to monetary penalties." *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *5. *See also* Apr. 24, 2025 Prelim. Inj. Hr'g Tr. 18:15-19:10.

[11]    Indeed, Defendant McMahon herself was unable to explain whether something was DEI. *Hearing on the Nomination of Linda McMahon to be Educ. Sec'y Before the S. Comm. on Health, Educ., Lab. and Pensions*, 119th Cong., 2025 WL 502955 (Feb. 13, 2025) (Q: "if you're running an African American history class, could you perhaps be in violation of [an executive order barring DEI]?" A: "I'm not quite certain and I'd like to look into it further."); *Hearing Examining the Policies and Priorities of the Dep't of Educ. Before the S. Comm. on Health, Educ., Lab. and Pensions*, 119th Cong., at 1:38:28 (June 4, 2025), https://edworkforce.house.gov/calendar/eventsingle.aspx?EventID=412504 (Q: "Would you say that it would be an illegal DEI for a lesson plan on the Tulsa race massacre [to be taught]?" A: "I'd have to get back to you on that.").

Court further noted that the Certification contains "vague statements about how *SFFA* and earlier existing law are going to be applied." Apr. 24, 2025 Prelim. Inj. Hr'g. Tr. 32:11–13.

Additionally, Defendants' contention that any vagueness around the definition of "DEI" is not fatal because the DCL and FAQs provide some guidance that narrows the Documents' scope is disingenuous. The language Defendants cite to--"whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled "DEI…"—is taken out of context. FAQs at 6. This language is not meant to narrow the scope of what programs and policies ED might construe as "discrimination on the basis of race." Rather, it widens the scope to include not just lawful programs with an explicit DEI label, but any programming that could be said to further those values. This is clear from the FAQs' own language just a few lines before referencing "veiling" "discriminatory programs" as "socio-emotional learning"—another lawful pedagogical practice. The lines after do not fare any better. Defendants' contention that even programs not labeled "DEI" might run afoul of the Title VI is another ploy to obviate the plain truth: the Title VI Documents imply that *all* DEI is prohibited, and even if a program or policy does not use the term "DEI," it might also run afoul of the Documents.

This Court has already rejected Defendants' argument that the Title VI Documents pass constitutional muster because the ultimate inquiry is whether "an educational institution treats a person of one race differently than it treats another person because of that person's race," ECF No. 36-1 at 22. As this Court explained, "this 'core' question hardly provides sufficient guidance." *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6 (giving several examples of questions raised by the Title VI Documents that would not be answered by this core question). Indeed, as this Court concluded, "[t]he challenged documents provide no answers to [] questions [raised by the Title VI Documents] and no clear 'boundaries of the forbidden areas' to guide schools'

compliance with the certification or to limit [ED's] enforcement actions." *Id.*; *see* Apr. 24, 2025 Prelim. Inj. Hr'g Tr. 23:24–24:1 ("THE COURT: . . . There is a lot of language in this letter . . . [that t]aken alone is extremely vague.").

This Court should not be persuaded by Defendants' argument that there should be no concerns about arbitrary enforcement because ED is not a law enforcement agency and because "courts have greater tolerance for enactments with civil rather than criminal penalties." ECF No. 36-1 at 26. As Defendants admitted, the False Claims Act has criminal penalties.[12] April 24, 2025 Prelim. Inj. Hr'g Tr. 18:6–10. *See also* 18 U.S.C. § 287 ("Whoever makes or presents to any . . . agency [of the United States], any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.").

Several other courts have likewise concluded that the administration's use of the terms "diversity," "equity," and "inclusion" is vague. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 2025 WL 1276857, at *45 (D.D.C. May 2, 2025) (collecting cases and holding that the Perkins Coie Executive Order is impermissibly vague insofar as it "'fails to provide adequate notice as to what are prohibited 'diversity, equity, and inclusion' policies,'" but nevertheless threatens adverse action based on the prohibited DEI); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *1–2, 4, 19–20, 26 (D. Md. Feb. 21, 2025) (holding that plaintiffs were likely to succeed on their vagueness claim where "[t]he meaning of

---

[12]     The threat of False Claims Act liability is even more menacing given the recent launch of the Department of Justice's Civil Rights Fraud Initiative, which intends to "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates federal civil rights laws," which seemingly includes "public institutions [that] codify inherently divisive policies like DEI." *See* Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://www.justice.gov/opa/pr/justice-department-establishes-civil-rights-fraud-initiative.

the word 'equity,'" as used by the administration in an executive order, "is unclear to a degree that

risks arbitrary and discriminatory enforcement," "leav[ing] current grant recipients and contractual

counterparts unsure about what activities are prohibited" and further noting the absence of

"guidance on what the new administration considers to constitute 'illegal DEI discrimination and

preferences,' . . . or what types of 'DEI programs or principles' the new administration considers

'illegal'") (internal citations omitted)), *stayed pending appeal*, No. 25-1189, ECF No. 29 (4th Cir.

Mar. 14, 2025); *S.F. A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636, at *21

(N.D. Cal. June 9, 2025) (holding that plaintiffs were likely to succeed on their vagueness claim

where "it is hard to imagine an Executive Order vaguer in its command" where it "renders

categorically ineligible for funding any contract or grant based on the single determination of

whether it is 'equity-related' without any guidelines as to what that term may mean."); *S.F. Unified

Sch. Dist. v. AmeriCorps*, No. 25-CV-2425-EMC, 2025 WL 1713360, at *18 (N.D. Cal. June 18,

2025) (collecting cases and holding that an anti-DEI executive order was "rife with vagueness and

ambiguity, leaving grantees to speculate what is proscribed and what is permitted."); *Chi. Women

in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14, 2025) (noting

that "the meaning of ['DEI'] is left entirely to the grantee's imagination. The Order that contains

the Certification Provision does not define the term 'DEI' itself, and it does not refer to any other

source indicating what the term means as used in the Order—let alone what might make any given

'DEI' program violate Federal anti-discrimination laws."); *S. Educ. Found. v. U.S. Dep't of Educ.*,

No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025) (finding a lack of "reasoned

explanation" where "the Termination Letter's list of possible bases[, one of which is taking part in

DEI initiatives,] 'is so broad and vague as to be limitless; devoid of import, even.'") (quoting *Am.

Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 856 (D. Md. 2025),

*reconsideration denied*, No. 1:25-CV-00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025) (same)).

Indeed, strikingly similar to NAACP's allegations, a court found that "the [DCL] does not make clear . . . what the Department believes constitutes a DEI program, or the circumstances in which the Department believes DEI programs run afoul of Title VI." *Nat'l Educ. Ass'n v.*, 2025 WL 1188160, at *18. That court continued, "[t]he [DCL] does not even define what a 'DEI program' is." *Id.*; *see also id.* at *19 (further explaining that "[t]he vagueness generated by the 2025 [DCL] is compounded by what few characterizations of 'unlawful' DEI the [DCL] contains" given that "the 2025 [DCL]'s isolated characterizations of unlawful DEI are inconsistent with the ordinary meaning of that phrase"). Given the foregoing, Plaintiff has sufficiently pled its Fifth Amendment vagueness claim.

### 3.      The NAACP Has Sufficiently Pled its First Amendment Claims (Counts III and IV).

As a threshold matter, courts have lowered the typically "rigorous" standard for facial challenges in the First Amendment context "[t]o 'provide[ ] breathing room for free expression.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). NAACP's allegations clear this bar.

### a)      The Complaint states a claim that the Title VI Documents unconstitutionally infringe upon NAACP members' right to receive information (Count III).

Count III plausibly alleges that the Title VI Documents unlawfully infringe upon NAACP members' right to receive information by engaging in viewpoint discrimination. The First Amendment protects the right to receive information and ideas because that right gives true effect to the "*recipient's* meaningful exercise of [their] own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982); *see also Martin v. City of Struthers*, 319 U.S. 141 (1943); *Lamont v. Postmaster Gen. of*

*U.S.*, 381 U.S. 301 (1965). Courts have recognized the unique importance of this right in the education setting, where students are "trained through wide exposure to that robust exchange of ideas." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

Restrictions that discriminate against speech, including a recipient's ability to receive speech, because of the opinion or perspective of the speaker are presumptively unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–89 (1995). Viewpoint discrimination is especially harmful in educational settings because schools are entrusted to "educat[e] the young for citizenship." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). While local authorities and, to a lesser extent, state authorities are afforded some deference in curricular decision-making, students' right to receive information may not be infringed upon to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872 (quoting *Barnette*, 319 U.S. at 642 (plurality opinion)); *see also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022) (holding that though the state has discretion in setting curricula, it cannot impose its own orthodoxy of viewpoint about the content it allows within classrooms).

NAACP pleads sufficient facts to establish that the Title VI Documents prohibit schools and universities from discussing disfavored viewpoints in violation of members' right to receive information. As alleged in the FAC, the Title VI Documents prohibit instruction on "systemic and structural racism" based on ED's viewpoint that such instruction is a "discriminatory practice[]" that has "toxically indoctrinated students." DCL at 2. The Title VI Documents similarly illustrate ED's views that "culturally responsive teaching" is a veiled discriminatory practice that should be prohibited. FAQs at 5; FAC ¶ 84. The Title VI Documents' broad prohibitions deny students the right to continue receiving accurate and pedagogically sound instruction, curricula, and

programming that acknowledges the existence of systemic racism or expresses support for inclusion and equity—viewpoints that Defendants vigorously disfavor.

NAACP also plausibly alleges that its members' schools and universities began to remove instruction, curricula, and programming that expressed viewpoints disfavored by Defendants to comply with the Title VI Documents' prohibitions, despite the desire to continue offering that instruction and programming and despite NAACP members' interest in receiving it. As alleged in the FAC, the Board of the City Schools of Decatur in Georgia voted on April 15, 2025, to comply with the Title VI Documents by rescinding two policies that advance culturally responsive instruction and curricula and that promote equity in the City Schools of Decatur. FAC ¶ 90. Because the Board rescinded these two policies, NAACP members and/or their children who had previously enrolled in an African-American History course—or other courses offering culturally responsive instruction—credibly feared that those courses would be substantially and detrimentally modified or terminated. *Id.* Following the injunction issued in this case, ECF No. 31, and two other cases, *see American Federation of Teachers v. Department of Education*, No. SAG-25-628, 2025 WL 1191844 (D. Md. April 24, 2025), and *National Education Association v. United States Department of Education*, 2025 WL 1188160 (D.N.H. April 24, 2025), the Board voted immediately to reinstate both previously rescinded policies. FAC ¶ 91.

NAACP pleads similar facts on behalf of members across the country, plausibly alleging that the Title VI Documents unconstitutionally infringe upon members' right to receive information that their schools and universities have offered and/or intend to offer. *See id.* ¶¶ 3, 4, 15, 28, 32, 47–57, 62–65, 75–77, 84, 85–87, 93, 134–35. For example, one member of the NAACP in Maryland reasonably feared that her children's school would remove discussions of systemic racism from the school curriculum to comply with the Title VI Documents. *Id.* ¶ 88. Another

NAACP member seeks to enroll in her university's African American Politics course but reasonably fears the removal of that course following the university's announcement that it was "considering the potential impacts" of the Title VI Documents. *Id.* ¶ 89. Following the issuance of the Tile VI Documents a university, to comply with the Documents' mandates, cancelled a course on disability, diversity, and human rights that is offered annually and in which NAACP members planned to enroll for 2025-26 school year.[13] Bailey Decl., ECF No. 13-4 ¶ 50. These cancellations were the predictable effect of Defendants' Title VI Documents. *See supra* § III(A).

Defendants claim that the instruction, curricula, and programming prohibited by the Title VI documents are not protected speech, but instead are speech that violates federal antidiscrimination law. This claim, however, is not borne out by the express language in the Title VI Documents, and Defendants point to no language in the Documents that supports this assertion. The Documents' prohibitions, including as enforced through the Certification, prohibit instruction on "systemic and structural racism," "culturally responsive instruction," and diversity, equity, and inclusion practices and programming, FAC ¶ 84, without "provid[ing] an actionable definition of what constitutes 'DEI' or a 'DEI' practice." *NAACP v. U.S. Dep't of Educ*, 2025 WL 1196212, at *6.[14] Indeed, another court rejected Defendants' argument that the DCL merely reminds the reader that discrimination is unlawful, noting "[t]he Department is not soliciting complaints about only

---

[13] Since the Court entered its injunction, the university appears to have reinstated the course. *See* Va. Commonwealth Univ., Interdisciplinary Developmental Disability Studies, https://bulletin.vcu.edu/azcourses/idds/ (last visited July 14, 2025).

[14] Defendants rely upon *Nat'l Urb. League v. Trump* for the proposition that "there is no constitutional right to operate DEI programs that violate federal antidiscrimination law." No. 25-471 (TJK), 2025 WL 1275613, at *24 (D.D.C. May 2, 2025). However, this argument is a red herring. NAACP does not sue to further unlawful discrimination. Indeed, NAACP has worked to combat discrimination for more than 80 years. NAACP brings this suit to vindicate the legal rights of its members, including, *inter alia*, the right of Black students not to be subject to racial discrimination or any other unequal treatment that prevents them from enjoying equal access to educational resources and opportunities.

those DEI programs . . . that discriminate based on race;" rather, "[b]y its own admission, it seeks to 'End DEI'" altogether. *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *21. The predictable and actual effect of these restrictions is that NAACP members were denied, and—absent the preliminary injunction—would continue to be denied, access to protected speech, including certain courses about African American history, African American politics, and the intersection of diversity and other issues that might tough upon structural inequalities that discuss reform which might be called "DEI."

Moreover, the Title VI Documents' mischaracterization of diversity, equity, and inclusion efforts, as unlawful "discriminatory practices," is unsupported by law. Courts have routinely upheld the legality of diversity, equity, and inclusion efforts, including diversity statements,[15] anti-bias trainings,[16] targeted recruiting,[17] and aspirational diversity goals.[18] NAACP's allegations about the instruction, curricula, and programming affected by the Title VI Documents are sufficient to establish, and support a reasonable inference, that the Title VI Documents target protected speech that is disfavored by the current administration. Defendants may not justify their intrusion upon the First Amendment rights of NAACP's members by baselessly and broadly labeling that protected speech as unlawful, nor may they disclaim liability for unconstitutional conduct by including boilerplate language stating that the Documents' unconstitutional prohibitions will be "enforce[d] . . . consistent with the First Amendment." FAQs at 6.

---

[15] *See supra* note 2.

[16] *See supra* note 3.

[17] *See supra* note 4.

[18] *See supra* note 5.

**b)** **The Complaint states a claim that the Title VI documents unconstitutionally infringe upon NAACP members' right to freely associate.**

NAACP plausibly alleges that Defendants violated its members' right to freedom of association. Defendants' argument that the NAACP did not adequately detail Defendants' violation of these rights not only ignores the NAACP's detailed allegations, but also reflects an improper analysis based on their own flawed interpretation of the Title VI Documents.[19] These arguments lack merit.

The First Amendment forbids Defendants from curtailing the ability of like-minded individuals to associate for the purpose of expressing commonly held views. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 309 (2012). In evaluating NAACP's freedom of association claim, this Court must consider whether and to what extent Defendants' actions burdened its members' right. *See Boy Scouts of Am. v. Dale,* 530 U.S. 640, 657–59 (2000). Government infringement can take a number of forms. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). The Supreme Court "has held, for example, that the freedom of association may be violated . . . where individuals are punished for their political affiliation . . . and where members of an organization are denied benefits based on the organization's message." *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 355 (1976); *Healy v. James*, 408 U.S. 169, 181–82 (1972).

Here, NAACP has plausibly alleged that Defendants have burdened their freedom of association by forcing certain student groups to self-censor their expression and coercing schools to cancel programming or withdraw official support from or terminate student groups that could

---

[19] To determine whether a group is protected by the First Amendment's expressive associational right, this Court must also determine whether the group engages in "expressive association." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Defendants do not contest that the groups in which Plaintiff's members participate engage in expressive conduct. As such, any argument to the contrary is waived. *Shands v. Comm'r of Internal Revenue*, 111 F.4th 1 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 1178 (2025) (arguments raised for the first time in a reply are waived).

arguably run afoul of the Title VI documents. NAACP alleges that the Title VI Documents appear to prohibit programming, resources, and opportunities that, for example, ED could conceivably deem "DEI," address "systemic racism," or operate with some measure of "race consciousness." FAC ¶¶ 29, 31, 34, 44. Additionally, ED required that SEAs certify compliance with the Title VI Documents and their ban against "DEI" programming; by signing the certification, SEAs and LEAs agreed that any failure to comply could result in a loss of funding and liability under the False Claims Act. *Id.* ¶¶ 25–27. As explained *supra* § III(A)(4), Defendants created uncertainty around what conduct is proscribed by the Title VI Documents and threatened funding loss and/or legal action, thus inducing recipients of federal funds to steer clear of, and cut, programming and policies that could conceivably be seen as furthering "DEI," helping students of color, or promoting other views disfavored by ED. *Id.* ¶ 33.

NAACP further alleges that specific student groups and programming associated with them—which require school approval, funds, and resources to operate—are burdened by the Title VI Documents. For example, one NAACP member in the City Schools of Decatur in Georgia participates in a student group that runs programming which educates students on topics such as systemic racism and Black History in Decatur. FAC ¶ 113. NAACP further explains that this member reasonably expected and feared that this student group would be forced to discontinue its activities due to their school district's efforts to comply with the Title VI Documents, which included rescinding an existing Equity Policy and another advancing culturally inclusive curricula. *Id.* at ¶¶ 90, 112–13. Another NAACP member fears that her child's afterschool program in the City Schools of Decatur will be terminated because the program, while open to all, is focused on empowering Black girls. *Id.* at ¶ 114. It is no stretch to infer that ED would view either group as creating a "hostile environment based on race" or "benefiting" one "racial group" over another and

would thus pressure the school district to terminate these programs or lose funding. And, given that this school district explicitly revoked DEI policies to comply with the Title VI Documents, it is not speculative, as Defendants suggest, to infer that these student groups would lose school support, be forced to change their programming, or be terminated if the school district were to be subject to the Title VI Documents' mandates.

Defendants argue that these allegations are insufficient because, as long as the student groups comply with the language in the DCL and FAQs, the Title VI Documents "should pose no First Amendment issues." Plaintiff has alleged that it is impossible to determine how student groups that center on disfavored topics might "comply" with the Documents' proscriptions. Drawing all reasonable inferences from the allegations in NAACP's favor, it is reasonable for NAACP's members to fear that ED will consider voluntary Black affinity groups, FAC ¶ 109, or a student group that aims to "confront systemic racism," *id.* ¶ 113, as discriminatory, and thus violative of the Documents, given the criticisms of both in the DCL and FAQs. *See also NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6–7; *Nat'l Educ. Ass'n*, 2025 WL1188160, at *21. Given that, NAACP reasonably fears that schools would withdraw support from such groups and/or that students would self-censor their expression regarding certain topics about race and racism to avoid an ED investigation. Finally, it is misleading for Defendant to assert that groups that "focus[] on interests in particular cultures, heritages, and areas of the world" are not *per se* violations of Title VI under ED's interpretation as long as they are open to all students. ECF No. 36-1 at 32 (citing FAQs at 6). In that same paragraph (which Defendants omit), the FAQs state that programs that "create a hostile environment based on race" are unlawful. FAQs at 6. In light of ED's misstatement of the law and mischaracterization of the diversity, equity, and inclusion programs, that standard is vague, *see supra* § III(A)(4), and provides no meaningful guidance for

students or schools who will feel pressured to curtail programs that might conceivably touch on those disfavored topics.

Defendants also argue that if any student groups *were* to "distribute benefits or burdens based on race," any enforcement of Title VI by ED would not violate members' associational rights; thus, the Title VI documents does not prevent Plaintiff's members from accessing student groups. ECF No. 36-1 at 10. Defendants, however, misstate Plaintiff's argument. Plaintiff does not allege that members' student groups "distribute benefits or burdens based on race." Rather, as explained, *supra*, members fear that they will lose access to lawful student groups or programming that touch on topics disfavored by ED because schools will be forced to withdraw official recognition and support or otherwise ban those student groups and associated programming in order to certify their compliance with the vague requirements of the Title VI Documents. *See Christian Legal Soc. Chap. of the Univ. of Cal., Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 667–68 (2010) (the government may not deny student groups their "access to school-sponsored forums because of the groups' viewpoints"); *Bd. of Educ. v. Mergens*, 496 U.S. 226, 249–50 (1990).

### c) Conditioning federal funding on fidelity to preferred viewpoints is antithetical to the First Amendment.

Defendants argue that they do not violate the First Amendment by withholding federal funding from school districts that allow students and staff to engage in protected speech activities that are disfavored by ED. While the Supreme Court has allowed the state to place conditions on public funding, it does not allow it to use those conditions to infringe on First Amendment rights or regulate First Amendment activity. *Regan v. Tax'n With Representation of Wa.*, 461 U.S. 540, 546 (1983). Indeed, government officials are prohibited from relying on the "threat of invoking legal sanctions and other means of coercion . . . 'to achieve the suppression' of disfavored speech."

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

NAACP has plausibly alleged that the Title VI Documents, and the Certification requirement in particular, unconstitutionally interfere with the First Amendment rights of Plaintiff's members. *See supra* § III(A)(2). NAACP also plausibly alleges that Defendant's actions are coercive—Defendants threaten to withhold *all* federal funding from school districts and educational entities that allow students and staff to engage in speech disfavored by Defendants. Certification at 2–3; FAC ¶ 27; *see also* FAC ¶¶ 60, 65, 75–76, 86–87, 105–06, 145, 150. In addition to the loss of funding, the Certification requirement adds the additional threat of private lawsuits under the False Claims Act and the potential costs of legal fees and even treble damages. Certification at 2–3; FAC ¶ 27. Additionally, as alleged in the FAC, ED actively solicits information for enforcement against schools via the EndDEI portal, which invites members of the public to report schools that promote "divisive ideologies and indoctrination" so that ED may open investigations into them. *See* FAC ¶ 85.

NAACP also alleges harm from school districts' loss of federal funding that goes beyond infringement on members' First Amendment rights. For example, without federal funding, around 24,000 students in Montgomery County Public Schools in Maryland risk losing access to special education services. Johns Decl., ECF No. 13-1 ¶ 121; *see also* FAC at 4 n.7 (noting that the Virginia Beach school board changed its policies to comply with the Title VI Documents to preserve more than $74 million in federal funding); *id.* ¶ 93 (noting that Haldane Central School District's board suspended its diversity, equity, and inclusion policy to "preserve $450,000 in federal financial assistance."). The promise of significant funding cuts and legal action can only be understood as a "means of coercion" to facilitate the suppression of speech disfavored by

Defendants, in violation of the First Amendment. *See Vullo*, 602 U.S. at 189. It is disingenuous to argue, as Defendants do, that schools districts can simply "decline the funds," ECF No. 36-1 at 29, when declining such funds would lead to the loss of critical educational programs that have nothing to do with the programs and speech that Defendants seek to suppress.

Accordingly, NAACP has plausibly pled that the funding conditions placed on school districts are unconstitutionally coercive and violate NAACP members' First Amendment rights.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff NAACP respectfully urges this Court to deny Defendants' motion to dismiss.

Dated: July 14, 2025

Respectfully submitted,


Jin Hee Lee, DC Bar No. 1740850
Michaele N. Turnage Young, DC Bar No. 242398*
Morgan Humphrey*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, D.C. 20005
(202) 682-1300
jlee@naacpldf.org
mturnageyoung@naacpldf.org
mhumphrey@naacpldf.org

*/s/ Katrina Feldkamp*
Katrina Feldkamp*
Allison Scharfstein*
Lauren Carbajal*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
(212) 965-2200
kfeldkamp@naacpldf.org
ascharfstein@naacpldf.org
lcarbajal@naacpldf.org


*Admitted Pro Hac Vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on July 14, 2025, this memorandum was filed electronically and will

be sent to all parties by operation of the Court's electronic filing system. Parties may access this

filing through the Court's CM/ECF System.

<div style="margin-left:45%">

*<u>/s/ Katrina Feldkamp</u>*
Katrina Feldkamp
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.

</div>