**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF
COLORED PEOPLE,

       *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,

       *Defendants*.

---

Case No. 1:25-cv-01120-DLF

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.     NAACP FAILS TO ESTABLISH ARTICLE III STANDING. ......................................... 2

     A.     NAACP Lacks Standing To Seek Prospective Relief. ............................................ 3

     B.     NAACP Fails To Satisfy The Requirements To Show Associational Standing. ............................................................................................................... 9

II.     THIS COURT SHOULD DISMISS THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM. ..................................................................................11

     A.     The Title VI Documents Are Not Final Agency Action And Are Not Subject To Notice And Comment Rulemaking. .................................................................11

     B.     This Court Should Dismiss NAACP's Constitutional Claims. ............................. 16

          1.     NAACP Fails to State an Equal Protection Claim (Count I) .................... 17

          2.     The Title VI Documents Are Not Unconstitutionally Vague (Count II) ..................................................................................................... 20

          3.     NAACP's First Amendment Claims Fail (Count III & IV) ...................... 23

CONCLUSION ........................................................................................................ 25

i

## INTRODUCTION

Defendants' Motion to Dismiss, ECF No. 36 ("Defs.' Mot.") showed that the Court lacks jurisdiction over NAACP's Amended Complaint that challenges guidance documents—the Dear Colleague Letter ("DCL"), the "Frequently Asked Questions" document ("FAQ"), and a certification requirement ("Certification") (collectively, the "Title VI Documents")—issued by the U.S. Department of Education ("ED"). Defendants explained that NAACP failed to show that any of its members faces an actual or imminent injury that is concrete, particularized, and fairly traceable to the challenged documents. NAACP opposes the Motion, Pl.'s Mem. of Law in Opp'n to Defs.' Mot., ECF No. 37 ("Pl.'s Opp'n"), but its brief only further underscores the speculative and attenuated nature of its allegations, falling well short of establishing Article III standing.

Defendants' Motion also showed that NAACP fails to state a claim on the merits. Where the Title VI Documents state explicitly that they do not bind the public or create new legal standards, NAACP's claims under the Administrative Procedure Act ("APA") fail at the threshold because it does not challenge any final agency action. NAACP resists this conclusion, claiming that the Title VI Documents are binding, but it confuses the guidance documents with the existing obligations under Title VI. Indeed, as another district court recently recognized, the DCL "prohibits no more than what Title VI prohibits." *Bd. of Educ. for Silver Consol. Schs. v. McMahon*, ---F. Supp. 3d---, 2025 WL 2017177, at *9 (D.N.M. July 18, 2025).

NAACP's constitutional claims—whether reviewed under the APA or directly under the constitution—fail as a matter of law. As Defendants explained in their Motion, NAACP fails to adequately plead its Equal Protection and vagueness challenges under the Fifth Amendment. NAACP urges this Court to infer from the Title VI Documents an intent to discriminate against its members, but it supports that claim only with conclusory allegations. That does not suffice sustain NAACP's equal protection claim.

Moreover, in its vagueness challenge, NAACP principally complains that the Title VI Documents use certain terms that are undefined, which allegedly makes it difficult for schools to understand what is prohibited under Title VI. But when viewing the challenged documents as a whole, they suffice in providing notice to schools what is prohibited under federal antidiscrimination laws, explaining that "discrimination on the basis of race, color, or national origin, has been, and will continue to be illegal." The Title VI Documents supply explanations, context, and even a shorthand test to aid schools in understanding their Title VI obligations. The Title VI Documents, therefore, provide a comprehensible normative standard. That the Title VI Documents do not provide exhaustive guidance, leaving open the possibility of certain edge cases, does not render these documents unconstitutionally vague.

Similarly, NAACP fails to state claims under the First Amendment. NAACP asserts its members' right to receive information and to freely associate. But where acts of racial discrimination are not protected by the First Amendment, and the Title VI Documents expressly provide assurances that ED will enforce federal civil rights law consistent with First Amendment principles, NAACP cannot overcome the major gaps in their allegations supporting these claims.

Accordingly, the Court should dismiss NAACP's Amended Complaint.

## ARGUMENT

## I.    NAACP FAILS TO ESTABLISH ARTICLE III STANDING.

To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) ("*Defenders*"). When an organization seeks to bring suit on behalf of its members—that is, to assert associational standing—it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose;

and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

### A.    NAACP Lacks Standing To Seek Prospective Relief.

NAACP insists that it has "sufficiently pled that [its] members have already suffered injury and will suffer future injury from the loss of academic and extracurricular programming, as well as the potential loss of federal funding for their schools, as a direct result of the Title VI Documents." Pl.'s Opp'n at 8. Specifically, NAACP argues that the Title VI Documents have "caused federally funded educational institutions to cease lawful policies and practices that benefited disadvantaged and under-resourced Black students . . ." *Id*. at 12. But NAACP does not have Article III standing to challenge the Title VI Documents.

First, NAACP has failed to show injury in fact. Because NAACP seeks "forward-looking relief," it "must show [it is] suffering an ongoing injury or face an immediate threat of injury." *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 689 (D.C. Cir. 2015). To claim standing based on "[a]n allegation of future injury," a plaintiff must show that "the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)).

But no such injury is present here. NAACP does not allege any ongoing injury to its members based on any actual instances of an educational institution terminating a class or an extracurricular program because of the Title VI Documents. The closest that NAACP gets is its allegation that a member had planned to attend a Black History Month read-in event, but the Iowa school "cancelled the event given concerns that the book's imagery ran afoul of the [Title VI Documents'] vague and broad prohibitions." Am. Compl. ¶ 108, ECF No. 34. But reliance on allegations of past injury (and a single one at that) does not suffice to seek declaratory and

injunctive relief that NAACP seeks. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (party that "seeks prospective declaratory and injunctive relief . . . must establish an ongoing or future injury that is 'certainly impending;' [they] may not rest on past injury" (citation omitted)).

In a similar vein, NAACP alleges that one of its members "expects that her daughter's college scholarship, awarded to students from diverse backgrounds, will be cancelled, because similar scholarships, such as the University of Michigan Alumni Association's LEAD Scholars Program, have been cancelled in response to the Title VI Documents." Am. Compl. ¶ 76. But unless a plaintiff can show he is "realistically threatened by a repetition of *his* experience [giving rise to the injury] . . . he has not met the requirements for seeking an injunction in a federal court," *City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983) (emphasis added). This member lacks standing to enjoin the Title VI Documents to prevent the cancellation of her scholarship based merely on speculation about what has allegedly happened at another university affecting other students.[1]

And, along those lines, NAACP alleges that its "members who had previously enrolled in, or whose children intended to enroll in, an African-American History course offered by the City Schools of Decatur reasonably feared that course would be substantially and detrimentally modified or would no longer be offered." Am. Compl. ¶ 90. To the extent that NAACP is referring to members who have already taken the course, any threat that the course would no longer be offered is not an injury to those members. And if NAACP is suggesting that the children of some members "intended" to enroll in the course, the allegation is also insufficient because "[s]uch

---

[1] Additionally, this allegation also raises a traceability issue: if this scholarship program excluded students based on race, it would contravene not only the Title VI Documents but also Title VI itself. *Cf. Am. All. For Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 769 (11th Cir. 2024) (considering whether "an entrepreneurship funding competition open only to businesses owned by black women, violates 42 U.S.C. § 1981, which prohibits private parties from discriminating on the basis of race when making or enforcing contracts.").

'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Defenders*, 504 U.S. at 564.

Accordingly, NAACP relies entirely on speculation of future injury—that its members will suffer injuries stemming from decisions by educational institutions to "terminate[] or detrimentally modif[y]" classroom instruction and extracurricular activities to comply with the Title VI Documents. Pl.'s Opp'n at 9;  *see*, *e.g.*, Am. Compl. ¶¶ 88–90, 107–10, 113–14. "This theory of harm 'stacks speculation upon hypothetical upon speculation' and thus 'does not establish an actual or imminent injury.'" *Irregulators v. FCC*, 953 F.3d 78, 84 (D.C. Cir. 2020) (citation omitted). The relevant standard is if the injury itself is imminent—not if a plaintiff is merely fearful of the possibility of future injury. The Supreme Court is clear on this point: "We hold that respondents lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is certainly impending and because they cannot manufacture standing by incurring costs in anticipation of non-imminent harm."  *Clapper*, 568 U.S. at 422.

NAACP alleges no facts showing that any injury related to the Title VI Documents is imminent or certainly impending. *See Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 851 F.3d 1, 5 (D.C. Cir. 2017). Indeed, NAACP "offers only vague and general descriptions of . . . activities" that its members intend to undertake. *Id*. But the FAQ makes clear that ED's "assessment of school policies and programs depends on the facts and circumstances of each case." FAQ at 6. And NAACP supposes that schools will interpret the Title VI Documents broadly— even unreasonably—and will discontinue classes and activities that NAACP members want. But as Defendants discussed in their Motion, *see* Defs.' Mot. at 10–11, 32–33,  NAACP has not alleged any "desired conduct . . . that might trigger" enforcement under the plain terms of the Title VI

Documents. *Matthew A. Goldstein, PLLC*, 851 F.3d at 4. Because its members' "activities, as they have described them, would not bring [their schools] within the ambit of [Title VI]," NAACP lacks a credible fear of the statute being enforced sufficient to satisfy Article III. *Am. Libr. Ass'n v. Barr*, 956 F.2d 1178, 1187 (D.C. Cir. 1992). Even where NAACP alleges that some school districts, such as the City Schools of Decatur, actually rescinded certain policies on a pre-enforcement basis, Am. Compl. ¶ 90, that action is too attenuated from the members' alleged fear that a specific African American history course or certain student groups will be "terminated or detrimentally modified." Pl.'s Opp'n at 9. Thus, NAACP fails to show that any injury resulting from educational institutions' efforts to comply with the Title VI Documents is actual or imminent.

Second, even if NAACP's future injury were cognizable, Article III standing requires an injury that is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Defenders*, 504 U.S. at 560. When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed" to satisfy Article III. *Id.* at 562. "In that circumstance, causation and redressability ordinarily hinge on the response of the regulated . . . third party to the government action." *Id.*  Because standing in this circumstance "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," standing in such circumstances is "substantially more difficult" to establish. *Id.* (citations omitted).

NAACP cannot meet this standard. As Defendants' Motion explains, Defs.' Mot. at 8–13, it is the various educational institutions and school districts—"third part[ies] not before the court," *Defenders*, 504 U.S. at 560—that adopted an unreasonable interpretation of the Title VI Documents and, consequently, chose to "terminate[] or detrimentally modif[y]," Pl.'s Opp'n at 9,

"DEI programs, equity-related policies, and student groups serving under-resourced and disadvantaged Black students . . ." that have caused the alleged injuries. *Id.* at 10. As Defendants pointed out, NAACP's cited examples plainly show educational institutions exercising independent discretion in responding to the Title VI Documents. Most institutions undertook actions untethered to a reasonable reading of the Title VI Documents, such as a school district withdrawing from—and returning books for—a read-in event, *id.*, and Decatur and Haldane school officials rescinding certain educational policies, *id.* at 11–12. Rowan University, among others, had a less dramatic response to the Title VI Documents. *Id.* at 12–13. Thus, where educational institutions "misunderstand" a relevant agency guidance, a subjective fear of enforcement arising from that misunderstanding does not create an Article III injury for even those institutions, let alone third-parties. *See Matthew A. Goldstein, PLLC*, 851 F.3d at 6–7 (affirming dismissal of pre-enforcement challenge for lack of standing where plaintiff's fear of enforcement was "based on a misunderstanding" of a State Department letter and the relevant regulation). And because NAACP is not "the object of the government action or inaction" it is "challeng[ing]," *see Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Defenders*, 504 U.S. at 562), its legal challenge to the Title VI Documents lands even further afield in establishing Article III standing. That shows that the "links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain [plaintiff's] standing." *Allen v. Wright*, 468 U.S. 737, 759 (1984) *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

NAACP hardly attempts to refute any of these points. Instead, it endorses these interpretations, saying Decatur acted reasonably to rescind its "Equity policies because, although it was impossible to determine the bounds of the prohibition, the policies seemed likely to be

covered by the documents." Pl.'s Opp'n at 10. What NAACP thinks of what a third-party may have thought about its legal obligations is conclusory and pure speculation, and courts "do not assume the truth of legal conclusions . . . or 'accept inferences that are unsupported by the facts set out in the complaint.'" *See Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (citations omitted). NAACP asserts that the Schools of Decatur "rescinded its policies promoting equity and inclusive curricula, causing NAACP members to reasonably fear that an African American History course and two student groups focused on empowering minority students would be terminated or detrimentally modified." Pl.'s Opp'n at 9. In support of this causal chain, NAACP says that "at least two school districts, including the City Schools of Decatur, cited the Court's [injunction] order when they reversed their prior decisions to rescind policies to comply with the Title VI Documents." *Id.* at 10. But NAACP's own allegations provide further evidence of the Decatur school board's misunderstanding of the Title VI Documents. Am. Compl. ¶ 90 n.86. The Chair of the school board stated:

> Since our last Board meeting on April 15, 2025, three courts issued orders on Thursday, April 24, 2025, regarding the U.S. DOE's ability to enforce the Dear Colleague Letter and the certification requirement. Specifically, three federal judges temporarily blocked the federal government from directing K-12 schools to *eliminate diversity, equity, and inclusion policies or lose federal funding*.

City Schools of Decatur Board of Education Newsletter, *Chair's Comments* (Apr. 29, 2025) ("CSD Bd. of Educ. Newsletter, *Chair's Comments*"), https://secure.smore.com/n/hwy41 (emphasis added). The Title VI Documents do not categorically prohibit "DEI" programs, *see*, *e.g.*, Defs.' Mot. at 12, 23–24, and the Chair's comments reflect a fundamental misapprehension. The Title VI Documents do not require schools to "eliminate diversity, equity and inclusion policies or lose federal funding" but this mistaken view reportedly caused the school board to rescind its policies. *See* CSD Bd. of Educ. Newsletter, *Chair's Comments*.

NAACP also suggests that the existence of a cause of action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, is sufficient to confer standing. Pl.'s Opp'n at 8. NAACP is mistaken. Setting aside the fact that there is no cause of action under the APA to bring this sort of claim, *see* Defs.' Mot. at 13–16, the existence of a private cause of action is a separate and independent requirement from "the irreducible constitutional minimum of standing." *Defenders*, 504 U.S. at 560. The additional requirement of identifying a private right of action that states a claim to relief has no bearing on the question of standing.

**B.      NAACP Fails To Satisfy The Requirements To Show Associational Standing.**

Even setting aside those deficiencies, NAACP fails to satisfy the requirements for associational standing. To establish associational standing, an organization must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt*, 432 U.S. at 343).

NAACP insists that it satisfies all the requirements of associational standing, including that its members would have standing to sue in their own right. Pl.'s Opp'n at 7. But its representational standing theory fails at the outset because "it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). And, as several courts in this Circuit have held, where "organizations have not identified any members by name," they "do not have associational standing to bring a claim." *Green Oceans v. U.S. Dep't of Interior*, Case No. 1:24-cv-141-RCL, 2025 WL 973540, at *8 (D.D.C. Apr. 1, 2025); *see, e.g.*, *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 192 (D.D.C. 2020); *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 69–70 (D.D.C. 2013); *Californians for Renewable Energy v. U.S. Dep't of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C. 2012). NAACP merely discusses its members at

a high level of generality, let alone identifies any specific member by name. In essence, by asserting that it "has more than 2,200 local branches, 371 college chapters, forty-nine Youth Councils, and twenty-three high school chapters across the country[,]" Am. Compl. ¶ 10, NAACP relies on little more than a speculative theory of "probabilistic standing"—*i.e.* "a statistical probability that some . . . members are threatened with concrete injury"—that the Supreme Court has rejected. *Summers*, 555 U.S. at 497, 499. To be sure, some courts have acknowledged that "it is possible, under some circumstances, to establish associational standing at the pleading stage without specifically naming the injured individuals" *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. 2022) (citing *Young Am.'s Found. v. Gates*, 560 F. Supp. 2d 39, 49–50 (D.D.C. 2008)). But NAACP's Amended Complaint provides no basis for excusing this defect. Even when some courts have excused associational plaintiffs for not identifying members by name, those courts still required evidence of the plaintiffs' standing to assure themselves of their jurisdiction. *See*, *e.g.*, *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (finding standing based on union's submission within the administrative record); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 (D.D.C. 2018) (finding that organization's complaint adequately identified where organization provided an anonymous affidavit from one of its members.). NAACP fails to provide any evidence or details of those members' individual circumstances to enable this Court to assess its members' standing. *See Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 121–22 (D.D.C. 2025) ("For example, Travelers United could have filed affidavits or declarations from some of those members stating that they plan to visit Hyatt hotels in the future. . . . But Travelers United has not alleged or shown that *anyone*, let alone any of its own members, plans to book a Hyatt hotel room in the future."). Although NAACP's complaint refers to some of its members, "the lack of any

10

substantive detail about the [members' individual] circumstances makes it all but impossible to determine whether any of the [members], as individuals," have standing to sue in their own right. *Indigenous People of Biafra*, 639 F. Supp. 3d at 85.

## II.    THIS COURT SHOULD DISMISS THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM.

### A.    The Title VI Documents Are Not Final Agency Action And Are Not Subject To Notice And Comment Rulemaking.

**1.** Final agency actions are those that (1) "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

The Title VI Documents, however, are not final agency action subject to review because they are "purely informational in nature" and have "no binding effect . . ." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).  At most, the Title VI Documents seek voluntary compliance with existing statutory and regulatory requirements and warns of consequences for refusing to comply. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (finding that FDA warning letters are not reviewable final agency actions because they "neither mark the consummation of the agency's decisionmaking process nor determine the appellants' legal rights or obligations"). Indeed, the DCL expressly states it is meant to "provide clarity to the public regarding *existing* legal requirements under Title VI, the Equal Protection Clause, and other federal civil rights and constitutional law principles." DCL at 1 n.2 (emphasis added). The FAQ, for its part, similarly provides that the "contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements." FAQ at 1 n.3. Notably, a district court recently denied a motion for a preliminary injunction, holding in relevant part that "the DCL prohibits no more than what Title VI prohibits." *Bd. of Educ.*

*for Silver Consol. Schs.*, 2025 WL 2017177, at *9. Thus, because the Title VI Documents lack the force and effect of law, and neither binds the public nor creates new legal standards, they are not final agency actions.

NAACP disagrees. It argues that it "sufficiently pleads that the Title VI Documents individually and collectively constitute final agency action subject to judicial review because they are a legislative rule." Pl.'s Opp'n at 14. NAACP contends that it satisfies the first *Bennett* prong, asserting that the that the "DCL represents the 'consummation of the agency's decision making process'" because it "was signed by the Acting Assistant Secretary for Civil Rights[,]" who NAACP indicates is "no mere subordinate." *Id.* (quoting *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020)). It further argues that the Title VI Documents satisfy the second prong of *Bennett* because they "have a legally binding effect." *Id.* at 15.

Setting aside the first prong, NAACP is wrong on the second. Notably, it did not distinguish any of the cases cited in Defendants' Motion, and those cases show there is no final agency action here. For example, in *Independent Equipment*, the D.C. Circuit similarly considered whether a letter from an agency constituted agency action, and the court concluded that it did not because it had no "concrete impact" and was "purely informational in nature." 372 F.3d at 427. Consequently, the court held that it lacks "authority to review claims where 'an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'" *Id*. (citation omitted). The same is true here. ED conveyed nothing more in its letter—along with the rest of the Title VI Documents—than its view of the current state of the law regarding Title VI after *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"). And the D.C. Circuit similarly determined in *Reliable* and *Holistic Candlers* that even agency documents seeking voluntary compliance with existing statutory obligations by warning of

consequences of noncompliance, as here, are not final agency action. *See Holistic Candlers*, 664 F.3d at 943; *Reliable Automatic Sprinkler Co*., 324 F.3d at 731. As the D.C. Circuit observed, "[a]gencies routinely use such letters"—like the DCL—"to warn regulated entities of potential violations before saddling them with expensive and demanding enforcement actions." *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016). "Treating such reminders of regulated parties' legal obligations as final and judicially reviewable agency action would discourage their use, 'quickly muzzl[ing] . . . informal communications between agencies and their regulated communities . . . that are vital to the smooth operation of both government and business.'" *Id*. (quoting *Indep. Equip. Dealers Ass'n*, 372 F.3d at 428). "[T]the Letter is just like other forms of informal agency advice that we have time and again treated as unreviewable." *Id*.

In any event, NAACP first argues that "the Title VI Documents have already been the basis for enforcement actions," Pl.'s Opp'n at 15, alluding to ED's Title VI investigation into "forty-five universities due to their alleged involvement with the Ph.D. Project," Am. Compl. ¶ 22. But NAACP's point is unfounded. ED's press release, which NAACP cites in its Amended Complaint, *id*. ¶ 22 n.11 (Press Release, U.S. Dep't of Educ., Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education (Mar. 14, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-viinvestigations-institutions-of-higher-education-0), announced that the Office of Civil Rights opened "investigations into 45 universities *under Title VI* . . ." (emphasis added). Thus, contrary to NAACP's suggestion, ED's investigation was not into potential violations of the DCL itself, but was into allegations that the universities were "engaging in race-exclusionary practices in their graduate programs[,]" which is in the heartland of Title VI enforcement. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). Though the announcement refers to the DCL, it says that the DCL simply "reiterated schools' civil rights obligations to end the use of racial preferences and stereotypes in education programs and activities." U.S. Dep't of Educ., Title VI Investigations Press Release.

Second, NAACP relies on two district court opinions that have held that the Title VI Documents "constitute legislative rulemaking." Pl.'s Opp'n at 15–17 (citing *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, ---F. Supp. 3d---, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ("*NEA*") and *Am. Fed'n of Tchrs. v. Dep't of Educ.*, ---F. Supp. 3d---, 2025 WL 1191844 (D. Md. Apr. 24, 2025) ("*AFT*")). But NAACP's reliance on those cases is misplaced, as neither is persuasive. For starters, the *NEA* court rejected the government's argument that the DCL "merely restates the Departments' interpretation of Title VI as well as their interpretation of [*SFFA*]." *NEA*, 2025 WL 1188160, at *17. The DCL, the court reasoned, "imposes substantial obligations, directing schools to cease all efforts to circumvent prohibitions on the use of race or else face potential loss of federal funding." *Id.* at *28. But that is not a new obligation. Title VI squarely prohibits racial discrimination in educational institutions receiving federal financial assistance, *see* 42 U.S.C. § 2000d, and it authorizes ED to enforce that prohibition by terminating that funding, *see id.* § 2000d-1. Moreover, that ED would use its enforcement authority to uncover acts of covert discrimination is in keeping with its obligations under Title VI and is also consistent with the Supreme Court's admonition that "universities may not simply establish through application essays or other means the regime we hold unlawful today. . . . [W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows, and the prohibition against racial discrimination is levelled at the thing, not the name." *SFFA*, 600 U.S. at 230. As for the *NEA* court's observation that the

14

Supreme Court "did not hold that the Constitution commands color-blindness," *NEA*, 2025 WL 1188160, at *29, that is hard to square with the Supreme Court's instruction that "[e]liminating racial discrimination means eliminating all of it." *SFFA*, 600 U.S. at 206. And that is not the only instance that the Supreme Court has expressed that sentiment or one like it. *E.g.*, *id*. at 230 ("Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting))); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.").

As for *AFT*, the court's analysis is similarly flawed. In essence, the court concluded that the DCL is final agency action because ED was applying the DCL "as if it is binding." *AFT*, 2025 WL 1191844, at *13. That conclusion is substantially premised on ED's investigations into universities involved with the Ph.D Project. *Id*. at *5, 13. But, again, as discussed, the basis of that investigation is allegations of discrimination "based on race and race stereotypes," not, as the *AFT* court misunderstood, on potential violations of the DCL's guidance. U.S. Dep't of Educ., Title VI Investigations Press Release.

**2.** Even if the Title VI Documents were final agency action, they fit comfortably within the APA's definition of an "interpretative rule[]," 5 U.S.C. § 553(b)(A), (d)(2), because they simply "advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). Accordingly, as an interpretive rule, "the text of the APA makes plain" that agency guidance, like the Title VI Documents, "do not require notice and comment." *Id*. at 105. And although the Title VI Documents updates the 2023 DCL, as the D.C. Circuit has observed, "[w]e have, time and again, upheld interpretive rules that narrow or

remove leeway afforded to regulated parties under a prior interpretation." *POET Biorefining, LLC*, 970 F.3d at 408.

NAACP argues that "[e]ven if the Title VI Documents constitute an interpretive rule . . . they still impose legal obligations and are, thus, substantive rules subject to notice and comment requirements." Pl.'s Opp'n at 16. It further insists that "[t]he APA's notice and comment exemptions must be narrowly construed." *Id*. But the APA, on its face, categorically exempts interpretive rules from notice and comment rule making. 5 U.S.C. § 553(b)(A).

For the reasons just discussed, the Title VI Documents are interpretive rules; therefore, they are exempt from notice and comment. *See Perez*, 575 U.S. at 105.

## B.    This Court Should Dismiss NAACP's Constitutional Claims.

Along with NAACP's constitutional claims that they bring under the APA (Count VI), NAACP also pleads duplicative claims that arise directly under the Constitution (Counts I–IV), appealing to this Court's traditional equitable powers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). As Defendants noted in their Motion, this Court should not consider these standalone constitutional challenges outside of the APA. Defs.' Mot. at 17.  NAACP objects, dismissing Defendants' citation to *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) as "dicta." Pl.'s Opp'n at 17–19. But, as the Supreme Court recently reiterated, the availability and scope of equitable causes of action are extremely limited, particularly where a statutory review scheme— like the APA—"provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S.---, 145 S. Ct. 1762, 1776 (2025); *see id*. at 1775–76 (observing that since the APA was enacted, the Supreme Court has "strictly limited nonstatutory ultra vires review" to avoid creating "an easy end-run around the limitations of . . . judicial-review statutes."); *see also Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("[*U*]*ltra vires* review — which is a suit in equity, not a

statutory cause of action — is 'strictly limited' when 'other judicial-review statutes' are present."
(quoting *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775)).

In any event, NAACP's standalone constitutional challenges fail as a matter of law and
should be dismissed for failure to state a claim.

### 1.    NAACP Fails to State an Equal Protection Claim (Count I)

NAACP alleges that the Title VI Documents violate its members' equal protection rights
under the Fifth Amendment. But, as Defendants argued in its Motion, the Title VI Documents are
race-neutral on their face, they expressly prohibit racial discrimination, and NAACP pleads no
facts showing discriminatory intent. Without meaningfully grappling with Defendants' points
raised in their Motion, NAACP argues that it "alleges sufficient facts which—when taken as true,
as they must be at this stage—support inferences that (a) the government has expressly classified
individuals based on their race, (b) promulgation of the Title VI Documents demonstrates disparate
treatment based on race, and (c) the Title VI Documents were adopted with discriminatory purpose
and have a discriminatory effect on Black students." Pl.'s Opp'n at 19. But as the Supreme Court
has recognized, "the tenet that a court must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions[,]" and "[t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do not suffice[]" to defeat a motion to
dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). NAACP's arguments are meritless.

At the outset, contrary to NAACP's argument, the Title VI Documents do not draw racial
classifications. NAACP chiefly points out that the DCL refers to racial discrimination against white
and Asian-American students. Pl.'s Opp'n at 19. But "[a] government policy must do more than
merely mention race . . . to amount to a racial . . . classification." *Saunders v. White*, 191 F. Supp.
2d 95, 124 (D.D.C. 2002). That is particular true where, as here, the Title VI Documents expressly
prohibit *all* discrimination on the basis of race. *see generally* DCL. Thus, the challenged

documents are "facially neutral with respect" to the types of racial discrimination that are prohibited. *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013).

NAACP argues that its theory of disparate treatment is "clear from the language in the Title VI Documents themselves that they are meant to benefit white students [and Asian-American students] while at the same time disfavoring Black students and other students of color." Pl.'s Opp'n at 20. But, to the extent that this theory is clearly advanced in the Amended Complaint (and it is unclear), NAACP provides no evidence of actual disparate treatment. As the First Circuit has held, "[s]ome evidence of actual disparate treatment is a 'threshold requirement' of a valid equal protection claim . . ." *Ayala-Sepulveda v. Municipality of San German*, 671 F.3d 24, 32 (1st Cir. 2012). None of NAACP's allegations show that the DCL imposes different rules based on race. *Id*. ("Ayala points to no evidence that he was treated differently than others similarly situated."); *see Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ("'Equal protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable."). By way of illustration, NAACP does not allege—nor could it—that the DCL permits schools to endorse racially exclusionary programs for white students but not for black students. Instead, to support this theory, NAACP argues, *inter alia*, that Title VI Documents "disparately treat Black students" by "require[ing] that schools redact any indicia of race." Pl.'s Opp'n at 21. But, to begin, neither the Title VI Documents—on their face—require schools to redact "any indicia of race"— nor is this requirement alleged in the Amended Complaint. And, in any event, that allegation, at most, might show a disparate impact, but a facially neutral policy—like the Title VI Documents— "is unconstitutional . . . only if [a disparate] impact can be traced to a discriminatory purpose." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 274 (1979).

More fundamentally, there is no merit to NAACP's arguments regarding its theories of

discriminatory purpose and effect. NAACP fails to provide "[p]roof of racially discriminatory intent or purpose" that "is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). NAACP argues that ED's actions were undertaken because of race. But, as in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), such conclusory allegations fail to support a constitutional claim. There, as here, plaintiffs alleged that a policy that allegedly had a discriminatory effect on the basis of race, religion, and/or national origin was implemented *because* of those discriminatory effects. *Id.* at 681. The Court rejected that claim at the motion to dismiss stage. It first held that allegations that defendants subjected plaintiffs to mistreatment on account of their protected status were "bald allegations" that were merely "formulaic recitation of the elements of a constitutional discrimination claim." *Id.*; *see also id.* ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

So too here. NAACP supports its allegations with nothing more than bald assertions that "Defendants' [actions] evince discriminatory intent . . ." Am. Compl. ¶ 118; *see id*. ¶ 119 ("Defendants' actions also evince racially discriminatory intent by attempting to chill lawful activities known to benefit Black students . . ."); *id*. ¶ 121 ("The events surrounding the promulgation of the Title VI Documents . . . also demonstrate that they are intended to harm Black students."); *id*. ¶ 122 ("The reasonably foreseeable discriminatory impacts of the Title VI Documents . . . raise a strong inference of discriminatory purpose."). Again, those are, at most, legal conclusions "couched as . . . factual allegation[s]," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" that "do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, take NAACP's argument that it "plausibly alleges that departures from normal procedures support an inference of

19

discriminatory intent." Pl.'s Opp'n at 24. NAACP points out that "[t]he DCL and Certification both imposed very short timelines" for schools to comply. *Id*. Although evidence of procedural irregularities could support an inference of racial discrimination, here, NAACP fails to draw any connection between the purported "short timelines" and the alleged discriminatory motive. *See Bellinger v. Bowser*, Civ. A. No. 17-2124 (TJK), 2018 WL 4705808, at *10 (D.D.C. Sept. 30, 2018) ("The District's failure to provide attractive windows was surely a disappointment to Plaintiffs. Nonetheless, it was hardly a procedural or substantive irregularity of the sort that could support an inference of racial discrimination."). Moreover, since the Title VI documents reminded recipients of *existing* obligations, such short deadlines are wholly consistent.

At bottom,  NAACP fails to ascribe discriminatory intent to the government based on its efforts to enforce Title VI. And where NAACP's allegation of discriminatory intent is contradicted by the plain text of the Title VI Documents that shows its antidiscriminatory purpose, courts "do not infer discriminatory intent if the words uttered are plainly lacking in racial animus." *Hairston v. Vance-Cooks*, 773 F.3d 266, 274 (D.C. Cir. 2014).

### 2.  The Title VI Documents Are Not Unconstitutionally Vague (Count II)

As the Supreme Court has explained, a statute is impermissibly vague if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). As argued in Defendants' Motion, neither of those is true here. First, the Title VI Documents reasonably describe the type of conduct that Title VI prohibits—differential treatment based on race. That is a "comprehensible normative standard" that will defeat a vagueness challenge, even if that standard is "imprecise." *Nat'l Urb. League v. Trump*, ---F. Supp. 3d---, 2025 WL 1275613, at *19 (D.D.C. May 2, 2025). Second, the Title VI Documents do not encourage arbitrary and discriminatory enforcement. At the outset, "speculation

about possible vagueness in hypothetical situations not before the Court will not support a facial attack when the provisions are valid in the vast majority of their intended applications." *Id.* (citation modified). But, in any event, that aspect of vagueness "is concerned about '*law enforcement authorities*' lacking 'adequate guidance.'" *Id.* (quoting *Hill*, 530 U.S. at 733). Because ED is not a law enforcement agency, this theory has no relevance in this challenge. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). To the extent that the Certification poses False Claims Act liability, that does not render the Certification unconstitutionally vague because the False Claims Act is civil enforcement. But even if the False Claims Act bears on the vagueness inquiry, the Certification—on its face—makes clear that the False Claims Act "imposes liability on anyone who *knowingly* submits a false claim to the Government." Certification at 4 (emphasis added). And that scienter "requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability[.]" *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015); *see also id*. at 288 (FCA does not "reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations").

NAACP urges that the Title VI Documents are unconstitutionally vague. But, as an initial matter, NAACP—tellingly—has little to say about its risk-of-arbitrary-enforcement theory. *See* Pl.'s Opp'n at 33. NAACP asserts only  that "the False Claims Act has criminal penalties" and cites 18 U.S.C. § 287, *id.*, but at issue is the Certification that expressly warns of civil False Claims Act liability under 31 U.S.C. § 3729(a). Certification at 4.

NAACP, therefore, seems to focus its argument on the theory that the Title VI Documents are unconstitutionally vague because they allegedly fail to provide adequate notice regarding the

scope of proscribed activities. Notably, much of NAACP's argument relies on this Court' PI opinion that found that the Certification was unconstitutionally vague, Pl.'s Opp'n at 31–33, but that reliance is misplaced. After all, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "[A]nd the findings of fact[s] and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id*.

Chiefly, NAACP disagrees that the Title VI Documents provide a comprehensible normative standard. Pl.'s Opp'n at 31. That is because, according to NAACP, many terms within the Title VI Documents are undefined. *Id*. at 29–30. But the Title VI Documents explain that "discrimination on the basis of race, color, or national origin is, has been, and will continue to be illegal" and, consequently, "educational institutions may neither separate or segregate students based on race, nor distribute benefits or burdens based on race." DCL at 2. The DCL further provides plain guidance: "If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law." *Id*. The FAQ also provides further guidance to schools regarding the scope of its interpretation of Title VI, including explanations about the sorts of activities that would not generally be covered, as well as how ED would determine whether a racially hostile environment exists. FAQ at 6–7.

NAACP makes much about the lack of definitive guidance over the term "DEI." Pl.'s Opp'n at 32. But any confusion over DEI is a red herring. Judge Kelly rejected a similar point in *National Urban League*: Setting aside whether an activity counts as DEI or not, Judge Kelly determined that the salient question is whether a regulated entity is "violating federal anti-discrimination law[s]." 2025 WL 1275613, at *20. And "any difficulty in determining . . . that fact

. . . does not render the provision unconstitutionally vague." *Id.* (citing *United States v. Williams*, 553 U.S. 285, 306 (2008)).

The Title VI Documents, therefore, provide ample context for understanding any undefined terms thereby providing adequate notice of Title VI's prohibitions. Of course, that the Title VI Documents are not exhaustive does not render the challenged documents unconstitutionally vague. *See Hernandez v. City of Phx.*, 43 F.4th 966, 983 (9th Cir. 2022) ("uncertainty about the correct resolution of edge cases 'will not warrant facial invalidation if it is clear what the [policy] proscribes in the vast majority of its intended applications.'" (citation omitted)). Instead, as the D.C. Circuit has explained, "we are not concerned with vagueness in the sense that the term requires a person to conform his conduct to an imprecise but comprehensible normative standard" *See United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017).

### 3.    NAACP's First Amendment Claims Fail (Count III & IV)

NAACP brings overlapping claims under the First Amendment, asserting that the Title VI Documents burdens its members' right to receive information and to freely associate. But, as Defendants explain their Motion, NAACP fails to state either of these claims. The Title VI Documents do not prohibit disfavored speech and viewpoints—they prohibit acts of racial discrimination. And it is well settled that acts of racial discrimination are not protected by the First Amendment. *See Am. All. For Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777–78 (11th Cir. 2024) (discussing *Runyon v. McCrary*, 427 U.S. 160 (1976) and *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992)); *see also Nat'l Urb. League*, 2025 WL 1275613, at *24 ("there is no constitutional right to operate DEI programs that violate federal antidiscrimination law."). Indeed, the FAQ makes clear that "[n]othing in Title VI . . . authorizes a school to restrict any rights otherwise protected by the First Amendment . . ." FAQ at 6; *see id.* ("[ED] OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution.").

23

NAACP resists this conclusion but, fundamentally, it fails to support its First Amendment claims with "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Notably, NAACP cites declarations it submitted with its preliminary injunction motion. Pl.'s Opp'n at 38 (citing Decl. of Cozy Bailey ¶ 50, ECF No. 13-4); *id.* at 44 (citing Decl. of Byron Johns ¶ 121, ECF No. 13-1). That is inappropriate because NAACP did not incorporate those materials in its Amended Complaint, and its citations to those declarations cannot now help it fill in the gaps. Regardless, NAACP contends that it "plausibly alleges that its members' schools and universities began to remove instruction, curricula, and programming that expressed viewpoints disfavored by Defendants to comply with the Title VI Documents' prohibitions . . ." *Id.* at 37. First, NAACP claims that after the Decatur school board rescinded two policies, "NAACP members *and/or* their children who had previously enrolled in an African-American History course—*or other courses offering culturally responsive instruction—credibly feared* that those courses would be substantially and detrimentally modified or terminated." *Id.* (citing Am. Compl. ¶ 90) (emphasis added). Second, NAACP indicates that "one member of the NAACP in Maryland *reasonably feared* that her children's school would remove discussions of systemic racism from the school curriculum to comply with the Title VI Documents." *Id.* (citing Am. Compl. ¶ 88) (emphasis added). And another member, according to the NAACP, "seeks to enroll in her university's African American Politics course but *reasonably fears* the removal of that course." *Id.* at 38 (citing Am. Compl. ¶ 89) (emphasis added). Critically missing from all of these examples is any allegation that despite the FAQ's assurances regarding the First Amendment, ED will enforce Title VI in such a way that will burden NAACP members' right to receive information. That is fatal to these claims.

And all of these allegations are the types of bare, conclusory assertions that are insufficient under *Twombley* and *Iqbal*. *See Iqbal*, 556 U.S. at 681.

So too for NAACP's allegations regarding its members' fears that their student groups will lose support due to the Title VI Documents. NAACP highlights a member in the City Schools of Decatur who participates in a student group that "educates students on topics such as systemic racism and Black History" but "reasonably expect[s] and fear[s] that this student group would be forced to discontinue." Pl.'s Opp'n at 41 (citing Am. Compl. ¶ 113). And another NAACP member fears that an afterschool program "will be terminated because the program . . . is focused on empowering Black girls." *Id.* (citing Am. Comp. ¶ 114). NAACP concludes that "[i]t is no stretch to infer that ED would view either group as creating a 'hostile environment based on race' or 'benefiting' one 'racial group' over another . . ." *Id.* But the Amended Complaint provides no factual allegations to support that inference to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Again, the FAQ makes clear that these kinds of activities would not run afoul of Title VI so long as they are "open to all," FAQ at 6, which NAACP says they are, Am. Compl. ¶¶ 113–14, and do not create a hostile environment based on race, FAQ at 6, which NAACP provides essentially no information about. That NAACP simply disbelieves the FAQ does not state a claim for relief.

## CONCLUSION

For the foregoing reasons, this Court should dismiss NAACP's First Amended Complaint.

Dated: August 4, 2025                    Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Civil Division, Federal Programs Branch

/s/ *James J. Wen*
JAMES J. WEN
EITAN R. SIRKOVICH
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 598-7361
E-mail: james.j.wen@usdoj.gov

*Counsel for Defendants*

26

**<u>CERTIFICATION OF SERVICE</u>**

     I hereby certify that, on August 4, 2025, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *James J. Wen*  </u>
JAMES J. WEN
